Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Antonio F. Soto, *individually and on behalf of all others similarly situated,* | Case No. _____ |
| Plaintiff | **Complaint for Violation of Federal Securities Laws** |
| v. | **Class Action** |
| Origin Materials, Inc., Richard J. Riley, John Bissell, and Nate S. Whaley, | **Demand for Jury Trial** |
| Defendants | |

Plaintiff Antonio F. Soto ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel, which included a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings made by Origin Materials, Inc. ("Origin" or the "Company"), as well as press releases and other public statements issued by the Company, media reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## Introduction

1.      Plaintiff brings claims against all Defendants for violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated by the SEC (17 C.F.R. § 240.10b-5) on behalf of the class of persons and entities that purchased or otherwise acquired Origin securities between February 23, 2023, and August 9, 2023, inclusive (the "Class Period").

2.      Origin is a sustainable materials company founded in 2008 by chemical engineering students at the University of California, Davis. The Company purports to have developed a platform to convert the carbon found in biomass into carbon negative materials that can replace the petroleum-based substances typically used in various end products. One of the sustainable materials in Origin's platform is chloromethylfurfural ("CMF"), a building block chemical that can be converted into, among other products, (1) paraxylene ("PX"), a product that can replace non-sustainable chemicals in existing supply chains to produce polyethylene terephthalate ("PET"); and (2) furandicarboxylic acid ("FDCA"), which can be converted into polyethylene furanoate ("PEF"). According to the Company, these chemicals can be used in a variety of applications. PET's applications include packaging, textiles, car parts, carpeting, toys, and construction materials, while FDCA and PEF's include surfactants, epoxy resins, and packaging, with PEF having the potential to compete with glass and aluminum.

3.      On August 9, 2023, after the market closed, Origin announced that it was significantly delaying the timeline for construction on its Origin 2 commercial plant and changing the product slate at Origin 2 from a focus on PX to a focus on FDCA. The Company disclosed that it "now expects Origin 2 to be completed in two phases, with Phase 1 estimated to be completed in late 2026 to 2027, and Phase 2 estimated to be completed in 2028, compared with our initial expectation for a mid-2025 completion." Origin blamed the delay on the "high-cost environment" for capital projects. The Company further revealed that the construction would cost more and yield less capacity than previously announced.

4.      On this news, Origin's stock price fell $2.88 per share, or 66.5%, to close at $1.45 per share on August 10, 2023.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by failing to disclose that (1) Origin would not be able to meet its previously announced timeline for the construction of the Origin 2 plant; (2) demand for PX had dropped such that it would not be the production focus of Origin 2; (3) Origin could not construct Origin 2 at its previously disclosed cost; (4) Origin could not construct Origin 2 at the scale it had previously identified; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

**Jurisdiction and Venue**

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated by the SEC (17 C.F.R. § 240.10b-5).

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District and the purchase of the Company's common stock by members of the Class who reside in this District. Additionally, the Company's principal offices are located in this District.

9.      In connection with the acts, transactions, and conduct alleged below, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**Parties**

10.      Plaintiff Antonio F. Soto, as set forth in the accompanying certification, purchased Origin securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.

11.      Defendant Origin is incorporated under the laws of Delaware with its principal executive officers located in West Sacramento, California. Origin's common stock trades on the NASDAQ under the ticker symbol "ORGN."

12.      Defendant Richard J. Riley was the Company's Co-Chief Executive Officer at all relevant times.

13.      Defendant John Bissell was the Company's Co-Chief Executive Officer at all relevant times.

14.      Defendant Nate S. Whaley was the Company's Chief Financial Officer at all relevant times.

15.     Defendants Riley, Bissell, and Whaley (the "Individual Defendants"), because of their positions with the Company, possessed the authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

**Background**

16.     Origin is an early-stage carbon negative materials company with a history of net losses. On February 17, 2021, Origin announced that it had entered into a merger agreement with Artius Acquisition Inc. ("Artius"), a publicly traded special purpose acquisition company ("SPAC") formed on January 24, 2020 with the sole purpose of effecting a business combination. The companies announced that as a consequence of the merger, Origin would begin trading on the NASDAQ.

17.     In connection with the merger, Origin announced that it was undertaking two initial capital projects: Origin 1 and Origin 2. The Company described Origin 2 as being in the "project development stage" and gave the following timeline for Origin 2's development:

> Origin expects Origin 2's project development stage to be completed in the middle of 2022, with the expected completion of certain milestones, such as engineering, procurement and construction contract selection and site selection, by the end of 2021. Origin expects the engineering, procurement and construction stage of Origin 2 to begin in the middle of 2022 and proceed through 2025, with the front-end engineering design package completed and construction and fabrication started by the middle of 2023. Origin expects that the construction of Origin 2 will be complete, and the plant operational, in 2025.

18.     On June 25, 2021, Origin and Artius closed their merger. Origin began trading on the NASDAQ under the ticker symbol "ORGN" on the same date.

19.     Once the Company went public, Defendants continually reaffirmed that Origin was on track to meet the timing and production goals it had set for Origin 2. For example, in a November 12, 2021 Form 8-K announcing the Company's financial results for the third quarter of 2021, Origin stated that "Origin 2 remains on track for completion by mid-2025." Similarly, in a May 9, 2022 earnings call, Defendant Bissell stated, "With regard to Origin 2, our previously disclosed capital budget and construction time line are unchanged. To be clear, we do see the inflationary environment and continue to closely monitor costs, but we are proactively managing our cost base and have built in substantial contingencies into our initial projections."

**Defendants' False and Misleading Statements**

20.     The Class period begins on February 23, 2023.

21.     On that day, Origin filed a Form 8-K with the SEC signed by Defendant Whaley attaching a press release titled "Origin Materials, Inc. Reports Financial Results for Fourth Quarter 2022." Within the press release, Defendant Riley is quoted as saying, "For Origin 2, front-end loading, construction planning, and financing are progressing with an update to be provided mid-2023." The press release goes on to say,

> The Company continues to make progress on front-end design, construction planning, and financing for Origin 2. The Company has also made progress developing new products and applications which may be incorporated into the design of the plant, such as FDCA, PEF, as well as biofuels from an "oils and extractives" stream co-produced alongside CMF and HTC, which has not been included in previous plans. The Company expects to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023.

22.     Also on February 23, 2023, the Company held an earnings call to discuss its results for the fourth quarter of 2022. On the call, Defendant Riley stated,

> As previously disclosed, due to strong customer demand, we are substantially committed for our Origin 2 paraxylene and PET capacity. As such, beginning in the fourth quarter, our sales and marketing team has shifted its focus from active

marketing of PET towards higher-margin products such as carbon black and advanced CMF-derived products including FDCA and PEF for Origin 2 and beyond.

23.    Riley went on to say,

As Origin has an ongoing global technology licensing effort and an active government affairs team, we anticipate potentially strategic partnerships and federal incentives programs to play a meaningful role in the financing of Origin 2. We continue to make progress on frontend design, construction planning, and financing. We have also made progress developing new products and applications which may be incorporated into the design of the plant, such as FDCA, PEF as well as biofuels from an oils and extractives stream co-produced alongside CMF and HTC and which has not been included in previous plans. We expect to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023.

24.    During the same earnings call, Defendant Bissell stated,

Turning to Origin 2 on Slide 11, we continue to make progress on the front-end design, construction planning, and financing of our second plant, to be built in Geismar, Louisiana. The overall site plot plan and logistics plan have been developed. Notably, we have made progress on developing new products and applications which may be incorporated into the design of that plant, such as FDCA, PEF as well as biofuels from an oils and extractives stream co-produced alongside CMF and HTC and which has not been included in previous plans. We expect to provide an update on new product offerings and construction plans for the plant in mid-2023.

25.    Bissell added,

I'd also like to provide you with some additional detail about what we're currently working on for Origin 2 in the area of product development. We have made progress developing new products and applications which may be incorporated into the design of Origin 2 such as FDCA, PEF, and biofuels. I highlight this because the markets for some of these new, functionally-advantaged products are showing up sooner than we initially anticipated. While we originally expected our Origin 1 product development activities to result in new, performance-advantaged products that we would make at Origin 3, we now believe that some of those products could be pulled forward meaningfully and produced at Origin 2 as well. We are pleased to potentially add some of these products into the demand slate of Origin 2.

26.    During the same earnings call, Defendant Whaley stated,

As we've previously discussed, we also anticipate various federal tax credit, grant, loan, and other programs promoting advanced manufacturing from the Inflation Reduction Act to be incrementally beneficial for the financing of Origin 2 once the

details of those programs are finalized by the relevant government agencies. We expect to provide an update on Origin 2 in mid-2023. As we have highlighted on our previous earnings calls, inflationary pressures remain an area of focus and something that we continue to monitor closely.

27.     Also on February 23, 2023, Origin filed a Form 10-K with the SEC for fiscal year 2022. Defendant Bissell signed the Form 10-K and each of the Individual Defendants certified to its accuracy under the Sarbanes-Oxley Act of 2002. The Form 10-K included a risk disclosure that said,

> Construction of our plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of our plants could severely impact our business, financial condition, results of operations and prospects . . . . There is a risk that significant unanticipated costs or delays could arise due to, among other things, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, unforeseen technical issues or increases in plant and equipment costs, insufficiency of water supply and other utility infrastructure, or inadequate contractual arrangements. Should these or other significant unanticipated costs arise, this could have a material adverse impact on our business, financial performance and operations. No assurance can be given that construction will be completed on time or at all, or as to whether we will have sufficient funds available to complete construction.

28.     On May 10, 2023, Origin filed a Form 8-K with the SEC signed by Defendant Whaley attaching a press release titled "Origin Materials, Inc. Reports Financial Results for First Quarter 2023." Within the press release, Defendant Riley is quoted as saying, "For Origin 2, front-end design, construction planning, and financing are progressing, and we expect to provide an update during our Q2 earnings call in August." The press release goes on to say,

> For Origin 2, the Company continues to make progress on front-end design, construction planning, and financing. The Company has also made progress developing new products and applications that may be incorporated into the design of the plant, including FDCA, PEF, and biofuels. The Company expects to provide an update on new product offerings and construction plans for the Origin 2 plant in August 2023.

29.     Also on May 10, 2023, Origin held an earnings call to discuss its results for the first quarter of 2023. During the earnings call, Defendant Riley stated,

Third, we continue to make progress on the front-end design, construction planning, and financing of Origin 2. We continue to expect that Origin 2 can be fully funded from a combination of existing cash on hand, previously indicated traditional project financing, and potential strategic partnerships. We plan to provide an update on new product offerings and construction plans for the Origin 2 plant in August 2023 during our Q2 earnings call.

30.     During the same earnings call, Defendant Bissell stated,

Regarding Origin 2, our second plant to be built in Geismar, Louisiana, we continue to advance for design, construction, planning, and financing. We continue to make progress developing new products and applications, which may be incorporated into the design of the plant such as FDCA, which can be converted to DEF and carbon black biofuels. We expect to provide an update on new product offerings and construction plans for the plant in August 2023.

31.     During the same earnings call, Defendant Whaley stated,

As Rich mentioned, we continue to expect that Origin 2 can be fully funded from a combination of existing cash on hand, previously indicated traditional project financing and potential strategic partnership. Given Origin's ongoing global technology licensing effort and an active governmental affairs team, we anticipate strategic partnerships and federal incentive programs to play a meaningful role in the financing of Origin 2. Again, we expect to provide an update on Origin 2 in August 2023.

32.     Whaley also received a question during the May 10, 2023 earnings call asking about financing for Origin 2. Whaley was asked "roughly what thoughts you have in terms of a time frame that you might be coming to market with those bonds [for Origin 2], understanding that Origin 2 is a 2025 startup." Whaley responded,

So first, as we announced back in February, we have hired Bank of America to help us bring that financing to market. Really, as far as timing, like we said earlier in the call, we are going to have a full update on Origin 2 and all of our expectations around that in August. So I want to -- I'm going to hold on that until our full update at that point.

33.     Also on May 10, 2023, Origin filed a Form 10-Q with the SEC for the first fiscal quarter of 2023. Each of the Individual Defendants signed the Form 10-Q and certified to its accuracy under the Sarbanes-Oxley Act of 2002. The Form 10-Q included a risk disclosure that said,

Construction of our plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of our plants could severely impact our business, financial condition, results of operations and prospects . . . . There is a risk that significant unanticipated costs or delays could arise due to, among other things, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, unforeseen technical issues or increases in plant and equipment costs, insufficiency of water supply and other utility infrastructure, or inadequate contractual arrangements. Should these or other significant unanticipated costs arise, this could have a material adverse impact on our business, financial performance and operations. No assurance can be given that construction will be completed on time or at all, or as to whether we will have sufficient funds available to complete construction.

34.     The statements identified in ¶¶ 21-33 were materially false and/or misleading, and failed to disclose material facts about Origin's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that (1) Origin would not be able to meet its previously-announced timeline for the construction of the Origin 2 plant; (2) demand for PX had dropped such that it would not be the production focus of Origin 2; (3) Origin could not construct Origin 2 at its previously disclosed cost; (4) Origin could not construct Origin 2 at the scale it had previously identified; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Begins to Emerge**

35.     On August 9, 2023, after the market closed, Origin disclosed that its previously announced plans for Origin 2 were inaccurate. In a Form 8-K signed by Defendant Whaley attaching a press release titled, "Origin Materials, Inc. Reports Operating and Financial Results for Second Quarter 2023," Defendant Riley is quoted as saying,

[T]oday we are pleased to announce that we are updating the product slate at our second commercial plant, Origin 2, to focus on the production of FDCA, for which we have seen much greater demand than anticipated, as we indicated in February. While we initially expected Origin 2 to primarily focus on para-xylene ('pX') production for bio-PET, we have made significant progress in FDCA product development and commercialization and we now plan to bring FDCA forward to

Origin 2, rather than at our third planned commercial plant, Origin 3, as initially reported in 2021 . . . . Today we also face new challenges. As we first indicated in May 2022, we are facing a higher-cost capital project environment than in early 2021, when we announced the initial plan for Origin 2. As such, we are revising the plant's outlook and introducing a phased approach to construction. We expect that adapting in this manner to the high-cost environment will reduce project risk as we move forward on the path to profitability, with Phase 1 start-up projected for late 2026 to 2027 and Phase 2 start-up projected for 2028.

36.     The press release goes on to state,

For Origin 2, the Company is updating its previously disclosed capital budget and construction timeline. During the second quarter, Origin completed detailed assessments with its engineering partners and updated its capital project plan based on the results. Significant market shifts have presented both opportunities and challenges. Factors influencing the updated plan include:

• Significantly higher than anticipated demand for higher-margin products including FDCA, PEF, and liquid biofuels.

• Increased cost of labor, materials, process inputs, metallurgy (e.g., steel) due to volatile global materials markets, requiring engineering re-work.

• Inflation and higher interest rates.

• Higher costs due to COVID-related supply chain constraints and additional value engineering requirements that have extended project timelines.

The Company now expects Origin 2 to be completed in two phases, with Phase 1 estimated to be completed in late 2026 to 2027, and Phase 2 estimated to be completed in 2028, compared with our initial expectation for a mid-2025 completion.

37.     Regarding the production focus of Origin 2, the press release states,

The Company continues to make progress developing new products and applications related to the design of Origin 2, including FDCA, PEF, PET/F, and liquid biofuels derived from our oils and extractives stream. Origin 2 production will focus primarily on FDCA, rather than pX for bio-PET as planned in early 2021. Apart from potential Origin 2 production, Origin plans to supply bio-pX to customers primarily through collaborations with strategic partners.

38.     Regarding the budget for Origin 2, the press release states,

The capital budget for Phase 1 of Origin 2 is expected to be up to $400 million while the capital budget for Phase 2 is projected to be up to $1.2 billion. This compares to the original $1.07 billion aggregate capital budget estimate originally provided in February 2021. The Company is exploring multiple opportunities to finance Origin 2 including a combination of existing cash, previously indicated traditional project

financing, federal and state government programs, licensing agreements, and strategic partnerships. The Company expects capital expenditure of up to $50 million for 2024, with the majority of Origin 2 capital spend to occur following the project's final investment decision ("FID") in 2025.

39.     Also on August 9, 2023, the Company held an earnings call to discuss its results for the second quarter of 2023. During the call, Defendant Bissell stated,

Today, we are providing an update for Origin 2, our second commercial plant to be built in Geismar, Louisiana. As just mentioned, we continue to make progress developing products and applications related to the design of Origin 2, including FDCA, PEF and liquid biofuels derived from our oils and extractives stream. While Origin 2 will focus primarily on FDCA production and some of our PET customers have already begun expanding their orders to include FDCA, we remain committed to providing paraxylene for our bio-PET customers and plan to bring commercial quantities of paraxylene to the market before 2030. While our current plan is a rational prioritization of Origin's researches towards more profitable, typically performance-enhanced chemical applications [at] Origin 2, we also see massive demand for our drop-in bio-paraxylene. We believe that the best way to meet this demand will be through collaborations with others.

40.     Regarding the budget and timing for Origin 2, Bissell added,

We are also updating our previously-disclosed capital budget and construction timeline for Origin 2. As we first indicated in May 2022, we are facing a higher cost capital project environment than in early 2021 when we announced the initial plan for Origin 2. As such, we are revising the plant's outlook and introducing a phased approach to construction. Adapting in this [manner] to the high-cost environment helps to reduce project risk as we move forward on the path of profitability.

Turning to Slide 11, since Origin became publicly trad[ed] in 2021, we have witnessed profound market shifts, presenting both opportunities and challenges. Factors influencing our updated plan include: significantly higher than anticipated demand for higher-margin products, including FDCA, PEF and liquid biofuels; increased cost of labor, materials, process inputs and metallurgy due to volatile global market -- materials markets, requiring engineering rework; inflation and higher interest rates; and higher costs due to COVID-related supply chain constraints and additional value engineering requirements that have extended project time lines.

Turning to Slide 12, we now expect Origin 2 to be completed in 2 phases with Phase 1 estimated to be completed in late 2026 to 2027 and Phase 2 estimated to be completed in 2028 compared with our initial expectation for a mid-2025 completion. During Phase 1, the company expects to achieve profitability from its oils and extractives stream. From this stream, Origin plans to produce a drop-in biofuel with potential applications, including marine fuel and heat and power

generation. Potential benefits include: improved energy density compared with existing renewable alternatives and the sustainability benefits of increased bio content; value propositions expected to be in high demand given, among other things, the decarbonization goals set out by the International Maritime Organization, a body of the United Nations. Phase 2 will expand production to include the mass production of platform chemicals, CMF and HTC. Phasing the plant is intended to enhance overall efficiency, while improving short-term and long-term economics. The capital budget for Phase 1 of Origin 2 is expected to be up to $400 million, while the capital budget for Phase 2 is projected to be up to $1.2 billion. This compares to the original $1.07 billion aggregate capital budget estimate first provided in February 2021.

41.     During the call, an investor asked Bissell:

Is any of the delay in the cost increase because of shifting the focus away from paraxylene over to FDCA? I kind of suspect not, but I wondered if that was part of it. And maybe more importantly, when you first rolled out your financials for Origin 2, you were targeting 1 million tons of biomass feedstock into that plant. Is that still the design? But more importantly, you were targeting $0.16 a pound of margin from this PET pathway. As you move towards more of an FDCA pathway, what would you suggest is a more reasonable margin that, that plant you think is going to be able to produce?

42.     Bissell replied,

So first, you asked is FDCA and shifting towards that kind of product base part of the capital increase and schedule shift. And the answer actually is, in part, yes. It's not the only thing, but it's meaningful. So looking at these other products, one, takes more time, right? So we obviously didn't expect to be producing those kinds of products off of OM2 when we originally provided our estimates on schedule and cost. And so there are changes that get made. I'd say, generally speaking, if you're looking at FDCA, that has more of a schedule impact than it does an overall cost impact . . . .

From a scale perspective, one of the things that's somewhat unusual for Origin, specifically as a chemical company, is that we tend to be more capital constrained than the typical chemical company that's going after the kinds of plants and projects [indiscernible] technologies that we are. And so consequently, we have to adapt to increased cost environments by also reducing the scope of the plant, not just by raising additional capital, right? We need to be disciplined with the way that we approach these kinds of projects. And so consequently, in a higher cost environment where we're going in general, right, which includes some of the things that we enumerated but things like higher material prices, obviously higher labor costs, energy, all sorts of things like that, as a consequence of those, we need to adjust by scoping down the scale of the plant. And so we expect that we're going to have a smaller-scale plant than the 1 million tons of biomass fed originally.

43.    On this news, Origin's share price fell $2.88 per share, or 66.5%, to close at $1.45 per share on August 10, 2023.

## Loss Causation

44.    Defendants' wrongful conduct directly and proximately caused the losses suffered by Plaintiff and the Class as described in ¶ 43.

45.    During the Class Period, Plaintiff and the Class purchased Origin securities at artificially inflated prices. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## Additional Indicia of Scienter

46.    Defendants knew that each of the public documents and statements identified above and issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Origin's ability to meet its stated objectives for the construction and operation of Origin 2, their control over, and/or receipt and/or modification of the Company's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Origin's operations, participated in the fraudulent scheme alleged herein.

## Class Action Allegations

47.    Plaintiff brings this action individually and as a class action on behalf of all persons or entities who purchased or otherwise acquired Origin securities between February 23, 2023, and August 9, 2023, inclusive, and who were damaged thereby (the "Class"). The Class does not

include Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

48.     This action is properly maintainable as a class action under Fed. R. Civ. P. 23(a) and (b)(3).

49.     The Class is so numerous that joinder of all members is impracticable. Throughout the Class Period, millions of Origin shares traded on the NASDAQ.  Consequently, the number of Class members is believed to be in the thousands and Class members are likely scattered across the United States. The precise number of Class members is unknown to Plaintiff at this time but could be determined following discovery as Record owners and other members of the Class may be identified based on documents possessed by Origin or its transfer agent. Those persons and entities may be notified of the pendency of this action as is typically done in securities class actions.

50.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Plaintiff does not have any interests adverse to the Class.

51.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in securities class action litigation, and will fairly and adequately protect the interests of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting any individual Class member.  The common questions include:

a.   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Origin;

b.   whether Defendants thereby violated the Exchange Act (15 U.S.C. §§ 78j(b) and

78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5);

and

c.   whether and to what extent Class members have been damaged by Defendants and the

proper measure of damages.

53.   A class action is superior to other available methods for the fair and efficient

adjudication of this controversy for several reasons. The prosecution of separate actions by

individual members of the Class would create a risk of inconsistent or varying adjudications with

respect to individual members of the Class, which would establish incompatible standards of

conduct for Defendants. Also, adjudications with respect to individual members of the Class

would, as a practical matter, be dispositive of the interest of other members or substantially

impair or impede their ability to protect their interests. Moreover, damages suffered by individual

Class members may be small, making it overly expensive and burdensome for individual Class

members to pursue redress on their own and the number of Class members makes joinder

impracticable.

54.   There will be no difficulty in the management of this litigation as a class action.

55.   Defendants have acted on grounds generally applicable to the Class with respect to

the matters complained of herein, thereby making appropriate the relief sought herein with

respect to the Class as a whole.

**Fraud on the Market**

56.   The market for Origin's securities was open, well-developed and efficient at all

relevant times. As a result of the materially false and/or misleading statements and/or failures to

disclose, Origin's securities traded at artificially inflated prices during the Class Period. Plaintiff

and other members of the Class purchased or otherwise acquired the Company's securities

relying on the integrity of the market price of Origin's securities and market information relating to Origin and have been damaged thereby.

57.     During the Class Period, the artificial inflation of Origin's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Origin's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Origin and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result. At all relevant times, the market for Origin's securities was an efficient market for the following reasons, among others:

a.   Origin shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   As a regulated issuer, Origin filed periodic public reports with the SEC and/or the NASDAQ;

c.   Origin regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Origin was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and

certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

58.     As a result of the foregoing, the market for Origin's securities promptly digested current information regarding Origin from all publicly available sources and reflected such information in Origin's share price. Under these circumstances, all purchasers of Origin's securities during the Class Period suffered similar injury through their purchase of Origin's securities at artificially inflated prices and a presumption of reliance applies.

59.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**No Safe Harbor**

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Origin who knew that the statement was false when made.

### Count One

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against All Defendants)

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     By reason of the conduct herein alleged, each Defendant named herein violated Section 10(b) of the Exchange Act and Rule 10b-5.

63.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Origin's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

64.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Origin's securities in violation of Section 10(b) of the

Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

65.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Origin's financial well-being and prospects, as specified herein.

66.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Origin's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Origin and its business operations and prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

67.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information

about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

68.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Origin's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69.     As a result of the dissemination of materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Origin's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Origin's securities during the Class Period at artificially high prices and were damaged thereby.

70.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff

and the other members of the Class and the marketplace known the truth regarding the problems that Origin was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Origin securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

71.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

73.     Plaintiff and the Class have sustained damages because they purchased Origin stock at an inflated price, which declined in value as a result of the corrective disclosures detailed herein.

## Count Two

### Violation of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

74.     Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1-60 as if fully set forth herein.

75.     Individual Defendants acted as controlling persons of Origin within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff

contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.     As set forth above, Origin and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**Prayer for Relief**

WHEREFORE, Plaintiff prays for relief and judgment against all Defendants as follows:

a.  Ordering that this action may be maintained as a class action and certifying Plaintiff as Class representative and his counsel as Class counsel;

b.  Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damage sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Awarding pre-judgment and post-judgment interest on such monetary relief;

d.  Awarding Plaintiff and their counsel reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

e.   Such other and further relief as this Court deems just and proper.

**Demand for Jury Trial**

Plaintiff hereby demands a trial by jury.

August 25, 2023                              Respectfully submitted,

                                             /s/ Jacob A. Walker
                                             Jacob A. Walker (SBN 271217)
                                             **BLOCK & LEVITON LLP**
                                             400 Concar Drive
                                             San Mateo, CA 94402
                                             (650) 781-0025 phone
                                             jake@blockleviton.com