UNITED STATES DISTRICT COURT

                       EASTERN DISTRICT OF CALIFORNIA

ANTONIO F. SOTO,                    :  Case No. 2:23-cv-01816-WBS-JDP

      Plaintiff,                    :     Sacramento, California
                                          Monday, December 11, 2023
          v.                        :     1:30 p.m.

ORIGIN MATERIALS, INC., *et al.*,:   MOTIONS FOR APPOINTMENT OF
                                         LEAD COUNSEL
      Defendants.                   :

: : : : : : : : : : : : : : : : : :

                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE WILLIAM B. SHUBB,
                  SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Carter Family:        Block & Leviton LLP
                              BY:  JACOB WALKER, ESQ.
                              400 Concar Drive
                              San Mateo, CA  94402

                              Holzer & Holzer, LLC
                              BY:  COREY D. HOLZER, PHV
                              211 Perimeter Center Pky., #1010
                              Atlanta, GA  30346

For Defendant, Origin         Freshfields Bruckhaus
Materials, Inc.:              BY:  DORU GAVRIL, ESQ.
                              855 Main Street
                              Redwood City, CA  94063


Court Recorder:               JENNY WOOD


Transcript prepared by:       JANICE RUSSELL TRANSCRIPTS
                              1418 Red Fox Circle
                              Severance, CO  80550
                              (757) 422-9089
                              trussell31@tdsmail.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

APPEARANCES (continued):

For FNY Partners Fund LP          Robbins Geller Rudman & Dowd LLP
and Peter Di Murro:              BY:  MICHAEL ALBERT, ESQ.
                                 655 West Broadway, Suite 1900
                                 San Diego, CA  92101

                                 Entwistle & Cappucci LLP
                                 BY:  VINCENT CAPPUCCI, PHV
                                 230 Park Avenue, Floor 3
                                 New York, NY  10169

For Movant, Todd Frega:          Bernstein Liebhard LLP
                                 BY:  LAURENCE J. HASSON, PHV
                                 10 East 40th Street
                                 New York, NY  10016

                                 Bragar Eagel & Squire, P.C.
                                 BY:  MELISSA A. FORTUNATO, ESQ.
                                 810 Seventh Avenue, Suite 620
                                 New York, NY  10019

SACRAMENTO, CALIFORNIA, MONDAY, DECEMBER 11, 2023, 1:30 P.M.

(Call to Order of the Court)

THE COURTROOM DEPUTY:  Item 2, Civil 23-1816, Antonio F. Soto versus Origin Materials, Incorporated, *et al.*

Counsel, your appearances, please?

MR. ALBERT:  Good afternoon, your Honor.  My name is Michael Albert.  I'm from the Robbins Geller Rudman & Dowd law firm and I represent Movant, First New York Partners Fund LP and Peter Di Murro.  With me at counsel table is Vincent Cappucci of the Entwistle --

MR. CAPPUCCI:  Good afternoon, your Honor.

MR. ALBERT:   -- & Cappucci law firm.

MR. HASSON:  Hi, your Honor.  My name is Laurence Hasson from Bernstein Liebhard and I represent Lead Plaintiff-Movant, Todd Frega.

MS. FORTUNATO:  I'm Melissa Fortunato from Brager Eagel & Squire.  I'm local counsel for Todd Frega.

THE COURT:  Who do you represent?

MS. FORTUNATO:  Local counsel for Todd Frega.

THE COURT:  All right.  Same, same as --

MS. FORTUNATO:  Uh-huh (indicating an affirmative response).

THE COURT:   -- counsel.

MR. WALKER:  Good afternoon, your Honor.  Jacob Walker from the law firm of Block & Leviton on behalf of the Carter

Family.  My co-counsel is with me as well.

MR. HOLZER:  Corey Holzer, your Honor, also on behalf of the Carter Family.

THE COURT:  Those are all the plaintiffs' attorneys.  All right.

And?

MR. GAVRIL:  Good afternoon, your Honor.  Doru Gavril from Freshfields on behalf of defendants.

THE COURT:  Mr. Gavril, do you have any position with regard to these competing motions?

MR. GAVRIL:  My only position, your Honor, is that I take no position.

THE COURT:  All right.

So let's start with the plaintiffs' attorneys.  Who would like to speak first?  You're at the lectern.

MR. ALBERT:  Please, your Honor.

THE COURT:  All right.  Why should, why should you be appointed?

MR. ALBERT:  Well, your Honor, as you pointed out, we're here today on five lead plaintiff motions filed in the Soto and Jones matter, which you consolidated on October 19th.  Appointment of lead plaintiff in securities class actions, it's a, it's a simple statutory process set forth in the Private Securities Litigation Reform Act of 1995.  Under the statute, the presumptive lead plaintiff is the person or group of

persons that (1) have the largest financial interest -- and what "largest financial interest" means it -- it -- losses are the determinative proxy according to most courts -- and (2) the person or group of persons must otherwise satisfy Rule 23's typicality and adequacy requirements. Once that presumption attaches, it can only be rebutted upon proof that the lead plaintiff won't adequately represent the class.

Here, you have five motions filed. Since then, two of the movants, Mr. Agapis and Mr. Park, withdrew their motions, or, rather, filed nonoppositions noting that they did not have the largest losses. And that's really the critical ingredient for lead plaintiff appointment in these cases, your Honor, having the largest loss. Here, there's actually no dispute that the Partners Fund, First New York Partners Fund and Peter Di Murro have the, the largest financial interest of any movant before the Court.

THE COURT: Do they also have the largest financial interest separately or only jointly?

MR. ALBERT: That's absolute - you're absolutely right, your Honor. The First New York Partners Fund has the largest individual financial interest of any class member before the Court today. As to the Rule 23 typicality and adequacy showing, the Partner Fund and Di Murro have shown that their claims are typical of and coextensive with those of the class. They're injured in the exact same way that all other

Origin Materials investors are.  They're aware of no conflicts between them and the rest of the class.  They put in a joint declaration -- and that's Docket No. 18-4 -- regarding their ability, their willingness, and their plan to jointly prosecute this case.

Moreover, your Honor, the Partners Fund, it's an experienced institutional investor that has been found to satisfy Rule 23's typicality and adequacy requirements twice in the last two years and it has extensive experience leading those cases in small cohesive groups with individual investors just like Mr. Di Murro.  In fact, Congress' express goal in passing the Reform Act was to put securities class actions into the hands of institutional investors just like the Partners Fund.

Now the competing movants, Mr. Frega and the Carter Family, they offered two arguments against the appointment of the Partners Fund and Mr. Di Murro and both of those arguments lack merit.  First, they argue that the Partners Fund shouldn't be allowed to join forces with Mr. Di Murro in this case because they don't have a pre-existing relationship, but that's not a requirement in this Circuit.

THE COURT:  What, what you haven't addressed is why they need to join forces at all.

MR. ALBERT:  Well, your Honor, their, their work together in this case, it partially stems from First New York's

successful prosecution of a different case involving a similar type of company.  It's, it's the Alta Mesa Securities Litigation.  There, they're prosecuting the case together with individual investors and it, it's one of the biggest cases against a special purpose acquisition company that's currently pending.  It's one of the first such cases that survived a motion to dismiss.

So there's a lot of institutional knowledge there and after, after talking to each other and discussing whether they're compatible, you know, they, they directed us as their lawyers to file a joint motion on their behalf.

THE COURT:  Well, the, the institutional experience is on behalf of First New York, right --

MR. ALBERT:  It --

THE COURT:  -- not Di Murro?

MR. ALBERT:  You're correct, your Honor.  It's on behalf of First New York and our law firms, both my law firm and the Entwistle & Cappucci law firm, where we're co-lead counsel in that action as well.

THE COURT:  I see.  I was wondering.  I noticed there were two firms representing jointly your clients here and they don't represent different clients.  Both your firms together represent both of the clients, is that correct?

MR. CAPPUCCI:  Yes.

MR. ALBERT:  That's correct, your Honor.

THE COURT:  Right.  It's not one firm representing New York and one firm representing Di Murro?

MR. CAPPUCCI:  No.

MR. ALBERT:  That's correct, your Honor.

THE COURT:  So if the Court wanted to sever First New York from Di Murro, that wouldn't be practical because both firms represent each, both of them, is that what you're saying?

MR. ALBERT:  I don't know that it wouldn't be practical, your Honor, or it wouldn't be workable, but they, they filed, they filed a group motion.  They're certainly amenable to be considered separately, but if I --

THE COURT:  But that, that would take care of at least one of your opponents' objections, correct?

MR. ALBERT:  You're correct that it would take care of one of their objections, correct.

THE COURT:  All right.  And --

MR. ALBERT:  And -- and -- and it's perfectly supported by, by case law as well.

THE COURT:  All right.

Had you finished addressing all of their objections?

MR. ALBERT:  No, I haven't, your Honor.  If, if, if I may.

One quick point I wanna make with respect to your question.  While severing the group is squarely within the case law, what isn't within the case law is, so to speak, throwing

the baby out with the bathwater.  No court since the Ninth Circuit's opinion in Mersho has declined to appoint the group that has the largest financial interest individually and as a group.

THE COURT:  Well, but if, if I were to sever and appoint only the attorneys for First New York, you could still say that because I would be appointing the -- the --

MR. ALBERT:  Absolutely.  That's --

THE COURT:  Okay.

MR. ALBERT:  -- why I'm saying.  That's, that's perfectly workable.

THE COURT:  All right.

MR. ALBERT:  What isn't supported by case law is, is what Mr. Frega and specifically what the Carter Family want, which is, no, just throw them out entirely.  Throw both of them out and, and --

THE COURT:  Right.

MR. ALBERT:  -- and what I'm saying is that that's not supported by the case law and that's contrary to the case law, including Mersho.

THE COURT:  Well, it's not contrary to the case law. Just say there hasn't been an instance where that has been done.  It's -- it's -- it's permissible under the case law.  It just hasn't been done.

MR. ALBERT:  That's correct.

THE COURT:  All right.

MR. ALBERT:  That, that's absolutely correct.

Going back, your, your Honor, to the, to the final argument that was made against the appointment of the Partners Fund and that argument is that the Partners Fund or its affiliates were fined by regulators on a couple of cases. That, that argument also doesn't carry the day.

THE COURT:  I thought they were just charged and they weren't convicted or --

MR. ALBERT:  That's exactly right.

THE COURT:  Okay.

MR. ALBERT:  They, they weren't convicted.  They weren't even, they weren't even charged.  They were, they were fined and in fact, three of these supposed four infractions, there were entities distinct from the Partner Fund that are not seeking lead plaintiff in this case.

So just as a factual matter, they're, they're wrong. The only instance they cite where it was the Partners Fund, it was a 2020 fine for a trading violation for one of those, for one of the First New York employees.  The regulator there made clear that the Fund itself did not commit any wrongdoing but was, rather, being fined for the vicarious liability of that employee's violation.  That employee is no longer with the Partners Fund and since that fine in 2020 the Partners Fund has been found to satisfy Rule 23's typicality and adequacy

requirements by two different courts and it has recovered and distributed millions of dollars to class members in connection with a successful settlement of a securities class action.

For these reasons, your Honor, and for the reasons we set forth in our papers, we maintain that the presumption in favor of the Partners Fund and Mr. Di Murro's favor has not been rebutted and we respectfully request the Court to appoint them as lead plaintiff.

THE COURT:  Let me make a suggestion, Mr. Gavril.  You don't need to be standing there because you're, you're not going to be making an argument.  Why don't I let you sit down.

MR. GAVRIL:  Happy to go back, your Honor.

THE COURT:  And, and one of the other lawyers can use that podium.

MR. GAVRIL:  Absolutely.

THE COURT:  All right.

Next.

MR. ALBERT:  Would you like me to remain here, your Honor?

THE COURT:  You can stay there, for now.  They're all sort of taking shots at you.

MR. HASSON:  Good afternoon, your Honor.  Laurence Hasson representing Lead Plaintiff Movant, Todd Frega.

Your Honor, we agree with counsel on the overarching standard for satisfying PSLRA, but we diverge on a couple of

things and one of them being that the very purpose of the PSLRA is to avoid lawyer-driven litigation and in this particular instance the group that was formed by the FNY Fund and Di Murro is precisely what the PSLRA was intended to avoid. Counsel stood here and said that they both represent both of the clients. That may be the case today, but the certifications that were signed by each of those clients, which were signed on the day the motion was due and the day prior, are formatted differently, they look different. And so that is very strong indication that these clients were signed up by different law firms in the initial instance.

THE COURT: So what's wrong with that?

MR. HASSON: Well, your Honor, what's wrong with that is that when a lead plaintiff group is put forward one of the things that they have to demonstrate is that they have, they can work together cohesively and that there is a purpose for the grouping and there really has been nothing of that other than the fact that the law firms here, the Entwistle firm and Robbins Geller, say they work well together. When your Honor asked the question is it necessary for them to work together, there really isn't a response to that and in fact, in their declaration they, they, they provide -- the declaration, by the way, also is signed on the day the motion was due. So very last minute. You know, there's only one indication of why this group formed together and it's that they represent stockholders

and options holders, but the FNY Group alone represents both of those securities.  There really is no purpose of grouping together other than to aggregate, to gain the largest financial interest.

THE COURT:  No, but counsel here has informed me that even separately First New York still has the largest financial interest.  So by grouping together, if he's correct, they haven't obtained the largest financial interest.

MR. HASSON:  That's true, your Honor, however, they had no idea who else was going to show up for the motion prior to grouping together last minute.  The very purpose of the PSLRA is to avoid lawyer-driven litigation.  So picking up the phone and calling another law firm and saying, "Hey, let's come together" for no other purpose other than trying to achieve the largest financial interest is inherently problematic and many courts have, have found as much.

THE COURT:  Give -- give -- give me a case.

MR. HASSON:  Well, so the Silver Lake case, which we put forward in the briefing, actually involved their client, the FNY Group, not the Group, just FNY Fund.  They filed a motion.  They did not have the largest financial interest and after initial motions were filed, they made a deal with the second largest movant to aggregate the largest loss so that they could try and beat the top dog in that case.  And the court would not have it, claimed that it was lawyer driven,

would not allow the belated formation to achieve the largest financial interest.

And that's a point that we tried to hit home in, in our briefing, your Honor, is that FNY, beyond the fines and censures, has a history at the lead plaintiff stage of this sort of gamesmanship.  In the Alta Mesa case, which was brought up earlier, that was a case where the Robbins Geller firm represented a different fund and actually made a challenge on the FNY firm, an FNY Fund for having grouped with an individual, saying that it was purely lawyer driven and to aggregate the largest financial interest.  At the end of the day, your Honor, in Alta Mesa the Robbins Geller firm and the Entwistle firm cut a deal and the court did not rule on the issue, didn't have to, because they entered a stipulation as to who would be the lead plaintiff in that case.

So that's the type of wheeling and dealing that the PSLRA was intended, precisely intended to avoid and there is evidence that it happened in Alta Mesa and it worked out because there was a stipulation.  In the Dynagas case, there was a stipulation.  The court never reviewed the actual motions.  And, and in the Silver Lake case, the court had a problem with the gamesmanship that happened and wouldn't allow a belated grouping by the FNY Fund.  So I --

THE COURT:  What, what's your response to counsel's observation, if that's what you wanna call it, that there has

been a real lack of any examples of appointing anybody other than the, the largest financial interest?

MR. HASSON:  So if I understood what counsel said, was that since the Mersho case, which I think they overstate, there hasn't been an instance of that.  But let's go back to the Mersho case for one quick second.

The Mersho case was a limited circumstance.  In that case the district court made a *prima facie* finding that the group at issue was okay and then at the next stage, which was supposed to be rebutting the presumption, the court gave in to its misgivings and decided that the group was no longer okay when the requirement at that presumption stage is for there to be a presentation of evidence or proof by other movants that the grouping was problematic.  The, the Mersho case is not, does not give carte blanche to anyone and everyone to group together and I think that that is what counsel is trying to suggest, essentially.

As far as since that case, what have the circumstances been?  Well, your Honor, all of these cases are very, very fact specific.  It depends who files the motion and who shows up. There may not have been a circumstance where it made sense, but here in this case the FNY Fund, we argue, the Carter Group argues, has inherent flaws.  In addition to the fines and censures, it has demonstrated that it serves its lawyers more so than anyone else.  It's willing to enter any kind of

machination in order to gain the lead plaintiff appointment for its counsel because this, your Honor, is winner-takes-all process.  Whoever --

THE COURT:  Once they gain the lead counsel appointment, what is their disincentive to gaining the most that they can gain for the, for the rest of the class?  Why, why would they be any less likely to vigorously pursue the case simply because they, if they're looking out for their own interest?  I assume they get a percentage of the, of the total.

MR. HASSON:  Sure, your Honor, but, but lawyers and clients may have different incentives and motivations for settling or making decisions in the case.  A law firm may decide it doesn't want to invest "X" amount of time in the case and may, and, and propose an early settlement and if a, a client is not sufficiently motivated and a client is not looking out for the interest of the class and the client is just gonna roll over.  So whatever the law firm tells it to do, then that's a problem.  Because your Honor, your role here is to, is to appoint a fiduciary for the class, not a fiduciary for class counsel.

THE COURT:  I was gonna ask you how it's different from any other contingent fee arrangement, but I think you've answered that by saying in those situations you have a client that has an interest to protect and here, the, the client's interest takes second place to the lawyers.

MR. HASSON:  That's right, your Honor.

And I think beyond that, I, I would just like to say, you know, our movant, Mr. Frega, there really have been no genuine arguments raised against him.  Mr. Frega is --

THE COURT:  Somebody, somebody accused him of being a day trader.

MR. HASSON:  Correct.  The Carter Group accuses him of being a day trader, but that's simply not the case.  The definitions of "day trading" all reflect that the, the day trading, the hallmark of day trading is buying and selling and ending your position flat that day, right?

So if you look at the trading that Mr. Frega has done in this class period, he started the, he started trading with 811 shares and progressively increased his holdings to 90 something thousand shares and ended the class period with around 85,000 shares, or 84,000 shares.  He has steadily increased his holdings.  He's clearly and undeniably a long-term investor in this company.  A short -- a day trader trying to achieve short-term profits just, just simply does not exhibit the type of trading that Mr. Frega has exhibited here. And to that point, the only cases that counsel for the Carter Group have proffered all involve cases where the movants have liquidated their positions multiple times.  Mr. Frega, not once, did he liquidate his position and on the few days that they highlight as, for him having traded, well, having buys and

sells, those five days that they highlighted, on all of those days, if you took the average, Mr. Frega had six times as many shares that he held as a long position.

So there is really no indicia here of day trading. They're simply complaining, from a third-place position, complaining that he traded a lot, but there's, there's nothing problematic with how he traded.

And then their second argument which they make really doesn't make any sense. They make a Dura argument. In that case, you're not allowed to account for losses that happen prior to a corrective disclosure. In this case, the trading that Mr. Frega did prior to the only corrective disclosure in this case resulted in small gains. So if you Dura'd out those trades, what you'd end up with is an increase in Mr. Frega's loss from the 275,000 we reported as a life-hold loss I believe plaintiff motion to a $286,000 loss.

So Mr. Frega also -- I should say the third, the third point that counsel brought up against our client was that he didn't provide sufficient information, but that's also not the, not the case at all. In his opening motion, Mr. Frega indicated where he lived, in Woodstock, Georgia; how long he invested, demonstrating his sophistication. He invests -- had been -- has been investing for 20 years. He signs his sworn PSLRA certification indicating that he knows what a lead plaintiff is and is willing to be a representative for the

class, not counsel.  Counsel could have done, easily done a background check on him.  He doesn't have a particularly common name and if they had come up with anything, they surely would have presented it to the Court, but nothing was brought to the Court's attention here.

So they have not met what is required, which is proof to rebut a presumption, which we believe should be in Mr. Frega's favor.

THE COURT:  You, you've told me why you think you should be a better appointment than counsel for First New York and Di Murro.  Why would you be better than counsel for the, the Carter Family Trust?

MR. HASSON:  Sure, your Honor.

So the PSLRA process works going down the line of who has the largest financial interest.  That's how the Court is required to assess candidates, right?  So there is no beauty contest.  So we believe that the FNY and Di Murro Group has not satisfied their *prima facie* Rule 23 requirements.  So they do not get the presumption and even if they did get the presumption, we believe we --

THE COURT:  So you're like the Vice President and we don't have to go to the Speaker of the House, is that --

MR. HASSON:  Well, well, your Honor, simply, that's, that's the fact of the matter.  If -- if --

THE COURT:  Okay.

MR. HASSON:  If they can't --

THE COURT:  I mean, I understand --

MR. HASSON:  Yeah.

THE COURT:  -- if that's it.

MR. HASSON:  Yeah.

THE COURT:  You're, you're next in line and nobody has, has suggested sufficient reason why you shouldn't be appointed.

MR. HASSON:  Correct, but I would just make one slight change to that and say we believe we're actually first in line.

THE COURT:  Okay.  Anything else you wanted to say?

MR. HASSON:  Unless your, your Honor has any questions you'd like to ask, I think that's, that's all I have to say for now.

THE COURT:  All right.  Why don't you take a seat now and we'll hear from --

MR. HASSON:  Thank you.

THE COURT:  -- counsel for the Carter Family Investors.

MR. WALKER:  Thank you, your Honor.  Jacob Walker from Block & Leviton.

Before I begin, I just wanted to address a question that you just asked, examples of cases where groups have been rejected, and we cite at Page 8 of our opposition the Cloudera case -- it's a 2019 Northern District of California case -- and

also to <u>Stitch Fix</u>.  Both of those cases have exactly that scenario.

I acknowledge, your Honor, that we are coming to you in what certainly looks like third place.  So let me talk to you about why I think, nonetheless, you can get to us and I, I'll do that first by addressing the <u>Mersho</u> case.  And counsel for FNY is correct that the <u>Mersho</u> case is actually my case. I'm quite familiar with it and I do think that they do overread what the case stands for.  I think most importantly from <u>Mersho</u> itself what the Ninth Circuit says is that district courts have "latitude" in what information they consider at what is Step 2, determining whether or not on a *prima facie* basis they meet the adequacy and typicality standard.  And many have considered a lack of a pre-litigation relationship as part of that adequacy analysis.  They often consider the size of the group, how the members found their counsel, and prosecution procedures set out in their filing.

So our position is that the Court at what is Step 2 can find that the indicia here is that they are a lawyer-driven amalgamation.  While they're --

THE COURT:  You mean First New York?

MR. WALKER:  First New York.

THE COURT:  All right.

So what, if you wanna move ahead --

MR. WALKER:  Sure.

THE COURT:  -- what disqualifies Todd Frega?

MR. WALKER:  Yes.  So we have a, obviously, a differing position on whether or not the trading is so-called day trading or, or why it is invalid.  And I think just to step back for a second, why does all this matter?  I mean, obviously it matters because we're all sort of vying to be lead plaintiff and lead counsel, but what the statute is really trying to do is to protect the class and defense counsel obviously has not much to say today, but we've had cases against this defense counsel.  They're very skilled.  They are going to, at the class certification stage, they're going to do everything they can to try to defeat class certification and with Mr. Frega, they're going to argue that he's not entitled to the presumption of reliance that would be required to certify this class and the reason is because there's evidence that he might not have been relying on the integrity of the market price in his trading.

And it's not just five days.  I just wanna talk about the statistics.  Over 60 percent of the shares that he purchased during the class period, he sold on the same day, over 60 percent.  He traded on 35 different days.

THE COURT:  Well, those are the ones that he acquired, but that's a small percentage of the total shares that he held, correct?

MR. WALKER:  Incorrect, actually.

So he, he bought 346,500 shares in total.  He sold 261,550 shares during the class period.  So most of his activity is during the class period and is not affected by the corrective disclosure.  On 12 different days out of the 35 that he traded, 12 different days, he sold all or more than all of the shares he bought that day.  So you know, June 20, June 21st, June 22nd, 12 different days where he, he sold all or more than all of the shares he bought that day.  Nine additional days where he sold a majority of the shares he bought that day.  Every day, he is buying and selling shares and, and profiting and none of that activity has anything to do with what ultimately happens at the date of the corrective disclosure here.

And so it's not that he's a bad person or a bad trader.  It's that the class will suffer if he is the class representative because defendants will -- and they may succeed, they may not succeed -- but there's going to be a sideshow about whether or not he relied on the integrity of the market price and the class doesn't deserve that.  After the Supreme Court case, China Agritech a few years ago, if the Court found, ultimately, that he didn't rely on the integrity of the market price -- and that happened years from now -- then the class is out of luck.  The statute of repose, statute of limitations may have passed and there's nothing anyone can do.

And so, you know, I'd submit to the Court that we

acknowledge that, what, what it looks like.  We're in third place, but no one has questioned the adequacy or typicality of the Carter Family and we're the only movant that's true for.  The -- the -- they put their own declaration in.  Mr. Carter explained his 40 years of experience in investing.

And I'm sorry.  Just to make one final point.  I think if the Court looks at the cases, the Reinschmidt case, the Applestein case, what you'll find is that the courts who have decided this issue, in both of those cases the lead plaintiff movant who was rejected for frequent trading, such as we accuse Frega of, still held shares at the end of the class period.  They're, they were in exactly the same position that Mr. Frega is.  And, and similarly, the, the Enphase case, which Mr. Frega points to as well, the judge in that case looked at both, at both issues, both the frequency of and the fact that the, that the trading balance had hit zero more than one occasion.  We acknowledge he did hold shares throughout.  He didn't go to zero, but that's not dispositive of the question.  The real question is is his trading gonna become a sideshow and that's certainly what we're afraid of for the class.

THE COURT:  Thank you.

Anybody else before I go back --

I'm sorry.  I forgot your name.

MR. ALBERT:  My name is Michael Albert.

THE COURT:  Mr. Albert.  Sorry about that.

-- before I go back to Mr. Albert?

(No response)

THE COURT:  All right.

You can stay there, if you want.

MR. WALKER:  Sure.

THE COURT:  Mr. Albert, do you wanna respond to what these other lawyers have presented?

MR. ALBERT:  Just a few points, your Honor, if, if that's okay.

So what I think we're hearing is that counsel for Mr. Frega and for the Carter Group, they don't have a single case after the, the Mersho case where a court declined to appoint a group.

THE COURT:  What, what's the date of that case?

MR. ALBERT:  It's, I believe, 2020.

THE COURT:  All right.  You're right.  Their cases are 2019, not so long ago, though.

MR. ALBERT:  It's not -- it's not -- you're right. It's not so long ago.  There are about 200 of these cases filed a year, on average.  Actually, never less than a hundred, 100 to 200, and counsel for the Carter Group cites, mentioned the Supreme Court's decision --

THE COURT:  Has, has your client ever been appointed when they didn't have the majority interest?

MR. ALBERT:  When they did not have --

THE COURT:  Yes.

MR. ALBERT:  -- the largest financial interest in the relief sought by the class?  Which, which client do you mean?  Do you mean either of them or, or the Partners Fund?

THE COURT:  Well, you're primarily First New York, right?

MR. ALBERT:  Your Honor, I, I don't believe so.

THE COURT:  I was just curious.  If -- if you -- if you've ever used the other argument.

MR. ALBERT:  The, the other -- oh, oh.  Their argument?

THE COURT:  If you've ever argued their position in another case?

MR. ALBERT:  Well, your Honor, every case is different and it does depend on the factual circumstances.

THE COURT:  Well, I just wondered if you've ever prevailed on their, on the argument that he's making now.

MR. ALBERT:  I mean, not when the facts are so stark, your Honor, and you have an institutional investor that has been appointed twice -- I'm sorry -- that has been certified under Rule 23.

And this is actually a pretty good opportunity for me to segue into this, into the Alta Mesa case where Mr. Walker said, you know, he posed a very fair question.  Why does this whole thing matter because defendants are gonna challenge class

certification?  Well, in the Alta Mesa case defendants took a two-day deposition of Mr. Fishman, the General Counsel at First New York.  First New York produced discovery.  They're leading this case.  This case is gonna go to trial, I believe in April or May.  If, if it does go to trial, it's gonna be the 23rd or 24th PSLRA case to ever go to trial.  They've been living and breathing this case for, for two years and as I mentioned, about a year and a half ago they, they finished distributing the settlement proceeds of the Dynagas LNG case before Judge Nathan up in the Southern District of New York.  You know, these, these horror stories, these, this parade of horribles, these are all exactly the speculation that Cavanaugh and Mersho tell us are insufficient to rebut the presumption in, in, in our favor, your Honor.

And I just wanna get back to --

THE COURT:  I assume the presumption has more weight if there is a larger number of shares that is held by the largest financial interest holder and if -- if the -- if the difference is smaller, the presumption doesn't carry as much weight.  Would that be true?

MR. ALBERT:  I have to say, your Honor, here, we, we have hundreds of thousands dollars more than the next movant, but, to answer your question directly, my understanding of, of the law within the Ninth Circuit and especially the Ninth Circuit on this because if you go over to Florida, it's, it's

more like you're saying, "You just have a little bit more and that," you know, "so you get the presumption a little bit more."  No, the Ninth Circuit has made clear -- with -- district courts within the Ninth Circuit have made clear, even $1 matters.  You either have a presumption or you don't.

THE COURT:  And -- and --

MR. ALBERT:  That's the winner-take-all nature of it.

THE COURT:  Okay.  It's not stronger depending on how much more you have?

MR. ALBERT:  It is not stronger.

THE COURT:  Ninth Circuit has made that clear?

MR. ALBERT:  District courts within the Ninth Circuit --

THE COURT:  Yeah.

MR. ALBERT:  -- have made that clear.

THE COURT:  That's different, but I understand what you're saying.

MR. ALBERT:  I tried to make that clarification as I --

THE COURT:  Right.

MR. ALBERT:  -- as I was saying.

THE COURT:  I give more weight to the Ninth Circuit --

MR. ALBERT:  Of course.

THE COURT:  -- than I do to my fellow district judges.

MR. ALBERT:  Your, your Honor, in, in conclusion,

First New York Partners Fund and, and Mr. Di Murro are ideal, ideally situated to serve as the lead plaintiff in this action. They undisputedly have the largest loss separately or combined, regardless of the methodologies used, regardless of trading or, or any of that.  They've made a showing of typicality and adequacy under Rule 23 and they have an institutional investor within their ranks with experience and recent success serving as the lead plaintiff, together with individual investors just like Mr. Di Murro.  They have a dedicated staff that's gonna, that's committed to working with Mr. Di Murro to oversee this case.  This idea that it's lawyer driven, it, it goes to the very heart of the P, of the purpose of the PSLRA, which was to put control in the hands of institutional investors because they're more sophisticated.  They have a General Counsel. They, they are going to ensure that, that the case is gonna be prosecuted in exactly the same way that the Alta Mesa case is. And again, two separate courts in the last two years have found Partners Fund satisfies Rule 23.

For that reason, your Honor, we, we don't think that the presumption in our favor has been rebutted.

THE COURT:  All right.  Thank you, Mr. Albert.

Does anybody else feel compelled to respond further before I take it under submission?

MR. WALKER:  I do feel like there's one fact pitch sitting there that I would like to address, which is you asked

if there are cases wherein this kind of scenario has happened. The _Tricida_ case in the Northern District of California, would have been a 2020 decision, is a case exactly like this. Our firm was appointed in that case by Lucy Koh at the time, now on the Ninth Circuit, where we were, again, in third or fourth place, but the court saw the issues in the parties above us and, and ultimately appointed us because of those issues. And again, I think -- we don't disagree about what the law is. Our position is really that the -- the --the -- my -- my -- my friends' group just doesn't get the presumption, to begin with and, and that's something that could happen at Stage 2.

THE COURT:  All right.

MR. WALKER:  Thank you, your Honor.

THE COURT:  Thank you.

The case was well, well argued.

MR. HASSON:  Your Honor?

THE COURT:  The Court will take the motion under -- oh.

Yes, sir.

MR. HASSON:  May I?  Just -- sorry.

Your Honor, just a few quick wrap-up points, if possible.

One, one is on the FNY Group.  We didn't really discuss this all that much, but I mean, your Honor should pay close attention to the declaration that they put before the

Court.  And, and no one here is arguing, your Honor, that groups are not possible, but when you look at the declaration that was brought here, it is sparse.  It says nothing.  It's completely boilerplate.  This is a two-person group.  They didn't even proffer a decision-making mechanism, which is an issue because if the, if Mr. Di Murro and the FNY Fund end up in a disagreement, that could potentially deadlock the case.  This is something that courts consider to be important.

So -- and then the other declarations, for example, even in the Mersho case, you know, they provided a date of when they spoke.  In the Musk case, they appointed an individual as a member of the group to be the spokesperson for the group.  There's a lot of detail that can go into this.  This can be done right under certain circumstances.  The point here, your Honor, is the circumstances are not right.

And then as to the arguments made against Mr. Frega, I just wanna reiterate that it's not uncommon for day-trader arguments to be made.  The issue is is that, first of all, reliance is the key issue and in none of the cases that counsel provided, none of them are analogous to this situation because Mr. Frega, again, never liquidated his position.  His position continued to grow.  As an example of cases where the day-trader argument failed, there is the In re Snap case and there's the Lopez v. AgEagle case that we cited in our briefs.

And as far as the cases that counsel raised, so the

Reinschmidt v. Zillow case, one of the things that they decline, declined to tell the court was that at the end of the day, even though that day-trader argument was raised, ultimately the court approved that movant, anyway, by stipulation.

So there's no situation that they've presented that's analogous to this situation here.  They're merely speculating that day trading is gonna be in a situation that the defendants are gonna raise at class certification, but there's really no basis for it.

Thank you, your Honor.

THE COURT:  Thank you.

The motions are taken under submission.

(Counsel thank the Court)

(Proceedings concluded at 2:11 p.m.)

<u>CERTIFICATE</u>

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Janice Russell*                          December 19, 2023

Janice Russell, Transcriber                          Date