**BRAGAR EAGEL & SQUIRE P.C.**
Marion C. Passmore (SBN #228474)
580 California Street, Suite 1200
San Francisco, CA 94104
(415) 568-2124 (phone)
(212) 486-0462 (fax)
passmore@bespc.com

*Liaison Counsel for Lead Plaintiff, Lead Counsel, and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re ORIGIN MATERIALS, INC. SECURITIES LITIGATION _____ This Document Relates To ALL ACTIONS CONSOLIDATED FROM: Antonio F. Soto, individually and on behalf of all others similarly situated,     Plaintiff,           v. Origin Materials, Inc., Richard J. Riley, and John Bissell,     Defendants. | Master File No.:  2:23-cv-01816-WBS-JDP LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CORRECTED AMENDED COMPLAINT <u>CLASS ACTION</u> <u>JURY TRIAL DEMANDED</u> Date: August 5, 2024 Time: 1:30 p.m. Judge: Hon. William B. Shubb Courtroom: No. 5 |

**TABLE OF CONTENTS**

                                                                **Page**

INTRODUCTION................................................... 1

STATEMENT OF RELEVANT FACTS.................................... 4

  A. Origin Announces the Planned Construction of Origin 2 –
     The Company's First Commercial Scale Plant ................... 4

  B. Defendants Mislead Investors by Representing That Origin 2
     Would Be a PET-Producing Plant and Constructed on Schedule .... 5

  C. Defendants Knew That Technical Issues with Scaling PX/PET
     Was Delaying the Development of Origin 2 ...................... 7

  D. Investors Learn the Truth – Origin 2 Will Not be a PX/PET
     Plant and Will Not Be Constructed on Time ................... 10

ARGUMENT...................................................... 11

I. LEGAL STANDARD ........................................... 11

II. PLAINTIFF ADEQUATELY PLEADS FALSE AND MISLEADING STATEMENTS
    CONCERNING THE PURPORTED PX/PET ORIGIN 2 PLANT ............... 12

  A. Defendants Knew Technical Issues Prevented the Development
     of the Origin 2 PX/PET Plant but Falsely Told Investors
     Otherwise .................................................. 13

  B. Defendants Falsely Claimed that PX Would Be the Company's
     Flagship Product ........................................... 15

  C. Statements Asserting That "Progress" Was Made on the
     Origin 2 PX/PET Plant's Construction Milestones Were
     False Because Origin Scrapped the PX/PET Design .............. 20

  D. Defendants' Statements Claiming Construction Would Begin
     in Mid-2023 on the PX/PET Origin 2 Plant Were False
     Because Origin Was Not Building a PX/PET Plant ............... 23

  E. Defendants' False and Misleading Statements Are Not
     Protected by the Safe Harbor ................................ 26

    1. Defendants' Cautionary Language Was Not Meaningful ......... 26

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

2. Defendants Knew Their Statements Concerning the Origin 2 PX/PET Plant Were False and Misleading ............. 29

III. PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER............. 29

A. The AC's CW Allegations Plead a Strong Inference of Scienter ...................................................... 30

B. The Core Operations Doctrine Supports Scienter ............... 38

C. Viewing the AC's Allegations Holistically, Defendants' Purported Innocence Falls Flat ............................... 39

IV. THE AC ADEQUATELY PLEADS LOSS CAUSATION ....................... 43

V. THE AC STATES AN EXCHANGE ACT §20(a) CLAIM ................... 47

CONCLUSION..................................................... 48

**TABLE OF AUTHORITIES**

*Page(s)*

*Cases*

*Anderson v. Peregrine Pharms., Inc.*,
  2013 WL 4780059 (C.D. Cal. Aug. 23, 2013) ........................ 39

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................... 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................... 11

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ............................. 13, 15, 33

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ........................ 46

*Brady v. Delta Energy & Commc'ns, Inc.*,
  2023 WL 2683203 (C.D. Cal. Jan. 25, 2023) ....................... 44

*Brendon v. Allegiant Travel Co.*,
  412 F. Supp. 3d 1244 (D. Nev. 2019) ............................. 18

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) .................................... 15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*
  *v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) .................................... 29

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ..................................... 19

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020) ............................. 18

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) ................................ 26

*Diaz v. N. Dynasty Mins. Ltd.*,
  2018 WL 5099749 (C.D. Cal. Apr. 30, 2018) ....................... 24

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................. 43

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ....................... 32

*Ferreira v. Funko, Inc.*,
  2021 WL 880400 (C.D. Cal. Feb. 25, 2021) ...........................28

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...............................passim

*Huddleston v. Herman & MacLean*,
  640 F.2d 534 (5th Cir. 1981), *aff'd in part and rev'd in part on
  other grounds*, 459 U.S. 375 (1983) ...............................27

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ......................................15

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ........................30

*In re Apple Inc., Sec. Litig.*,
  2020 WL 2857397 (N.D. Cal. June 2, 2020) .........................15

*In re BioMarin Pharm., Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ..................29, 38, 41

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2257980 (S.D. Cal. May 23, 2017) .........................47

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005), *abrogation on other grounds
  recognized by In re Genius Brands,* 97 F.4th 1171 (9th Cir. 2024)..43

*In re Ditech Commc'ns Corp. Sec. Litig.*,
  2007 WL 2990532 (N.D. Cal. Oct. 11, 2007) ........................33

*In re Genius Brands*,
  97 F.4th 1171(9th Cir. 2024) .................................43, 47

*In re Intel Corp. Sec. Litig.*,
  2023 WL 2767779 (N.D. Cal. Mar. 31, 2023) ............16, 26, 27, 28

*In re Invision Techs., Inc. Sec. Litig.*,
  2006 WL 538752(N.D. Cal. Jan. 24, 2006) .........................32

*In re Pivotal Sec. Litig.*,
  2020 WL 4193384 (N.D. Cal. July 21, 2020) ........................32

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ..............................passim

*In re Social Media Adolescent Addiction/Personal Injury
  Prod. Liab. Litig.*,
  2023 WL 7524912 (N.D. Cal. Nov. 14, 2023),
  *motion to certify appeal denied*,
  2024 WL 1205486 (N.D. Cal. Feb. 2, 2024) .....................13, 14

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

*In re Stec Inc. Sec. Litig.*,
  2012 WL 6965372 (C.D. Cal. Mar. 7, 2012) ........................... 46

*In re Toyota Motor Corp. Sec. Litig.*,
  2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ........................ 32

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ..................................... 32

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ...................................... 42

*In re Wrap Techs., Inc. Sec. Exch. Act Litig.*,
  No. CV 20-8760-DMG (PVCx) (C.D. Cal. Nov. 15, 2021) .............. 24

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ...................................... 41

*In re Yahoo! Inc. Sec. Litig.*,
  2012 WL 3282819 (N.D. Cal. Aug. 10, 2012) ........................ 24

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
  998 F.3d 397 (9th Cir. 2021) ...................................... 44

*Johansson v. Ferrari*,
  2015 WL 5000848 (D. Del. Aug. 20, 2015) .......................... 17

*Karinski v. Stamps.com, Inc.*,
  2020 WL 6572660 (C.D. Cal. Nov. 9, 2020) ......................... 46

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ......................... 11, 12, 13, 17

*Leventhal v. Chegg, Inc.*,
  2024 WL 924484 (N.D. Cal. Mar. 4, 2024) .......................... 41

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ...................................... 48

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................. 43, 45

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ...................................... 43

*Markette v. Xoma Corp.*,
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ....................... 19

*Melot v. JAKKS Pac., Inc.*,
  2014 WL 12589334 (C.D. Cal. June 6, 2014) ........................ 30

*Metzler v. Corinthian*,
  540 F.3d 1049 (9th Cir. 2008) ..................................... 43

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

*Omnicare, Inc. v. Laborers Dist. Council Const.*
  *Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................. 18, 19, 22, 23

*Pardi v. Tricida, Inc.*,
  2022 WL 3018144 (N.D. Cal. July 29, 2022) ........................ 46

*Plumley v. Sempra Energy*,
  847 F. App'x 426 (9th Cir. 2021) ................................. 33

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) .................................... 39

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ..................................... 38

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ....................... 33

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................. 38, 39, 40

*Scheller v. Nutanix, Inc.*,
  450 F. Supp. 3d 1024 (N.D. Cal. 2020) ........................... 32

*Scheller v. Nutanix, Inc.*,
  2020 WL 5500422 (N.D. Cal. Sept. 11, 2020) ................... 30, 41

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ..................................... 29

*Sgarlata v. Paypal Holdings, Inc.*,
  409 F. Supp. 3d 846 (N.D. Cal. 2019), *aff'd sub nom.*
  *Eckert v. PayPal Holdings*, 831 F. App'x 366 (9th Cir. 2020) ...... 36

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2018) ........................ 13, 33

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob.*
  *Holdings Inc.*,
  2022 WL 989240 (W.D. Tenn. Mar. 31, 2022) ....................... 19

*Tellabs Inc. v. Makor Issuers & Rights, Ltd.*,
  551 U.S. 308 (2007) ....................................... 12, 30, 40

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ............................ 25

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ...................................... 13

*Welgus v. TriNet Grp., Inc.*,
  765 F. App'x 239 (9th Cir. 2019) ................................. 19

vi
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

*Weston v. DocuSign, Inc.*,
  669 F. Supp.3d 849 (N.D. Cal. 2023) ..............................29

*Weston v. Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ...........................22, 24, 25

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .............................22, 25

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 956 (N.D. Cal. 2005) ..............................32

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................34

### *Statutes*

15 U.S.C. §78u-4(b)(2) ........................................29

15 U.S.C. §78u-5(c)(1) ........................................29

15 U.S.C. § 78u-4(b)(1)(B) ....................................13

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

Lead Plaintiff Todd Frega ("Plaintiff") submits this memorandum of law in opposition to Defendants' motion to dismiss the Corrected Amended Complaint for Violations of the Federal Securities Laws (the "AC").[1]

## INTRODUCTION

The securities laws do not allow public companies to knowingly make untrue or misleading statements to investors like Defendants did during the Class Period. Defendants propped up Origin's stock price by telling investors that the Company was building a commercial-scale plant ("Origin 2") to convert wood waste into PX/PET (a replacement for petroleum-based PET commonly used in plastic bottles). Origin advised investors that it already pre-sold all its PX/PET capacity for the Origin 2 plant and was considering incorporating additional types of recyclable bioplastics into the plant to make extra revenue. Importantly, Defendants published statements throughout the Class Period affirming that there were no technical issues preventing the development of the PX/PET plant and that the construction of Origin 2 would begin in mid-2023 and be completed in mid-2025. Defendants even touted during "fireside chats" with analysts that PX/PET would be the Company's "flagship" product.

But Origin's Co-CEOs, Defendants Bissell and Riley, knew that the Company could not build a commercial plant that produced PX/PET. While

---

[1] Unless otherwise defined, all capitalized terms have the same definitions as in the AC (ECF No. 61). "¶__" refers to paragraphs in the AC. "Mot." or "Motion" refers to Defendants' Motion filed in Support of the Motion to Dismiss the Plaintiff's Corrected Amended Complaint (ECF No.69). "Defs. Ex." refers to the exhibits Defendants submitted in support of their Motion.

1

the Defendants were publishing statements to the market praising Origin's "progress" on the development of its PX/PET plant, internally, Defendants Bissell and Riley held meetings where they told employees, including CW1, that they could not build Origin 2 as a viable PX/PET plant. Defendants therefore knew at the beginning of the Class Period that Origin would have to build a different plant, for a different process, on a longer timeline. This information directly contradicted what Defendants were telling investors.

Origin's actions also corroborate Defendants' knowledge of their false and misleading statements. Since Defendants knew that Origin 2 could not produce PX/PET commercially, they changed the design for Origin 2 to a FDCA/PEF plant. But unlike PET, PEF was not widely produced for end-products. Only Avantium had success making FDCA/PEF at a commercial scale, so Defendants struck a deal with Avantium to assist with redesigning Origin 2 to produce FDCA. Avantium's CEO, however, advised his investors in the Netherlands that he expected revenue from the Origin deal on a much later timeline than when Origin was telling its investors because it would take Origin years to design and build a FDCA/PEF plant. Shortly thereafter, Defendants also revised their contract with Pepsi, one of the Company's most important investors and customers, to reflect Defendants' knowledge that Origin 2's schedule for construction and operations had been postponed.

Faced with the AC's particularized allegations of corroborated, firsthand information establishing Defendants' knowledge of issuing false and misleading statements, Defendants' motion to dismiss distorts the facts and makes inapplicable arguments. There is no dispute that this case deals with forward-looking statements and

2
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

opinions. There is also no dispute that such statements are generally protected under the securities laws. But forward-looking statements that do not contain adequate cautionary language and are made with actual knowledge that they are false or misleading are actionable. Opinions are also unprotected if they are knowingly false. Here, the AC demonstrates a plausible theory of actual knowledge that the statements were false or misleading when issued and why the PSLRA Safe Harbor does not protect Defendants' statements.

The AC also holistically pleads a cogent and compelling theory showing Defendants knew they were issuing materially false and misleading statements to investors. Even Defendants' dubious counternarrative, that Defendants Bissell and Riley were waiting on an engineering report for the design of Origin 2, skirts the well-pled allegations that Defendants knew PX/PET was off the table, undoing all the engineering work on Origin 2 as a PX/PET plant. As Defendant Bissell would later admit, the Company needed to spend "thousands of hours" to turn a new engineering assessment and compile a revised estimate on the plant's cost and schedule. If Defendants told investors at the beginning of the Class Period that Origin was removing PX/PET from the Origin 2 plant design — instead of the false and misleading statements that it was only planning to incorporate additional processes like FDCA into the PX/PET plant — the stock price would have tanked.

Indeed, loss causation for this action is particularly strong because when Defendants finally revealed the truth about Origin 2, Origin's stock price fell 66.5%, causing millions of dollars in losses to Class members. The AC sufficiently alleges the negative stock price

3

reaction to Origin's revelation that Origin 2 would not be a PX/PET plant, was not starting construction in mid-2023, would not be completed in mid-2025, and thus providing no foreseeable revenue production for years to come. As analyst HSBC Global Research reported while downgrading the Company: with Origin 2 delayed, "[the Company's] investment case is broken" and "[t]he USD10+ bn in product demand is irrelevant without access to production capacity before 2026."

Accordingly, the AC adequately alleges violations of Sections 10(b) and 20(a). Defendants' motion to dismiss should be denied in full.

### STATEMENT OF RELEVANT FACTS

**A.   Origin Announces the Planned Construction of Origin 2 – The Company's First Commercial Scale Plant**

Origin is a sustainable materials company that claims to have developed a platform to convert the carbon found in plant-based carbon or non-food biomass, such as wood residues, into "building block" chemicals known as CMF (chloromethylfurfural) and HTC (hydrothermal carbon). CMF can then be converted into PX (paraxylene), a product that can replace non-sustainable chemicals to produce PET (polyethylene terephthalate), and FDCA (furandicarboxlic acid), which can be converted into PEF (polyethylene furanoate). ¶ 6. Origin claims that these chemicals can replace the petroleum-based substances typically used in various end products, such as food and beverage packaging, plastics, and car parts. ¶¶ 5, 31-33.

Prior to the Class Period, Origin announced that the Company would be building two plants: Origin 1, a smaller plant which would be operational by the end 2022; and Origin 2, a commercial-scale plant

4

which would be operational by mid-2025. ¶¶ 40-41. Origin 2 would be the Company's largest and first commercial-scale plant and supply most of the Company's products from 2025 through 2027. ¶¶ 42-45.

The completion of Origin 2 was critical to Origin's financial success and proof of the Company's ability to produce its technology on a commercial scale. ¶ 44. Defendants represented that Origin's future revenue and positive EBITDA depended on the completion of Origin 2, as they did not expect to reach commercial-scale production and positive EBITDA, until Origin 2 was operational in 2025. ¶¶ 44, 70.

**B.    Defendants Mislead Investors by Representing That Origin 2 Would Be a PET-Producing Plant and Constructed on Schedule**

Defendants announced that Origin 2 would focus on the large-scale production of PET, a product derived from PX (¶¶ 47, 60) and touted the benefits of producing PX/PET prior to, and throughout the Class Period. ¶¶ 60-68; *see e.g.*, ¶ 62 ("The reason we went for PET is because PET has by far the best end of life answer for, frankly, I would say commodity materials generally, not even just plastics"); ¶ 68 ("for PET, the market is so large"); ¶ 66 ("due to strong customer demand," Origin was "substantially committed for our Origin 2 paraxlyene [PX] and PET capacity."); ¶¶ 67-68 (PET derived from PX was the Company's "flagship" product); ¶ 137 (referring to the decision to focus on the production of PET as "brilliant"); ¶ 139 (Origin 2 expected "to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC"); ¶ 146 (touting the benefits of PET and representing that the Defendants' decision to make Origin 2 a PET plant "was very intentional").

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

Critically, while Defendants stated that additional products "may be" incorporated into Origin 2's product-slate in addition to PX/PET, such as FDCA, PEF and biofuels (¶¶ 113, 115, 117, 127, 129), Defendants continuously represented that Origin 2 would be focused on producing PX/PET. *See* ¶¶ 136, 139, 145, 147.

With respect to the timing for Origin 2, Defendants represented that front-end engineering design (FEED)[2] would be completed in early 2023, construction would begin by mid-2023, and the plant would be operational in mid-2025. ¶ 48. Defendants also represented that Origin 2 would cost $1.07 billion. ¶ 44. Defendants confirmed these representations numerous times prior to, and throughout the Class Period. *See* ¶¶ 69, 72-74, 79-80, 128.

For example, on February 23, 2023 (the first day of the Class Period), Defendants disseminated a PowerPoint presentation reaffirming that Origin 2's FEED package would be imminently completed, and that construction would commence in mid-2023. ¶ 116. Defendants confirmed this timeline on March 7, 2023, May 12, 2023, and May 22, 2023. *See* ¶ 125 (March 7, 2023 PowerPoint Presentation – representing that FEED package would be complete in early-2023 and that "Construction expected to start by mid-2023 and the plant is expected to be operational mid-2025"); ¶ 139 (May 12, 2023 PowerPoint Presentation – "Construction expected to start by mid-2023 and the plant is expected

---

[2] Origin adopted the front-end loading (FEL) approach for the development of Origin 2. ¶ 59. FEL is divided into three stages: FEL 1, FEL 2 (or pre-FEED study), and FEL 3 (or the FEED study). ¶¶ 52-56. The FEED study informs a project's financial investment decision (FID), which is the point when a company finalizes its approach to a project's development and construction can then begin. ¶¶ 57-58.

6

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

to be operational mid-2025"); ¶ 141 (May 22, 2023 – "Origin 2, is scheduled to come online in the 2025 time frame …").

C.    **Defendants Knew That Technical Issues with Scaling PX/PET Was Delaying the Development of Origin 2**

A former Origin technical development engineer who worked at Origin prior to and throughout the Class Period ("CW1"), reported that Origin was experiencing technical issues when trying to convert CMF to PX/PET at a commercial scale for Origin 2. CW1 was responsible for developing the technology for converting CMF to PX for Origin 2. ¶ 85-86. CW1 was also responsible for compiling chemistry data from Origin's Research and Development ("R&D") group and rerouting the data to Origin 1 to test the findings on a larger scale. *Id*. If successful, CW1 and the internal engineering team would then pass the data to Origin's outside engineering firm that was compiling FEL 2 for Origin 2. *Id*.

In late 2022, CW1 attended biweekly meetings with Origin's R&D group, where he learned that fouling issues were occurring at every step of the Company's conversion from CMF to PX at a commercial scale. ¶ 86. These fouling issues resulted in the Company being unable to finalize the chemistry for Origin 2, which in turn caused CW1 and his team to fall behind in providing critical engineering data/designs to Origin 2's outside engineering firm and the Company to fall behind in completing FEL 2 for Origin 2. *Id.*

By December 2022, Defendants Riley and Bissell were aware of the problems with Origin 2's development and that changes needed to be made. ¶ 87. At a December 2022 quarterly all-hands Company meeting, Defendants Riley and Bissell announced that the Company was considering scaling down the size of Origin 2, splitting the building

7

of the plant into two phases, and shifting the focus of Origin 2 from PX/PET to another product. *Id.* Defendants Riley and Bissell further divulged that Origin could not execute on its original plan for Origin 2. *Id.* Specifically, due to the economics of PX, Defendants stated that the Company would have to make less PX/PET at Origin 2 or pivot the plant's production to another product. *Id.* At the meeting, CW1 was instructed that the Company was far off from completing FEL 2. *Id.*

In early 2023, CW1 learned from biweekly meetings with Origin's R&D group that the Company faced unexpected chemical issues necessary for scaling commercial PX. ¶ 88. While the engineers started developing solutions for the issues, it took more time, slowed down Origin 2's engineering designs, and increased costs. *Id.*

Because of the undisclosed technical issues, in February 2023, the Company's commercial strategy pivoted from producing PX/PET at Origin 2 to the development of higher margin products, such as FDCA/PEF. ¶¶ 92-93, 158. Accordingly, on February 21, 2023, right before the start of the Class Period, Origin entered into a partnership agreement with Avantium, a technology development company that was completing the world's first factory to produce FDCA on a commercial scale. ¶¶ 94-95. Notably, Origin agreed to pay at least €12.5 million to garner access to Avantium's process technology and design and construction expertise so that Origin could build a commercial-scale plant for the conversion of CMF into FDCA. ¶¶ 96-97, 182-184. As Avantium's CEO discussed during a conference call on February 22, 2023, the only plausible plant for Origin to utilize Avantium's FDCA production technology was Origin 2. ¶ 184. However, Avantium's CEO

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

further stated that it would take Origin several years to implement the production of FDCA into its current Origin 2 plant design. ¶ 98.

Unknown to investors, by March 2023, Defendants announced internally that Origin 2 was not going to be built as originally represented – it was no longer going to produce PX/PET, it was shifting to new products, and it was being broken up into two phases. ¶ 89. CW1 also learned from weekly Friday meetings with Defendants Riley and Bissell in March 2023, that FEL 2 for Origin 2 was being delayed. ¶ 90.

Knowing that PX/PET would no longer be produced at Origin 2, on May 9, 2023, Defendants amended Origin's 2018 offtake agreement with Pepsi, one of the Company's most important clients and investors, to incorporate Origin's new plan for Origin 2 to focus on the production of FDCA and to account for the yet-to-be disclosed delay to the plant's construction and commercial operation timelines. ¶¶ 99, 188-189. Specifically, the amendments extended Origin 2's milestone dates past 2025[3]–pushing back Pepsi's right to terminate the agreement to 2026. ¶ 103. The Original Pepsi Offtake Agreement obligated Origin to keep Pepsi "regularly informed" on the progress and inform Pepsi if the Company obtained actual knowledge of a substantial likelihood that Origin 2's milestone dates in 2025 may not be met. ¶¶ 101-102. The amendments required Origin to meet with Pepsi on at least a quarterly basis to discuss the Company's status on meeting the new 2026 deadlines. ¶ 106.

---

[3] The commercial operation date deadline of June 30, 2025 set forth in the Original Pepsi Offtake Agreement was consistent with the mid-2025 timeline Defendants repeatedly represented to the market. ¶ 190.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

The Pepsi amendments corroborate CW1's account that Defendants decided to shift the focus of Origin 2 from PX/PET to FDCA/PEF months before the end of the Class Period, as the amendments stated that it was Origin's "strategic plan to accelerate the production of FDCA and PEF." ¶ 105. Indeed, by May 2023, FDCA/PEF had been firmly incorporated into Origin 2's designs, as Origin was required to provide Pepsi with pricing calculations and technical specifications for the FDCA to be produced at Origin 2 before or upon completing FID. ¶¶ 105-106.

**D.    Investors Learn the Truth – Origin 2 Will Not be a PX/PET Plant and Will Not Be Constructed on Time**

On August 9, 2023, Defendants finally revealed that everything investors had been told about Origin 2 had changed—Origin 2 would no longer produce PX/PET but, instead, would produce FDCA/PEF, the plant would be smaller in scale than represented, construction of the plant would be broken up into 2 phases, and it was impossible to begin construction in mid-2023 and complete the design and construction of a new FDCA plant by mid-2025. ¶¶ 110, 149-153. Defendants revealed that Origin 2's FID and the start of construction was delayed until at least 2025, and the earliest that certain aspects of the plant could be operational was delayed to sometime between late-2026 and 2027. *Id.* Defendant Bissell admitted that once the Company decided to take Origin 2 in a new direction and focus on FDCA/PEF, the Company needed to spend "thousands of hours" to turn a new engineering assessment and compile a revised estimate on the plant's cost and schedule, which played a "meaningful" role in delaying Origin 2's timing. ¶¶ 111, 154-157. In fact, the shift in production from PX to FDCA had such a dramatic effect on Origin 2's timeline that FDCA/PEF

10

will not be produced at the plant until 2028, a delay of almost three years. ¶¶ 112, 159.

In response to the news concerning the revised product-slate, scope, and timeline for Origin 2, the Company's share price fell 66.5% on August 10, 2023. ¶ 160. Analysts were shocked, downgraded the stock, and underscored that with Origin 2 delayed, "[the Company's] investment case is broken" and that "[t]he USD10+ bn in product demand is irrelevant without access to production capacity before 2026." ¶¶ 162-163. Origin's share price never recovered, as the Company's main source of future revenue—Origin 2—is now several years from completion. ¶ 164. The Company has since reduced its workforce by 30 percent. ¶ 166.

**ARGUMENT**

**I.   LEGAL STANDARD**

Dismissal pursuant to Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable theory or sufficient facts to support a cognizable theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted). A complaint must only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any [12(b)(6) motion,] accept all factual allegations in the complaint as true . . . [and] consider the complaint

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

in its entirety." *Tellabs Inc. v. Makor Issuers & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To state a claim under §10(b) of the Exchange Act, a plaintiff must plead: (1) a material misstatement or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Khoja*, 899 F.3d at 1008. Here, Defendants contest falsity, scienter, and loss causation. However, each of these elements is adequately alleged and Defendants' Motion should be denied.

## II. PLAINTIFF ADEQUATELY PLEADS FALSE AND MISLEADING STATEMENTS CONCERNING THE PURPORTED PX/PET ORIGIN 2 PLANT

The Amended Complaint pleads particularized facts from CW1 and Origin contracts and partners showing that Defendants did not plan to build Origin 2 as a PX/PET plant during the Class Period. Those facts provide a basis for why the false and misleading statements: (i) concealed technical issues; (ii) falsely described Origin 2 as a PX/PET-producing plant; (iii) insincerely touted PX/PET as the Company's main product; and (iv) deceptively claimed progress was being made on the PX/PET plant's construction milestones with start-up in mid-2023. ¶¶ 113-148.

Pleading a material misstatement or omission ("falsity") "is subject to … the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Falsity must satisfy Rule 9(b), and the PSLRA requires that "the complaint shall state with particularity all facts" supporting the plaintiff's belief that defendants made an untrue statement or "omitted facts necessary in

12

order to make the statement made in the light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b)(1)(B).

A misrepresentation or omission is actionable if it "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "'[O]nly if reasonable minds could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6).'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2018) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

Plaintiff has adequately alleged falsity under Rule 9(b) and the PSLRA by "'specify[ing] each statement alleged to have been misleading, … the reason or reasons why the statement is misleading, and … stat[ing] with particularity all facts on which that belief is formed.'" *Khoja*, 899 F.3d at 1008; 15 U.S.C. § 78u-4(b)(1)(B).

A. **Defendants Knew Technical Issues Prevented the Development of the Origin 2 PX/PET Plant but Falsely Told Investors Otherwise**

Throughout the Class Period, Origin issued false and misleading disclosures concerning the risks associated with the construction of Origin 2. *See* ¶¶ 123, 134.[4] Specifically, Defendants warned on February 23, 2023 and May 10, 2023 that:

---

[4] Defendants do not address Plaintiff's allegations that Origin's risk disclosures were false and misleading and thus, have waived this argument. *See In re Social Media Adolescent Addiction/Personal Injury Prod. Liab. Litig.*, 2023 WL 7524912, at *19 (N.D. Cal. Nov. 14, 2023) (defendants waived argument that failure to warn claims were precluded by the First Amendment, where they did not raise it in their motion

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

- "***there is a risk that*** significant unanticipated costs or ***delays could arise due to***, among other things … ***unforeseen technical issues***" (*see* ¶¶ 123-124, 134-135); and

- "***we may not be successful***… in developing or implementing new production processes….***Such risks include difficulties in designing, developing, implementing, and scaling up new process technologies***." ¶¶ 134-135.

Plaintiff alleges that at the time Origin made these risk disclosures, these risks had already materialized. By February 2023, Origin had already experienced "unforeseen technical issues" in connection with scaling the production of PX, which was delaying Origin 2's development and construction. ¶ 123-124. CW1 reported that Origin knew in late 2022 that PX fouled at a commercial scale. ¶ 86. CW1 also learned firsthand from Defendants Riley and Bissell in December 2022 that they knew PX/PET could not support Origin 2 and the Company needed to pivot. ¶ 87. The technical issues continued to plague Origin 2's development such that, by March 2023, Defendants told CW1 and Origin employees that Defendants were abandoning production of PX/PET at Origin 2 altogether. ¶¶ 89-90. However, on May 10, 2023, Defendants continued to conceal that they were experiencing technical issues in their 1Q'23 Form 10-Q. ¶¶ 127-138. These issues further delayed Origin 2's development because once Defendants decided to focus on FDCA, they needed to spend "thousands of hours" to turn a new engineering assessment and compile a revised estimate on the plant's cost and schedule. ¶¶ 89-91, 111, 154-157.

---

to dismiss, but rather raised it for the first time in their reply brief to plaintiffs' opposition to the motion to dismiss), *motion to certify appeal denied*, 2024 WL 1205486 (N.D. Cal. Feb. 2, 2024).

14
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

Thus, the risk that Origin "could" experience unforeseen technical issues that "could" delay the development of Origin 2, and the risk that the Company "may" not be successful in scaling up new processes, were not future, potential risks – they were risks that had already materialized. *See Berson*, 527 F.3d at 987 (risk disclosures that "speak[ ] entirely of as-yet-unrealized risks and contingencies" and do not "alert[ ] the reader that some of these risks may already have come to fruition" are misleading); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)(by presenting the risk as a future possibility, instead of a present reality, Defendants "create[d] an impression of a state of affairs that differs in a material way from one that exists."); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702-703 (9th Cir. 2021)(risk disclosures that warned that "even unfounded concerns about Alphabet's 'practices with regard to the collection, use, disclosure, or security of personality information…' could damage the company's reputation[,]" were misleading because they were made after Google detected cybersecurity issues).[5]

**B.   Defendants Falsely Claimed that PX Would Be the Company's Flagship Product**

During the Class Period, Defendants touted PX/PET as the Company's "flagship" product and confirmed that Origin 2 would be a PX/PET plant. On May 10, 2023, Defendant Riley stated, "PET derived

---

[5] *See also In re Apple Inc., Sec. Litig.*, 2020 WL 2857397, at *16 (N.D. Cal. June 2, 2020) (when risks have already materialized, disclosing them "in the abstract" while omitting that they have "already come to fruition" is misleading).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

from PX remained the Company's flagship product." ¶¶ 136; *see also* ¶ 139 (May 12, 2023 - Origin 2 was "expected to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC…"); ¶ 145 (June 8, 2023 - referring to PX/PET as the "flagship" product); ¶ 147 (June 8, 2023 - "para-xlene [PX], which hopefully goes into PET, is kind of our flagship and our first product").

These statements were false and misleading because by March 2023, Defendants encountered technical issues while attempting to scale the production of PX/PET. ¶¶ 86-88. This resulted in Defendants advising CW1 and Company employees that Origin 2 would no longer produce PX/PET but instead would produce FDCA/PEF and other products.[6] ¶¶ 89, 173. Consistent with these allegations, Defendants took steps to incorporate the production of FDCA/PEF into Origin 2: (1) in February 2023, the Company's commercial strategy pivoted from demand generation to revenue generation and the development of higher margin products, such as FDCA (¶ 158); (2) on February 21, 2023, Origin agreed to pay Avantium at least €12.5 million for access to Avantium's process technology and expertise so that Origin could turn Origin 2 into a commercial-scale plant for the production of FDCA (¶¶ 96-98, 182-184); and (3) on May 9, 2023, Defendants amended Origin's offtake agreement with Pepsi to incorporate Origin's new plan for Origin 2 to focus on the production of FDCA/PEF (¶¶ 99, 188-189). Critically, the

---

[6] This fact distinguishes this case from *In re Intel Corp. Sec. Litig.*, 2023 WL 2767779 (N.D. Cal. Mar. 31, 2023). Mot. at 15-16. The plaintiffs in *Intel* did not plead any facts to support their allegation that Intel had definitive plans to outsource production of its 7nm chips. *Id*. at *19.

16
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

amendments stated that it was Origin's "strategic plan to accelerate the production of FDCA and PEF." ¶ 105. Indeed, by May 2023, FDCA had been firmly incorporated into Origin 2's designs, as Origin was now required to provide Pepsi with pricing calculations and technical specifications for the FDCA to be produced at Origin 2. ¶¶ 105-106.[7]

Accordingly, Plaintiff satisfies the falsity requirement of the PSLRA and Rule 9(b). *See Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time"). "Requiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one." *Glazer Cap. Mgmt.*, 63 F.4th at 769.

Defendants argue that there is liability for concealing their decision to change Origin 2 to a FDCA/PEF plant because "companies are allowed to evaluate options" and that there was "no duty to disclose internal deliberations." Mot. at 17. Defendants also go so far as to rely on a pure "omission" case from the District of Delaware to show Defendants did not have to tell investors that plans changed. *Johansson v. Ferrari*, 2015 WL 5000848, at *5 (D. Del. Aug. 20, 2015) (no statement alleged to be false or misleading). These arguments fail because here, Defendants falsely told investors Origin 2 would make

---

[7] Defendants wrongly argue that Plaintiff challenges Defendants' statements that Origin was considering "adding" products to Origin 2. Mot. at 18-19, 20-22. What Plaintiff has challenged is Defendants' representations that Origin 2 was going to be a PX/PET plant, despite knowing that it had been phased out of the plant's plans by March 2023. While Defendants stated that additional products may be added to Origin 2, they did not disclose that Origin 2 would no longer produce PX/PET thereby delaying the plant.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

PX/PET plastic from wood waste when that they knew that was never going to happen.

Defendants also argue that their statements representing that PET/PX was Origin's flagship product are protected opinions.[8] *See* Mot. at 19-20. However, opinion statements are actionable misstatements so long as the opinion contains "embedded statements of facts" that are untrue. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015). Here, Defendant Riley's statements that PX/PET remained Origin's "flagship" product rest on an underlying, verifiable fact: that Origin 2, Origin's first commercial-scale plant, would be focusing on the production of PX. However, at the time these statements were made, this was no longer true. ¶ 89. *See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1259 (D. Nev. 2019) (opinion that airline was a safe operation was actionable because it was embedded with a factual denial of questions on corporation's operational challenges as they reflected safety issues); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 134 (S.D.N.Y. 2020) (statement that the company was "working on" the "rights renewal process outside the U.S." was actionable opinion with an embedded fact that the renewal process was ongoing).

Further, even if Defendants' "flagship" statements were "pure" opinions, they are still actionable because *Omnicare* does not insulate

---

[8] Merriam-Webster defines flagship as "the finest, largest, or most important one of a group of things." https://www.merriam-webster.com/dictionary/flagship#:~:text=ship%20%CB%88flag%2D%CB%8Cship-,1,store%20is%20the%20company's%20flagship

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

Defendants when an opinion "omits material facts about [a defendant's] inquiry into, or knowledge concerning, a statement of opinion, and if those facts conflict with what a reasonable investor, reading the statement fairly and in context, would take from the statement itself." *Omnicare*, 575 U.S. at 189; *see also Glazer Cap. Mgmt.*, 63 F.4th at 771 (statements actionable where the defendants "repeatedly reassured investors during the class period that the number … of prospective sales in the pipeline was unchanged … and reassured them that the pipeline was full and growing" because the statements created an impression of state of affairs that did not "fairly align[] with the information in [Forescout's] possession at the time") (citing *Omnicare*, 575 U.S. at 189). Here, Defendants' "flagship" statements reassured investors that Origin 2 would be a PX/PET-producing plant and are actionable.[9]

Defendants also disingenuously claim that their "flagship" statements were true by citing pre-Class Period Origin partnerships for PX/PET to prove PX/PET was Origin's flagship product; however, those were over a year before Defendants scrubbed PX/PET from Origin 2's plans. *See* Mot. at 20, Defs. Ex. 20, (ECF No. 69-22) at 17-35.

---

[9] Defendants' cited authority is inapposite. *See Welgus v. TriNet Grp., Inc.*, 765 F. App'x 239, 240-241(9th Cir. 2019) (plaintiff failed to plead any facts showing that the defendants knew their statements were false when made); *Markette v. Xoma Corp.*, 2017 WL 4310759, at *5-6 (N.D. Cal. Sept. 28, 2017) (same). Further, Defendants' opinion on the importance of the production of PX/PET for Origin was neither open-ended, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014), nor a vague expression on the Company's ability to produce PET, *Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings Inc.*, 2022 WL 989240, at *22 (W.D. Tenn. Mar. 31, 2022).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

Tellingly, the revised partnerships confirm FDCA/PEF was expected to be the new flagship product during the Class Period. *See* Defs. Ex. 5, (ECF No. 69-6) at 9 ("Origin 2 initially anticipated to focus primarily on [PX] production for bio-PET…Origin now plans to supply pX to customers prior to 2030 primarily through collaborations with strategic partners…Active discussions with strategic partners interested in licensing or co-developing low carbon bio-pX plants using Origin's technology, in the US and across the globe"). Accordingly, the "flagship" statements are actionable.

> **C.     Statements Asserting That "Progress" Was Made on the Origin 2 PX/PET Plant's Construction Milestones Were False Because Origin Scrapped the PX/PET Design**

Plaintiff adequately alleges that Defendants' Class Period updates on the "progress" toward Origin 2's PX/PET construction milestones were false. *See* ¶ 116 (February 23, 2023 4Q'22 Earnings Presentation - reaffirming that FEED would be imminently completed); ¶ 113 ("the Company continues to make progress on front-end design, construction planning and financing for Origin 2"); ¶ 114 ("for Origin 2, front-end loading, construction planning and financing are progressing…"); ¶ 117 ("we continue to make progress on the front-end design, construction planning, and financing of our second plant…"); ¶¶ 118, 127-128, 130 (same); and ¶ 125 (March 7, 2023 PowerPoint – reaffirming that FEED would be imminently completed).

Defendants' statements were materially false and misleading because Origin was not making progress towards the construction milestones for the Origin 2 PX/PET plant. By February 2023, Origin had already encountered technical issues in connection with scaling the production of PX, which was delaying Origin 2's development and

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

construction. ¶¶ 88, 124. On February 21, 2023, Origin agreed to pay Avantium at least €12.5 million to assist with incorporating FDCA into Origin 2. ¶¶ 93-98,176-187. In light of this immense change, Avantium's CEO opined that FDCA production at Origin 2 would not be operational in two years but would take several years past the plant's timeline. *Id.* By March 2023, Defendants knew that (i) the Company was no longer working towards the Origin 2 plant as previously represented to investors (one that focused on the production of PX), and instead, required a new engineering assessment for an FDCA plant, (ii) FEL 2 was further delayed for the plant, and (iii) the plant's developmental problems had resulted in its construction being broken up into two phases. ¶¶ 89, 90, 154-157, 173.

Defendants wrongly argue that their progress statements are nonactionable opinions. *See* Mot. at. 10-12. However, Defendants' statements that the Company was making "progress" on Origin 2's front-end design and construction planning (¶¶ 113-118, 127-130) are actionable because they were confirmations that Origin was going forward and progressing on the milestones for the Origin 2 PX/PET plant.[10] Defendants repeatedly represented that Origin 2 would produce PX and touted the benefits and advantages of focusing on PX. *See* ¶ 47 (touting that Origin was "the only company that can make PET that is

---

[10] Defendants claim that Plaintiff alleges that their statements that Origin "ha[d] made progress developing new products and applications …" were false and misleading. Mot. at 11 (citing ¶¶ 113-15, 118, 127-130). To the contrary, Plaintiff alleges that Defendants' statements representing that PET was the Company's "flagship" product were materially false and misleading. *See* ¶¶ 138, 140, 144, 148.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

chemically identical using a carbon negative process - not buying offsets."); ¶ 60 (Origin 2 slated for PET production); ¶ 62 ("[t]he reason we went for PET is because PET has by far the best end of life answer…"); ¶ 68 (the Company's decision to focus on PET "was very intentional" because "it's one of the best polymers out there…."); *see also* ¶¶ 63-66.

Defendants' statements about the "progress" of front-end design, construction and planning for Origin 2 were false representations that gave investors the misleading impression that Origin was making progress towards the Origin 2 plant as represented – a plant that would produce primarily PX/PET and would begin construction in mid-2023. *See Weston v. Fam. P'ship LLLP v. Twitter, Inc.,* 29 F.4th 611, 620-621 (9th Cir. 2022) (recognizing that "on track" statements are an implied affirmation when defendants set corresponding and specific targets). Indeed, Defendant Bissell stated that he was "proud of how our team continues to execute against our Origin 1 and Origin 2 construction milestones" (¶¶ 117, 129) and analysts following the Company understood the representations on "progress" to mean that Origin 2 was on schedule. ¶¶ 120, 132.

Further, even if Defendants' "progress" statements were "pure statements of opinion," they are still actionable because Plaintiff has alleged that, unknown to investors, Origin was making *no* progress on the PX/PET Origin 2 plant as originally represented. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) (noting that "great progress" could be an actionable statement if no progress had been made) (citing *Omnicare*, 575 U.S. at 187). Instead, Defendants were abandoning PX as the target product, reducing the scope of the plant,

22

and extending the timing for construction (breaking it up into two phases).[11] *See* ¶¶ 121, 133. Accordingly, Defendants' "progress" statements are actionable.

### D. Defendants' Statements Claiming Construction Would Begin in Mid-2023 on the PX/PET Origin 2 Plant Were False Because Origin Was Not Building a PX/PET Plant

During the Class Period, Defendants repeatedly provided updates on the expected timeline for Origin 2, representing that construction would begin in mid-2023. *See* ¶ 116 (February 23, 2023 PowerPoint slide affirming that construction of Origin 2 was expected to begin in mid-2023); ¶ 125 (March 7, 2023 PowerPoint slide confirming that construction was expected to start by mid-2023); ¶ 139 (May 12, 2023, republishing the same PowerPoint slide that was published on March 7, 2023).

Defendants' statements concerning the construction start-up for the Origin 2 PX/PET plant were materially false and misleading for the same reasons Defendants' statements concerning Origin's "progress" on Origin 2's milestones were false. *See* § II.C, *supra*. By March 2023, Defendants knew that (i) the Company was no longer working towards the Origin 2 plant as previously represented to investors (one that focused on the production of PX), and instead, required a new engineering assessment for an FDCA plant, (ii) FEL 2 was further delayed for the

---

[11] Moreover, a "pure statement[] of opinion" is actionable if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 186, 189. Here, Defendants' statements omitted numerous conflicting, material facts—particularly, the delays to FEL 2 for Origin 2 and the product shift away from PX.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

plant, and (iii) the plant's developmental problems had resulted in its construction being broken up into two phases. ¶¶ 89, 90, 154-157. Defendant Riley later admitted that abandoning PX/PET played a "meaningful" role in delaying the plant's timing. ¶¶ 154-157.

Contrary to Defendants' assertions, Plaintiff does not allege that Defendants had a duty to update. Mot. at 8-10. Defendants had a duty to be truthful and not misleading. Plaintiff alleges that Defendants knew of material facts that drastically altered Origin 2's scope and timeline that had been represented to investors. ¶¶ 113-148. Despite technical issues with the scaling of PX causing delays and altering Origin 2's plans, Defendants continued to reaffirm Origin 2's production focus and expected timeline. By omitting disclosure of the known-delay and product-switch, Defendants altered the "total mix" of information made available for investors. *See Diaz v. N. Dynasty Mins. Ltd.*, 2018 WL 5099749, at *5 (C.D. Cal. Apr. 30, 2018).[12]

Defendants' representations as to Origin 2's timeline are very different from those in *Weston*. *Weston*, 29 F.4th at 620. In *Weston*, the plaintiff alleged that Twitter's failure to disclose a software bug's impact on its Mobile App Promotion (MAP) product left a "misimpression" that the work Twitter was doing to improve MAP was "on track." 29 F.4th at 620. However, the court held that Twitter's

---

[12] Since Plaintiff does not allege a duty to update, Defendants' cited cases are inapposite. *See In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *1, *20 (N.D. Cal. Aug. 10, 2012) (declining to find whether a duty to update exists); *In re Wrap Techs., Inc. Sec. Exch. Act Litig.*, No. CV 20-8760-DMG (PVCx), slip op. at 9 (C.D. Cal. Nov. 15, 2021) (Dkt. No. 75) (plaintiff alleged a separate duty to correct past statements).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

statements that they were working on the MAP program did not suggest that Twitter's MAP program was "on track" because Twitter qualified their statements with warnings that "we're not there yet" and "we're still in the middle of that work." 29 F.4th at 620. As such, Twitter's statements were "so imprecise and noncommittal that they are incapable of objective verification." *Id.* at 621. The court further noted that perhaps – "if Twitter had set a specific deadline" for MAP – like Defendants did here with respect to the construction start-up date – Twitter's "statements could "seem like an implied affirmation of that target. *Id.* at 620-21 (citing *Wochos*, 985 F.3d at 1192).

Defendants also incorrectly describe Origin 2's delays as hypothetical. Mot. at 9, 15, 17, 28. Unlike the dismissed attempt to require disclosure of prospective FTC violations at issue in *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019) (Mot. at 17), the AC details with particularity the delays that Origin 2 was encountering: (i) CW1's reports on delays to Origin 2's FEL 2 process; (ii) Avantium CEO's belief that the plant would be delayed; and (iii) Defendants' amendments to Origin's contract with Pepsi to account for delays to the timeline. These definitive and known delays amount to more than merely "reflect[ing] generally on difficulties experienced with the overall [project]'" (Mot. at 15) or calling for the "self-flagellation" of disclosing potential delays (Mot. 17).

Accordingly, the AC sufficiently alleges that Defendants' statements concerning the construction timeline for the PX/PET Origin 2 plant were false and misleading.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

**E.    Defendants' False and Misleading Statements Are Not Protected by the Safe Harbor**

The false and misleading statements alleged are not protected by the PSLRA's safe harbor provision.[13] Forward-looking false or misleading statements only find safe harbor if they are accompanied by meaningful cautionary language or are not made with actual knowledge that they are false or misleading. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).[14] Here, the safe harbor does not apply to any of Defendants' false or misleading statements because Defendants' cautionary language was not meaningful, and Defendants knew their statements were false or misleading.

### 1.    Defendants' Cautionary Language Was Not Meaningful

The Ninth Circuit has long held that cautioning of supposed future problems that in fact already exist is not meaningful. *Glazer Cap. Mgmt.*, 63 F.4th at 781 ("…in the context of the safe harbor: cautionary language is not 'meaningful' if it discusses as a mere *possibility* a risk that has already materialized."); *Cutler v. Kirchner*, 696 F.

---

[13] Defendants oddly refer to Defs. Exs. 5 and 13 (ECF Nos. 69-5, 69-15) to support their assertion that Defendants' statements were forward-looking. Mot. at 13. However, Ex. 13 is a May 10, 2023 presentation that is not referenced in the AC, and Ex. 5 pertains to statements made at the end of the Class Period on August 9, 2023, that are not alleged to be false or misleading.

[14] Defendants' May 10, 2023, May 22, 2023, and June 8, 2023 statements (*see* ¶¶ 137, 141 and 145) made during "fireside chats" were not identified as a forward-looking statements or accompanied by any cautionary language during the interviews. Instead, only insufficient boilerplate language by the transcript company appear on the final pages of transcripts. *See* Pl. Exs. 5 at 14, 7 at 14, and 8 at 10. Therefore, because Defendants knew these statements were false and misleading (*see*, §III, *infra*) they are not protected by the safe harbor. *See In re Intel*, 2023 WL 2767779, at *15.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

App'x 809, 813 (9th Cir. 2017) (disclosing a risk "in the abstract" but omitting the fact that it had "already… come to fruition" is not meaningful) (citation omitted); *In re Intel*, 2023 WL 2767779, at *1 at *13 ("cautionary language may not be meaningful if it suggests that risks have not been realized when they have already occurred.") (citation omitted).  The reason is clear – cautioning of a risk that has already occurred is "deceit[ful]." *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983).

Here, the risk language used by Origin throughout the Class Period was not meaningful because it warned of the potential risk of "unanticipated delays" that "*could* arise" due to "unforeseen technical issues" and of the potential risk that Defendants "may not be successful" in "scaling up new process technologies" when those risks had already materialized.[15]

From the onset of the Class Period on February 23, 2023, Defendants knew that technical issues in connection with scaling the production of PX were delaying Origin 2's development and

---

[15] *See* Pl. Ex. 9 at 49 (incorporated by reference into Pl. Ex. 1 at 7, Pl. Ex. 2 at 2 and Defs. Ex. 14 (ECF No. 69-16) at 4); Defs. Ex. 22 (ECF No. 69-24) at 18 (incorporated by reference into Pl. Ex. 3 at 2, Pl. Ex. 4 at 7, Defs. Ex. 15 (ECF No. 69-17) at 4); and Pl. Ex. 10 at 43-44 (incorporated by reference into Pl. Ex. 6 at 2).

Defendants point to cautionary language issued by Origin's predecessor two years before the Class Period. Mot. at 13-14 (citing Defs. Exs. 4 and 19 (ECF Nos. 69-6, 69-21). Not only are these warnings irrelevant to Defendants' Class Period statements, but they show that Defendants' risk language remained virtually unchanged, despite the fact that these risks were no longer potential future risks, and therefore, were not meaningful and were false and misleading. *See* ¶¶ 124, 135.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

construction. ¶ 124. In March 2023, Defendants made the decision to shift the focus of Origin 2 away from PX, further delaying FEL 2 for the plant. ¶¶ 89-91. In face of this reality, on May 9, 2023, Defendants amended Origin's agreement with Pepsi to incorporate Origin 2's new focus on the production of FDCA and to account for the known delay to the plant's construction and commercial operations timelines. ¶¶ 188-199. Nevertheless, Origin's cautionary language failed to alert investors that Origin was already experiencing technical issues that were delaying the completion of FEL 2 and the construction timeline for the Origin 2 PX/PET plant.

Accordingly, Origin's risk language was not meaningful for purposes of the safe harbor. *See Glazer Cap. Mgmt.*, 63 F.4th at 781 (cautionary language not meaningful for purposes of the safe harbor where the defendants were "aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its investors of this development"); *see also Ferreira v. Funko, Inc.*, 2021 WL 880400, at *18 (C.D. Cal. Feb. 25, 2021)(no safe harbor protection for forward-looking statements where the risk disclosure "set forth various hypothetical risks associated with maintaining excess inventory without disclosing that this risk had materialized").[16]

---

[16] *In re Intel* is distinguishable because, while the court recognized that cautionary language may not be meaningful if it suggests that risks have not been realized when they have already occurred, the risk language in that case specifically warned investors that product delays had already occurred. 2023 WL 2767779, at *13.

28

**2. Defendants Knew Their Statements Concerning the Origin 2 PX/PET Plant Were False and Misleading**

As set forth below in Section III, *infra*, Plaintiff has alleged particularized facts showing that Origin's statements concerning Origin 2 are not protected by the safe harbor because they were made with actual knowledge that they were false and misleading. *See* 15 U.S.C. §78u-5(c)(1); *In re BioMarin Pharm., Inc. Sec. Litig.*, 2022 WL 164299, at *8 (N.D. Cal. Jan. 6, 2022) (finding same).

Accordingly, the safe harbor does not allow Defendants to avoid liability for issuing false and misleading statements.

**III. PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER**

Plaintiff has more than adequately alleged that Defendants acted with scienter. To properly plead scienter under Rule 9(b) and the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required statement of mind." 15 U.S.C. §78u-4(b)(2). "A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*. 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 883-84 (N.D. Cal. 2023) ("particularized allegations that defendants had actual access to the disputed information" either through documents or information shared at quarterly meetings raises a strong inference of scienter") (citing *Quality Sys.*, 865 F.3d at 1145 and *City of Dearborn*, 856 F.3d at 620). In ruling on a motion to dismiss, the scienter inference "need not be irrefutable, *i.e.*, of the

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

'smoking-gun' genre.'" *Tellabs*, 551 U.S. at 324. Rather, "it must be cogent and at least as compelling as any opposing inference." *Id.* at 314. "In other words, the tie goes to the Plaintiff." [17] *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). The AC readily satisfies these standards based on many of "the same" facts that "show falsity," as discussed above. *Glazer Cap. Mgmt.*, 63 F.4th at 766 (noting that although they have distinct pleading standards "some facts might be used to support both an inference of scienter and an inference of falsity").

### A.    The AC's CW Allegations Plead a Strong Inference of Scienter

A complaint can establish a strong inference of scienter through confidential witness ("CW") allegations by satisfying a two-part test: (1) the CW "must be described with sufficient particularity to establish their reliability and personal knowledge;" (2) their "statements…must themselves be indicative of scienter." *Quality Sys.*, 865 F.3d at 1144. Here, the AC satisfies both prongs.

**Basis of Knowledge:** To satisfy the first prong, a complaint must describe the CW "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 1145 (citation omitted). The AC pleads enough details about CW1's job description, including his

---

[17] Defendants make much ado over AC not including allegations of insider trading; however, as Defendants concede, such allegations are not required to adequately plead securities fraud. Mot. at 24; *see*, *e.g.*, *Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at *9 (N.D. Cal. Sept. 11, 2020) (finding scienter despite no suspicious insider sales); *Melot v. JAKKS Pac., Inc.*, 2014 WL 12589334, at *15 (C.D. Cal. June 6, 2014) (same).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

title, role and duties, and tenure to show that he was positioned to know the information attributed to him.[18] ¶¶ 83-91. *See Quality Sys.*, 865 F.3d at 1145 (CWs reliable where complaint alleges their "job description and responsibilities, and, in some instances, the witness's exact title"). CW1 was a technical development engineer who was employed at Origin prior to and throughout the Class Period and who worked on developing the technology for the fourth stage of converting CMF to PX for Origin 2. ¶ 85. CW1 was part of an internal engineering group responsible for compiling chemistry data provided by the R&D group, rerouting the information to Origin 1 to test those findings on a larger scale, and passing the data to the outside engineering firm compiling FEL 2 for Origin 2. ¶¶ 85, 86, 88. Thus, CW1 was well positioned to directly observe that Origin was experiencing problems with scaling the production of PX at Origin 2. ¶ 84.

CW1 knew of the problems with PX and Origin 2's delays from attending biweekly meetings with Origin's R&D group in late 2022 and early 2023, as well as attending meetings with Individual Defendants

---

[18] Plaintiff withheld CW1's exact tenure at Origin and to which executive CW1 reported to further protect CW1's anonymity at his request due to fears of retaliation from Origin. While Plaintiff believes these descriptions are sufficient, more information can be provided to the Court *in camera*.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

in December of 2022[19] and March of 2023[20] during which those very issues were discussed. ¶¶ 86-90. Thus, the AC does not merely rely on CW1's or Individual Defendants' general attendance at "routine" Company meetings in which no pertinent issues were discussed. *Contra* Mot. at 26 (citing: *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) (finding lack of scienter as CWs had no personal knowledge of misstatements at issue); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1088 (9th Cir. 2002) (finding lack of scienter as defendants merely attended management and board meetings with no allegations that the pertinent issues were discussed); *Fadia v. FireEye, Inc.,* 2016 WL 6679806, at *13 (N.D. Cal. Nov. 14, 2016) (same); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *17 (N.D. Cal.

---

[19] Allegations by CW1 about pre-Class Period issues with Origin 2 are relevant, consistent with, and further corroborate CW1's Class Period allegations. *See, e.g.*, *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012) ("…facts relevant to scienter 'will ordinarily date from before any alleged misrepresentations' because the 'circumstances preceding the statements…would be among those knowable at the time of the statements'") (quoting *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 956, 971 (N.D. Cal. 2005); *In re Invision Techs., Inc. Sec. Litig.*, 2006 WL 538752, at *2 n.1 (N.D. Cal. Jan. 24, 2006)("To the extent that these [pre-class period] statements are used to demonstrate the truth or falsity of Class Period statements, they are relevant").

[20] Despite Defendants' efforts to obfuscate CW1's allegations (Mot. at 25-26), the AC alleges that CW1 learned from both his direct manager via email and from his attendance at weekly meetings held by Individual Defendants that Origin 2 was being broken up into two phases, was shifting to new products, and would no longer produce PX. ¶ 89. CW1 further learned from the weekly Friday meetings with Individual Defendants in March 2023, that FEL 2 was being delayed for Origin 2. ¶ 90. It is apparent that Individual Defendants knew of these issues by virtue of their participation in these weekly meetings.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

July 21, 2020) (finding lack of scienter in light of only general allegations of individual defendants' attendance at meetings)).

Given CW1's role, Defendants' "quibbl[ing] that these witnesses weren't in a position to see the [information] first-hand" fails. *Berson*, 527 F.3d at 985. Defendants' assertion that CW1 is unreliable because he did not directly communicate with Individual Defendants (Mot. at 25) is wrong since CW1 heard the Individual Defendants admit facts that contradict what they were representing to investors. CW1 is also not required to identify the exact date and time of every communication with the Individual Defendants. Mot. at 27-28. *See*, *e.g.*, *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (finding scienter based on CWs who had "no direct contact with the defendants" but partook in a monthly meeting in "early 2018", received an email "around November or December 2018," and participated in a meeting "toward the end of 2018" in which pertinent issues were discussed).[21]

Defendants' attempt to portray CW1's allegations as contradictory also fails. Mot. at 27. CW1 worked on developing the technology for the fourth stage of converting CMF to PX for Origin 2. ¶ 85. This

---

[21] Accordingly, Defendants rely on several inapplicable cases. *See* Mot at 25-26 (citing: *Shenwick*, 282 F. Supp. 3d at 1149 (scienter not found as CWs only generally referred to communicating with "senior management"); *Plumley v. Sempra Energy*, 847 F. App'x 426, 432 (9th Cir. 2021) (lead plaintiff failed "to identify any particular Defendant" in connection with the actionability of purported false and misleading statements); *In re Ditech Commc'ns Corp. Sec. Litig.*, 2007 WL 2990532, at *8 (N.D. Cal. Oct. 11, 2007) (scienter not found as plaintiffs did not allege any information regarding timing or content of meetings with defendants)).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

included scaling the chemistry to produce PX at a commercial level for Origin 2, during which CW1 and his team encountered "fouling issues" which delayed finalizing the chemistry and building the plant. ¶¶ 85-86. Thus, when Defendants delayed the timeline for Origin 2, CW1 believed it was "technology maturity" (the ability to scale the production of PX) that caused the delay. ¶ 91. PX's chemistry issues and economics naturally coincide as resolving PX's chemistry issues drove up the costs of scaling its production. ¶¶ 87-90. There is nothing inconsistent about these allegations.

**Indicative of Scienter:** In assessing the second prong, courts "look to the level of detail provided by the [CW], the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citations omitted). Allegations of first-hand statements or interactions with defendants are particularly significant. *See Quality Systems*, 865 F.3d at 1145. Here, CW1 offers specific and corroborative details both before and during the Class Period, including Individual Defendants' participation at internal Origin meetings that, contrary to their public assurances, demonstrates they knew that Origin 2 was encountering issues with scaling the production of PX, experiencing delays, and requiring revised plans.

CW1 recalled that at a quarterly Company meeting in December 2022, Defendants Riley and Bissell told Origin employees that due to the economics of scaling PX, Origin was forced to either produce less PX at Origin 2 or pivot the plant's production to another product, and

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

that the Company was "far off" from completing FEL 2. ¶ 87. In other words, Individual Defendants revealed that Origin could not execute on its plan for Origin 2. This required changes and delayed FEL 2. Then, per CW1, Defendants Bissell and Riley held weekly Friday meetings in March 2023 advising employees of their decision to no longer produce PX at Origin 2 and break the plant's construction up into two phases, further delaying the plant's completion of FEL 2. ¶¶ 89-91. Such statements by Defendants were personally witnessed by CW1.[22]

CW1's account that Origin 2's problems and delays were known by Individual Defendants are corroborated by other facts alleged. With technical fouling issues causing delays to Origin 2's construction schedule and increasing the costs to produce PX at the plant in late 2022 and early 2023, Defendants were forced to explore alternatives to PX. ¶¶ 83-88. In February 2023, the Company's commercial strategy pivoted from demand generation to revenue generation and the development of higher margin products, such as FDCA. ¶ 158. Accordingly, on February 21, 2023, Origin entered into a deal with Avantium to garner its assistance and expertise with the production of FDCA at an Origin plant.[23] ¶¶ 93-98,176-187. As Avantium's CEO

[22] Unlike the cases cited by Defendants (Mot. at 25, 28), the AC is not relying on general information provided to Individual Defendants but Individual Defendants' own knowledge, which they shared with Origin employees, and their involvement in meetings in which specific and pertinent issues were discussed.

[23] Defendants' assertion that Origin also entered into an offtake agreement to purchase FDCA from Avantium is irrelevant. Mot. at 29. Avantium CEO's statements demonstrate that the primary purpose of the partnership was to "open the market to accelerate the large-scale production of FDCA and PEF" by allowing Origin to use "Avantium's process technology to enable the conversion of CMF into FDCA at a

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

discussed during a conference call on February 22, 2023, the only plausible plant for Origin to utilize Avantium's FDCA production technology was Origin 2. ¶ 184. During the call, Avantium's CEO, the preeminent expert on building a commercial-scale FDCA plant, further corroborated CW1's allegations that Individual Defendants knew in March 2023 that FEL 2 for Origin 2 was delayed by advising that with Origin 2 pivoting to FDCA, the plant would not be operational in accordance with Defendants' timeline and would require substantially more time to develop. ¶¶ 98, 178-179, 184. Unlike the vague and attenuated basis for a former employee's statements raised in *Sgarlata v. Paypal Holdings, Inc.*, 409 F. Supp. 3d 846, 857 (N.D. Cal. 2019), *aff'd sub nom. Eckert v. PayPal Holdings*, 831 F. App'x 366 (9th Cir. 2020) (Mot. at 27), Avantium's CEO was well positioned to provide a credible opinion on Origin 2's timeline. Not only is Avantium the first company in the world to build a commercial-scale FDCA plant, but the company was specifically contracted with, and paid by Origin to provide Origin with that very expertise for Origin 2. ¶¶ 178-184. Then, on May 9, 2023, to account for the known delay to Origin 2's construction timeline and the plant's pivot from PX to FDCA, Defendants amended Origin's offtake agreement with Pepsi to reflect these developments. ¶¶ 99-112, 188-199. This was driven by the Original Pepsi Agreement's provisions requiring Origin to inform Pepsi if it obtained actual knowledge of a substantial likelihood that Origin 2's milestone completion dates in 2025 may not be met, which would then

facility of 100 kiloton per annum scale" – which could only be Origin 2. Defs. Ex. 26 (ECF No. 69-28) at 1-2.

36

trigger certain termination rights for Pepsi.[24] ¶¶ 190-192. In the face of delays to Origin 2, Origin and Pepsi opted to salvage their offtake agreement by extending the termination dates beyond 2025–evincing that Origin now expected Origin 2's commercial operation to occur by June 30, 2026 and product delivery by December 31, 2026. *Id.* Accordingly, the Pepsi Offtake Agreement Amendments demonstrate that Defendants knew by May 9, 2023 that Origin 2 was experiencing delays, would not begin construction by mid-2023, and would not be operational by mid-2025. ¶ 193. This is further supported by the amendments' incorporation of the production of FDCA into Origin 2's design.[25] As Defendant Bissell later admitted on August 9, 2023, once the Company decided to focus on the production of FDCA instead of PX, the Company needed to spend "thousands of hours" to turn a "new engineering assessment" and compile

---

[24] The AC's allegations that known delays to Origin 2 resulted in the amendments is not speculative, as they can be inferred from the Original Pepsi Agreement's provisions directly dealing with such knowledge and Origin's obligations to report such. This is further buttressed by new provisions in the amendments requiring Origin to provide Pepsi with more formalized updates on at least a quarterly basis moving forward with respect to Origin 2. ¶ 106. Accordingly, Defendants fail to offer an alternative explanation or even address the amendment's revised timeline for Origin 2. *See* Mot. at 30-31.

[25] Defendants cling to PX's general inclusion in the amendments. Mot. at 30-31. However, this is a red herring as the amendments demonstrate that FDCA, not PX, had become the actual priority for Origin 2 and no longer required the production of PX at the plant. *See* ¶ 105 (underscoring that it was Origin's "strategic plan to accelerate the production of FDCA and PEF" at Origin 2); ¶ 106 (noting the Company would provide Pepsi with pricing calculations and technical specifications for FDCA before or by the completion of the plant's FID,); *see also* Defs. Ex. 28 (ECF No. 69-30) at 4 ("…The obligations of the Parties under this Agreement with respect to the purchase and sale of the Bio-pX produced from intermediates manufactured at the New Plant, **if Bio-pX is so produced and made available to Buyer**…"(emphasis added).

37

a revised estimate on the plant's cost and schedule, which played a "meaningful" role in delaying the plant's timing. ¶ 111.

**B.    The Core Operations Doctrine Supports Scienter**

The AC's core operations allegations—that the completion of Origin 2 was vital to Origin's financial success and proof of large commercial production of its touted technology—further support scienter. ¶ 200. Under the core operations theory, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). PX/PET from Origin 2 was expected to be the backbone of Origin, supply most of Company's products for years, and carry the Company into profitability.[26] ¶¶ 42, 44-45, 60, 70. *See BioMarin*, 2022 WL 164299, at *14 (finding valrox "to be a significant and lucrative product" which "reinforced" an inference of scienter).

Given the importance of Origin 2 to Origin's commercial operation and bottom line, "it would be absurd to suggest that management was without knowledge" of Origin 2's failures in meeting its construction milestones and the plant's production issues, even absent other scienter allegations. *Reese v. Malone*, 747 F.3d 557, 577 (9th Cir.

---

[26] Compared to Origin 1, Origin's only other plant under development, Origin 2' production output was expected to be over sixteen times greater, equating to almost 6 times the revenue. ¶ 60. Origin 2 was also expected to generate $385M in profit, while Origin 1 would operate at a loss. *Id.*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

2014) (quoting *S. Ferry LP, No. 2*, 542 F.3d at 786). CW1 confirms that Individual Defendants closely monitored the status of Origin 2 by leading weekly and quarterly meetings in which Origin 2's development and product slate were discussed. ¶¶ 87, 89-91. Indeed, for two and a half years, Individual Defendants publicly provided extensive and regular updates on Origin 2's planning, construction, and product focus, and unlike the defendants in *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1109, 1112 (9th Cir. 2021) (Mot. at 32), Defendants admitted they were closely monitoring the plant's construction costs and timeline. ¶¶ 69,71-82, 113-140 (*e.g.*, "[w]e are of course continually reviewing construction costs and timeline…we were pleased to reaffirm our previously disclosed expected capital budget and production timelines for Origin 1 and Origin 2") (¶ 69). *See Quality Sys.*, 865 F.3d at 1145 (that defendants "themselves told investors they had real-time access to, and knowledge of, sales information" bolstered scienter). Defendants' knowledge of the core operations strengthens the AC's inference of scienter.[27]

### C. Viewing the AC's Allegations Holistically, Defendants' Purported Innocence Falls Flat

The guiding question for determining whether a plaintiff has alleged scienter is "whether all of the facts alleged, taken

---

[27] Defendants' reliance on *Anderson v. Peregrine Pharms., Inc.*, 2013 WL 4780059, at *12 (C.D. Cal. Aug. 23, 2013) (Mot. at 31-32) is inapposite, as the court rejected the core operations theory because it was impossible for defendants to have any knowledge of the drug's study errors and mislabeling as the study was a double-blind study conducted by outside investigators and the drug was labeled by a third-party.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Courts must consider "the totality of [the] circumstances" and "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2*, 542 F.3d at 784. Here, the AC's allegations, when viewed holistically, demonstrate Defendants knew they issued false or misleading statements to investors because:

- in late 2022, Origin was experiencing fouling issues "at every step" of the process of converting CMF to PX at a commercial scale, resulting in the Company being unable to finalize the chemistry for Origin 2 and causing delays to the plant's engineering development and completing FEL 2 (¶¶ 83-86);

- in December 2022, Defendants Bissell and Riley told Origin's employees in a meeting that due to the economics of scaling PX, Origin was forced to either produce less PX at the plant or pivot the plant's production to another product (¶ 87);

- in early 2023, Origin's R&D group started developing solutions to the chemical issues; however, this further delayed Origin 2's engineering designs and increased the plant's costs (¶ 88);

- in light of these problems, Defendants made a strategic shift in Origin's commercial strategy in February 2023 to focus on high-margin products, such as FDCA (¶ 158), and entered into a deal with Avantium on February 21, 2023 to produce FDCA at Origin 2; Avantium's CEO advised that Origin 2 would not be operational in two years but would take several years past the plant's timeline (¶¶ 93-98, 176-187);

- in March 2023, it was revealed during weekly meetings attended by Defendants Bissell and Riley that Origin 2 was being broken up into two phases, shifting to new products, including FDCA, and no longer producing PX, which further delayed FEL 2 for the plant (¶¶ 89-91, 173);

- once the Company decided to take Origin 2 in a new direction, the Company then needed to spend "thousands of hours" to turn a new engineering assessment and compile a revised estimate on the plant's cost and schedule, which played a "meaningful" role in delaying the plant's timing (¶¶ 154-157);

40

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

- on May 9, 2023, Defendants amended the Original Pepsi Offtake Agreement to reflect that Origin 2's construction would not begin by mid-2023, operations would not begin by June 30, 2025, and the plant's focus shifting to FDCA (¶¶ 99-108, 188-200); and

- ultimately, the shift from PX to FDCA had such a dramatic effect on Origin 2's timeline that FDCA will not be produced at the plant until 2028, a delay of almost three years (¶ 159).

These facts show that Defendants knew but "withheld important warning signs from the market." *BioMarin*, 2022 WL 164299, at *14; *see also Leventhal v. Chegg, Inc.*, 2024 WL 924484, at *8 (N.D. Cal. Mar. 4, 2024)("[t]he extensive communications between university officials and Chegg about rampant cheating on the platform combined with detailed former employee testimony, however, meet the high bar for pleading scienter at this stage"); *Scheller*, 2020 WL 5500422, at *9 (finding scienter in connection with statements regarding new customers given the importance of the corporate-defendant's sales pipeline, confidential witnesses attending meetings with individual defendants in which sales pipeline was discussed and inferring that problems with the pipeline were discussed at the meeting based on other allegations in the complaint, including the "hands-on" nature that the CEO-defendants approached the sales pipeline). At most, this presents a "a close question," which, at this stage, must be resolved in Plaintiff's favor. *Scheller*, 2020 WL 5500422, at *9.

Crucially, unlike the defendants in *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) (Mot. at 30), Defendants fail to rebut the AC's strong inference of scienter with any viable non-fraudulent inference. Defendants' plea of ignorance until August 2023 when FEL 2 for Origin 2 was completed by an outside engineering

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

firm is refuted by CW1 and Defendants' Class Period revisions to the Pepsi Agreement.[28] Mot. at 28-29. If Defendants were truly in the dark as to whether Origin 2 was encountering problems and needed a revised timeline, then the Company would have had no reason to revise its offtake agreement with Pepsi before FEL 2's completion. Instead, they revised the Pepsi Agreement in May 2023 to reflect delays that were already known to Defendants to Origin 2's timeline and the known loss of future PX/PET production. ¶¶ 99-108. Defendants' actions confirm that the much more plausible explanation is that they knew Origin experienced technical issues with scaling the production of PX, which repeatedly delayed the FEL 2 process for Origin 2 (¶¶ 86-88), Defendants concluded that scaling the production of PX was not economically viable (¶ 87), requiring Origin to abandon PX/PET and pivot Origin 2's focus to FDCA/PEF (¶¶ 89-98, 176-187), and push back the plant's construction timeline.[29] Instead of identifying any plausible and innocent explanation, Defendants only seek to "attack individual allegations in isolation," which "cannot overcome the overwhelming inference drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).

---

[28] Moreover, CW1 clearly described how Origin's employees were intimately involved in the FEL 2 process. ¶ 85.

[29] This is supported by CW1's allegations (¶¶ 83-91), the Company's shift in commercial strategy to high-margin products, such as FDCA (¶ 158), Origin's partnership with Avantium (¶¶ 176-187), and the Pepsi Offtake Agreement Amendments (¶¶ 188-199). Further, once the Company decided to pivot Origin 2's focus to FDCA, the Company then needed to spend "thousands of hours" to turn a new engineering assessment and compile a revised estimate on the plant's cost and schedule, which played a "meaningful" role in delaying the plant's timing. ¶ 111.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

**IV.   THE AC ADEQUATELY PLEADS LOSS CAUSATION**

Loss causation is the "causal connection between the material misrepresentation and the loss" incurred by the plaintiff. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). A complaint must give the defendant "notice" of this causal connection; in other words, "the complaint must allege that the defendant's share price fell significantly after the truth became known." *Metzler v. Corinthian*, 540 F.3d 1049, 1062 (9th Cir. 2008) (internal citation and quotation marks omitted). The misrepresentation need not be the "sole" reason for the decline as long as it is a "substantial cause," and the allegations, "if assumed true, are sufficient" to indicate a causal relationship between the company's "financial misstatements" and "the drop in [its] stock price." *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005), *abrogation on other grounds recognized by In re Genius Brands Int'l*, 97 F.4th 1171 (9th Cir. 2024). "At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," rather than other factors. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). The ultimate question is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

Plaintiff alleges that Defendants made materially false and misleading statements related to the timing and production of PX/PET at Origin 2. ¶¶ 113-148. Plaintiff further alleges that Origin's stock was artificially inflated during the Class Period because of Defendants' false and misleading statements. ¶ 209. On August 9, 2023,

43

Origin revealed the alleged fraud by informing the market that it was materially altering its stated plans for Origin 2, including significantly delaying the timeline for the construction, opening of a new Origin 2 plant with a new product slate, and changing from PX/PET (for which capacity was purportedly sold out) to FDCA/PEF. ¶¶ 110-12, 149-157, 212. The next day, in response to this news, Origin's stock fell 66.5%, to close at $1.45 per share. ¶¶ 160, 213. This decline was a direct result of Defendants' false and misleading statements being revealed to the market. ¶¶ 214, 160, 161. Analysts immediately devalued Origin's stock by downgrading it. ¶¶ 162-163. They stated that the delay and changes to Origin 2 "broke" the Company's "investment case" and highlighted that product demand "is irrelevant without access to production capacity before 2026." *Id.* Accordingly, the AC's allegations sufficiently plead loss causation. ¶¶ 149-163, 209-224.

Defendants try to confuse the theory of the case to make the AC's allegations seem unmanageable like in *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) and *Brady v. Delta Energy & Commc'ns, Inc.*, 2023 WL 2683203, at *9 (C.D. Cal. Jan. 25, 2023). Mot. at 32-33. But the AC plainly links the drop in Origin's stock price to the truth of the Company's revised plans for Origin 2 being disclosed to the market and provides Defendants with ample and specific notice of Plaintiff's loss causation theory. ¶¶ 110-112, 149-157, 212. The AC's misstatements all relate to a singular and cogent issue—the Company's plans for Origin 2—and when substantial changes to those plans were revealed to the market on August 9, 2023, Origin's stock dropped precipitously. Indeed, analyst commentary linking these disclosures to the subject of the misstatements confirms

44

their corrective nature and belie Defendants' arguments. *See Lloyd*, 811 F.3d at 1210-11; *see also*, *e.g.*, ¶ 162 (August 10, 2023 HSBC report downgrading Origin and stating that the new plans for Origin 2, including the delay, broke the investment case for the Company); ¶ 163 (August 11, 2023 Craig-Hallum report downgrading Origin in light of Origin 2's production focus shift and multiple-year delay describing it as a "major curveball," which may not be successful).

Defendants also attempt to incorrectly expand the subject matter of the AC's misstatements to oppose loss causation. *See* Mot. at 33-35. Specifically, Defendants wrongly cite to ¶¶ 113-118, 123, 125, 127-30, 134, 136-137, 139, 141-143, 145-147, and erroneously list several topics as misstatements (*e.g.,* updates on financing assessments, the location of Origin 2, the pride that management felt in Origin's teams and achievements, and the carbon footprint of its products), and inaccurately claim that the AC's alleged misstatements were made over a 6-month span).[30] *Id.* Defendants also recycle their falsity arguments and claim that losses were not caused by the fraud because they believe there were no false or misleading statements. *Id.* at 35-36. Defendants cite various risk factors, which themselves were false or misleading because they concealed the known technical issues

---

[30] The paragraphs cited by Defendants provide factual context and Defendants ignore the actual paragraphs in the AC that pinpoint the specific false and misleading misstatements made over the course of three and a half months (February 23, 2022 through June 8, 2023). *See* ¶¶ 121-122, 124, 126, 133, 135, 138, 140, 144, 148. While Defendants correctly identify one set of misstatements("[Origin] continues to make progress on front-end design, construction planning, and financing for Origin 2") (¶¶ 113, 133), they are implied affirmations of Origin 2's PX/PET construction milestones (*supra,* §II.C) which were later revealed to be false on August 9, 2023 (¶¶ 150-153).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

that caused the Company to abandon PX/PET and abandon the Origin 2 schedule. *Id.*

Finally, Defendants erroneously claim that the May 9, 2023 Pepsi Offtake Agreement Amendments disclosed to the market the allegedly concealed information that Origin 2's construction was delayed. *Id.* at 36. "This argument amounts to a truth-on-the-market defense", *Karinski v. Stamps.com, Inc.*, 2020 WL 6572660, at *7 (C.D. Cal. Nov. 9, 2020), and is typically inappropriate at the motion to dismiss stage as it involves a mixed question of law and fact that is a matter for trial. *See Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020); *see also Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *6 (N.D. Cal. July 29, 2022) ("[c]ourts regularly conclude that this defense is not available at the motion to dismiss stage…because, as the Supreme Court and Ninth Circuit have explained, the truth-on-the-market defense is a method of refuting an alleged misrepresentation's materiality.") (internal citation and quotation marks omitted).

Even if Defendants' argument were to be considered at this stage, it is belied by the Company's stock price rising 6.7% in the wake of the Pepsi amendments but then falling 66.5% following the August 9, 2023 Corrective Disclosure. ¶¶ 160, 221; *see In re Stec Inc. Sec. Litig.*, 2012 WL 6965372, at *12 (C.D. Cal. Mar. 7, 2012) (noting a similar flaw in this defense). Defendants also did not include or make readily available the Original Pepsi Offtake Agreement when it reported the amendments on May 10, 2023. ¶ 192. Moreover, even if an Origin investor was able to track down the original agreement, they would need to possess specialized legal skills to compare it to the

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

amendments, identify and understand the original agreement's triggering mechanisms, and understand the implications of the amendments. This is above and beyond what the Ninth Circuit has required. *See In re Genius Brands*, 97 F.4th at 1186 (rejecting defendant's argument that corrective disclosure's information was already public and that courts must consider "whether the pre-existing public information at issue…is readily available to the public, easily digestible in its native format, and understandable to a lay person…").

Accordingly, the AC sufficiently alleges loss causation in connection with the massive losses tied to the revelation that Defendants misled investors by issuing false and misleading statements.

## V.    THE AC STATES AN EXCHANGE ACT §20(a) CLAIM

The AC states a viable §10(b) claim under Rule 10b-5(b)[31] and establishes that Individual Defendants were control persons. ¶¶ 246-254. Since Defendants only challenge to Plaintiff's §20(a) claim is on the basis that Plaintiff failed to establish a §10(b) violation (Mot. at 38, n.6), the §20(a) claim should be sustained. *See In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017).

---

[31] Plaintiff agrees that a separate scheme liability analysis under Rules 10b-5(a)and (c) is unnecessary and would be duplicative of the Rule 10b-5(b) analysis for the false and misleading statements alleged in the AC. *See* Mot. at 36-37.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP

**CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[32]

Dated: May 30, 2024                Respectfully submitted,

*/s/ Marion C. Passmore, Esq.*

**BRAGAR EAGEL & SQUIRE P.C**
Marion C. Passmore (SBN #228474)
580 California Street, Suite 1200
San Francisco, CA 94104
(415) 568-2124 (phone)
(212) 486-0462 (fax)
passmore@bespc.com

*Liaison Counsel for Lead Plaintiff,*
*Lead Counsel, and the Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Michael S. Bigin
Stephanie M. Beige
Adam M. Federer
10 East 40th Street
New York, NY  10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bernstein@bernlieb.com
bigin@bernlieb.com
beige@bernlieb.com
afederer@bernlieb.com

*Lead Counsel for the Lead Plaintiff*
*and the Proposed Class*

---

[32] If the Court grants any part of the Motion, Plaintiff respectfully requests leave to amend. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

48
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
2:23-cv-01816-WBS-JDP