UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| In re ORIGIN MATERIALS, INC. SECURITIES LITIGATION | No. 2:23-cv-01816 WBS JDP |
| ALL ACTIONS CONSOLIDATED FROM:<br><br>ANTONIO F. SOTO, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>ORIGIN MATERIALS, INC., RICHARD J. RILEY, and JOHN BISSELL,<br><br>    Defendants. | MEMORANDUM AND ORDER RE: <u>MOTION TO DISMISS CORRECTED AMENDED COMPLAINT</u> |

----oo0oo----

Lead plaintiff Todd Frega brings this putative class action against defendants Origin Materials Inc., Richard Riley, and John Bissell, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a).

1

Defendants now move to dismiss.  (Docket No. 69.)

I.  Factual and Procedural Background[1]

Defendant Origin Materials ("Origin" or "the company") is a publicly traded company that purports to produce "sustainable materials" by converting plant-based matter such as wood residues into materials that can replace the petroleum-based plastics typically used in consumer products.  (Corrected Am. Compl. ("CAC") (Docket No. 61) ¶ 5.)  Defendants Bissell and Riley are the co-CEOs of Origin.  (Id. ¶ 14.)

Origin produces chloromethylfurfural ("CMF"), a "building block" chemical that can be converted into other products.  (Id. ¶ 6.)  As relevant here, CMF can be converted into (1) paraxylene ("PX"), a chemical used to produce a type of plastic called polyethylene terephthalate ("PET"); and (2) furandicarboxylic acid ("FDCA"), a chemical used to produce a different type of plastic called polyethylene furanoate ("PEF"). (Id.)  (The complaint frequently refers to PX and PET interchangeably or as one unit.  As such, the court will refer to the first product line as "PX/PET."  The court will refer to the second product line as "FDCA/PEF.")

In February 2021, Origin announced plans to build Origin 2, a manufacturing plant intended to focus on, inter alia, production of PX/PET, with construction to be completed by mid-2025.  (See id. ¶¶ 41-43, 60, 71-75.)

In November 2021, Origin retained an outside engineering firm to conduct the "front-end loading" process, a

---

[1] All facts recited in this Order are as alleged in the Corrected Amended Complaint unless otherwise noted.

1  multiphase development process involving "progressively refining
2  the project scope, definition, and feasibility, ultimately paving
3  the way for detailed engineering and construction."  (Id. ¶¶ 51,
4  59.)
5          Origin subsequently encountered chemical engineering
6  issues related to scaling up the production of PX/PET.  (See id.
7  ¶¶ 86-88.)  As a result, the plans for Origin 2 changed, with the
8  plant to instead focus on the production of FDCA/PEF and
9  construction to be delayed by several years.  (See id. ¶¶ 89,
10 110-12.)  On August 9, 2023, defendants publicly announced these
11 changes.  (See id. ¶¶ 150, 153.)  The company's share price
12 subsequently fell.  (See id. ¶ 160, 165.)
13 II.  Section 10(b)
14         Section 10(b) of the Securities Exchange Act of 1934
15 makes it unlawful for any person to "'use or employ, in
16 connection with the purchase or sale of any security registered
17 on a national securities exchange . . . any manipulative or
18 deceptive device or contrivance in contravention of such rules
19 and regulations as the [Securities and Exchange] Commission may
20 prescribe as necessary or appropriate in the public interest or
21 for the protection of investors.'"  In re Rigel Pharms., Inc.
22 Sec. Litig., 697 F.3d 869, 876 (9th Cir. 2012) (quoting 15 U.S.C.
23 § 78j(b)).  "One of those rules promulgated under the Act is
24 Securities and Exchange Commission Rule 10b-5," id., which makes
25 it unlawful to, inter alia, (a) "employ any device, scheme, or
26 artifice to defraud," (b) "make any untrue statement of a
27 material fact or to omit to state a material fact necessary in
28 order to make the statements made, in the light of the

circumstances under which they were made, not misleading," or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

"To survive a motion to dismiss under this regime, [the plaintiff] must plead: (1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Espy v. J2 Glob., Inc., 99 F.4th 527, 535 (9th Cir. 2024) (quotation marks omitted).

"At the pleading stage, a complaint alleging claims under section 10(b) and Rule 10b-5 must . . . satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act" ("PSLRA"). Rigel Pharms., 697 F.3d at 876.

Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Thus, Rule 9(b) requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." Rigel Pharms., 697 F.3d at 876.

"Under the PSLRA, 'the complaint shall [1] specify each

4

statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and [2], if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." In re Genius Brands Int'l, Inc. Sec. Litig., 97 F.4th 1171, 1180 (9th Cir. 2024) (quoting 15 U.S.C. § 78u-4(b)(1)(B)); see also Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 321 (2007) (same).  The PSLRA also requires that the complaint "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Rigel Pharms., 697 F.3d at 882 (quoting 15 U.S.C. § 78u-4(b)(2)).

III. Confidential Witness Allegations

In pleading the alleged violations, the complaint relies primarily upon statements attributed to a former Origin employee referred to as Confidential Witness 1 ("CW1").

To comply with the PSLRA, "[a] complaint relying on confidential witness statements must describe the confidential witnesses 'with sufficient particularity to establish their reliability and personal knowledge.'" Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 766-67 (9th Cir. 2023) (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 995 (9th Cir. 2009)). In determining whether the complaint has established the reliability and personal knowledge of a confidential witness, courts consider "the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the

5

1 sources, corroborating facts, and similar indicia of
2 reliability." Id. at 767.
3       According to the complaint, CW1 was a "technical
4 development engineer who was employed at Origin prior to and
5 throughout the Class Period" and "worked on developing the
6 technology for . . . converting CMF to PX for Origin 2."  (CAC ¶
7 85.)  CW1 was part of an engineering group that compiled
8 chemistry data and sent it to the Origin 1 plant for further
9 testing.  (Id.)  If the tests were successful, CW1 and his team
10 would send the data to the outside engineering firm working on
11 the "front-end loading" development process for Origin 2.  (Id.)
12       The allegations attributed to CW1 are summarized as
13 follows.  In "late 2022" and "early 2023," CW1 "learned from
14 attending biweekly meetings with Origin's R&D group" that there
15 were "unexpected chemical issues" (referred to as "fouling"
16 occurring "at every step" of the PX/PET production process),
17 leading to delays in the development process for Origin 2.  (Id.
18 ¶¶ 86, 88.)  In December 2022, CW1 attended a meeting at which
19 defendants Riley and Bissell provided updates on Origin 2,
20 including that the company was "considering" changing the plans
21 and construction schedule for Origin 2.  (See id. ¶ 87.)
22       "CW1 further reported that in March 2023, based on
23 emails with his direct manager and his attendance at weekly
24 meetings held by Defendants Riley and Bissell, CW1 learned that
25 Origin 2 was being broken up into two phases, was shifting to new
26 products, and would no longer produce [PX/PET]."  (Id. ¶ 89.)
27 "CW1 also learned from these weekly Friday meetings with
28 Defendants Riley and Bissell in March 2023, that [front-end

6

loading] was being delayed for Origin 2." (Id. ¶ 90.)

The allegations concerning what CW1 "learned" at the March 2023 "weekly meetings held by" Riley and Bissell are crucial to establishing both that the plans for Origin 2 had definitively changed months in advance of the August 2023 corrective disclosure, and that Riley and Bissell knew of those changes. In other words, the confidential witness statements are crucial to the complaint's pleading of both falsity and scienter.

However, the allegations concerning what CW1 "learned" at meetings attended by defendants are fatally vague, as they do not indicate "when this information was conveyed to [defendants], who conveyed it, or the substance of what was allegedly conveyed." See In re Ditech Commc'ns Corp. Sec. Litig., No. 05-cv-02406 JSW, 2007 WL 2990532, at *8 (N.D. Cal. Oct. 11, 2007) (allegations concerning what confidential witness "learned" during meetings were insufficient to support inference of scienter). The complaint also fails to allege with specificity what defendants' role was during these meetings and whether defendants had access to the same information that was communicated to CW1. When questioned several times at oral argument, counsel was unable to provide any further detail concerning what CW1 "learned" and how he learned it.

It is possible for example that CW1 believes he "learned" of the changed plans, merely through his own deductions based on such things as the body language of the meeting attendees. In that circumstance, CW1's belief that the plans had changed would not bear sufficient "indicia of reliability." See Glazer, 63 F.4th at 767; see also In re Downey Sec. Litig., No.

7

08-cv-3261 JFW RZX, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (a confidential witness statement is insufficient where it "lack[s] specificity" and is "based on hearsay, rumor, or speculation").

The lack of detail provided concerning the March 2023 meetings is particularly glaring given that the complaint provides greater detail concerning other meetings. For instance, the complaint states the following concerning a meeting that occurred in December of 2022:

> During this meeting, Defendants Riley and Bissell discussed the state of the Company, the research and development process at Origin 2, and provided an update on the plant -- such as how the plant would look. According to CW1, Defendants Riley and Bissell revealed that the Company was already considering scaling down the size of Origin 2, splitting the building of the plant into two phases, and shifting the focus of Origin 2 from PX to another product. Defendants Riley and Bissell further stated that the Company would either have to make less PX at the plant or pivot the production to another product due to the economics of PX. At the meeting, CW1 was instructed that the Company was far off from completing FEL 2 for Origin 2.

(CAC ¶ 87.) These detailed allegations concerning what defendants Riley and Bissell themselves said and what CW1 was "instructed" of at the December 2022 meeting stand in stark contrast to the threadbare assertion that "based on emails with his direct manager and his attendance at weekly meetings held by Defendants Riley and Bissell [in March 2023], CW1 learned that Origin 2" was changing course. (See id. ¶ 89.)

In evaluating the statements of a confidential witness, sufficient detail is all the more important, as both the court and the defendants lack a crucial piece of information -- the witness's identity -- traditionally used in weighing the credibility of the allegations. And under the PSLRA, it is not

8

sufficient for plaintiff to merely "set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate h[is] claim." In re Daou Sys., Inc., 411 F.3d 1006, 1015 (9th Cir. 2005) (cleaned up).

For the foregoing reasons, the court concludes that the statements attributed to CW1 -- which are foundational to plaintiff's allegations that defendants committed securities violations – fail to satisfy the PSLRA's particularity requirements.

IT IS THEREFORE ORDERED that defendants' motion to dismiss (Docket No. 69) be, and the same hereby is, GRANTED. Plaintiff has twenty days from the date of this Order to file an amended complaint, if he can do so consistent with this Order.

Dated: October 29, 2024

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE