IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

In re Origin Materials,
Inc. Securities Litigation
_____/

| | |
|---|---|
| All Actions Consolidated From: | Sacramento, California No. 2:23-cv-01816 |
| Antonio F. Soto, individually and on behalf of all others similarly situated, | Tue., Oct. 15, 2024 1:40 p.m. |
|     Plaintiffs, | |
| v. | |
| Origin Materials, Inc., Richard J. Riley, and John Bissell, | |
|     Defendants. | |
| _____/ | |

TRANSCRIPT OF HEARING

BEFORE THE HONORABLE WILLIAM B. SHUBB, SENIOR JUDGE

---oOo---

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | Bernstein Liebhard, LLP 10 East 40th Street New York, NY  10016 By:  Michael Stephen Bigin Pro Hac Vice |
| For the Defendants: | Freshfields US, LLP 855 Main Street Redwood City, CA  94063 By: Boris Feldman Doru Gavril Attorneys at Law |
| Official Court Reporter: | Kimberly M. Bennett, CSR, RPR, RMR, CRR 501 I Street Sacramento, CA 95814 |

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription

(Court called to order, 1:40 p.m.)

THE CLERK:  Item 3, civil 23-1816, Antonio F. Soto versus Origin Materials, Incorporated, et al.

Counsel, your appearances.

Your appearances, please.

MR. BIGIN:  Good afternoon, Your Honor.  Michael Bigin from Bernstein Liebhard on behalf of the plaintiff and the class.

MR. FELDMAN:  May it please the Court, Boris Feldman of the Freshfields law firm on behalf of defendant.  I'm here with my partner, Doru Gavril.

THE COURT:  All right.  Is your partner going to address the Court on this motion or just you?

MR. FELDMAN:  Only if I faint.

THE COURT:  Stay vertical.

All right.  What would you like to say in support of the motion?

MR. FELDMAN:  Your Honor, I never use demonstrative evidence, but I want to begin by talking about two things: What it is that Origin does and what the case is about, and then the three legal defects.

What they do is they hope to convert the manufacture of bottles like this, plastic bottles that are made with petroleum and have a climate impact, they want to convert that to being carbon negative not carbon neutral.

They take materials like wood pellets or pulp waste and they convert those into the building blocks of a variety of plastics, and in doing that they benefit the climate in two ways. One, they don't use petroleum in creating the product. And two, they take carbon out of the materials that they're using. As you can imagine, if they can pull this off, the scale could have very great consequences. They were founded by two UC Davis engineering students in 2008 and the company is based nearby, West Sacramento.

There is something of an alphabet soup in the briefs --

THE COURT: Oh, there is. And I don't need to get into all of that --

MR. FELDMAN: Exactly.

THE COURT: -- in order to decide this motion.

The question is whether the pleadings are sufficient in order to get past a motion to dismiss on a 10(b)(5) motion.

MR. FELDMAN: Yes, Your Honor. And there are three respects in which they're not sufficient. The first is failure to plead falsity under the standards required by the Reform Act. The second is inadequate scienter allegations. And the third is loss causation.

As to the first, falsity, there are two defects with the entire theory of the complaint. The first one my friends have sort of acknowledged, and that's the safe harbor. The opposition brief at page 2 says, quote, There is no dispute

that this case deals with forward-looking statements and opinions, closed quote.

When Congress rewrote the federal securities laws in 1995, arguably the most important part of the statute was to create a safe harbor for forward-looking statements so that companies would feel able to make predictions about the future without knowing -- without fearing that they would be sued if those statements changed or failed to come true. The statute does that in two ways, each of which is an independent basis for dismissing a claim under the safe harbor.

One basis is adequate warnings. If the warnings are adequate then it doesn't matter what the intent was. In the alternative, if the warnings weren't adequate the complaint still has to plead, in compelling terms, actual knowledge of falsity. As Your Honor knows, in a civil case that's a pretty high standard. Not -- not negligent, not reckless, actual knowledge --

THE COURT: But isn't intent something different than a prediction of what's going to happen in the future?

MR. FELDMAN: It is. That's going to be the second point, Your Honor, is the scienter standard for fraudulent intent. But the safe harbor provides that a forward-looking statement is not actionable. It's not the scienter element, it's the falsity element. The safe harbor can knock it out.

The first part of the safe harbor is the warnings. I'm not

going to bore you with lengthy recitations, I'll just read you one.  And this is Exhibit 4 attached to the declaration at 56.  It goes to the heart of the issue.  This was prior to the announcement in August of last year of a change in plans because of cost:

Quote, The construction and commission of any new project is dependent on a number of contingencies, some of which are beyond Origin's control.  There is a risk that significant unanticipated costs or delays could arise due to, among other things -- and then there is a long laundry list.  I'm happy to read it.  After that list it says, Should these or other significant unanticipated costs arise, this could have a material adverse impact on Origin's business, financial performance, and operations.  No assurance can be given that construction will be completed on time or at all, or as to whether Origin will have sufficient funds available to complete construction, closed quote.

That is precisely the kind of detailed warning that the safe harbor protects --

THE COURT:  But that's not -- is that before the Court on a motion to dismiss?

MR. FELDMAN:  Hundred percent.  It's what the company said in its SEC filing.  The laws -- it's rare in the Ninth Circuit to say the law is consistent on anything.  On this issue, whether the SEC filings that contain the risk disclosure

are before the Court, the answer is a hundred percent they are.

So as to that one, that triggers the protection of the safe harbor --

THE COURT:  Well, I'm wondering, because there was a lot of other discussion in the briefs.  And if you -- if you take it at face value, you have something like your client's expressing the opinion -- not the opinion -- the plan to do something different than they had previously represented.  Now, is that something that's covered by the safe harbor?

MR. FELDMAN:  Yes.  Absolutely, Your Honor.  When a company -- let's say that you start a company and you're going to build a bridge over the American River.  And at the time you do it you say, things may change, I may not get environmental approvals, you list all the factors, and then later something happens to make you no longer able to build that bridge or to change the plans.

THE COURT:  Right.

MR. FELDMAN:  You can't sue for securities fraud over that.  That was the whole point of the safe harbor.

So for a substantial period, the --

THE COURT:  So if I had a discussion with somebody and I said, look, I don't want to tell the shareholders this, but we're not going to build that bridge, we're going to take this money and we're going to do something else with it, is that covered by the safe harbor?

MR. FELDMAN:  I hate to go to that example because you won't like the answer.  But if the risk disclosures were adequate, yes, it would be covered by the safe harbor.

The Reform Act was the only statute that President Clinton vetoed as to which the veto was overwritten.  And when he vetoed it, he said in his message to Congress, the safe harbor creates a license to lie.  And he gave, in effect, the example that Your Honor just gave and Congress overwrote it.

Now that's not remotely our situation.  In our situation, the company disclosed repeatedly, we're going to get our external cost analysis from an independent entity -- it's one of the alphabets, FEL 2 -- we're going to get that in August. And when they got it in August they realized they couldn't afford to build the new plant in Louisiana the way they had expected to so they were going to build it in two phases -- phases.

That is nothing like saying at the time you're telling the investors what your plans are that you have no interest in doing it, you're going to use the money for something else. It's not remotely that.  The --

THE COURT:  It would still be covered by the language of the provision that you have in --

MR. FELDMAN:  It would -- no.  The language of the provision that Congress enacted over President Clinton's veto --

THE COURT:  No.  In this case.  You called the safe harbor the -- the -- there is a word I'm thinking of --

Go ahead.

MR. FELDMAN:  So in terms of falsity, which is the first branch, Your Honor, I told the Court that there are two separate bases for rejecting the statements.

The second is, the entire theory of the complaint, and in a way embodied in Your Honor's question, is that there is a duty to update.  That once you've said we're going to build a bridge over the river, or we're going to build another plant, every time something happens on that you have to go out and update the market on it.  Again, this is a fairly settled area under Ninth Circuit law -- it's always dangerous to say that -- but there is no duty to provide realtime updates under Section 10 -- Rule 10(b)(5).

So in the Yahoo case, which is 611 F.App'x 387, the lower Court had said, quote, Neither the Supreme Court nor the Ninth Circuit has affirmatively recognized the duty to update disclosures.

There is an important securities law decision out of the Ninth Circuit called Ronconi against Larkin.  It was in 2001.  We cited it in the brief.  Quote, Much of any business consists of having problems and dealing with them.

The reason I held up the bottle wasn't just to be a smart aleck.  Switching this from creating it out of petroleum to

making it from scrap wood, it's kind of -- it's a thing that people get Nobel Prizes for.  So of course there're going to be setbacks along the way.  And what the law says is, every time there is a setback, or you have an internal engineering meeting, or there is another challenge, you don't have to put out a realtime release.

The most important decision for the Court on this is called Weston Family Partnership against Twitter, 29 F.4th 611.  The Ninth Circuit held that just because there was a software bug in Twitter -- this is the pre-Musk Twitter, it's legacy Twitter -- those bugs did not require Twitter to come out and update and revise statements they had previously said that program improvements were, quote, ongoing, and, quote, on track, and the court held a company does not have an obligation to offer an instantaneous update of every internal development.

THE COURT:  Was that on a motion for summary judgment or a motion to dismiss?

MR. FELDMAN:  Motion to dismiss, Your Honor.  These are all motion to dismiss cases.

And the Ninth Circuit actually in another case said why.  This is Shurkin against Golden State Vintners --

THE COURT:  Let me ask another question.

Did they give leave to amend in that case?

MR. FELDMAN:  I don't know that.

Typically -- typically, if it's gotten to the Ninth Circuit

it would have gone past the final amendment.  But I don't know that and I will check, Your Honor.

THE COURT:  I just wondered because it requires a lot of detailed pleadings in order to get to that stage that you've summarized the court got to in that case.

MR. FELDMAN:  Exactly.  But the concept, Your Honor -- the concept makes a lot of sense, especially when you have a revolutionary new technology that's never been done before, you have completed the construction --

THE COURT:  See, but you don't know that in a motion to dismiss.

MR. FELDMAN:  You do, actually.

THE COURT:  No, you don't.  You'd need a different judge before I can make that kind of determination on a motion to dismiss.

MR. FELDMAN:  I -- I don't want a different judge. I'm happy to have this judge.

THE COURT:  No.  But I could never reach that kind of a conclusion from reading a complaint.

MR. FELDMAN:  And, fortunately, you don't need to because Congress gave you a safe harbor that protects -- remember, this is not one of those cases that I'm sure Your Honor has had where there is an accounting problem and the company has to restate its financials, or there is a product recall because it's killing people, or a DOJ indictment comes

down.

This is about future plans to build a new factory. And the company gave adequate warnings about what might change that. The company said, during the class period, we're going to tell you in August, when we get the consultant's report, what impact that has. And they did. They got the consultant's report in July, and in August, at their next quarterly release, they said because of the cost increases here, we're going to break this into two phases and we're going to focus on a different product initially.

So that -- that doesn't require you to make any factual findings at all.

THE COURT: Yes, it does. It really does. Because from looking at the plaintiffs' perspective, they're saying that your client actually changed their plans. Didn't just have a problem, actually changed their plans and didn't tell anybody about it. So I have to -- I have to make a determination, did they really change their plans or did they just encounter some difficulties and they were trying to work it out.

MR. FELDMAN: You don't have to make a factual decision on that. It's just a pleading issue. And the standards for pleading in a Reform Act case are different than in any other case Your Honor decides.

THE COURT: Oh, yeah. But that's why I said the

complaint is going to have to be a lot longer than the complaint is in this case.

I suppose I would give them leave to amend. But what they would have to say in order to get around the argument you're making would -- would involve a lot of facts.

MR. FELDMAN: I have -- I have no objection if Your Honor wants to allow them to amend. That seems like a fair outcome to me.

But, remember, it's not -- it's not the facts that I say they need to allege, it's what the Ninth Circuit and Congress said they need to allege. Because there were so many securities cases where something would happen at a company, the stock price would go down, and they would automatically get sued, so Congress said we're going to adopt a unique pleading regime. Doesn't apply to any other civil cases in federal court, and we want the judges to use it to weed out these cases.

In other securities cases --

THE COURT: That's true. I have other problems with their complaint that you haven't even mentioned yet.

MR. FELDMAN: I'm still in bucket one, Your Honor.

THE COURT: I know. But what you're talking about now is different than the problems that I have, which I really do see as fair to have enough facts to get past the motion.

But you're talking about -- anyway --

MR. FELDMAN:  Well, if I've misspoken, please give me a second chance.

THE COURT:  No.  You haven't misspoke.

MR. FELDMAN:  I don't mean -- for the Court to grant this motion, you don't need to conclude anything about the nature of the technology.  I was just trying to give you --

THE COURT:  That's what you've been talking about so far.  That's what's been concerning me.

MR. FELDMAN:  Then I went on the wrong path and I apologize for that.

But the safe harbor does not require any extraneous knowledge by you.  It doesn't require anything outside the pleadings, including the SEC filings.  And if you look at those, there is no way around those for the safe harbor.

The second bucket is scienter.  And as Your Honor knows, the long scienter is very demanding not just in this circuit, in every circuit.  And so you can always begin -- you've had a lot of cases, and I bet you've often asked, Where is the money?  What was the motive here?  Why would somebody do this?

This was a six-month class period during which the company did not hold a stock offering, it had gone public years before, it didn't do --

THE COURT:  But how do I know all these facts from reading the complaint?

MR. FELDMAN:  Well, you know --

THE COURT:  Every time you start to make a point, I start to think, where is that in the complaint?  And I don't know that all these facts that you're talking about are in the complaint.

MR. FELDMAN:  But it's the absence of it in the complaint that dooms the case.

THE COURT:  I --

MR. FELDMAN:  I'm not making up the requirements --

THE COURT:  No.  But the facts you just mentioned --

MR. FELDMAN:  Yes.  The facts I just mentioned. If -- well, first of all, my friends are not going to lie and say, yeah, they did a -- they did a secondary public offering during the class period, but they would have alleged that if between the beginning of 2023 and August the company that quote/unquote inflated stock prices had raised $200 million to build Origin 2 in Louisiana.  That would be the centerpiece of the complaint.  If the share -- if the individual defendants, the founders, had dumped their interest in the company, that would be in the complaint.

So it's the absence -- their burden is to create a compelling inference of scienter.  And the way they try to -- they don't have motive.  They have one lower level former employee that they would like to talk to you about in camera -- although that's squarely forbidden by the Ninth Circuit -- and as to him it never says he had a one-on-one conversation with

any of the defendants.

THE COURT:  That's right.  That's where we're getting into my concerns.

MR. FELDMAN:  I like this part way better.

THE COURT:  Because they appeal to me better?

MR. FELDMAN:  Yes.  That's the only thing that matters.  It doesn't matter if I like it, it matters if you like it.

THE COURT:  All right.

MR. FELDMAN:  So I'm hoping that one of the paragraphs -- and, by the way, the Ninth Circuit law on this -- and it really is the seminal decision on CWs -- you know where they got that because you've had a lot of criminal cases where the indictment will say --

THE COURT:  CI in criminal cases.

MR. FELDMAN:  Exactly.  Makes them not look like a big deal.

THE COURT:  Matter of fact, in my notes I mistakenly put CI in it.  I want to be in the right jargon with this type of case.

MR. FELDMAN:  Exactly.  So the seminal Ninth Circuit decision from 2008 is Zucco Partners against Digimarc.

And if you compare two parts of the complaint, I think it says a lot.  At the beginning of these securities cases they do a summary to sort of whet the appetite and tell you what the

case is really about.  So paragraph 14 of the complaint says, quote, Then in March 2023, defendants Riley and Bissell disclosed internally that Origin 2 was being broken up into two phases and that the plant was shifting to new products and no longer producing PX, which would further delay FEL 2 for the plan, closed quote.

But the wonders of modern control F, you can sort of search for other places in the complaint.  So that took me to paragraph 89 where they have the CW allegation that they purport to summarize in the opening.  And here is what it actually says:

CW1 further reported that in March 2023, based on e-mails with his direct manager and his attendance at weekly meetings held by defendants Riley and Bissell, CW1 learned that Origin 2 was being broken up into two phases, was shifting to new products, and would no longer produce PX.

I think it -- they used to refer to Philadelphia bond lawyers.  Do they do that anymore?  This was drafted very carefully, and I think Your Honor noticed that.  It's very different --

THE COURT:  I did.  And I'm going to ask Mr. Bigin when we get to him to address this, because there are other parts of the complaint where he says somebody said something, here he just says somebody learned something.  And to me that is a lawyer speaking, not somebody out of court.

MR. FELDMAN:  I'm going to stop on that and just make my third point and then shut up.

Loss causation, which seems very complicated as the announcement at the end, does it repudiate what they said before.  You only need to compare the May earnings release the company put out, right smack dab in the middle of the class period.  Origin said to investors, quote, The company expects to provide an update on new product offerings and construction plans for the Origin 2 plant in August 2023, closed quote.  And that's exactly what they did.

So to have loss causation, it -- I'm going to keep going back to your hypothetical that I hated, Your Honor.

So if it -- if a company originally said, We're going to build a bridge over the river.  And then later they announced, Actually, we never were working on plans for a bridge over the river, we're going to build a tunnel under the river instead --

THE COURT:  Or we're going to put the money in the bank and do something else.

MR. FELDMAN:  We'll keep the money.  We'll be opportunistic.  Then you can say that disclosure repudiated what they said before.

But here, what the company told investors is, We're going to get the outside cost estimate from the consultant -- that's FEL 2 -- and when we get that we're going to update you on product offerings and construction plans.

That's all I've got, Your Honor.  Thank you.

THE COURT:  All right.  I may come back to you now, but I want to get to Mr. Bigin.

I want you to address the point that we just talked about.  But if you get past that hurdle, I'd like you to address the other arguments that Mr. Feldman is making about why your complaint is deficient for other reasons.

MR. BIGIN:  Absolutely.  Thank you, Your Honor.

Actually, that was the place I was going to start my presentation was with CW1.  That's really what this whole case is about.  We didn't get to it in the defendants' presentation until about 10, 15 minutes in as we're talking about Congressional standards for forward-looking statements.

CW1's information cuts through all that.  Cuts through defendants' cases that have dismissed other cases -- other similar cases -- securities cases because CW1 allowed us to plead actual knowledge of defendants that they were stopping this PX project by March.

THE COURT:  But you admit that they originally did plan this project to build Origin -- was it Origin 2?

MR. BIGIN:  Origin 2.

THE COURT:  Origin 2.  They originally did plan to build Origin 2?

MR. BIGIN:  They did.  And before the class period, when this company first went public, they were going to build

three Origins.

THE COURT:  Okay.

MR. BIGIN:  Origin 1, 2, and 3.

THE COURT:  So at some point in time they changed that plan, and your position is they didn't inform the shareholders about that change in plans and you're going to use CW No. 1 to prove that.

MR. BIGIN:  So, yes, Your Honor.  The change in plan is what they're making at C -- at Origin 2.  So it was very important to investors Origin 2 makes what's called PX/PET.  You'll see it throughout -- throughout our brief.  That is the bio-PET.  That is what you're seeing plastic, hopefully, being made one day out of from a plant.

THE COURT:  Okay.

MR. BIGIN:  They couldn't do that.

THE COURT:  Okay.  So how much time passes between the time you contend that they changed their plans and the time they informed the shareholders about that change in plans?

MR. BIGIN:  About five months, Your Honor.

THE COURT:  About five months.

Now that's different from the hypothetical that I raised with counsel about never having planned to build a bridge, and putting it in the bank, and so forth.

MR. BIGIN:  Yep.

THE COURT:  Now, one of his points, apart from CW No.

1, is that you haven't proved scienter, you haven't alleged scienter, you haven't said what their motive was.  Why would they -- why would they benefit from a five-month delay?  They weren't offering the stock, he says.  Didn't allege they were offering new stock.

MR. BIGIN:  That's correct, Your Honor.  Motive is not required, number one, so putting -- assigning too much importance to motive --

THE COURT:  Well, nothing is required, but then you've got this heightened pleading standard --

MR. BIGIN:  It --

THE COURT:  -- which requires about as much as you can give us.

MR. BIGIN:  So let me -- let me fill this in.

What we're seeing here from CW1 is that things in Origin have fallen apart.  Prior to the class period even there were technical problems trying to produce this PX/PET.  They had gone out to investors and told them that they pre-sold most of the capacity for Origin 2 for PX/PET.  That was going to be the one thing that made this company finally profitable in its life.  It's been losing money forever.  So it's extremely important that this goes forward with the PX/PET.

The problem was -- and we're seeing this from CW1's information, his interactions with the R&D group, as well as his weekly meetings with the co-CEOs who set the vision for the

company, that he is finding that the product is not scaling. They're not able to commercial -- make this on a commercial scale, PX/PET, it's fallen.  From what I understand, there is different chemical problems with that.  You're not able to use it for bottles anymore because -- because of various -- various issues of the chemistry.

So the reason why -- I'll get to your point.  I can see -- the reason why we think this is happening over the five months is because they don't want to disclose the truth that they have no plan.  If they disclose in March that they have no plan to develop anything at Origin 2, because the plan was PX/PET, and maybe they were exploring adding some other things, the stock would have dropped to zero.

So what they did is a play for time.  You keep --

THE COURT:  Do you allege that they had no plan for Origin No. 2 or that they were trying to figure out a new plan?

MR. BIGIN:  I just -- just making sure our allegations -- they were trying to figure out a new plan in that, you know, we have allegation at the end of the class period, which we accept, that there is a -- what they call this black box that the engineering group is spending thousands and thousands of hours on trying to figure out what to make.  They don't know what to make.

So what they need to do is to keep the stock high so that they can announce good news and bad news.  It's a common thing

that companies do in order to --

THE COURT:  It's common.  But they're going to announce some good news and bad news.  What's that going to do?  If they're not selling new stock, what's the difference?

MR. BIGIN:  So what's it doing?  It's keeping that stock afloat.  So that there is a 66 percent loss versus a 90 percent loss.

I mean, this company, you know -- this is -- this idea of insider trading being a requirement or prerequisite just -- just isn't -- isn't fair and isn't smart.

You know, we have defendants here, they're not going to -- this isn't a company that's trying to cash out and make a quick buck.  This is a long game.  They're trying to -- you know, I agree, they are trying to do something good for the environment, but when things are falling apart they're also making bad decisions and hiding the facts from investors, which is causing those -- that stock price to stay high and for our investors to purchase that stock without having a true value of the company.

THE COURT:  Let me shift to something that's been bothering me from the beginning and I want you to get there.

It's the way you allege that CW No. 1 learned something, and you didn't say how he learned it, you didn't say where he heard it, you didn't say who said it.  But when you're talking about the December 2022 meetings, you do talk about what Riley

and Bissell said.  But when you start to talk about the March 2023 conversations, it's CW No. 1 learned this, learned that.

And to me -- what I said to counsel here is that sounds like a lawyer talking, trying to get around what he actually heard and reach your own conclusions that he learned this, and we don't know how he learned it.  You know, he may have just divined it from something else he heard.

MR. BIGIN:  Yes.  So, Your Honor, fair -- fair point.  Maybe a poor choice of words there.  I think what we were trying to --

THE COURT:  It may be the smartest choice that you could make.  That's so we don't know until you tell us what it is he actually heard.  What Bissell actually said.  What Riley actually said.  When?  Where?  Who was present?

MR. BIGIN:  So, Your Honor, we're telling you -- telling the Court that, you know, he's learning it at these meetings.  We're telling you that he's learned by March of 2023.  We're -- they're on Fridays.  I mean, they're discussing the --

THE COURT:  You're still hedging.  You are just telling me what he learned.

You know, I learn a lot of things that aren't true.  I make some mistakes, I make some inferences about what people say, and then I tell you, Well, that's what I learned.  You know, I

learned that this certain political candidate never really intended to reduce my taxes.  And I want to know how I learned that.  And did he say that or did she say that?  That's -- that's -- that's a big difference.

MR. BIGIN:  So, Your Honor, for pleading purposes, though, you know, he's learning these facts at meetings with the co-CEOs of the company.

The co-CEOs of the company are setting the vision for Origin, setting the vision for Origin 2, what that plan is.  For them, this is --

THE COURT:  For pleading purposes in other cases you may be right, but for pleading under the PSLRA, I don't think that's the law.

MR. BIGIN:  Well -- so, you know, what we need to do is we need to be able -- to be able to plead facts that show that it's certainly plausible that they would know that there was -- that they -- that they were not creating the PX --

THE COURT:  I don't know that that plausible standard applies.  I'll hear from both of you on this, but I'm understanding that it's a much more heightened pleading standard.

MR. BIGIN:  So it's absolutely a heightened pleading standard.  It's absolutely that.  You know, we're subject to 8(a), 9(b), PSLRA.

Once you get past the PS -- the PSLRA piece is to put forth

particularized facts showing why that statement is false and misleading. And the particularized facts that show why this statement is false and misleading are coming from CW1, who's communicating what he's learned through his experience at these meetings with the CEOs.

I mean, this is a different case from many of the cases defendants cite and that you'll look at because very rare that plaintiff has a confidential source, a whistleblower, who comes forward and gives information where he's at the meeting with the CEOs, the decision-makers of the company, and then is communicating that -- excuse me -- communicating that in an allegation saying that they knew that they were not going forward with a type of plant, PX/PET, in March.

THE COURT: What somebody knew is always a state of mind. When we instruct the jury we say, we can never open up somebody's head and look inside what they're thinking.

He says they knew something. Okay. We never can put on evidence of what somebody knew, but we can put on evidence of what they said, and what they did, from which you can infer what they knew. You don't have that here. You just have him saying, I learned that they knew.

MR. BIGIN: So with the information that we have, that he learned it, how he learned it, by going through these meetings, getting from e-mails, being in the right place at the right time, knowing this information --

THE COURT: No. The fact that you're not saying any more right now tells me there is no more to say.

What did Bissell say, what did Riley say, exactly that led him to this conclusion that they knew that?

MR. BIGIN: So the problem I'm having, Your Honor, is that the word says "learned." So, you know, I can't change it to "he said" or change my allegation --

THE COURT: If I give you leave to amend you probably -- you're going to tell me you could or you couldn't?

MR. BIGIN: I'd have to talk to the witness again. But the witness -- we have -- I -- we'd have to investigate. I'm pretty -- I can't make that statement right now, Your Honor.

THE COURT: All right.

MR. BIGIN: But with regard to what we have here, it's adequate. And that's -- that's the real point, is that what we've alleged here is adequate to get over the pleading stage.

You know, certainly this is the core business of this company. The idea that a -- that the CW would have learned this at these meetings and it wasn't coming from the CEOs is what the case law would say is absurd. That's the only place that this information would be coming from. The people who were in charge and are able to stop the plant's design are the named defendants in this case.

THE COURT:  I don't know even what CW No. 1's motive is.  Isn't that relevant to determine whether -- whether what they say is credible?

MR. BIGIN:  You know, I'm always surprised by these CW1s coming forward.  His motive is to tell the truth and to shine a light on this conduct.

You know, CW1 is --

THE COURT:  Maybe his motive is something different.  We don't know what his motive is.  Maybe he's a -- maybe he's sour grapes.  Maybe he's got some -- maybe he was fired.  I don't know.  We don't anything about his motive.

MR. BIGIN:  Your Honor -- that's what discovery is for, Your Honor.

THE COURT:  Not in these cases.  That's the point.  I'm learning something from this case because I don't think since 1995 I've had one of these cases.  And so this is a learning experience for me too.  But I don't -- I'm not sure what you're saying is correct under the PSLRA.

MR. BIGIN:  I -- I hope to persuade you differently, Your Honor.

It's some of the most compelling allegations that you'll see from a securities case like this, where there is access to the CEOs, who is reporting that they're not going to make a plant that they've been telling investors that they are going to make throughout the entire time --

THE COURT: But they -- he never says they said that. He never says they told him they weren't going to build that plant. He never says it. He says he learned it.

MR. BIGIN: Well if he learned it from e-mails -- if he learned it from the meetings, I mean, it's being discussed --

THE COURT: Why doesn't he tell us? If he learned it from e-mails, don't you think you have the obligation to tell us that?

MR. BIGIN: Your Honor, if he's learning it at attendance at a weekly meeting, that's a verbal communication against the --

THE COURT: I don't know if it's a verbal communication. He may say, you know, I looked in his eyes and I could tell that he wasn't being honest with me. And I learned from looking in his eyes just exactly what he intended to do.

MR. BIGIN: Your Honor, I -- I think that our -- the allegation is stronger than that.

THE COURT: It's not much.

MR. BIGIN: You know, to the extent -- you have to look at what this -- what the CW is also telling you about what he does.

He is at the chokepoint between construction development and the chemical process failing. So he understands what is

going on and is communicating that with the CEO defendants.  So the CEO defendants are the ones -- that's how he's learning they're not going forward --

THE COURT:  Can I ask you a question?

MR. BIGIN:  Yes, Your Honor.

THE COURT:  At what point in time do the CWs' identities become disclosed.

MR. BIGIN:  Almost immediately after the case is sustained.

THE COURT:  So why -- why do we have to keep it a secret until I rule on a motion to dismiss and then suddenly expose it?  Why don't we just expose their identities and let people know that when I rule on the motion?

MR. BIGIN:  Your Honor, there are cases where the names can be put into the complaint.  Often CWs don't want to be disclosed in the earlier version of the complaint.  If a complaint is dismissed they're -- they're tagged with that for the rest of their career as something.

So, you know, we try to protect their -- their identity.  I think there used to be a lot of law surrounding trying to protect the identity as work product, but plaintiffs have since realized defendants have the right to discovery and they'll show up on the initial disclosure.  So it comes up very quick in the discovery process, and they'll have a deposition, and they'll talk to the CW and find out if we're telling you the

correct allegations.

THE COURT:  It seems to me you could get situations where the judge says, If I'd known that about the CW, I would not have denied the motion to dismiss.  I can see that happening.

MR. BIGIN:  You know, I -- I haven't really seen that, Your Honor.  I think that most courts recognize that CWs are taking a pretty big risk by coming out there and putting forth this information.  You know, their future jobs and everything else are kind of in peril as a result of giving some information, saying that their bosses and CEOs are actually not telling the truth to investors throughout the class period.

THE COURT:  If it was somebody that had already been fired they're not at any risk.

MR. BIGIN:  They may not have been already fired.

THE COURT:  No, they may not.  Probably haven't been.  But I'm saying there are things that we might learn about a CW if we knew who they were that would have a bearing on whether the court gives enough credibility to their allegations to sustain the case.

MR. BIGIN:  I mean, Your Honor knows also just because someone is fired or leaves on some sort of not so great terms doesn't mean they're not telling the truth.

THE COURT:  No.

MR. BIGIN:  And that's, you know, what CW1 is doing

here, is -- is telling us the truth, that they had stopped the design of the PX/PET plant in March, and they were telling investors the exact opposite throughout the class period.

THE COURT:  But, you know, I've -- I've been around enough to know that the minds of entrepreneurs don't necessarily work that way.  They never give up.  They have a plan.  And it morphs more times than you can imagine.  And they just keep going.  They never give up.  So it's very -- more likely in any situation that nobody ever really gives up a plan.

Take the Oakland As moving to Las Vegas.  You know, they still may stay in Oakland.

MR. BIGIN:  They're going to come here, right?  Sacramento.

THE COURT:  They're coming here now but I haven't bought any tickets.

But that -- that's the way business is done.  And the more successful the business, the more likely it is that they never really give up.

MR. BIGIN:  I agree.

THE COURT:  So you're telling me that there -- that CW No. 1 learned that they gave up the plan to build Origin No. 2 when that sort of runs contra to the way entrepreneurs usually operate.

MR. BIGIN:  So, if I can, Your Honor.  So I agree

that's how entrepreneurs usually operate, but when the chemical process doesn't work, you can't make it.  And that's -- that's --

THE COURT:  They never give up on that either.  They think --

MR. BIGIN:  They did.  They never made PX/PET ever again.  That's done.  That whole dream is over.  The only people who are doing it are over in the Netherlands commercially.  Otherwise they --

THE COURT:  That's what you say.  That's what you say.  But when you get down to taking their depositions I think you'll find out, if we could do it, we'd still like to do it.

MR. BIGIN:  Everyone would like to do it.  I mean, they have a small hobby plant up in Canada that's trying to do it.  But they --

THE COURT:  That's right.

MR. BIGIN:  But they --

THE COURT:  That's right.

MR. BIGIN:  But they're not able to do it commercially and that is exactly the problem.

THE COURT:  And if you asked them they'd say, If we could do it commercially, we'd like to do it, and we're still thinking about a way we can do it commercially.  I just predict.  I don't know.

MR. BIGIN:  Yeah.  But in this case we have facts

showing that, one, they stopped; two, five months later they tell the market that they absolutely stopped, they're not going to make it anymore, it's over.

THE COURT:  Right.

MR. BIGIN:  They also tell the market that it was a black box.  We didn't know what we were making and we're going to send it off to engineers to try to figure this thing out because we are really up the creek.

And that's what's going on here, is that we have CW1's allegations showing us that they were up the creek.  They couldn't -- could not go forward with the plan early in the class period, and that they continue in May and June to keep on telling investors that they're going to begin construction in mid-2023, which is only months away, that they're going to become commercial in 2025, you know, that this product is going to become their flagship product, when the product is not going to be made there ever.  Also that they're progressing on a PX/PET plant which they are not making.

THE COURT:  What about the --

MR. BIGIN:  I think they're making biofuel.

THE COURT:  I think the word I was trying to think of when I had a mental block was disclaimer.

Mr. Feldman read a disclaimer clause to me and he said that that basically overcomes any argument that you have.  Would you like to address that?

MR. BIGIN:  Sure, Your Honor.

So safe harbor is a thing.  It exists as far as they're able to bring that defense.  There are exceptions to the safe harbor and our case falls within that exception.  The -- there are three elements that need to be met for the exceptions to apply.

One is that there has to be material information, which this certainly is, this is their core business.

Two, there has to be actual knowledge on part of the defendants that they're making a false statement.  We believe that the CW1 allegations show that.

And then three is that they have to have a -- it's called meaningful -- quote, meaningful cautionary language.

THE COURT:  Okay.  But say all of those are met, meaningful cautionary language, was that not meaningful?

MR. BIGIN:  It was not meaningful.  So that's not meaningful cautionary language.  That's boilerplate language that talks about risks that might materialize in the future that have already materialized.

THE COURT:  It does sound like vague boilerplate language.  Do you have any case law that says that's not meaningful?

MR. BIGIN:  Actually, I think that the -- I'll have to get back to Your Honor.

I was going to cite the -- you know, the Twitter case is an

interesting case in that it's -- it's kind of an interesting counter case for us.  Defendants end up winning that case on meaningful cautionary language.  So it's good for the Court to see as to how meaningful cautionary language can be applied, but there it was found not to be meaningful because -- it was found to be meaningful only because they had a specific warning saying basically that -- for this case purposes that we are suffering technical issues right now.

THE COURT:  They don't have that here?

MR. BIGIN:  They don't have that here.

THE COURT:  So you don't have any cases on the other side?  You said you'd leave it to me.  You don't have any cases on your side that say the language that was -- that we have here was not meaningful?

MR. BIGIN:  So I -- I think the Glazer case is -- talks about that as well.  I'm just trying to look through my brief.

THE COURT:  It does seem to somebody not specially schooled in this area that that's an easy way out of liability, to have these disclaimers be so broad that you can't overcome them.

MR. BIGIN:  Yeah.  So it -- it -- so from our point of view -- right? -- that can be the case; however, the -- if they're too broad, they don't work.  And that's -- and that's where the law is kind of balanced out on this is that --

THE COURT:  Tell me your best case there.

MR. BIGIN:  I think the Glazer case is the best case on that.

THE COURT:  What does it say?

MR. BIGIN:  It talks about materialization of risk, and whether or not -- if a risk has not -- if you're talking about a risk and claim that has not materialized yet, when in fact it has materialized, then that's a -- not a meaningful cautionary language.

THE COURT:  But that's not what we have here.

MR. BIGIN:  So --

THE COURT:  That language was used before the risk materialized.

MR. BIGIN:  So to -- consistent with the allegation of CW1, the risk materialized at least in March.  So in -- by March the -- is when they had technical issues -- actually, in December at that all-hands meeting that Your Honor cited before -- at the all-hands meeting they were having issues developing the plant as solely a PX/PET plant, and were dealing with technical issues, and were splitting the case in two --

THE COURT:  But where was this cautionary language?

MR. BIGIN:  The cautionary language that exists, that's -- defendants tagged that to their -- generally their SEC filings.

THE COURT:  Okay.  But that existed before the change

in circumstances.

MR. BIGIN:  Correct.  Correct.  So it's consistent language -- they just put out the same type of language that says, if we experience this, you can have problems.  And the problem is, when the -- when the facts change, and if you don't change that cautionary language, it's not meaningful.  And here it was not meaningful.

THE COURT:  They didn't change it for five months.

MR. BIGIN:  Correct.  And they should have, because they came out with more risk language in May, and that risk language in May, they knew that they weren't creating a PX/PET plant, that they weren't moving forward with FEL 2 as scheduled, they were not progressing as scheduled.  All those things they knew and they still put out the same --

THE COURT:  Not progressing as scheduled, though, that's -- that doesn't make it false, they're just not making as good of progress as they thought they would.  They're not abandoning the plant.

MR. BIGIN:  Yeah, except for the progress that they're making is supposed to be on the one PX/PET plant.  So if you're making progress on something that you're not doing anymore, that's completely false.

THE COURT:  Well, okay.  I see what you're saying.

Anything else you want to say?

I do want to go back to Mr. Feldman here before I finish.

MR. BIGIN:  Yeah.  So I also want to make -- I guess I'll make a point -- we've covered falsity.  Scienter, we talked a little bit about the insider trading.  Just remind the Court that, you know, a smoking gun is not required.  We think CW -- CW1 is sufficient.  We also think that there are other outside facts that kind of corroborate what CW1 was saying, such as the Pepsi off-take agreement which was changed to -- that comports with what CW1 is saying that they're changing their schedule and not able to develop it on time.

THE COURT:  So I want to back up.

CW1, we know he's a real person.  I assume you have an obligation to verify the facts that you allege in your compliant under Rule 11, right?

MR. BIGIN:  Indeed.

THE COURT:  Okay.  But it didn't go so far in your case to ask him how he learned what he says he learned, because I've asked you many times and you haven't been more specific.

MR. BIGIN:  When -- when the CW1 tells you that they learned it at the meetings, we assumed they're learning at the meetings from -- with the CEO, who are the ones who can actually dictate what the plant looks like.  He can't learn that information from anybody else.  If a lower level employee tells him, hey, we're not making the PX/PET --

THE COURT:  It's not so much where you learned it from it's what you mean by learned.  How -- how you learned

something.

You know, I learned that two and two are five, I just learned it from a bad teacher, but that doesn't make two and two five.

MR. BIGIN:  Sure.  But, you know, that was your -- that was your belief from your teacher.  So, you know, if the CEO --

THE COURT:  If I told you I learned two and two is five from Charlie Manson, you probably wouldn't believe it.

MR. BIGIN:  I would say, Your Honor, we should go to discovery and depose Mr. Manson.

So, you know, there is issues here with regards to scienter that we think that also show that they -- that they knew that they were making false and misleading statements at the time.

And core businesses is also very important here.  I mean, you know, this is a case in which this is what the company is about.  This is where their profitability is coming from.

The idea that the co-CEOs don't know they're changing the plant to something else from PX/PET or have no idea what they're doing, putting it into a black box, it just further supports that why are they putting out these statements to investors saying that they're on schedule, on track, that they're going to be constructing in a matter of months -- three or four months -- you know, mid-2023, when you're talking March 2023, it's very close.  Why are they putting those

statements out there to investors?  Why aren't they pulling that?  That shouldn't be out there because it's false.

I guess the other thing I'll talk about is just loss causation.  We were a little surprised by the loss causation argument here.

This case is clean -- one of the cleaner loss causation cases we'll read.  It's basically one set of facts.  They're not making a plant, they announce that they're not going to make that plant, the stock drops 66 percent, analysts come out and complain that the company is not being straight with them, throwing them a major curve ball, and then they tell them to stop purchasing the stock.  I mean, this was -- this was a big deal.  This is a quintessential loss causation type fact scenario.

THE COURT:  Do you have an expert if you go to trial --

MR. BIGIN:  Absolutely.  Yes.

THE COURT:  -- that will testify as to causation?

MR. BIGIN:  Yes.  Yes.

THE COURT:  All right.

MR. BIGIN:  So I think with that, Your Honor, if you have any other questions, I'm happy to address them.

THE COURT:  Thank you.

Mr. Feldman.

MR. FELDMAN:  You've been so patient, Your Honor.  If

you can tolerate three more points, I'll do it.  But I'm happy to shut up if you'd rather.

THE COURT:  Let's hear them.

MR. FELDMAN:  You know, sometimes when a good advocate gets in a flow their enthusiasm obscures the underlying reality.

So when counsel talks about a black box, and the company just set it all off into a black box to figure it out, no.  There is a description in the filings in the complaint about the FEL 2 black box process on cost.

FEL 2 was an outside group that was hired to come up with a cost estimate for building the new plant.  They gave that to the company in July.  The company had disclosed to investors in May, we're getting this in the next quarter and will disclose it in August.  And when they looked at the cost estimate they said, We need to break the plant into two phases and we're going to shift production from this product into that.

So this black box notion, as if somehow they gave it up to somebody, not true.

Second, Your Honor has correctly honed in on the most important, the "learned" paragraphs of the complaint, which is, as you have read to us, paragraphs 86 through around 89.  And when you get the transcript and you look at what my friend just told you, you will see --

THE COURT:  I'm not going to order a transcript of

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

this.

MR. FELDMAN:  I'm ordering it and I'm going to give it to the Court pro bono publico.

When he says -- you keep pushing him on learned, and he says but he learned it in March in the meetings, but that's not what the complaint says.

Paragraph 89, which is the fulcrum of this lawsuit, says, quote, CW1 further reported that in March 2023, based on e-mails with his direct manager and his attendance at weekly meetings held by defendants Riley and Bissell, CW1 learned that Origin 2 was being broken up into two phases, was shifting to new products, and would no longer produce PX.

THE COURT:  But when you get the transcript I think you're going to see that he also speculated that he may have learned it from e-mails too.  He mentioned e-mails.

MR. FELDMAN:  But at another point he kept referring to the regular meetings he had.  He referred to one in December, where he said even in December at the meetings Riley and Bissell told him --

THE COURT:  But my point is you're going to -- I'm not sure you're going to benefit from a transcript because he did mention e-mails.

But whether you learned it from an e-mail or from a conversation, what did you learn and how did you learn it?  Who said it?  What made you come to the conclusion?  He can't

answer those questions.  He's going to have to go back and talk to this person to find out what their answers to those questions are.

MR. FELDMAN:  Exactly.

I have nothing else to add, Your Honor, unless -- I'm sorry.  I have one more.  Please, forgive me.

Earlier, when I read you the risk factor that he now says is just boilerplate, it shows up everywhere, I -- I served my client poorly because in a desire to abbreviate it I said, and dot, dot, dot.  Now I want to fill in the dots.

This is Exhibit 4 at page 56.  I'm going to read the whole paragraph.  And then I'll shut up:

The construction and commission of any new project is dependent on a number of contingencies, some of which are beyond Origin's control.  There is a risk that significant unanticipated costs or delays could arise due to, among other things, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, unforeseen technical issues, or increases in plant and equipment costs, insufficiency of water supply and other utility infrastructure or inadequate contractual arrangements.  Should these or other significant unanticipated costs arise, this could have a material adverse impact on Origin's business, financial performance, and operations.  No assurance can be given that construction will be completed on

time or at all, or as to whether Origin will have sufficient funds available to complete construction, closed quote.

That is --

THE COURT:  I think you read the last part of that earlier.  I'd have to see what the cases really do have to say about the sufficiency of that type of a disclaimer because it just -- it doesn't -- it doesn't seem like that would be sufficient.

You could just put at the bottom of every e-mail that you send out.  It's sort of like one of these things, I accept, and it's one of the 20 dozen paragraphs you accept when you agree to do something.

MR. FELDMAN:  There was actually -- so PSLR is Private Securities Litigation Reform Act of 1995.  There was a conference report that is the definitive document accompanying it, pre-override of President Clinton's veto --

THE COURT:  That's what you talked about earlier.

MR. FELDMAN:  And the conference report says that the risk factors in the safe harbor can be meaningful even if you don't identify the particular risk that later eventuates.  It's the gestalt.  It's the package.  But here they identify the exact factor.  The cost for the plant was such that they had to break it into two phases and shift the product mix.

So without any interest in CW1, the disclosures themselves are dispositive here.

Thank you, Your Honor.

THE COURT:  Thank you.  I'm not sure I'll get to this right away.  If I get to it right away, it will come out in the next couple of days.  If not, it will take at least a couple of weeks for me to get you the decision on this.

MR. FELDMAN:  Thank you, Your Honor.

MR. BIGIN:  Thank you, Your Honor.

(Proceedings adjourned, 2:39 p.m.)

---oOo---

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Kimberly M. Bennett
KIMBERLY M. BENNETT
CSR No. 8953, RPR, CRR, RMR