BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
CARL HUDSON, State Bar No. 317201
carl.hudson@freshfields.com
REBECCA LOCKERT, State Bar No. 348810
rebecca.lockert@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants Origin
Materials, Inc., Richard J. Riley, and
John Bissell*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| In re ORIGIN MATERIALS, INC. SECURITIES LITIGATION | Case No.: 2:23-cv-01816-WBS-JDP |
|---|---|
| _____ | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates To | |
| ALL ACTIONS CONSOLIDATED FROM: | |
| Antonio F. Soto, individually and on behalf of all others similarly situated, | Date:        February 18, 2025 |
| Plaintiff, | Time:        1:30 p.m. |
| v. | Location:    Courtroom 5 – 14th Floor |
| Origin Materials, Inc., Richard J. Riley, and John Bissell, | Judge:       Hon. William B. Shubb |
| Defendants. | |

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

## TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION...................................... 1

INTRODUCTION.................................................... 1

I. Origin's Mission to Create Carbon-Negative Plastic Alternatives.................................................. 3

II. Origin Prepares for and Launches Commercial Production at Origin 1.................................................... 3

III. Meanwhile, Origin Continues Planning for Origin 2 Construction, Design, and Product Slate........................ 4

IV. Outside Engineering Firm Completes FEL 2 and Origin Adjusts Its Plans in Response................................. 5

V. This Court Grants Defendants' Motion to Dismiss, and Plaintiff Rewrites CW1 Allegations............................ 6

ARGUMENT....................................................... 7

I. PLAINTIFF FAILS TO ADD ANY PARTICULARIZED FACTUAL ALLEGATIONS OF SCIENTER...................................... 7

A. Plaintiff Does Not Cure CW1's Inadequate Allegations...... 8

B. Even Taking CW1's Allegations As True, Plaintiff Fails to Establish Scienter..................................... 14

C. Plaintiff Does Not Amend Any Remaining Scienter Allegations.............................................. 16

II. NONE OF THE CHALLENGED STATEMENTS ARE FALSE............... 19

A. Origin Truthfully Told Investors That It Was Making Progress and Would Provide an August 2023 Update........... 19

1. Plaintiff's Revised CW1 Allegations Do Not Plead Any False Statement About Construction Design or Progress..... 20

2. The Challenged Statements About Progress Are Not Actionable Under the Federal Securities Laws.............. 25

a) No Liability for Statements About Progress.......... 26

b) No Duty to Update Investors on Progress or Delays... 27

c) Statements About Progress and Forecasts of Construction Schedules Are Opinions................... 29

d) Each of the Challenged Progress Statements Are Forward-Looking Statements Protected by the PSLRA's Safe Harbor........................................ 31

B. Origin Truthfully Told Investors That It Was Both Developing PX/PET and Other New Products for Origin 2....... 37

1. Plaintiff Cannot Plead Falsity for Any Statement About PX/PET................................................. 37

2. As a Matter of Law, Statements About PX/PET Are Not Actionable.............................................. 40

a) Statements About "Flagship" Products Are Nonactionable Opinions................................ 40

-i-

b) Statements About Future Product Slate Are Forward-Looking Statements............................. 41

III. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION WITH PARTICULARITY.................................................. 42

A. Generic, Inconsistent Price Impact Allegations Do Not Show Loss Causation....................................... 43

B. Loss Causation Allegations Require Corrective Disclosures, and Plaintiff Pleads None..................... 45

1. The Purported "Corrective Disclosures" Did Not "Correct" Anything....................................... 45

2. The "Corrective Disclosures" Did Not Reveal New Information............................................. 46

**CONCLUSION**........................................................ **48**

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

**TABLE OF AUTHORITIES**

**Cases**                                                                          **Page**

*Anderson v. Peregrine Pharm., Inc.*,
   2014 WL 2444373 (C.D. Cal. May 1, 2014),
   *aff'd*, 654 Fed. Appx. 281 (9th Cir. 2016)..................... 14

*Anderson v. Peregrine Pharms., Inc.*,
   2013 WL 4780059 (C.D. Cal. Aug. 23, 2013).................. 18

*Applestein v. Medivation, Inc.*,
   861 F. Supp. 2d 1030 (N.D. Cal. 2012),
   *aff'd*, 561 Fed. Appx. 598 (9th Cir. 2014)..................... 9

*Bonnano v. Cellular Biomedicine Grp., Inc.*,
   2016 WL 4585753 (N.D. Cal. Sept. 2, 2016)................ 45, 46

*Brady v. Delta Energy & Commc'ns, Inc.*,
   2023 WL 2683203 (C.D. Cal. Jan. 25, 2023)................... 44

*Browning v. Amyris, Inc.*,
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)............... *passim*

*Chang v. Accelerate Diagnostics, Inc.*,
   2016 WL 3640023 (D. Ariz. Jan. 28, 2016)..................... 40

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.
   Align Tech., Inc.*,
   65 F. Supp. 3d 840 (N.D. Cal. 2014),
   *aff'd*, 856 F.3d 605 (9th Cir. 2017).......................... 30

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.
   Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017)......................... 7, 29, 41

*City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*,
   2024 WL 235183 (N.D. Cal. Jan. 22, 2024)..................... 7

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)................................. 40

*In re Credit Suisse First Boston Corp. Analyst Reps. Sec. Litig.*,
   431 F.3d 36 (1st Cir. 2005)................................. 30

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010)......................... 31, 33, 37

*Dhaliwal v. Singh*,
   2013 WL 4460266 (E.D. Cal. Aug. 16, 2013)............... 19, 21

-iii-

**Page**

*In re Downey Sec. Litig.*,
   2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ..................... 10

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................ 44

*In re ECOtality, Inc. Sec. Litig.*,
   2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) .................. 26

*Ellusionist Cash Balance Plan & Tr. v. Spiegel Acct. Corp.*,
   2024 WL 4294645 (N.D. Cal. Sept. 24, 2024) .................. 26

*In re FoxHollow Techs., Inc., Sec. Litig.*,
   2008 WL 2220600 (N.D. Cal. May 27, 2008),
   *aff'd*, 359 F. App'x 802 (9th Cir. 2009) ................. 22, 39

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   594 U.S. 113 (2021) ........................................ 43

*Golub v. Gigamon, Inc.*,
   372 F. Supp. 3d 1033 (N.D. Cal. 2019),
   *aff'd*, 847 F. App'x 368 (9th Cir. 2021) .................... 29

*Graybill v. Wells Fargo Bank, N.A.*,
   953 F. Supp. 2d 1091 (N.D. Cal. 2013) ...................... 16

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) .............................. 46

*Hering v. Rite Aid Corp.*,
   331 F. Supp. 3d 412 (M.D. Pa. 2018) ........................ 30

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ............................. 36

*In re Intel Corp. Sec. Litig.*,
   2023 WL 2767779 (N.D. Cal. Mar. 31, 2023),
   *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024) ............. 32

*In re Intel Corp. Sec. Litig.*,
   2024 WL 1693340 (9th Cir. Apr. 19, 2024) ................... 27

*In re Intrexon Corp. Sec. Litig.*,
   2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ................... 46

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021) ........................... 42, 43

DEFS' MOTION TO DISMISS  SAC
CASE NO. 2:23-cv-01816-WBS-JDP

**Page**

*Johnson v. Costco Wholesale Corp.,*
   2019 WL 6327580 (W.D. Wash. Nov. 26, 2019)................... 11

*Karth v. Keryx Biopharmaceuticals, Inc.,*
   6 F.4th 123 (1st Cir. 2021)................................ 35

*Kovtun v. VIVUS, Inc.,*
   2012 WL 4477647 (N.D. Cal. Sept. 27, 2012),
   *aff'd sub nom. Ingram v. VIVUS, Inc.,* 591 F. App'x 592
   (9th Cir. 2015)........................................... 32

*In re Leapfrog Enter., Inc. Sec. Litig.,*
   237 F. Supp. 3d 943 (N.D. Cal. 2017)...................... 15

*Lopes v. Fitbit, Inc.,*
   2020 WL 1465932 (N.D. Cal. Mar. 23, 2020),
   *aff'd,* 848 F. App'x 278 (9th Cir. 2021).................. 47

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.,*
   39 F.4th 1092 (9th Cir. 2022)............................. 27

*Markette v. XOMA Corp.,*
   2017 WL 4310759 (N.D. Cal. Sept. 28, 2017)................ 40

*In re Mellanox Techs. Ltd. Sec. Litig.,*
   2014 WL 12650991 (N.D. Cal. Mar. 31, 2014)............. 30, 37

*Murphy v. Precision Castparts Corp.,*
   2021 WL 2080016 (D. Or. May 24, 2021),
   *aff'd,* 2022 WL 2800825 (9th Cir. 2022)................... 26

*MVP Asset Mgmt. (USA) LLC v. Vestbirk,*
   2013 WL 1726359, at *7 (E.D. Cal. Mar. 22, 2013).......... 48

*Nguyen v. Endologix, Inc.,*
   2018 WL 10321880 (C.D. Cal. Sept. 6, 2018)................ 26

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda,*
   *Cal.,* 730 F.3d 1111 (9th Cir. 2013)...................... 47

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,*
   774 F.3d 598 (9th Cir. 2014).............................. 42

*Oracle Partners, L.P. v. Concentric Analgesics, Inc.,*
   2021 WL 2322351 (N.D. Cal. June 7, 2021).................. 43

**Page**

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*,
    2023 WL 4161355 (D. Ariz. June 23, 2023)................. 44, 45

*Pirani v. Netflix, Inc.*,
    710 F. Supp. 3d 756 (N.D. Cal. 2024)........................ 25

*Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
    2024 WL 4251896 (N.D. Cal. Sept. 17, 2024).................. 29

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)............................... 18

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021)............................... 18

*Rasidescu v. Midland Credit Mgmt., Inc.*,
    435 F. Supp. 2d 1090 (S.D. Cal. 2006)........................ 9

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012).................... 14, 19, 24, 28

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018)...................... 32

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)............................... 21

*Scheller v. Nutanix, Inc.*,
    450 F. Supp. 3d 1024 (N.D. Cal. 2020)...................... 10

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020)...................... 16

*Sgarlata v. PayPal Holdings, Inc.*,
    409 F. Supp. 3d 846 (N.D. Cal. 2019),
    *aff'd*, 831 F. App'x 366 (9th Cir. 2020)............. 10, 13, 17

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017)...................... 11

*Shurkin v. Golden State Vintners, Inc.*,
    2005 WL 1926620 (N.D. Cal. Aug. 10, 2005).................. 29

*Shurkin v. Golden State Vintners, Inc.*,
    303 F. App'x 431 (9th Cir. 2008)........................... 28

-vi-

**Page**

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
  2022 WL 22609807 (S.D. Cal. Apr. 11, 2022),
  *aff'd*, 97 F.4th 634 (9th Cir. 2024)........................... 15

*Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*,
  2018 WL 6787349 (C.D. Cal. Dec. 13, 2018).................... 33

*Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*,
  2023 WL 3549506 (C.D. Cal. May 9, 2023)....................... 27

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob.
  Holdings Inc.*,
  2022 WL 989240 (W.D. Tenn. Mar. 31, 2022),
  *aff'd*, 83 F.4th 514 (6th Cir. 2023).......................... 41

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).......................................... 7

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019)......................... 12

*Waswick v. Torrid Holdings, Inc.*,
  2023 WL 9197563 (C.D. Cal. Dec. 1, 2023)..................... 36

*Welgus v. Trinet Grp., Inc.*,
  765 Fed. Appx. 239 (9th Cir. 2019).......................... 40

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022)................................. 27

*Wilson v. Merrill Lynch & Co., Inc.*,
  671 F.3d 120 (2d Cir. 2011)................................. 36

*In re Wireless Facilities, Inc. Sec. Litig.*,
  2007 WL 9667131 (S.D. Cal. May 7, 2007)...................... 15

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021)........................... 26, 29

*Wozniak v. Align Tech., Inc.*,
  2011 WL 2269418 (N.D. Cal. June 8, 2011).................... 10

*In re Wrap Techs., Inc. Sec. Litig.*,
  2021 U.S. Dist. LEXIS 250595 (C.D. Cal. Nov. 15, 2021)....... 28

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2008)............................. *passim*

-vii-

**Page**

**Statutes**

15 U.S.C. § 78u-5(c)(1)......................................... 31

15 U.S.C. §§ 78u-5(i)(1)(B)..................................... 31

15 U.S.C. §§ 78u-5(i)(1)(D)..................................... 31

**Other Authorities**

H.R. Rep. No. 104-369 (1995) (Conf. Rep.)....................... 32

-viii-

**TABLE OF ABBREVIATIONS**[1]

| Abbreviation | Meaning |
|---|---|
| ¶, Amended Complaint, Complaint, or SAC | Plaintiff's Second Amended Complaint for Violations of the Federal Securities Laws, filed November 18, 2024 (ECF No. 85) |
| CMF | Chloromethylfurfural |
| Defendants | Defendants Origin Materials, Inc., Richard J. Riley, and John Bissel |
| Ex. | Exhibit attached to Declaration of Carl Hudson in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint |
| FAC | Plaintiff's Corrected Amended Complaint for Violations of the Federal Securities Laws, filed March 1, 2024 (ECF No. 61) |
| FDCA | Furandicarboxylic acid |
| FEL | Front-end loading |
| Mot. | Defendants' Notice of Motion and Motion to Dismiss Plaintiff's Corrected Amended Complaint for Violations of the Federal Securities Laws, filed April 15, 2024 (ECF No. 69) |
| Mot. Order | Memorandum and Order re: Motion to Dismiss Corrected Amended Complaint, filed October, 29, 2024 (ECF No. 82) |
| Origin or the Company | Origin Materials, Inc. |
| PEF | Polyethylene furanoate |
| PET | Polyethylene terephthalate |
| Plaintiff | Lead Plaintiff Todd Frega |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| R&D | Research and development |

[1] Herein, emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that at the time and place noted above, Defendants will and do move to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(6), 8(a), and 9(b).

**INTRODUCTION**

Plaintiff changed little in the Second Amended Complaint. The theory of the case is the same flawed understanding of the federal securities laws. The factual predicate remains the same collection of disparate events, glued together with conjecture. The one substantive change was made in response to the Court's rightful skepticism about the account Plaintiff attributes to CW1. In now-paragraph 91 of the Amended Complaint, Plaintiff's counsel changed "based on emails with his direct manager and his attendance at weekly meetings held by Defendants Riley and Bissell, CW1 learned that Origin 2 was being broken up into two phases" to "[d]uring the March 3, 2023 meeting, CW1 heard Mr. Bissell discuss how Origin 2 would now be broken up into two phases." *See* Ex. 1. This does not cure the deficiencies identified by the Court for multiple reasons.

**No scienter**. First, the tweak does not bear the indicia of reliability required to credit CW allegations. The phrasing of the allegation is curious. CW1 heard Mr. Bissell, but was Mr. Bissell even at the meeting? Or was he elsewhere? How could the CEO of the Company have decided on such a momentous change without the Board of Directors—which only considered and decided the issue in its July 2023 meeting, four months later? How could the CEO reach this decision without knowing the FEL 2 process results for Origin 2? Most important of all, if Mr. Bissell was so dedicated to

-1-

committing securities fraud that he would engage in the alleged conduct over a period of years, why would he suddenly expose his own fraud to the entire company? What happened to the emails from CW1's boss that were previously alleged to have informed him of Mr. Bissell's intentions? Set aside that these allegations are not particularized, as required by the PSLRA, they lack even the basic indicia of plausibility. The Court should not credit Plaintiff's shape-shifting narrative of CW1's recollections without holding a hearing and listening to CW1 itself.

**No falsity.** Second, even assuming that every word Plaintiff's counsel now attributes to CW1 is true—a heroic assumption—those allegations fail as a matter of law to state a claim under the federal securities laws. The events described do not contradict any of Defendants' public statements. To the extent that Plaintiff argues that Defendants needed to disclose blow-by-blow their thought processes, analyses, and contingency plans, there is simply no such duty under the federal securities laws. In addition, the statements Plaintiff challenges are expressions of future intent or subjective opinion statements—each protected by federal securities law. So even if Plaintiff's additional factual pleading was true, it would not avail him. A plaintiff may plead as much factual detail as possible, and yet it cannot change the reality that those facts fail to state a claim as a matter of law.

**No loss causation.** Third, tellingly, the market did not react to any of the alleged disclosures with the sort of recognition usually reserved for fraud. No market analyst echoed Plaintiff's suppositions of nefarious conduct. There has been no SEC investigation, no restatement of financials. Plaintiff is alone in

-2-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

suspecting wrongdoing and seems to be taking significant liberties with the pleadings in order to survive the pleadings stage.

Usually amended complaints get better. This one did not, because its legal theory is flawed—regardless of the factual specificity. It should be dismissed with prejudice.

**BACKGROUND**

The facts concerning Origin's founding and operations were discussed at length in the previous motion. Mot. at 3-7. Defendants focus on the facts related to Plaintiff's amendments below.

## I. Origin's Mission to Create Carbon-Negative Plastic Alternatives

Origin is a West Sacramento-based industrial materials company that is pioneering production of "carbon-negative" alternatives to traditional petroleum-based plastic materials. Ex. 2 at 6. Only a little chemistry is needed to understand Plaintiff's SAC and Defendants' motion to dismiss it. Origin takes biomass (like wood chips and rice hulls) and converts it into chloromethylfurfural ("CMF"). Ex. 3 at 14. CMF is a chemical foundation: It can be converted into paraxylene ("PX"), which then converts into polyethylene terephthalate ("PET"), or into furandicarboxylic acid ("FDCA"), which then converts into polyethylene furanoate ("PEF"). Ex. 4 at 174, Ex. 5 at 7-10.[2] Both products have significant potential markets, but PEF has superior recyclability, structural characteristics, is more degradable, and has higher margins. Ex. 7 at 1.

## II. Origin Prepares for and Launches Commercial Production at Origin 1

Leading up to and throughout 2023, Origin focused on two

_____

[2] Origin also produces hydrothermal carbon ("HTC"), which converts to "carbon black," a key input to tires and other mechanical rubber goods. Ex. 6 at 5-6.

-3-

plants: Origin 1, its first commercial scale facility in Ontario, Canada; and Origin 2, a second facility to be constructed in Louisiana. Origin 1's primary purpose was to "[p]roduce CMF and HTC at commercial volumes," which could then be converted into PX/PET and other products. Ex. 8 at 16. Once online, the plant would have capacity for "approximately 50 million pounds of biomass input annually." Ex. 9 at 8. Origin 1 quickly began production after coming online on June 26, 2023, Ex. 10 at 1, setting the stage for products like Origin's all-PET bottle caps, Ex. 11 at 1, and strategic partnerships for the development of "100% bio-based PET and polyesters." *See* Ex. 12 at 1.

**III. Meanwhile, Origin Continues Planning for Origin 2 Construction, Design, and Product Slate**

Alongside bringing commercial production online at Origin 1, the Company moved forward with planning, design, and construction of Origin 2. That process, called "front-end loading" ("FEL"), is "multi-phased" and involves "progressively refining the project scope, definition, and feasibility, ultimately paving the way for detailed engineering and construction." ¶ 51. By late 2022, Origin 2 had progressed to the "FEL 2" stage, during which an outside engineering firm "dives deeper into defining the project scope and technical specifications," and "defin[es] the project schedule with a more realistic timeline[]." ¶ 55.

Throughout FEL 2, Origin gave frequent investor updates about construction progress and Origin 2's slate of potential products. The Company disclosed repeatedly that it was "ma[king] progress developing new products and applications which may be incorporated into the design of the plant, such as FDCA [and] PEF," in addition to PX/PET. ¶¶ 115, 117, 119, 129, 131. Mr. Riley explained these

-4-

opportunities to investors, disclosing that the Company would shift its focus "from PET towards higher-margins products . . . including FDCA and PEF for Origin 2 and beyond." ¶ 117. Origin also told investors that "[c]onstruction" for Origin 2 was "expected to start by mid-2023," and that "the plant [wa]s expected to be operational mid-2025." ¶¶ 127, 141. Origin repeated these disclosures throughout the proposed Class Period. ¶¶ 115, 119-20, 129-30, 132. But, as Mr. Bissell noted, Origin would not have full visibility into the feasibility of its proposed construction schedule and product slate until it exited the "black box" of FEL 2. ¶ 159. As such, Origin repeatedly told investors that it "expect[ed] to provide an update on new product offerings and construction plans" for Origin 2 in August 2023. ¶¶ 115-19, 129-31.

**IV. Outside Engineering Firm Completes FEL 2 and Origin Adjusts Its Plans in Response**

In July 2023, the outside engineering firm completed FEL 2, and reported the results to Origin. Immediately thereafter, Origin's management briefed the Board of Directors on FEL 2 results. At its August 4, 2023 meeting, the Board decided that the Company would move FDCA production up to Origin 2 (instead of Origin 3, a later planned plant) and would phase Origin 2's construction schedule. Affirming its promise to provide updated timing, ¶¶ 115-19, 129-31, Origin disclosed the outcome of FEL 2 and the Board's decision to investors on August 9, 2023. Ex. 13 at 1-2. These decisions were due to several factors, including "[i]nflation and higher interest rates," and "COVID-related supply chain constraints," but also "[s]ignificantly higher than anticipated demand for higher-margin products including FDCA [and] PEF." *Id* at 3. Still, Origin retained a focus on PX and PET, and

-5-

noted it "plann[ed] to supply bio-pX to customers primarily through collaborations with strategic partners." *Id.* at 4. Due to the uncertainty in the market, Origin's stock price declined, and Plaintiff's lawsuit followed.

## V. This Court Grants Defendants' Motion to Dismiss, and Plaintiff Rewrites CW1 Allegations

This Court granted Origin's motion to dismiss Plaintiff's FAC on October 29, 2024, because, at a minimum, Plaintiff relied on fatally vague confidential witness ("CW1") allegations. Mot. Order at 9. At this Court's hearing on the motion to dismiss, Plaintiff's counsel admitted repeatedly that he could not allege CW1 was ever told by a Defendant that Origin 2 would be delayed as of March 2023. Instead, he alleged CW1 merely "learned" it, through some unspecified means. *See, e.g.*, Ex. 14 at 23:16-22 ("MR. BIGIN: So, Your Honor, we're telling you -- telling the Court that, you know, [CW1]'s learning it at these meetings. We're telling you that he's learned by March of 2023 . . . THE COURT: You're still hedging. You are just telling me what [CW1] learned."). The Court thus dismissed the FAC, "conclud[ing] that the statements attributed to CW1——which are foundational to plaintiff's allegations that defendants committed securities violations——fail[ed] to satisfy the PSLRA's particularity requirements." Mot. Order at 9.

Plaintiff has wordsmithed CW1's allegations in the SAC, but the fundamental allegations remain the same: CW1 speculates that "months in advance," Defendants had formulated a "plan" to move away from PX/PET production at Origin 2. ¶ 92. Facing only vague and unsubstantiated allegations, Defendants move once again to dismiss.

-6-

**ARGUMENT**

Plaintiff again fails to plead three of the elements of a claim under Section 10(b) and Rule 10b-5: (1) "scienter," (2) "a material misrepresentation or omission," and (3) "loss causation." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017). Plaintiff also fails to "satisfy the dual heightened pleading requirements of [Rule] 9(b) and the [PSLRA], which require that the complaint plead both falsity and scienter with particularity." *Id.*

## I. PLAINTIFF FAILS TO ADD ANY PARTICULARIZED FACTUAL ALLEGATIONS OF SCIENTER

The "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). Rather than simply crediting a plaintiff's scienter allegations, the Court must also consider "plausible, nonculpable explanations for the defendants' conduct." *City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*, 2024 WL 235183, at *14 (N.D. Cal. Jan. 22, 2024) (dismissing § 10(b) claim for failure to plead scienter) (*citing Tellabs*, 551 U.S. at 326).

Plaintiff's scienter allegations are beyond saving without CW1, as the Court observed. Mot. Order at 5. Despite Plaintiff's attempt to wordsmith that account, it still lacks critical information sufficient to meet the PSLRA's heightened pleading standards. This Court already rejected allegations that CW1 "learned" at the March 2023 weekly meetings. FAC ¶ 90. Now, Plaintiff elusively claims that CW1 "heard" Origin 2 being discussed at a March 3, 2023 meeting, rather than describing what

-7-

Mr. Bissell actually *said* on March 3, 2023. In fact, Plaintiff never corroborates that Mr. Bissell even **attended** the March 3, 2023 meeting, but instead relies solely on CW1 to describe what "generally" occurred at meetings, who "usually" would speak, and who "would often lead discussions." ¶ 90. CW1's account remains "fatally vague" and does not "bear sufficient 'indicia of reliability.'" Mot. Order at 7-8.

CW1's account also simply does not add up. CW1 purports to have heard Mr. Bissell discuss major changes to Origin 2 at the March 3, 2023 meeting. ¶ 91. CW1 is thus claiming that Mr. Bissell knew about changes to the Origin 2 timeline many months before an outside engineering firm completed FEL 2 and reported the results to Origin in July 2023. CW1 also claims that Mr. Bissell decided to reveal his purported fraud before all of the company's employees. *See* ¶ 90. But rather than provide facts to show Mr. Bissell's fraudulent intent, Plaintiff weds himself totally to CW1's speculation, personal beliefs, and far-fetched account, that are all distinct from the Defendants' state of mind.

The rest of Plaintiff's allegations are even more deficient, because Plaintiff speculates with *no basis* on Origin's partnership with Avantium and PepsiCo and raises a generic "core operations" theory of liability. Each fails to show that scienter is "more cogent or compelling than an alternative innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999-1000 (9th Cir. 2008). Plaintiff's Section 10(b) claims should be dismissed.

## A. Plaintiff Does Not Cure CW1's Inadequate Allegations

To be at all credible, CW1 "must be described with sufficient particularity to establish [his] reliability and personal

-8-

knowledge." *Zucco*, 552 F.3d at 995. Plaintiff's menial tweaks to CW1's inconsistent account does not give the Court any reason to revisit its prior ruling.

***CW1's new allegations are contradictory.*** CW1's allegations in the SAC fatally contradict his original statements. *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012), *aff'd*, 561 Fed. Appx. 598 (9th Cir. 2014) (granting motion to dismiss after finding that "confidential witness statements in the [third amended complaint] are unreliable because they contradict statements made by the same group of witnesses in the [second amended complaint]"). Plaintiff previously claimed that CW1 "learned" that Origin 2 "was being broken up into two phases, was shifting to new products, and would no longer produce PX" in March 2023 "based on emails with his direct manager and his attendance at weekly meetings held by Defendants Riley and Bissell." FAC ¶ 89. Now, Plaintiff alleges that CW1 "heard" of this plan from only Mr. Bissell during a meeting that occurred on March 3, 2023. ¶ 91. In doing so, Plaintiff drops all allegations of Mr. Riley's involvement in the meeting that he raised in the previous complaint. *See Rasidescu v. Midland Credit Mgmt., Inc.*, 435 F. Supp. 2d 1090, 1101 (S.D. Cal. 2006) ("Claims in the original complaint which are not realleged in the amended complaint are no longer before the court and are deemed waived."). CW1's previously alleged email correspondence with "his direct manager" is also nowhere to be found, as he now claims that "email communications with his group" in late March 2023 simply reiterated what Mr. Bissell had "told the group at the weekly meetings." ¶ 93. CW1's changing narrative underscores the unreliability of his account. It

-9-

should not be credited. *See Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 857–58 (N.D. Cal. 2019), *aff'd*, 831 F. App'x 366 (9th Cir. 2020) (dismissing complaint with prejudice upon finding that CW's "discrepancy raises credibility concerns about" CW's account).

*CW1's allegations continue to be vague and generalized.*
Plaintiff only attempts to buttress CW1's deficient account with trivia: when meetings would allegedly "start" in the morning, how long they would "generally last[,]" what the order of speakers allegedly was, how the meetings would allegedly "proceed," and how Mr. Bissell "would often" behave. ¶ 90. CW1's hazy allegations of what would usually happen is not legally sufficient to plead scienter. *See Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *12 (N.D. Cal. June 8, 2011) (finding that the CW attesting to the topics generally discussed at meetings is insufficient to establish scienter); *In re Downey Sec. Litig.*, 2009 WL 736802, at *13 (C.D. Cal. Mar. 18, 2009) (finding that the CW's attestation of how loans are usually approved is insufficient to establish scienter). CW1's allegations that Mr. Bissell was "usually one of the later people to speak" and "Bissell would often lead," ¶ 90, are both vague allegations of what *could have* happened, and do not speak to what *actually occurred* on March 3, 2023. This lengthy description of Mr. Bissell's purported *general* practices also makes it highly suspicious whether CW1 can speak to one of his *specific* statements. *See Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) (CW's presence "at quarterly 'all-hands' meetings does not demonstrate the requisite personal knowledge to establish

-10-

scienter with respect to the individual defendants"). If he could do that, why not just say that?

These are the type of broadly sweeping scienter allegations that Ninth Circuit courts do not credit, and this Court should not do so here. *See Zucco*, 552 F.3d at 991 ("To adequately plead scienter, the complaint must now 'state with ***particularity*** facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind.'").

***CW1's allegations are based on his own personal beliefs.*** CW1's allegations continue to be based purely on his personal beliefs and deductions. CW1 was apparently a "technical development engineer" who "worked on developing the technology for the fourth stage of converting CMF to PX for Origin 2." ¶ 85. CW1 was purportedly "responsible for compiling chemistry data provided" by Origin's R&D team and "rerouting the information to Origin 1 to test those findings on a larger scale." *Id.* Plaintiff nowhere alleges that CW1 had any direct, personal contact with either Mr. Riley or Mr. Bissell, or any other members of management. Instead, CW1 purports to have virtually attended a meeting which Mr. Bissell and some unstated number of other employees also attended. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (finding CW's "[v]ague references" to meetings attended by "management" insufficient to show scienter); *see also Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *19 (W.D. Wash. Nov. 26, 2019) (finding no indication of scienter because "[p]laintiffs do not allege that the CWs had any direct interactions with individual Defendants"). Despite this fact, CW1 claims that he was "aware of management's shift in the Origin 2 timeline before May

-11-

2023 because management was slowing down PX development for the plant." ¶ 89. CW1 also declares that Mr. Bissell "must have known well before March 3, 2023 that Origin 2 would not produce PX" and that the plan was "likely formulated months in advance because it was well thought out." ¶¶ 92, 175. However, CW1 never describes any basis for this "awareness" and "'merely speculative' awareness of Individual Defendants' knowledge is not enough." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019). This is especially so when CW1's job description[3] suggests that he was not in a position to know when plans would be formulated and communicated before they were conveyed at weekly meetings. *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014)(allegations that CW "believe[d]" that Company management was aware of issues were insufficient to "establish a basis for personal knowledge of all the facts he alleges" when missing "who the CW works with and what sources of information are available to him").

**CW1's revised allegations require inferential leaps.** CW1's account cannot be credited because it is inconsistent. *See Zucco*, 552 F.3d at 999 (dismissing complaint after CW accounts were "too contradictory to be compelling"). CW1 claims that he learned from his meetings with the R&D group that "fouling issues," which "occurr[ed] at every step," "resulted in the Company being unable to finalize the chemistry for Origin 2," which later "caused the Company to fall behind in completing FEL 2 for Origin 2." ¶ 86.

---

[3] This description, moreover, makes clear that CW1 would only be aware of data coming out of *Origin 1*. ¶ 85. Though nothing about CW1's role suggests he would be aware of *any* higher-level plans, they would certainly not concern Origin 2.

-12-

However, CW1 also claims that "technology maturity was the biggest issue for completing Origin 2." ¶ 89. Plaintiff and CW1 completely fail to explain what connection, if any, "technology maturity" has with "fouling issues."[4]

Also, though CW1 now suspiciously alleges what he "heard" Mr. Bissell discuss, ¶ 91, rather than what he "learned," FAC ¶ 89, he still does not allege any facts to describe how he concluded what Mr. Bissell *knew*. *PayPal*, 409 F. Supp. 3d at 857–58 (dismissing with prejudice where first complaint alleged that CW "suspected or saw" the alleged data breach but second alleged that CW was "informed" of the breach at a special meeting). CW1's deduction from Mr. Bissell's presentation that Origin would not produce PX at Origin 2 is suspicious at worst, and illogical at best. For example:

- Why would the Company decide to "scrap[] years of the plant's development," ¶ 15, when its objective was "to get the company net positive"? ¶ 91.
- Why would the Company abandon its plan of 10+ years to go in a completely "new direction" and incur even more costs, especially when the "cost of the plant is very high"? *Id.*
- Why would an entrepreneur like Mr. Bissell, who is familiar with the ebbs and flow of business, decide to abandon the Company's operations of 15 years, just because "PX [was] not performing strongly"? *Id.*

_____

[4] CW1's statement about "finaliz[ing] the chemistry," ¶ 86, is also a non-sequitur: that statement has no relation to the timing of FEL 2 (which in any event, finished on time, *infra* 23), and reveals nothing about the state of mind of any Defendant about phasing Origin 2 or focusing on FDCA.

-13-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

- How was CW1 sure that a "new direction" meant that the "Company would no longer produce PX"? *Id.*
- CW1's allegations stop in March 2023, five months prior to the alleged truth being revealed. If CW1 continued to work at Origin until August 2023, as Plaintiff alleges, why no further allegations?
- What were the terms of CW1's employment being terminated? Is he a disgruntled former employee with a vendetta against the Company?
- If CW1 left the Company on good terms, why can't CW1 come forward with his true identity?
- If CW1 no longer works at the Company, why would CW1 be afraid of the repercussions he may face by coming forward?

### B. Even Taking CW1's Allegations As True, Plaintiff Fails to Establish Scienter

"Even assuming, *arguendo*, that Plaintiff adequately pled that [Mr. Bissell] had *knowledge*" of Origin 2 being broken up into two phases, was shifting to new products, and would no longer produce PX, such allegations of *knowledge* alone are insufficient to adequately plead scienter. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 883-84 (9th Cir. 2012). This is because Plaintiff still fails to show that Mr. Bissell "*believed* that [he] made false or misleading statements" related to the problems described, or otherwise believed to have been making a misrepresentation. *Id.* Instead, CW1's statements are "replete with qualifying phrases that suggest [CW1] is engaging in speculation" as to Mr. Bissell's state of mind: discussing what "Bissell must have known" and when the plan "was likely formulated." ¶ 92; *Anderson v. Peregrine Pharm., Inc.*, 2014 WL 2444373, at *5 (C.D. Cal. May 1, 2014), *aff'd*, 654

-14-

Fed. Appx. 281 (9th Cir. 2016). Allegations consisting of "mere speculation" of what defendants "must have known" is "insufficient to establish a strong inference of scienter." *In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 9667131, at *19 (S.D. Cal. May 7, 2007).

Additionally, Origin warned of the exact issues that CW1 accuses Mr. Bissell of allegedly "reveal[ing]" on March 3, 2023. ¶ 91. To clarify, Origin never stated that it "would *only* produce PET and HTC," and the portion of the May 12, 2023 PowerPoint that Plaintiff cherry-picks does not even reveal such a fact. ¶ 141. This makes sense given Plaintiff himself concedes that CMF can be converted into either PX or FDCA, ¶ 6, which contradicts the assertion that Origin potentially switching its focus to FDCA somehow caused the Company to "scrap[] years of the plant's development." ¶ 15. Instead, as Plaintiff concedes, the Company was disclosing throughout the putative Class Period that Origin 2 may produce FDCA/PEF *in addition* to PX/PET. *See, e.g.*, ¶¶ 115, 117, 119, 129, 131. Origin also publicly disclosed that it agreed to produce both PX and FDCA by filing its amended offtake agreement in May 2023 with Pepsi. Ex. 15 at 1. "The fact that Defendants disclosed this information to the public and expressly warned of the consequences . . . further weighs against an inference of scienter." *In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 952 (N.D. Cal. 2017); *see also In re Sorrento Therapeutics, Inc. Sec. Litig.*, 2022 WL 22609807, at *8 (S.D. Cal. Apr. 11, 2022), *aff'd*, 97 F.4th 634 (9th Cir. 2024) (concluding that plaintiff had not adequately alleged scienter given "information indicating that STI-1499 was still in preclinical stages and had

-15-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

not yet received FDA approval was disclosed contemporaneously to the public").

### C. Plaintiff Does Not Amend Any Remaining Scienter Allegations

Despite having the opportunity to amend his complaint, add new factual allegations, and remedy his defective claims, Plaintiff chooses to simply repeat the same deficient pleadings. Unfortunately for Plaintiff, where "[t]he factual allegations are unchanged" and "there is no new basis for [Plaintiff's] claim," a court may "dismiss[] it again for the same reasons." *Graybill v. Wells Fargo Bank, N.A.*, 953 F. Supp. 2d 1091, 1108 (N.D. Cal. 2013) (dismissing fraud allegations in amended complaint).

***Avantium Partnership.*** Plaintiff deliberately mischaracterizes Origin's partnership with Avantium, which was "founded on a series of agreements," Ex. 16 at 2, including "a non-exclusive license agreement," ¶ 98, and an offtake agreement. Ex. 16 at 2. Pursuant to the offtake agreement, Origin agreed to *buy*, not *make*, "a significant amount of FDCA and PEF" from Avantium. *Id.* Plaintiff attempts to "cherry-pick portions of [Avantium's CEO's] statements and ignore other portions" by claiming that Origin entered into this partnership to "explore alternatives to PX for Origin 2." ¶ 95; *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020). Despite Plaintiff's counterfactual narrative that Origin was looking to "pivot[] to the production of FDCA from PX," ¶ 99, Origin and Avantium's CEOs both explain that Origin "expect[ed] to incorporate Avantium's process technology into the supply chain for product from *its future plants*." Ex. 16 at 2; Ex. 17 at 1.

-16-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

Despite this, Plaintiff points to statements made by Avantium's CEO regarding his "own experience" for his scienter allegations, ¶ 100, even though those statements are not indicative of what Mr. Riley and Mr. Bissell knew. *See Paypal*, 409 F. Supp. 3d at 857 (plaintiff fails to show defendant knew of data breach when "[n]o statement is attributed to [defendant]"). In fact, Avantium's CEO expressly disclaimed any such notion, because he admitted that "it's up to Origin to make announcement [sic] regarding the timing of [Origin 2]" and "it is up to [Origin] to make further announcements." ¶ 100. Plaintiff fails to explain how Avantium's CEO's prognostication concerning Origin 2's time of completion bares any connection to Mr. Riley and Mr. Bissell's states of mind, or what they believed of Origin 2's timing.

*PepsiCo Offtake Agreement.* Rather than presenting a theory of scienter that is "more cogent or compelling than an alternative innocent inference," *Zucco*, 552 F.3d at 999-1000, Plaintiff engages in pure speculation as to the parties' decision to amend the PepsiCo Offtake Agreement. Plaintiff claims that the May 9, 2023 amendment to the Pepsi Offtake Agreement is "further evidence [of] Defendants' knowledge that the Company was now prioritizing the production of FDCA and PEF at Origin 2." ¶ 107. However, Origin never agreed to produce *only* FDCA and in fact, agreed to do the exact opposite by continuing to offer to supply both PX and FDCA to PepsiCo. Ex. 15 at 1. Also, the production of FDCA at Origin 2 was never a certainty, as is clear that Origin was "*contemplating producing*, or having produced, FDCA from intermediates produced at New Plant [Origin 2] *and/or its subsequent plant, Origin 3*." ¶107. The Company publicly disclosed this fact in its Form 10-Q for the

-17-

first quarter of 2023, when it stated that the amendment "added FDCA as a product *potentially available* to be supplied to the customer . . . while adding *the planned Origin 3 facility as a potential source* of product to be supplied to the customer." ¶ 109. Contrary to Plaintiff's allegations, the amendments to the PepsiCo Offtake Agreement is not evidence that Defendants "knew by May 9, 2023 that Origin 2's schedule was delayed." ¶ 110.

*Core Operations.* The core operations doctrine, only to be invoked "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter," should not be applied here. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Even the vitality of Origin 2's success, which "was expected to be the Company's largest and most important commercial operation," does not have bearing on this outcome. SAC ¶ 205; *see Anderson v. Peregrine Pharms., Inc.*, 2013 WL 4780059, at *1, 12 (C.D. Cal. Aug. 23, 2013) (core operations doctrine "completely inapplicable" even when the company's "financial success was dependent on commercial development of the drug"). Plaintiff's claim that Mr. Riley and Mr. Bissell were "aware of the chemistry and engineering complications," ¶ 211, should be rejected as Plaintiff provides no "detailed allegations about the defendants' actual exposure to information." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1109, 1112 (9th Cir. 2021) (rejecting "conclusory" allegation that CEO possessing "power and authority" over a department "would have been involved in" alleged fraud).

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

Plaintiff's scienter allegations simply rehash and replicate the prior complaint's deficient pleadings, and gives this Court no reason to revisit its decision. Plaintiff's attempt to add irrelevant minutiae to CW1's vague and contradictory account still "fail[s] to satisfy the PSLRA's particularity requirements." Opinion at 9. Therefore, Plaintiff's complaint should be dismissed.

## II.  NONE OF THE CHALLENGED STATEMENTS ARE FALSE

A "securities fraud complaint must plead [falsity] with particularity." *Dhaliwal v. Singh*, 2013 WL 4460266, at *14 (E.D. Cal. Aug. 16, 2013). It can only do so by "setting forth what is false or misleading [] about the statement[s] and why the statements were false or misleading at the time they were made." *Rigel*, 697 F.3d at 876. Regardless of Plaintiff's cosmetic tweaks, and even taking the allegations about CW1 as true——which they are not——none of the challenged statements were false when made.

### A. Origin Truthfully Told Investors That It Was Making Progress and Would Provide an August 2023 Update

Before and throughout the proposed Class Period, Origin repeatedly reminded investors that it "continue[d] to make progress on front-end design, construction planning, and financing for Origin 2" and that it "expect[ed] to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023." ¶ 115. Plaintiff has not, because he cannot, pleaded contemporaneous facts showing that these statements were false when they were made on February 23, February 24, and May 10, 2023. ¶¶ 115-17, 119-20, 129-32. Nor can Plaintiff challenge as false the slides accompanying these statements, which offered a projected "[c]onstruction schedule" listing "[o]bjectives" that the Company hoped to achieve "by end of Q1 2023" and reminding investors that

-19-

it "expect[ed] to provide an update on new product offerings and construction plans in mid-2023." ¶¶ 118, 127; *see also* ¶¶ 141 (telling investors that "[c]onstruction [was] expected to start by mid-2023 and the plant is expected to be operational mid-2025"), 143 (telling investors Origin 2 was "scheduled to come online in the 2025 time frame").

### 1. Plaintiff's Revised CW1 Allegations Do Not Plead Any False Statement About Construction Design or Progress

Even taking Plaintiff's CW1 allegations as true——which this Court should not, *supra* 8-14——Plaintiff still fails to plead that, throughout the proposed Class Period, Origin was not making progress on the front-end design, construction planning, and financing process for Origin 2.

**"[L]ate 2022" CW1 Allegations**: Plaintiff alleges that "CW1 learned from attending biweekly meetings with Origin's R&D group that fouling issues" were "result[ing] in the Company being unable to finalize the chemistry for Origin 2," meaning that "the Company could not move forward with building the plant" and CW1's team was "falling behind in providing critical engineering data/designs to Origin 2's outside engineering firm," causing the Company to "fall behind in completing FEL 2 for Origin 2." ¶ 86.

Even if true, CW1's allegations do not render Origin's statements false. Running into issues developing an innovative production process is not inconsistent with continuing to make progress on plant design and construction. As any entrepreneur knows, setbacks are unavoidable. Innovation does not move unfailingly forward. Indeed, the Ninth Circuit recognizes that "[m]uch of any business consists of having problems and dealing

-20-

with them." *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001). But even so, Plaintiff's allegations fall short. Plaintiff does not allege that the purported "fouling issues" persisted past "late 2022." ¶ 86. Nor does Plaintiff allege with particularity that the "fouling issues" would prevent building Origin 2. Plaintiff's supposition that it would is just that: conclusive conjecture. He does not plead particularized facts——as the Exchange Act requires for securities fraud——of what those issues consist, how they would impact production, which products they affected, or whether they were material. In other words, Plaintiff dodges the hard task of pleading fraud. That is because Plaintiff is relying on incomplete information provided a year ago by a CW with limited knowledge. Instead, Plaintiff asks this Court to assume, without support, that the purported problems, their magnitude and effects unknown, occurred "prior to, and throughout the Class Period." ¶ 83. The PSLRA does not permit courts to accept allegations lacking facts. *Singh*, 2013 WL 4460266, at *14 (falsity requires pleading "with particularity").

**December 2022 CW1 Allegations**: Next, Plaintiff alleges that "[i]n December of 2022," Mr. Riley and Mr. Bissell "revealed that the Company was already considering scaling down the size of Origin 2, splitting the building of the plant into two phases, and shifting the focus of Origin 2 from PX to another product" and "that the Company would either have to make less PX at the plant or pivot the production to another product due to the economics of PX." ¶ 87.

These allegations——devoid of factual basis——do not contradict Origin's statements that it "continue[d] to make progress on

-21-

front-end design, construction planning, and financing for Origin 2." ¶ 115; *see also* ¶¶ 116-17, 119-20, 129-32. The Company *was* making progress on the planning and construction process for Origin 2, which logically could include decisions about the scale of the facility, how many construction phases would be appropriate, and the optimal product slate. That the Company is considering contingency plans while a third-party contractor is working on FEL 2 is not fraud—it is common sense and good business planning. As it was considering those possibilities, Origin was "not obligated to disclose every detail of its internal [ ] business strategy." *In re FoxHollow Techs., Inc., Sec. Litig.*, 2008 WL 2220600, at *23 (N.D. Cal. May 27, 2008) (collecting cases), *aff'd*, 359 F. App'x 802 (9th Cir. 2009). As Plaintiff admits, Origin continually told investors that it "expect[ed] to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023." ¶ 115.

Similarly, CW1's allegation that he "was instructed" by some unnamed source "that the Company was far off from completing FEL 2 for Origin 2," does not render any statement about Origin 2's progress false. ¶ 87. What does it mean that CW1 was instructed? By whom? When? Why? Plaintiff does not clarify what he meant that the Company "was far off from completing FEL 2[.]" *Id.* "Far off" could equally mean months from completion (aligning with Origin's goal to complete FEL 2 and update investors in summer 2023), as it could years from completion (which Plaintiff would prefer to infer).[5] This type of vague assertion is precisely the type of allegation that Congress sought to prevent when passing the PSLRA. Tellingly, FEL 2

---

[5] The timing of FEL 2, moreover, again has no relevance to phasing Origin 2's construction or focusing on FDCA. *Supra* 13 n.4.

-22-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

was, in fact, completed on time, seven months later.

"[E]arly 2023" CW1 Allegations: Plaintiff next alleges that "CW1 learned from his biweekly meetings with Origin's R&D group that the Company faced unexpected chemical issues necessary for scaling commercial PX" and that "[t]he engineers started developing solutions for the issues, but it took more time, slowed down engineering designs, and increased costs, which all factored into shifting the plant's focus away from PX and scaling Origin 2 into two phases." ¶ 88.

Putting aside the deficiencies of these allegations, Plaintiff once again fails to show that any challenged statement about Origin 2's construction and planning progress was false. Rather, the allegations show Origin's engineers were actively engaging in the design and construction planning process: identifying problems, then designing and implementing solutions. This is entirely consistent with Origin's public statements that it "continue[d] to make progress on front-end design, construction planning, and financing for Origin 2." ¶ 115; *see also* ¶¶ 116–17, 119–20, 129–32. Similarly, CW1's allegations that he "was aware of management's shift in the Origin 2 timeline before May 2023 because management was slowing down PX development for the plant" is not inconsistent with progress. ¶ 89. It is unsurprising that any company (let alone a manufacturing start-up) would run into challenges as it developed and scaled a new technology. What CW1 leaves conveniently unsaid is how management could be slowing down PX development for a plant that has not yet been built. Origin was already making PX at Origin 1; what does it mean to slow down the development for PX at Origin 2 when the plant does not even exist?

-23-

**March 3, 2023 CW1 Allegations:** In the only amended allegations in the SAC, Plaintiff now alleges "CW1 heard Bissell discuss how Origin 2 would now be broken up into two phases, was shifting to new products, and would no longer produce PX," "explain[] the changes by saying things like: PX is not performing strongly, the cost of the plant is very high, and we need to get the company net positive," and allegedly "t[ell] the group, 'we are going to move in this new direction.'" ¶ 91. Mr. Bissell also allegedly "presented a detailed plan of action to move forward with the changes at Origin 2 away from PX production and the changes to plant construction." ¶ 92. Curiously, CW1 does not say Mr. Bissell actually said in March 2023 that the decision to phase Origin 2 had been made. Plaintiff only alleges that CW1 "heard" Mr. Bissell discuss that. ¶ 91. If Mr. Bissell had already made the decision, then why is CW1 not simply alleging so?

Even if true, none of these allegations render false Origin's statements that it "continue[d] to make progress on front-end design, construction planning, and financing." ¶ 129; *see also* ¶¶ 131–32.[6] Making decisions balancing costs and benefits and adjusting course based on new information is part and parcel of designing and planning a complex process. CW1 nowhere alleges that Origin was scrapping all the work that had been done and starting from zero; rather, he alleges (at best) that Origin's plans continued to move forward in a modified direction.

_____

[6] CW1's amended allegations also have no effect on statements before March 3, 2023. Nothing Plaintiff alleges about what CW1 purportedly learned in March 2023 shows that statements made in February 2023 were false when made. *See Rigel,* 697 F.3d at 876 (plaintiff must plead "why the statements were false or misleading at the time they were made").

-24-

**No CW1 Allegations After March 3, 2023**: Plaintiff offers no alleged testimony from CW1 after March 3, 2023, despite the fact that CW1 purportedly continued to work as "technical development engineer" at the Company throughout the proposed Class Period. ¶ 85. This silence is curious, given that Mr. Bissell allegedly "presented a ***detailed*** plan of action to move forward with the changes." ¶ 92. If Origin had indeed dramatically changed its production and construction plans, presumably a "technical development engineer" who "was part of an internal engineering group responsible for compiling chemistry data provided by the Company's Research and Development ('R&D') group" would have been involved in such plans. ¶ 85. Plaintiff's silence is not sufficient under the PSLRA and cannot plead contemporaneous falsity for any statements made after March 2023. *See* ¶¶ 129, 131-32; *Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 770 (N.D. Cal. 2024) (dismissing allegations where "[t]he vagueness around timing, as well as around what was said and by whom, means that [Plaintiff] has failed to state with particularity facts giving rise to a reasonable inference that the [challenged] statements . . . were false or misleading *when made*").

## 2. The Challenged Statements About Progress Are Not Actionable Under the Federal Securities Laws

Even if CW1's revised allegations were true, Plaintiff's claims still fail as a matter of law for at least four reasons: (1) statements about progress are not actionable as a matter of law; (2) the Ninth Circuit does not recognize any free-standing duty to update investors on challenges or delays; (3) statements about progress are inactionable opinions; and (4) statements about progress are protected forward-looking statements.

-25-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

### a) No Liability for Statements About Progress

Controlling Ninth Circuit law holds that statements about progress are not actionable unless the company is "making no progress at all." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021); *see also In re ECOtality, Inc. Sec. Litig.*, 2014 WL 4634280, at *9 (N.D. Cal. Sept. 16, 2014) (statements of "making progress" and "solid progress" were "inactionable under the PSLRA"); *Ellusionist Cash Balance Plan & Tr. v. Spiegel Acct. Corp.*, 2024 WL 4294645, at *8 (N.D. Cal. Sept. 24, 2024) (for a statement about engaging professionals to conduct due diligence "to have been false and misleading when made, however, Plaintiffs would have to allege that no due diligence was conducted"); *Nguyen v. Endologix, Inc.*, 2018 WL 10321880, at *6 (C.D. Cal. Sept. 6, 2018); *aff'd*, 962 F.3d 405 (9th Cir. 2020) (no falsity because "all of the alleged false statements are about the progress of the IDE clinical trial, and there are no facts pled to show that the IDE clinical trial was not 'on track'"); *see also Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *4 (D. Or. May 24, 2021), *aff'd*, 2022 WL 2800825 (9th Cir. 2022) ("Donegan's statements that 'the framework is intact' cannot be false unless there was no longer any part of the framework intact."). At no point does Plaintiff claim that CW1 alleged that all progress had stopped on Origin 2. *See* ¶¶ 83–93.

Nor would allegations that design and construction planning faced delays be materially misleading. As the Ninth Circuit has stated, the fact that progress is made, "albeit at a diminished rate," does not render a statement about that progress misleading and it does not "affirmatively create[ ] an impression of a state of affairs that differ[ed] in a material way from the one that

-26-

actually exist[ed]." *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022); *see also Sylebra Cap. Partners Master Fund Ltd v. Everbridge, Inc.*, 2023 WL 3549506, at *8 (C.D. Cal. May 9, 2023) ("When the challenged statements were made, Everbridge was 'still growing,' 'albeit at a diminished rate, so these feel-good descriptions' stop short of the line of creating an impression of a state of affairs materially differing from the one that existed at the time.").

Finally, CW1 does not allege that Origin's "timeline required intermediate checkpoints to be met, let alone that such checkpoints were missed before the statements at issue." *In re Intel Corp. Sec. Litig.*, 2024 WL 1693340, at *1 (9th Cir. Apr. 19, 2024). Indeed, the only "checkpoint" that Origin promised was an investor update in August 2023——which the company provided. ¶¶ 115–19, 129–31. "Plaintiff[] thus fail[s] to plead with particularity that any defendant had 'actual knowledge,' when making the challenged statements, that [Origin] would miss the projected [planning and construction] dates." *Intel*, 2024 WL 1693340, at *1. The Ninth Circuit makes abundantly clear that vague allegations about delays are far from sufficient to ground a securities law claim.

### b) No Duty to Update Investors on Progress or Delays

Controlling precedent rejects the argument that a company, "when faced with a setback . . . ha[s] a legal duty to disclose it to the investing public." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022) (rejecting the argument that a company needed to disclose software bugs despite statements that improvements were "ongoing" and "on track"). Yet this is what Plaintiff would have Origin do: disclose immediately to its

-27-

investors any purported setbacks it may be experiencing, without regard to the severity of those challenges or whether they would, in fact, throw the Company off course. Such a duty of instantaneous disclosure "would inject instability into the securities market, as stocks may wildly gyrate based on even fleeting developments." *Id.* That is precisely why the securities laws "require only periodic[,] not continuous disclosure[.]" *Shurkin v. Golden State Vintners, Inc.*, 303 F. App'x 431, 433 (9th Cir. 2008).

Complex engineering projects like Origin 2 illustrate why the Ninth Circuit rejects the duty to update. As Plaintiff explains, Origin 2 was undergoing "FEL 2" during the proposed Class Period, a process in which engineers "dive[] deeper into defining the project scope and technical specifications" and "defin[e] the project schedule **with a more realistic timeline**." ¶ 55. In the midst of FEL 2, it would have been inappropriate for Origin to provide updates on potential delays when working with incomplete information about the outside engineering firm's ongoing analysis. Origin's statements——that FEL 2 was "mak[ing] progress" and that it would "provide an update" regarding plans for Origin 2's design when it was available——were accurate and appropriate disclosures when made. *See* ¶¶ 113-15, 117, 120, 127-29; *see Rigel*, 697 F.3d at 876 (plaintiffs must show statements were "false or misleading at the time they were made"). None of these statements (each describing progress "as of that date") "create[d] a continuing representation" about ongoing progress, and none create a duty to update. *In re Wrap Techs., Inc. Sec. Litig.*, 2021 U.S. Dist. LEXIS 250595, at *20 (C.D. Cal. Nov. 15, 2021) (no liability for statements representing performance of product up until date of the statements).

-28-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

### c) Statements About Progress and Forecasts of Construction Schedules Are Opinions

"Misstatements of opinion can give rise to a claim" only if they "[a]re both objectively and subjectively false or misleading." *Align*, 856 F.3d at 614; *see Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, at *14 (N.D. Cal. Sept. 17, 2024) ("In this circuit, one way plaintiffs may satisfy the pleading standard for opinion statements is by alleging that 'there is no reasonable basis for the belief' articulated in the challenged statement.").

**The challenged opinions are not objectively false**. Plaintiff "fail[s] to show objective falsity with particularized facts that 'directly contradict[ed]' or [we]re 'necessarily inconsistent with'" any challenged opinion statements. *Golub v. Gigamon, Inc.*, 372 F. Supp. 3d 1033, 1052 (N.D. Cal. 2019), *aff'd*, 847 F. App'x 368 (9th Cir. 2021); *supra* 20-25. Far from alleging that Origin "had been 'making no progress at all,'" *Tesla,* 985 F.3d at 1196. Plaintiff *concedes* that Origin was making progress at all relevant times. ¶¶ 87 (referring to ongoing "research and development process at Origin 2" and averring Defendants "provided an update on the plant"), 88 ("[E]ngineers started developing solutions" for scaling commercial PX).

Nor can changes to Origin 2's projected design and production schedules announced in *August* 2023 render statements in *February through June* 2023 false. As with any challenged statement, "the relevant inquiry is whether the statement was false . . . when the opinion was disseminated to the public." *Shurkin v. Golden State Vintners, Inc.*, 2005 WL 1926620, at *9 (N.D. Cal. Aug. 10, 2005). Lacking allegations of contemporaneous falsity, *supra* 20-25,

-29-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

Plaintiff's allegations are nothing more than impermissible fraud-by-hindsight. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 856-57 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017) (dismissing complaint where "without injecting hindsight into the analysis, the Court c[ould] not reasonably infer that [an analysis] was objectively false"); *In re Credit Suisse First Boston Corp. Analyst Reps. Sec. Litig.*, 431 F.3d 36, 52 (1st Cir. 2005) (affirming dismissal because "forecasts [] cannot be found to be false——objectively or subjectively——simply because they turn out to be inaccurate").

**The challenged opinions are not subjectively false**. As explained above in Section I, Plaintiff also "fail[s] to plead[] subjective falsity——that [Mr. Bissell and Mr. Riley] actually disbelieved" their subjective assessments of progress. *See In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *16 (N.D. Cal. Mar. 31, 2014); *supra* 7-19. Even a subjective belief that Origin 2 faced challenges would not contradict the simultaneous belief that the Company was continuing to make progress to *solve* those challenges. *Supra* 14-15; *see also Hering v. Rite Aid Corp.*, 331 F. Supp. 3d 412, 427 (M.D. Pa. 2018) (statements that an FTC "review process was progressing as expected" were inactionable and "reflect[ed] the subjective analysis of the Defendants").

> **d) Each of the Challenged Progress Statements Are Forward-Looking Statements Protected by the PSLRA's Safe Harbor**

In passing the PSLRA, Congress "provide[d] an additional barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'" *In re Cutera Sec. Litig.*, 610 F.3d

-30-

1103, 1111 (9th Cir. 2010). The Safe Harbor immunizes statements from liability "if they were identified as forward-looking statements and accompanied by meaningful cautionary language, under subsection (A)(i); or if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading, under subsection (B)." *Id.* at 1112; 15 U.S.C. § 78u-5(c)(1). Plaintiff fails to plead around this statutory protection.

**The challenged statements were forward-looking**. The PSLRA provides that a forward-looking statement includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer" and "any statement of the assumptions underlying or relating to" statements of plans and objectives. 15 U.S.C. §§ 78u-5(i)(1)(B), (D). The challenged statements here fit squarely into this statutory definition:

- Plaintiff attacks statements that Origin "continue[d] to make progress on front-end design, construction planning, and financing for Origin 2" and "expect[ed] to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023." ¶ 115; *see also* ¶¶ 116-17; 119-20, 129-32.
- Similarly, Plaintiff targets investor presentations setting out a planned construction and design schedule, noting timeline "objectives," reiterating that Origin "expects to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023," and informing investors that "[c]onstruction [is] expected to start by mid-2023 and the plant is expected to be operational mid-2025." ¶ 127; *see also* ¶¶ 118, 141 (investor presentations), 143 (Q&As).

Each of these statements "are plainly forward-looking statements of plans and objectives" concerning Origin 2's

-31-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

construction and design timelines. *In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *11 (N.D. Cal. Mar. 31, 2023), *aff'd*, 2024 WL 1693340 (9th Cir. Apr. 19, 2024) ("[S]tatements regarding Intel's 7nm timeline . . . are plainly forward-looking statements of plans and objectives.").

**The challenged statements were accompanied by meaningful cautionary language**. Each of the above statements was accompanied by "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1052 (N.D. Cal. 2018); *see* ¶¶ 125, 136. As a matter of law, "the cautionary language 'does not need to warn of the 'exact risk' that transpires'" in order to be meaningful. *Intel*, 2023 WL 2767779, at *11; *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *12 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015) (rejecting allegation that "the disclosures that the FDA might not approve Qnexa and that VIVUS might have problems that could cause it to cancel clinical trials, were 'generic' and could be applied to any company"). Congress made as much clear when it passed the PSLRA, writing that "[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor."[7]

Courts have approved of risk disclosures that are substantially similar to Origin's disclosures. In *Amyris*, for example, Judge Orrick granted a motion to dismiss in favor of

---

[7] H.R. Rep. No. 104-369, at 44 (1995) (Conf. Rep.) (attached as Ex. 18).

-32-

Amyris, a start-up that——much like Origin——was developing a "chemical precursor . . . with commercial potential," and planned to scale production to meet growing demand. 2014 WL 1285175, at *1. Shareholders sued over alleged misstatements relating to scaling production at the company's Brazilian manufacturing facility, citing a confidential witness who alleged that "Amyris knew that the Brazil plant was poorly designed and constructed, and it needed to be retrofitted to prevent contamination." *Id.* at *2. Later, Amyris announced that it "no longer planned to complete expansion of one of its 100 million liter plants," allegedly causing its stock to drop and precipitating the plaintiff's lawsuit. *Id.* at *5.

In granting Amyris's motion to dismiss, Judge Orrick approved of risk factors substantially similar to those that Origin provided to its investors:[8]

| Approved Risk Disclosures in *Amyris* | Origin's Risk Disclosures |
|---|---|
| "Our technology may not perform as expected when applied at commercial scale, or we may encounter operational challenges for which we are unable to devise a | "We have no experience in producing large quantities of our products. While we have succeeded in producing small amounts of our products in our pilot plant for customer trials and testing purposes, we have not yet commenced large-scale production. There are |

_____

[8] Each of Origin's earnings calls and investor presentations incorporated these warnings. *Cutera*, 610 F.3d at 1112 (earnings call sufficiently cautioned investors); *Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*, 2018 WL 6787349, at *2 (C.D. Cal. Dec. 13, 2018) ("[E]very earnings call . . . cited in the [complaint] incorporated the cautionary language from [the company's] public filings, putting investors on notice of the risks that the [c]ompany was facing."); *e.g.*, Ex. 19 at 4 ("For a further discussion on [] material risks . . . please refer to our filings with the SEC, including our annual report on Form 10-K filed on February 23, 2023.").

-33-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

| | |
|---|---|
| workable solution. . . . [C]ontamination in the production process could decrease process efficiency, create delays and increase our costs." *Amyris*, 2014 WL 1285175, at *13. | significant technological and logistical challenges associated with producing . . . products in the specialty chemicals industry, including our products, and we may not be able to resolve all of the difficulties that may arise in a timely or cost-effective manner, or at all. While we believe that we understand the engineering and process characteristics necessary to successfully build and operate our additional planned facilities and to scale up to larger facilities, we may not be able to cost effectively manage production at a scale or quality consistent with customer demand in a timely or economical manner." Ex. 2 at 18. |
| "'[C]onstruction of the [Brazil] facility must be completed on a timely basis and within the budget. Once the facility is operational, it must perform as we have designed it. If we encounter . . . engineering problems . . . or other serious challenges in bringing this facility online, we may be unable to produce our initial renewable products in the time frame we have planned . . . .'" *Amyris*, 2014 WL 1285175, at *13. | "Construction of our plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of our plants could severely impact our business, financial condition, results of operations and prospects. . . . There is a risk that significant unanticipated costs or delays could arise due to, among other things, . . . unforeseen technical issues or increases in plant and equipment costs . . . ." Ex. 2 at 17-18.<br><br>"The construction of new manufacturing facilities entails a number of risks and assumptions, including the ability to begin production within the cost and timeframe estimated . . . . If we experience delays or increased costs, our estimates and assumptions are incorrect, or other unforeseen events occur, our business, ability to supply customers, financial condition, results |

-34-

| | of operations and cash flows could be adversely impacted." Ex. 2 at 22. |
|---|---|
| "[W]hile Amyris believe[s it] will be able to sell Biofene into other specialty chemical markets if [it] can attain at commercial production scale the production process efficiencies that [it has] achieved to date, [Amyris] cannot assure [ ] that [it] will be able to do so in the timelines [it] have planned or at all.'" *Amyris*, 2014 WL 1285175, at *14. | "[W]e may not be successful or efficient in developing or implementing new production processes. Innovation in production processes involves significant expense and carries inherent risks. Such risks may include difficulties in designing, developing, implementing, and scaling up new process technologies, development and production timing delays . . . ." Ex. 2 at 22. |

As in *Amyris*, Origin's disclosures that "specifically explained that [it] might have problems scaling up its production, achieving desired technical results, and meeting production targets" are meaningful and provided company-specific warnings relevant to Origin's business. 2014 WL 1285175, at *13.

**None of the risks had materialized at the time of the disclosures.** Plaintiff fails to adequately plead that any of the warned-of risks had already materialized, rendering any disclosures meaningless (or, as Plaintiff alleges, themselves materially misleading). Multiple circuits agree that "[i]f the company did not 'kn[ow] with certainty' that a risk would materialize, it is not necessarily liable for characterizing that risk as a 'future risk.'" *Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 138 (1st Cir. 2021) (quoting *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130-31 (2d Cir. 2011)). As described above, none of CW1's

-35-

allegations "support[] the inference that Defendants knew [Origin 2] was so far behind in its [construction and design process] that it was virtually certain to cause harm to the business." *Ind. Pub. Ret. Sys. v. Pluralsight, Inc*., 45 F.4th 1236, 1256–57 (10th Cir. 2022); *supra* 7-19.

But even if Origin was facing some amount of delay, this would not be sufficient to render the risk disclosures misleading or meaningless. "[A] risk disclosure is not misleading as a matter of law where it concerns a risk that is inherent in running a business, always present to some extent, and the significance of which is not a yes-or-no question of occurrence but one of degree." *Waswick v. Torrid Holdings, Inc*., 2023 WL 9197563, at *7 (C.D. Cal. Dec. 1, 2023). Construction and design delays are precisely the types of risks that are inherent to Origin's business and a matter of degree. A delay could be a delay of a week, a month, or a year. Progress can move quickly, slowly, or even backwards for a time. But if it is securities fraud to warn of the risk of delays, then countless enterprises would be held liable for lack of complete clairvoyance. Businesses with brand new ideas and cutting-edge products would be particularly at risk precisely because they do not have a playbook to follow. The securities laws are not meant to punish companies for innovating.

**Where disclosures are meaningful, subjective belief is irrelevant.** Finally, even if Mr. Bissell and Mr. Riley did not subjectively believe the truth of their statements—which Plaintiff cannot allege—the Safe Harbor immunizes their statements. The PSLRA's statutory test is disjunctive: "when statements are identified as forward-looking and are accompanied by meaningful

-36-

cautionary language, they automatically fall within the PSLRA's safe harbor and no showing of the speaker's state of mind can revive claims based on the immunized statements." *Mellanox*, 2014 WL 12650991, at *13. As the Ninth Circuit has stated, "[t]he defendants' state of mind is not relevant to subsection (A). To read the provisions otherwise would make no sense." *Cutera*, 610 F.3d at 1113.[9] Because Origin's risk disclosures were meaningful, this Court need not probe Defendants' states of mind.

### B. Origin Truthfully Told Investors That It Was Both Developing PX/PET *and* Other New Products for Origin 2

Like its statements about construction and design planning, Origin frequently disclosed to its investors its product plans both before and during the putative Class Period. Plaintiff ignores these frequent disclosures and instead weaves a narrative that Origin's PX/PET production would *only* occur at Origin 2 and that Origin 2 would produce *no other* product. This narrative has no basis in fact. Moreover, the statements are protected opinions and forward-looking statements, and cannot ground liability under the federal securities laws.

#### 1. Plaintiff Cannot Plead Falsity for Any Statement About PX/PET

**None of the Challenged Statements Assert that Origin 2 Would *Only* Produce PX/PET**. Plaintiff misreads each of the challenged statements to assume that PX/PET would be the only product that Origin 2 produces and ignores disclosures that:

- Origin "has also made progress developing **new products and applications which may be incorporated into the design of the [Origin 2]**, such as **FDCA, PEF**, as well as biofuels from an

---

[9] *See also* Ex. 18 at 44 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.").

-37-

'oils and extractives' stream co-produced alongside CMF and HTC, which has not been included in previous plans." ¶ 115; *see also* ¶¶ 117, 119, 129, 131.

- "[B]eginning in the fourth quarter, our sales and marketing team has **shifted its focus from active marketing of PET towards higher-margin products** such as carbon black and advanced CMF-derived products **including FDCA and PEF for Origin 2** and beyond." ¶ 117.
- Origin had "made progress developing new products and applications which may be incorporated into the design of **Origin 2 such as FDCA, PEF, and biofuels . . .** because the markets for some of these new, functionally-advantaged products are showing up sooner than we initially anticipated" and "now believe that some of those products could be pulled forward meaningfully and produced at **Origin 2** as well." ¶ 119.
- Origin 2 was "expected" to produce "carbon-negative materials used to make PET **and HTC**," not solely PET. ¶ 127; *see also* ¶ 141

Origin repeated these disclosures in its investor materials, telling investors that:

- "Using its versatile platform technology, Origin has been developing commercialization pathways for **higher-value applications** for its intermediates CMF and HTC. In addition to para-xylene and bio-PET, Origin is exploring or qualifying **FDCA**," among other products. Ex. 9 at 4.
- Origin 1 was intended to be a "[c]ommercial-scale plant expected to enable customers to qualify products and applications beyond PET and HTC fuel pellets;" whereas "higher value products [would] ultimately [ ] be produced and sold at world scale from Origin 2, Origin 3, and beyond." Ex. 20 at 38.
- Origin was still in the process of finalizing FEL 2 for Origin 2, including "optimizing and refining the scope and layout of the plant" and "producing updated equipment arrangement [and] flow diagrams through [its] FEL2 engineering contractor." Ex. 21 at 8.

None of these statements are consistent with Plaintiff's theory that Origin 2 was a facility intended to *only* produce PX/PET, and therefore statements about the Company's "progress" were false *unless* the Company was making progress on producing

-38-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP

*PX/PET* at *Origin 2*. *See* ¶¶ 123-24, 126. Rather, these statements are consistent with disclosures that Origin was undergoing a detailed planning process and would make an announcement about Origin 2's design and product slate in mid-2023. *Supra* 4-5. While that process was ongoing, Origin was "not obligated to disclose every detail of its internal [ ] business strategy" as those details developed. *FoxHollow*, 2008 WL 2220600, at \*23.

**Statements About Origin's "Flagship" Product Never Tied PX/PET to Origin 2**. Plaintiff's narrative that statements about PX/PET were false because of purported issues with developing PX/PET for Origin 2 ignores two uncontrovertible facts:

1. ***None of the challenged statements stated that PX/PET would be Origin 2's "flagship" product.*** Plaintiff challenges Mr. Bissell's May 10, 2023, statements about PX/PET, but nowhere in those statements does Mr. Bissell mention Origin 2. ¶¶ 138-39. Similarly, Plaintiff challenges Mr. Riley's May 22, 2023, description of "Origin's process for PET," and June 8, 2023, description of CMF as a "highly efficient platform technology," but again, neither description mentions Origin 2. ¶¶ 144-45, 147, 148-149. Indeed, Origin itself described "Origin 2" as a "commercial scale **CMF** plant," not a commercial scale **PX/PET** plant. Ex. 20 at 37.

2. ***Origin developed* Origin 1 *to launch PX/PET, developed from CMF, as its first commercial product.*** Plaintiff's challenges to Mr. Bissell's statement that "for [Origin], going into PET was very intentional" and Mr. Riley's statement that PX/PET "is kind of our flagship and our first product," ¶¶ 148-49, ignore that Origin's first plant——Origin 1——was only months away from launching commercial production of CMF, the chemical precursor to PX/PET. *See* Ex. 9 at 8-9. It also ignores that during the Class Period, the Company was continuing to build out its PX/PET business through strategic partnerships. *See* Ex. 13 at 2, 4 (referring to "active discussions with multiple strategic partners" regarding "low carbon bio-pX plants using Origin's technology," primarily "large, well-capitalized industrial producers of petro-PTA, PET, and other downstream

-39-

products," and a "[p]artnership with Terphane, a global leader in specialty PET polyester films ("BOPET"), to produce . . . bio-polymer films"). Neither of these challenged statements told investors that Origin would produce PX/PET as its flagship product at *Origin 2*, as Plaintiff speculates.

"[R]ead in context," these challenged statements "are simply not false or misleading." *Chang v. Accelerate Diagnostics, Inc.*, 2016 WL 3640023, at *5 (D. Ariz. Jan. 28, 2016). This Court need not credit Plaintiff's allegations where he contradicts both his own pleadings *and* judicially noticeable facts.

### 2. As a Matter of Law, Statements About PX/PET Are Not Actionable

Statements about Origin's product slate are not actionable under the securities laws because: (1) the statements are nonactionable opinions; and (2) they are protected forward-looking statements.

#### a) Statements About "Flagship" Products Are Nonactionable Opinions

Terms like "flagship" (*see* ¶¶ 138, 147, 149) concerning the focus, expertise, and plans of a company, are necessarily subjective labels. *See Welgus v. Trinet Grp., Inc.*, 765 Fed. Appx. 239, 240-41 (9th Cir. 2019) (statement that "risk management is a core competency" was an opinion); *Markette v. XOMA Corp.*, 2017 WL 4310759, at *4-5 (N.D. Cal. Sept. 28, 2017) (statement that results were "encouraging to our ultimate goal" was an opinion because it "inherently reflect[ed] the speaker's assessment of and judgment about the underlying circumstances"); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014) ("representations that [UBS] 'prioritized adequate diversification of risk' and 'avoidance of undue concentrations' [we]re too open-ended and subjective" to be actionable); *Teamsters Loc. 237*

-40-

*Welfare Fund v. ServiceMaster Glob. Holdings Inc.*, 2022 WL 989240, at *22 (W.D. Tenn. Mar. 31, 2022), *aff'd*, 83 F.4th 514 (6th Cir. 2023) (no liability for "vague sentiments and opinions" including "renewed efforts to focus heavier on preventative rather than just curative" products). Plaintiff fails to show these opinions were objectively *or* subjectively false——both of which are required under Ninth Circuit law. *Align*, 856 F.3d at 614; *supra* 29–30.

### b) Statements About Future Product Slate Are Forward-Looking Statements

Statements about what products a company intends to produce or focus on are necessarily prospective and forward-looking. *E.g.*, ¶ 115 ("[Origin] has also **made progress in developing** new products and applications which **may be incorporated** into the design of the plant, such as FDCA [and] PEF."); ¶¶ 117, 119, 129, 131 (same); ¶ 127 ("[Origin 2] is **expected** to convert 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC."); ¶ 141 (same). Accordingly, Origin noted that the forward-looking statements in its public filings and announcements included "commercial and operating plans" and "product development plans" (Ex. 9 at 2), and could vary based on "changes in the Company's strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects and plans." Ex. 22 at 28.

Like its disclosures about construction timelines and product scaling, *supra* 32–36, Origin's risk disclosures were meaningful. Origin warned that it "has no experience in producing large quantities of its products" and "[t]here are significant technological and logistical challenges associated with producing, marketing, selling and distributing products in the specialty

-41-

chemicals industry." Ex. 4 at 57. Origin warned that "market acceptance of our products will depend on numerous factors, many of which are outside of our control . . . including . . . our ability to produce products of consistent quality that offer functionality comparable or superior to existing or new products." Ex. 2 at 20. These warnings clearly disclosed that Origin could run into problems scaling up PX/PET production or commercialization and could experience setbacks. As such, they are meaningful (and not misleading) for the same reasons set out *supra* 32-36. *See Amyris*, 2014 WL 1285175, at *13-14 (accepting as meaningful warnings about scaling production and launching chemical product).

## III. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION WITH PARTICULARITY

The Ninth Circuit dictates that the particularity requirements of "Rule 9(b) appl[y] to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). This uniquely high standard for pleading fraud is intended to apply to each element of Plaintiff's claims. *Id.* ("The requirement of loss causation, in particular, is founded on the common law of fraud and deceit . . . . Since securities fraud is derived from common law fraud, it makes sense to apply the same pleading standard to all circumstances of securities fraud."). Under this standard, loss causation allegations "must contain 'sufficient detail' to (1) give the defendant 'ample notice of [Plaintiff's] loss causation theory' and (2) provide the court 'some assurance that the theory has a basis in fact.'" *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 404 (9th Cir. 2021).

-42-

### A. Generic, Inconsistent Price Impact Allegations Do Not Show Loss Causation

The SAC's loss causation allegations are identical to the boilerplate allegations contained in the FAC. Plaintiff alleges in a two-page section that certain statements by Defendants were accompanied by stock price movements——both increases and decreases. ¶¶ 223-28. Then, the SAC simply points to the stock drop after the August 9, 2023, announcement, ¶ 216, and concludes that the announcement should be assumed to have caused loss because of "[t]he timing and magnitude of the price decline." ¶ 220. This does not meet Plaintiff's burden of particularized pleading. *See Uber*, 998 F.3d at 407 (dismissing loss causation allegation "because Irving did not adequately and with particularity allege that these revelations caused the resulting drop in Uber's valuation").

The inconsistent movement of Origin's stock price after alleged misstatements alone should warrant dismissal here. The Supreme Court has warned that "[t]he generic nature of a misrepresentation often will be important evidence of a lack of price impact." G*oldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021). These concerns are clearly implicated here, given the highly generic allegations of how Defendants' statements purportedly caused loss, and the conflicting increases and drops of Origin's stock price after those statements. ¶¶ 223-28. It is implicated even further by Plaintiff's conclusory allegations that decreases were "buoyed from a steeper decline by Defendants' false and misleading statements." ¶¶ 226-28. Plaintiff alleges no facts at all to establish this "buoy[ing]," which merits dismissal. *Oracle Partners, L.P. v. Concentric Analgesics, Inc.*, 2021 WL 2322351, at *7 (N.D. Cal. June 7, 2021) (dismissing loss

-43-

causation allegations that "amount[ed] to a claim that [a] 'loss' stem[med] from share inflation due to the misrepresentations, but fail[ed] to explain how Plaintiffs *actually* suffered any loss").

Established case law also makes clear that Plaintiff cannot simply list a slew of purported misrepresentations about various topics, then point to a stock drop. The Supreme Court has held, accordingly, that the securities laws are intended "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). District courts in the Ninth Circuit thus require particularized connections between statements and losses. Of note:

- Judge Slaughter in the Central District of California dismissed allegations where, as here, "ultimately, there [were] no specific allegations demonstrating the alleged misrepresentations that *caused* the decline in the value of [the] investments, and the complaint d[id] not differentiate between" them. *Brady v. Delta Energy & Commc'ns, Inc.*, 2023 WL 2683203, at *9 (C.D. Cal. Jan. 25, 2023).

- In the District of Arizona, Judge Liburdi held that plaintiffs did not allege loss causation by claiming that a company's disclosures of a failure to achieve a certain metric "corrected" certain statements. Those plaintiffs failed to establish causation by pointing to CW accounts of a "substantial factor" to that metric, solar panel manufacturing and performance problems. *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023).

This case law dismissing allegations that do not connect alleged misrepresentations and losses *with particularity* is especially relevant here. Plaintiff challenges a hodgepodge of statements concerning expected progress in Origin 2's design, construction, and financing; expected timing for updates to

-44-

investors; exploration of potential products to be produced at the company's plants; assessments of the commercial potential of various chemical products; management's pride in the Origin team's achievements, and more. ¶¶ 115-20, 125, 127, 129-32, 136, 138-39, 141, 143-45, 147-49. Plaintiff fails to allege how any of these statements were false, let alone how Origin's promised August 2023 update "relate[s] back" to any of these statements in particular. *First Solar*, 2023 WL 4161355, at *6.

### B. Loss Causation Allegations Require Corrective Disclosures, and Plaintiff Pleads None
#### 1. The Purported "Corrective Disclosures" Did Not "Correct" Anything

"Corrective disclosures" require that some statement was "corrected." *See Bonnano v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753, at *3 (N.D. Cal. Sept. 2, 2016) ("To be corrective, the disclosure must relate to the misrepresentation and not to some other negative information about the company."). Plaintiff's unchanged loss causation allegations still fail to explain how the August 9, 2023 announcement "corrected" anything.

Despite carrying the pleading burden, Plaintiff does not show how any statements were falsified by an already overbroad purported "corrective disclosure" that "reveal[ed] Origin was significantly delaying the timeline for the construction of Origin 2, changing the product slate at the plant from a focus on PX to a focus on FDCA, reducing the plant's production capacity by half, greatly increasing the plant's cost, and delaying start-up and meaningful earnings." ¶ 216. For example:

- Origin's August 2023 announcement did not falsify its earlier statement that Origin "expect[ed] to provide an update" on Origin 2's construction plans. ¶¶ 115-19, 129-31. Rather, the August 2023 announcement *itself* was the update, so it *affirmed*

-45-

these prior statements rather than showing them false.

- Similarly, the August 2023 announcement *affirmed* prior repeated statements that Origin was "ma[king] progress developing new products and applications which may be incorporated into the design of Origin 2, such as FDCA [and] PEF." ¶¶ 115, 117, 119, 129, 131. It is objectively true that Origin made this progress, since it was now able to "plan to bring FDCA forward to Origin 2, rather than at [its] third planned commercial plant, Origin 3, as initially reported in 2021." Ex. 13 at 1.

Plaintiff's loss causation allegations cannot stand where the purported "corrective disclosures" actually *affirmed* the purported misrepresentations as true. *See Cellular Biomedicine*, 2016 WL 4585753, at *4 ("corrective disclosure" needed to disclose "true facts" correcting a prior misstatement).

### 2. The "Corrective Disclosures" Did Not Reveal New Information

Plaintiff also does not and cannot show that the August 2023 announcement disclosed any new information to investors. As Judge Seeborg in the Northern District of California held, a plaintiff cannot plead loss causation based on a disclosure that "does not 'reveal to the market something previously hidden or actively concealed.'" *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017); *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1202-03 (9th Cir. 2020)(plaintiffs can only "rely on a corrective disclosure . . . by alleging that the [] information had not been previously disclosed"). Contrary to Plaintiff's narrative:

- Far from "reveal[ing]" for the first time in August 2023 "that the Company's strategy of focusing on high-margin products, such as FDCA, *began in February 2023*," ¶ 160, Origin had disclosed that strategy *as early as November 2022*. Ex. 8 at 3. Origin told investors that Origin's "sales team [would] focus

-46-

on high margin products such as carbon black and advanced CMF-derived products for Origin 2 and beyond," including FDCA. *Id.* Indeed, in May 2023, an analyst explicitly noted that he could "appreciate the strategy change a little bit to look more at the revenue generation and higher-margin products." Ex. 19 at 12.

- Origin repeatedly disclosed the initiation and progress of FEL 2 for Origin 2, ¶¶ 115, 117, 119–20, 129–30, 132, and the expected timing for an update on the plant's construction. ¶¶ 115–19, 129–31. Plaintiff admits that in light of this process, investors knew that Origin "expect[ed] to provide an update on new product offerings and construction plans for the Origin 2 plant in mid-2023." ¶ 113. It was certainly not "new" information that the update came when Origin told investors to expect it. Ex. 13 at 1-2.

Plaintiff will still no doubt ask the Court to simply infer that the August 2023 announcement caused loss because of the "timing and magnitude" of the drop that day. ¶ 220. But the burden of pleading loss causation *with particularity* lies with Plaintiff. Plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some other intervening event." *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *5 (N.D. Cal. Mar. 23, 2020), *aff'd*, 848 F. App'x 278 (9th Cir. 2021); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013)("[T]o satisfy the loss causation requirement, *the plaintiff must show* that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff."). Plaintiff cannot plead loss causation based on facts that the market already knew. *See Fitbit*, 2020 WL 1465932, at *12 (finding that a defendant's press release describing struggling sales and high inventory levels did not constitute a corrective disclosure because it "added no new

-47-

information to the market").

**CONCLUSION**

Defendants respectfully request that the Complaint be dismissed with prejudice.[10]

Dated: December 19, 2024　　　　FRESHFIELDS US LLP

/s/Boris Feldman
BORIS FELDMAN
DORU GAVRIL
CARL HUDSON
REBECCA LOCKERT
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
boris.feldman@freshfields.com
doru.gavril@freshfields.com
carl.hudson@freshfields.com
rebecca.lockert@freshfields.com

*Attorneys for Defendants Origin Materials, Inc., Richard J. Riley, and John Bissell*

---

[10] Plaintiff's Section 20(a) claim should also be dismissed, because he fails to allege any primary violation of the securities laws. *MVP Asset Mgmt. (USA) LLC v. Vestbirk*, 2013 WL 1726359, at *7 (E.D. Cal. Mar. 22, 2013) ("Because Plaintiff's primary claim under Section 10(b) is dismissed, the[] [Section 20(a)] claim[] must also be dismissed.").

-48-

DEFS' MOTION TO DISMISS SAC
CASE NO. 2:23-cv-01816-WBS-JDP