# EXHIBIT 4

As filed with the Securities and Exchange Commission on March 8, 2021

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM S-4
# REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# ARTIUS ACQUISITION INC.
**(Exact Name of Registrant as Specified in its charter)**

| **Cayman Islands**(1) | **6770** | **N/A** |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(Primary Standard Industrial Classification Code Number)** | **(IRS Employer Identification Number)** |

**3 Columbus Circle, Suite 2215**
**New York, NY 10019**
**(212) 309-7668**
**(Address, including Zip Code, and Telephone Number, including Area Code, of Principal Executive Offices)**

**Boon Sim**
**Chief Executive Officer and Chief Financial Officer**
**3 Columbus Circle, Suite 2215**
**New York, NY 10019**
**(212) 309-7668**
**(Name, Address, including Zip Code, and Telephone Number, including Area Code, of Agent for Service)**

*Copies to:*

| | | | |
|---|---|---|---|
| **Paul J. Shim, Esq.** | **Clare O'Brien, Esq.** | **Joshua C. Lee, Esq.** | **Matthew P. Dubofsky, Esq.** |
| **Adam J. Brenneman, Esq.** | **Shearman & Sterling LLP** | **General Counsel** | **John T. McKenna, Esq.** |
| **Cleary Gottlieb Steen &** | **599 Lexington Avenue** | **Micromidas, Inc.** | **Peter H. Werner, Esq.** |
| **Hamilton LLP** | **New York, NY 10022** | **930 Riverside Parkway** | **Garth Osterman, Esq.** |
| **One Liberty Plaza** | **(212) 848-8966** | **Suite 10** | **Cooley LLP** |
| **New York, NY 10006** | | **West Sacramento, CA** | **101 California Street** |
| **(212) 225-2000** | | **95605** | **5th Floor** |
| | | **(916) 231-9329** | **San Francisco, CA 94111** |
| | | | **(415) 693-2000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effectiveness of this registration statement.

If the securities being registered on this form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | | Smaller reporting company | ☒ |
| | | | Emerging Growth Company | ☒ |

Table of Contents

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross Border Third-Party Tender Offer) ☐

---

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Amount to be Registered (1) | Proposed Maximum Offering Price Per Public Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock (2)(3) | 90,562,500 | $10.46 | $ 947,283,750(4) | $103,348.66 |
| Warrants to purchase Common Stock (2)(5) | 24,150,000 | $ 1.80 | $ 43,470,000(6) | $ 4,742.58 |
| Common Stock (2)(7) | 103,213,000 | N/A | $ 991.83(8) | $ 1.00 |

(1)    Immediately prior to the consummation of the Business Combination described in the proxy statement/prospectus forming part of this registration statement (the "proxy statement/prospectus"), Artius Acquisition Inc., a Cayman Islands exempted company ("Artius"), intends to effect a deregistration under the Cayman Islands Companies Act (As Revised) and a domestication under Section 388 of the Delaware General Corporation Law, pursuant to which Artius's jurisdiction of incorporation will be changed from the Cayman Islands to the State of Delaware (the "Domestication"). All securities being registered will be issued by Artius (post-Domestication), as the continuing entity following the Domestication, which will be renamed "Origin Materials, Inc." in connection with the Domestication, as further described in the proxy statement/prospectus. As used herein, the "Combined Company" refers to Artius after the Domestication, the consummation of the Business Combination, and such change of name, as applicable.

(2)    Pursuant to Rule 416(a) of the Securities Act, there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(3)    The number of shares of common stock of the Combined Company ("Combined Company Common Stock") being registered represents the number of Class A ordinary shares of Artius that were registered pursuant to the registration statements on Form S-1 (SEC File Nos. 333-239421 and 333-239841) (together, the "IPO Registration Statement") and offered by Artius in its initial public offering (the "Artius public shares") and 18,112,500 Class B ordinary shares of Artius ("Artius founder shares"). The Artius public shares and Artius founder shares automatically will be converted by operation of law into shares of Class A common stock and Class B common stock of Artius in the Domestication and such shares of Class A common stock and Class B common stock will become shares of Combined Company Common Stock upon the completion of the Business Combination.

(4)    Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the Artius public shares on Nasdaq on March 5, 2021 ($10.46 per Class A ordinary share) (such date being within five business days of the date that this registration statement was first filed with the SEC). This calculation is in accordance with Rule 457(f)(1) of the Securities Act.

(5)    The number of redeemable warrants to acquire Combined Company Common Stock being registered represents the number of redeemable warrants to acquire Artius public shares that were registered pursuant to the IPO Registration Statement referenced in note (3) above and offered by Artius in its initial public offering (the "Artius public warrants"). The Artius public warrants automatically will be converted by operation of law into redeemable warrants to acquire shares of Artius Class A common stock in the Domestication, and will become redeemable warrants to acquire Combined Company Common Stock upon the completion of the Business Combination.

(6)    Estimated solely for the purpose of calculating the registration fee, based on the average of the high and low prices of the Artius public warrants on the Nasdaq on March 5, 2021 ($1.80 per warrant) (such date being within five business days of the date that this registration statement was first filed with the SEC). This calculation is in accordance with Rule 457(f)(1) of the Securities Act.

(7)    Based on the maximum number of shares of Combined Company Common Stock estimated to be issued in connection with Merger described herein. This number is based on the sum of (i) the 78,213,000 shares of Combined Company Common Stock issuable upon the consummation of the Merger, without giving effect to downward adjustments, and (ii) up to 25,000,000 shares of Combined Company Common Stock that may be issued after such date for certain holders of Origin's shares of common stock and options pursuant to the earn-out provisions of the Merger Agreement described herein.

(8)    Estimated solely for purposes of calculating the registration fee in accordance with Rule 457(f)(2) of the Securities Act. Micromidas, Inc., a Delaware corporation ("Origin") is a private company, no market exists for its securities, and has an accumulated deficit. Therefore, the proposed maximum aggregate offering price is one-third of the aggregate par value of the Origin securities expected to be exchanged in the Business Combination.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

**The information contained in this document is subject to completion or amendment. A registration statement relating to these securities has been filed with the United States Securities and Exchange Commission. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This document is not an offer to sell these securities and it is not soliciting an offer to buy these securities, nor shall there be any sale of these securities, in any jurisdiction in which such offer, solicitation or sale is not permitted or would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.**

**PRELIMINARY PROXY STATEMENT AND PROSPECTUS**
**SUBJECT TO COMPLETION, DATED March 8, 2021**

**PROXY STATEMENT/PROSPECTUS FOR 193,775,500 SHARES OF COMMON STOCK AND 24,150,000 WARRANTS TO PURCHASE SHARES OF COMBINED COMPANY COMMON STOCK, IN EACH CASE OF ARTIUS ACQUISITION INC. AFTER ITS DOMESTICATION AS A CORPORATION INCORPORATED IN THE STATE OF DELAWARE, WHICH WILL BE RENAMED "ORIGIN MATERIALS, INC." IN CONNECTION WITH THE BUSINESS COMBINATION.**

The board of directors of Artius Acquisition Inc., a Cayman Islands exempted company ("Artius," "we," "our" or "us"), has unanimously approved (i) the agreement and plan of merger and reorganization, dated as of February 16, 2021 (as amended by the letter agreement dated March 5, 2021, and as further amended or modified from time to time, the "Merger Agreement"), by and among Artius, Zero Carbon Merger Sub Inc., a Delaware corporation and a direct, wholly-owned subsidiary of Artius ("Merger Sub"), and Micromidas, Inc., a Delaware corporation doing business as Origin Materials ("Origin"), which provides for, among other things, the merger of Merger Sub with and into Origin, with Origin continuing as the surviving corporation (the "Merger" and, together with the other transactions contemplated by the Merger Agreement, the "Business Combination"), (ii) the change of Artius's jurisdiction of incorporation from the Cayman Islands to the State of Delaware by deregistering as an exempted company in the Cayman Islands and domesticating and continuing as a corporation incorporated under the laws of the State of Delaware (the "Domestication," and Artius post-domestication and upon the consummation of the Business Combination, the "Combined Company") and (iii) the other transactions contemplated by the Merger Agreement and documents related thereto.

As described in this proxy statement/prospectus, Artius's shareholders are being asked to consider and vote upon (among other things) the Business Combination and the Domestication. Assuming the proposals are approved, the Domestication is expected to be effectuated prior to the closing of the Business Combination (the "Closing"). The continuing entity following the Domestication will be named "Origin Materials, Inc."

On the effective date of the Domestication, (i) the issued and outstanding Class A ordinary shares, par value $0.0001 per share (the "Artius Class A Ordinary Shares"), of Artius will convert automatically by operation of law, on a one-for-one basis, into shares of Class A common stock, par value $0.0001 per share, of Artius (the "Artius Class A Common Stock"); (ii) the issued and outstanding redeemable warrants that were registered pursuant to the Registration Statements on Form S-1 (SEC File Nos. 333-239421 and 333-239841) of Artius (the "IPO Registration Statement") will automatically become redeemable warrants to acquire shares of Artius Class A Common Stock (no other changes will be made to the terms of any issued and outstanding public warrants as a result of the Domestication); (iii) each issued and outstanding unit of Artius that has not been previously separated into the underlying Artius Class A Ordinary Share and warrant upon the request of the holder thereof, will automatically entitle the holder thereof to one share of Artius Class A Common Stock and one-third of one redeemable warrant to acquire one share of Artius Class A Common Stock; (iv) each issued and outstanding Class B ordinary share, par value $0.0001 per share (the "Artius Class B Ordinary Shares"), of Artius will convert automatically by operation of law, on a one-for-one basis without giving effect to any rights of adjustment or other anti-dilution protections, into shares of Artius Class B Common Stock; and (v) the issued and outstanding warrants of Artius issued in a private placement will automatically become warrants to acquire shares of Artius Class A Common Stock (no other changes will be made to the terms of any issued and outstanding private placement warrants as a result of the Domestication). The Artius Class A Common Stock and the Artius Class B Common Stock are to be authorized pursuant to the proposed Interim Certificate of Incorporation (as defined below). Upon completion of the Business Combination, the outstanding shares of Artius Class A Common Stock and Artius Class B Common Stock will become shares of common stock of the Combined Company, par value $0.0001 per share ("Combined Company Common Stock") and the warrants to acquire shares of Artius Class A Common Stock will become warrants to acquire Combined Company Common Stock. The Combined Company Common Stock is to be authorized pursuant to the proposed Certificate of Incorporation (as defined below).

At the Effective Time, by virtue of the Merger and without any action on the part of Artius, Merger Sub, Origin or the holders of any of Origin's securities, each outstanding share of the common stock of Origin (the "Origin Common Stock"), the Series A Preferred Stock of Origin (the "Origin Series A Preferred

Table of Contents

Stock"), the Series B Preferred Stock of Origin (the "Origin Series B Preferred Stock") and the Series C Preferred Stock of Origin (the "Origin Series C Preferred Stock" and, together with the Origin Series A Preferred Stock and the Origin Series B Preferred Stock, the "Origin Preferred Stock") will automatically convert into the right to receive a number of shares of Combined Company Common Stock equal to the Common Exchange Ratio, Series A Exchange Ratio, Series B Exchange Ratio and Series C Exchange Ratio, respectively (subject to certain adjustments as described in the Merger Agreement). The "Common Exchange Ratio" means (i) the quotient of 78,213,000 (minus adjustments as described in this proxy statement/prospectus) minus the Aggregate Liquidation Preference Consideration (as defined in the Merger Agreement) (ii) divided by Origin's fully diluted shares outstanding (as defined in the Merger Agreement), as of immediately prior to the Effective Time. The "Series A Exchange Ratio" means (i) the quotient of the Series A Per Share Liquidation Preference (as defined in the Merger Agreement) divided by the per share value of Artius Common Stock (as adjusted pursuant to the Merger Agreement) calculated in accordance with the Amended and Restated Certificate of Incorporation of Origin (the "Artius Trading Price") (plus adjustments as described in this proxy statement/prospectus) (ii) plus the Per Share Residual Consideration (as defined in the Merger Agreement). The "Series B Exchange Ratio" means (i) the quotient of the Series B Per Share Liquidation Preference (as defined in the Merger Agreement) divided by the Artius Trading Price (plus adjustments as described in this proxy statement/prospectus) (ii) plus the Per Share Residual Consideration. The "Series C Exchange Ratio" means (i) the quotient of the Series C Per Share Liquidation Preference (as defined in the Merger Agreement) divided by the Artius Trading Price (plus adjustments as described in this proxy statement/prospectus) (ii) plus the Per Share Residual Consideration. As of the date of this proxy statement/prospectus, the Common Exchange Ratio was approximately , the Series A Exchange Ratio was approximately , the Series B Exchange Ratio was approximately and the Series C Exchange Ratio was approximately . In addition, certain holders of Origin's securities will be entitled to receive, in the aggregate, up to 25,000,000 shares of Combined Company Common Stock subject to certain earnout provisions.

Artius's Class A ordinary shares, units and warrants are currently listed on the Nasdaq Capital Market ("Nasdaq") under the symbols "AACQ," "AACQU" and "AACQW," respectively. Artius will apply for listing, to be effective at the time of the Business Combination, of the Combined Company Common Stock and Common Stock Public Warrants (as defined below) on the Nasdaq under the proposed symbols "ORGN" and "ORGNW," respectively.

---

**This proxy statement/prospectus provides shareholders of Artius with detailed information about the Business Combination and other matters to be considered at the extraordinary general meeting of Artius. We encourage you to read this entire document, including the Annexes and other documents referred to herein, carefully and in their entirety. You should also carefully consider the risk factors described in "_Risk Factors_" beginning on page 50 of this proxy statement/prospectus.**

We are not licensed to conduct investment business in the Cayman Islands by the Cayman Islands Monetary Authority and this proxy statement/prospectus does not constitute an offer to members of the public of our issued share capital, whether by way of sale or subscription, in the Cayman Islands. Our issued share capital has not been offered or sold, will not be offered or sold and no invitation to subscribe for our common shares will be made, directly or indirectly, to members of the public in the Cayman Islands.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THE ACCOMPANYING PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THE ACCOMPANYING PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.

**This proxy statement/prospectus is dated , 2021 and
is first being mailed to Artius's shareholders on or about , 2021.**

**Table of Contents**

**LETTERS TO SHAREHOLDERS OF ARTIUS ACQUISITION INC.**

**Artius Acquisition Inc.**
**3 Columbus Circle, Suite 2215**
**New York, NY 10019**
**(212) 309-7668**

Dear Artius Acquisition Inc. Shareholder:

We cordially invite you to attend the extraordinary general meeting (the "Special Meeting") in lieu of the 2021 general annual meeting of the shareholders of Artius Acquisition Inc., a Cayman Islands exempted company ("Artius," "we," "us," or "our"), which, in light of public health concerns regarding the coronavirus (COVID-19) pandemic, will be held at and virtually via live webcast at , on , at . The Special Meeting can be accessed by attending the offices of or visiting , where you will be able to listen to the meeting live and vote during the meeting. Additionally, you have the option to only listen to the Special Meeting by dialing (toll-free within the U.S. and Canada) or (outside of the U.S. and Canada, standard rates apply). The passcode for telephone access is , but please note that you cannot vote during the meeting or ask questions if you choose to participate telephonically.

On February 16, 2021, Artius, Zero Carbon Merger Sub Inc., a Delaware corporation and a direct, wholly-owned subsidiary of Artius ("Merger Sub"), and Micromidas, Inc., a Delaware corporation doing business as Origin Materials ("Origin"), entered into an Agreement and Plan of Merger and Reorganization (as amended by the letter agreement dated March 5, 2021, and as further amended or modified from time to time, the "Merger Agreement"), which provides for, among other things, the merger of Merger Sub with and into Origin, with Origin continuing as the surviving corporation (the "Merger" and, together with the other transactions contemplated by the Merger Agreement, the "Business Combination"). As a result of the Merger, each share of the capital stock of Origin (the "Origin Capital Stock") will be cancelled and converted into the right to receive the merger consideration in accordance with the terms of the Merger Agreement, and Artius will thereafter own 100% of the outstanding capital stock of Origin as the surviving corporation of the Merger. Following the closing of the Business Combination, the Combined Company will own, directly or indirectly, all of the issued and outstanding equity interests in the Surviving Corporation and its subsidiaries, and the stockholders of Origin as of immediately prior to the effective time of the Merger (the "Origin Stockholders") will hold a portion of our common stock, par value $0.0001 per share (the "Combined Company Common Stock"). **You are being asked to vote on the Business Combination.**

Subject to the terms of the Merger Agreement, the aggregate merger consideration to be paid in connection with the Business Combination is expected to comprise of (i) 78,213,000 shares of Combined Company Common Stock (based on assumed value of $10.00 per share) with a value equal to approximately $782 million and (ii) additional consideration of up to 25 million shares of Combined Company Common Stock, which shall be payable in three equal installments of 8.333 million shares of Combined Company Common Stock if the price per share reaches a $15 per share threshold during the 3-year period after the closing of the Business Combination, a $20 per share threshold during the 4-year period after the closing of the Business Combination, and a $25 per share threshold during the 5-year period after the closing of the Business Combination. Each threshold is met if the volume weighted average sale price of one share of Combined Company Common Stock equals or exceeds the threshold price for ten consecutive days during the specific period. The number of Combined Company Common Stock to be issued to Origin Stockholders will be reduced (dollar for dollar based on a $10 per share price) if Origin's net debt at the closing of the Business Combination is greater than $15.3 million and/or if Origin's expenses in connection with the Business Combination exceed $17.5 million, and will not be subject to adjustments based on Origin's working capital at the closing of the Business Combination.

As a condition to closing the Business Combination (the "Closing"), the board of directors of Artius has unanimously approved a change of Artius's jurisdiction of incorporation by deregistering as an exempted company in the Cayman Islands and continuing and domesticating as a corporation incorporated under the laws of the State of Delaware (the "Domestication"). As used herein, the "Combined Company" refers to Artius as a

Table of Contents

Delaware corporation by way of continuation following the Domestication and the Business Combination, which, in connection with the Domestication, will change its corporate name to "Origin Materials, Inc."

At the effective time of the Domestication, (i) the issued and outstanding Class A ordinary shares, par value $0.0001 per share, of Artius (the "Artius Class A Ordinary Shares") will convert automatically by operation of law, on a one-for-one basis, into shares of Class A common stock of Artius (the "Artius Class A Common Stock"); (ii) the issued and outstanding redeemable warrants that were registered pursuant to the IPO Registration Statement will automatically become redeemable warrants to acquire shares of Artius Class A Common Stock (no other changes will be made to the terms of any issued and outstanding public warrants as a result of the Domestication); (iii) each issued and outstanding unit of Artius that has not been previously separated into the underlying Artius Class A Ordinary Share and underlying warrant upon the request of the holder thereof, will automatically entitle the holder thereof to one share of Artius Class A Common Stock and one-third of one redeemable warrant to acquire one share of Artius Class A Common Stock; (iv) each issued and outstanding Class B ordinary share, par value $0.0001 per share, of Artius (the "Artius Class B Ordinary Shares") will convert automatically by operation of law, on a one-for-one basis without giving effect to any rights of adjustment or other anti-dilution protections, into shares of Artius Class B Common Stock (the "Artius Class B Common Stock"); and (v) the issued and outstanding warrants of Artius issued in a private placement will automatically become warrants to acquire shares of Artius Class A Common Stock. Upon completion of the Business Combination, the outstanding shares of Artius Class A Common Stock and Class B Common Stock will become shares of Combined Company Common Stock and the warrants to acquire shares of Artius Class A Common Stock will become warrants to acquire Combined Company Common Stock. Four and one half million shares of the Sponsor's Combined Company Common Stock will be subject to the certain restrictions as more fully described in this proxy statement/prospectus.

At the Special Meeting, our shareholders will be asked to consider and vote upon a proposal by special resolution to effect the Domestication (the "Domestication Proposal" or "Proposal No. 1") and a proposal to approve the Merger Agreement, a copy of which is attached to the accompanying proxy statement/prospectus as Annex A, and the transactions contemplated thereby, including the Business Combination (the "Transaction Proposal" or "Proposal No. 2"). In addition, you are being asked to consider and vote upon: (i) a proposal to approve, for purposes of complying with applicable Nasdaq listing rules, the issuance of more than 20% of Artius's issued and outstanding Common Stock in connection with the Business Combination (the "Issuance Proposal" or "Proposal No. 3"); (ii) a proposal to approve and adopt the proposed Interim Certificate of Incorporation (as defined below), to be in effect as of the Domestication and prior to the Effective Time, and the Bylaws of Artius, to be in effect as of the Domestication in the form attached hereto as Annex C and Annex D, respectively (the "Interim Charter Proposal" or "Proposal No. 4"); (iii) a proposal to approve and adopt the proposed Certificate of Incorporation (as defined below), to be in effect at the Effective Time (as defined below) in the form attached hereto as Annex E (the "Charter Proposal" or "Proposal No. 5"); (iv) eight separate proposals with respect to certain material differences between Artius's existing amended and restated memorandum and articles of association ("Existing Organizational Documents") and the proposed Interim Certificate of Incorporation (the "Interim Certificate of Incorporation"), the proposed Certificate of Incorporation (the "Certificate of Incorporation") and the proposed Bylaws (the "Bylaws") (the "Organizational Documents Proposals" or "Proposal No. 6"), which will be voted upon on a non-binding advisory basis; (v) a proposal to approve the 2021 Equity Incentive Plan (the "2021 Equity Incentive Plan") including the authorization of the initial share reserve under the 2021 Equity Incentive Plan, in the form attached hereto as Annex H (the "Equity Incentive Plan Proposal" or "Proposal No. 7"); (vi) a proposal to approve the employee stock purchase plan (the "ESPP") that provides for the ability to grant stock purchase rights with respect to Combined Company Common Stock to employees of the Combined Company and its subsidiaries (the "ESPP Proposal" or "Proposal No. 8"); (vii) a proposal to elect directors to serve staggered terms on the board of directors of the Combined Company until the first, second and third annual meeting of stockholders following the date of the filing of the Certificate of Incorporation, as applicable, and until their respective successors are duly elected and qualified (the "Director Election Proposal" or "Proposal No. 9"); and (viii) a proposal to allow the chairperson of the Special Meeting to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Domestication Proposal, the Transaction Proposal, the Issuance Proposal, the Interim Charter Proposal, the Charter Proposal, the Equity

Table of Contents

Incentive Plan Proposal, the ESPP Proposal or the Director Election Proposal but no other proposal if the Domestication Proposal, the Transaction Proposal, the Issuance Proposal, the Interim Charter Proposal, the Charter Proposal, the Equity Incentive Plan Proposal, the ESPP Proposal and the Director Election Proposal (together, the "Required Proposals") are approved (the "Adjournment Proposal" or "Proposal No. 10").

Each of these proposals is more fully described in this proxy statement/prospectus, which each shareholder is encouraged to read carefully.

Our Public Shares, Public Units and Public Warrants are currently listed on the Nasdaq under the symbols "AACQ," "AACQU" and "AACQW," respectively. Artius will apply for listing, to be effective at the time of the Business Combination, of the Combined Company Common Stock and Common Stock Public Warrants on the Nasdaq under the symbols "ORGN" and "ORGNW," respectively.

Pursuant to Artius's amended and restated memorandum and articles of association (the "A&R Memorandum and Articles") and the Investment Management Trust Agreement, dated as of July 13, 2020, by and between Artius and Continental Stock Transfer & Trust Company (the "Trust Agreement"), we are providing our Public Shareholders with the opportunity to redeem, upon the closing of the Business Combination, Artius Class A Ordinary Shares then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the closing of the Business Combination) in the Trust Account that holds the proceeds of the Artius IPO (including interest not previously released to Artius to pay its taxes). The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the Deferred Discount (as defined below) that we will pay to the underwriters of the Artius IPO or transaction expenses incurred in connection with the Business Combination. For illustrative purposes, based on the balance of the Trust Account of $724,716,475.96 as of December 31, 2020, the estimated per share redemption price would have been approximately $10.00. Public Shareholders may elect to redeem their shares even if they vote for the Business Combination. A Public Shareholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the Artius Class A Ordinary Shares included in the Public Units sold in the Artius IPO. We refer to this as the "15% threshold." We have no specified maximum redemption threshold under our A&R Memorandum and Articles, other than the aforementioned 15% threshold. Each redemption of Artius Class A Ordinary Shares by our Public Shareholders will reduce the amount in the Trust Account. In no event will we redeem our Artius Class A Ordinary Shares in an amount that would result in Artius's failure to have at least $5,000,001 of net tangible assets. Holders of our outstanding Public Warrants do not have redemption rights in connection with the Business Combination. Unless otherwise specified, the information in the accompanying proxy statement/prospectus assumes that none of our Public Shareholders exercise their redemption rights with respect to their Artius Class A Ordinary Shares. Our Sponsor and current independent directors (collectively, our "Initial Stockholders"), as well as our officers and other current directors, have agreed to waive their redemption rights with respect to their Artius Ordinary Shares in connection with the consummation of the Business Combination, and the Founder Shares (as defined below) will be excluded from the pro rata calculation used to determine the per-share redemption price. Our Initial Stockholders have also agreed to waive their right to a conversion price adjustment with respect to any shares of our Artius Ordinary Shares they may hold in connection with the consummation of the Business Combination. Currently, our Initial Stockholders own 20% of our issued and outstanding shares of common stock, including all of the Founder Shares. Our Initial Stockholders have agreed to vote any Artius Ordinary Shares (as defined below) owned by them in favor of the Business Combination. The Founder Shares are subject to transfer restrictions.

We are providing this proxy statement/prospectus and accompanying proxy card to our shareholders in connection with the solicitation of proxies to be voted at the Special Meeting (including following any adjournments of the Special Meeting). Information about the Special Meeting, the Business Combination and other related business to be considered by our shareholders at the Special Meeting is included in this proxy statement/prospectus. **Whether or not you plan to attend the Special Meeting in person or via the virtual meeting platform, we urge all our shareholders to read this proxy statement/prospectus, including the Annexes and the accompanying financial statements of Artius and Origin, carefully and in their entirety.**

**Table of Contents**

**In particular, we urge you to read carefully the section entitled "*Risk Factors*" beginning on page 50 of this proxy statement/prospectus.**

After careful consideration, our Board has unanimously approved the Merger Agreement and the transactions contemplated therein, and unanimously recommends that our shareholders vote "**FOR**" the approval of the Merger Agreement and approval of the transactions contemplated thereby, including the Business Combination, and "**FOR**" all other proposals presented to our shareholders in the accompanying proxy statement/prospectus. When you consider our Board's recommendation of these proposals, you should keep in mind that our directors and officers have interests in the Business Combination that may conflict with your interests as a shareholder. Please see the section entitled "*The Business Combination—Interests of Certain Persons in the Business Combination—Interests of the Artius Initial Stockholders and Artius's Other Current Officers and Directors*" for additional information.

Approval of each of the Proposals, with the exception of the Domestication Proposal, the Interim Charter Proposal and the Charter Proposal, requires the affirmative vote of a majority of the votes cast by holders of our outstanding ordinary shares represented in person or by proxy at the Special Meeting or via the virtual meeting platform and entitled to vote at the Special Meeting. Approval of each of the Domestication Proposal, the Interim Charter Proposal and the Charter Proposal requires the affirmative vote of the holders of at least two-thirds of the votes cast by holders of our outstanding ordinary shares represented in person or by proxy at the Special Meeting or via the virtual meeting platform and entitled to vote at the Special Meeting.

Your vote is very important. Whether or not you plan to attend the Special Meeting, please vote as soon as possible by following the instructions in this proxy statement/prospectus to make sure that your shares are represented at the Special Meeting. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting. Unless waived by the parties to the Merger Agreement, the closing of the Business Combination is conditioned upon the approval of the Domestication Proposal, the Transaction Proposal, the Issuance Proposal, the Interim Charter Proposal, the Charter Proposal, the Equity Incentive Plan Proposal, the ESPP Proposal and the Director Election Proposal. If we fail to obtain the requisite shareholder approval for any of these proposals, we will not satisfy the conditions to closing of the Merger Agreement and we may be prevented from closing the Business Combination. Each of the proposals is conditioned on the approval of the Domestication Proposal, the Transaction Proposal, the Issuance Proposal, the Interim Charter Proposal, the Charter Proposal, the Equity Incentive Plan Proposal, the ESPP Proposal and the Director Election Proposal, other than the Organizational Documents Proposals and the Adjournment Proposal, which are not conditioned on the approval of any other proposal set forth in this proxy statement/prospectus.

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted "**FOR**" each of the proposals presented at the Special Meeting. If you fail to return your proxy card or fail to instruct your bank, broker or other nominee how to vote, and do not attend the Special Meeting in person or via the virtual meeting platform, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the Special Meeting. If you are a shareholder of record and you attend the Special Meeting and wish to vote in person or via the virtual meeting platform, you may withdraw your proxy and vote in person at the Special Meeting or via the virtual meeting platform.

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST DEMAND THAT ARTIUS REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT AND TENDER YOUR SHARES TO ARTIUS'S TRANSFER AGENT AT LEAST TWO BUSINESS DAYS PRIOR TO THE VOTE AT SUCH MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING THE DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED FOR CASH. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO

**Table of Contents**

WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

On behalf of our Board, I would like to thank you for your support of Artius Acquisition Inc. and look forward to a successful completion of the Business Combination.

Sincerely,

Boon Sim
Chief Executive Officer and Chief Financial Officer (Principal Executive, Financial and Accounting Officer)

**Table of Contents**

Table of Contents

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THIS PROXY STATEMENT/PROSPECTUS, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT/PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.

This proxy statement/prospectus is dated , 2021, and is expected to be first mailed or otherwise delivered to Artius shareholders on or about , 2021.

## ADDITIONAL INFORMATION

**No person is authorized to give any information or to make any representation with respect to the matters that this proxy statement/prospectus describes other than those contained in this proxy statement/prospectus, and, if given or made, the information or representation must not be relied upon as having been authorized by Artius or Origin. This proxy statement/prospectus does not constitute an offer to sell or a solicitation of an offer to buy securities or a solicitation of a proxy in any jurisdiction where, or to any person to whom, it is unlawful to make such an offer or a solicitation. Neither the delivery of this proxy statement/prospectus nor any distribution of securities made under this proxy statement/prospectus will, under any circumstances, create an implication that there has been no change in the affairs of Artius or Origin since the date of this proxy statement/prospectus or that any information contained herein is correct as of any time subsequent to such date.**

## WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statement and other information with the SEC required by the Exchange Act. Our public filings are available to the public from the SEC's website at www.sec.gov. You may request a copy of our filings with the SEC (excluding exhibits) at no cost by contacting us at the address and/or telephone number below.

If you would like additional copies of this proxy statement/prospectus or our other filings with the SEC (excluding exhibits) or if you have questions about the Business Combination or the proposals to be presented at the Special Meeting, you should contact us at the following address and telephone number:

Artius Acquisition Inc.
3 Columbus Circle, Suite 2215
New York, NY 10019
(212) 309-7668
Email: info@artiuscapital.com

You may also obtain additional copies of this proxy statement/prospectus by requesting them in writing or by telephone from our proxy solicitation agent at the following address and telephone number:

Morrow Sodali LLC
470 West Avenue
Stamford, CT 06902
Individuals call toll-free (800) 662-5200
Banks and Brokers call (203) 658-9400
Email: AACQ.info@investor.morrowsodali.com

You will not be charged for any of the documents you request. If your shares are held in a stock brokerage account or by a bank or other nominee, you should contact your broker, bank or other nominee for additional information.

**Table of Contents**

If you are an Artius shareholder and would like to request documents, please do so by , or five business days prior to the Special Meeting, in order to receive them before the Special Meeting. If you request any documents from us, such documents will be mailed to you by first class mail, or another equally prompt means.

This proxy statement/prospectus is part of a registration statement and constitutes a prospectus of Artius in addition to being a proxy statement of Artius for the Special Meeting. As allowed by SEC rules, this proxy statement/prospectus does not contain all of the information you can find in the registration statement or the exhibits to the registration statement. Information and statements contained in this proxy statement/prospectus are qualified in all respects by reference to the copy of the relevant contract or other document included as an Annex to this proxy statement/prospectus.

All information contained in this proxy statement/prospectus relating to Artius has been supplied by Artius, and all such information relating to Origin has been supplied by Origin. Information provided by either Artius or Origin does not constitute any representation, estimate or projection of any other party. This document is a proxy statement of Artius for the Special Meeting. Artius has not authorized anyone to give any information or make any representation about the Business Combination or the parties thereto, including Artius, which is different from, or in addition to, that contained in this proxy statement/prospectus. Therefore, if anyone does give you information of this sort, you should not rely on it. The information contained in this proxy statement/prospectus speaks only as of the date of this proxy statement/prospectus, unless the information specifically indicates that another date applies.

**Table of Contents**

**NOTICE OF THE SPECIAL MEETING OF ARTIUS ACQUISITION INC. IN LIEU OF THE 2021 ANNUAL GENERAL MEETING OF ARTIUS ACQUISITION INC.**

**TO BE HELD , 2021**

To the Shareholders of Artius Acquisition Inc.:

NOTICE IS HEREBY GIVEN that a special meeting (the "Special Meeting") in lieu of the 2021 annual meeting of the shareholders of Artius Acquisition Inc., a Cayman Islands exempted company ("Artius," "we," "us," or "our" and, after the Domestication and the consummation of the Business Combination as described below, the "Combined Company"), which, in light of public health concerns regarding the coronavirus (COVID-19) pandemic, will be held at and virtually via live webcast at , on , at . The Special Meeting can be accessed by attending the offices of or visiting , where you will be able to listen to the meeting live and vote during the meeting. Additionally, you have the option to listen only to the Special Meeting by dialing (toll-free within the U.S. and Canada) or (outside of the U.S. and Canada, standard rates apply). The passcode for telephone access is , but please note that you cannot vote during the meeting or ask questions if you choose to participate telephonically. You are cordially invited to attend the Special Meeting to conduct the following items of business:

1. *Domestication Proposal*—To consider and vote upon a proposal by special resolution to change the corporate structure and domicile of Artius by way of continuation from an exempted company incorporated under the laws of the Cayman Islands to a corporation incorporated under the laws of the State of Delaware (the "Domestication"). The Domestication will be effected prior to the closing of the Business Combination (the "Closing") by Artius (i) filing a Certificate of Domestication and the Interim Certificate of Incorporation (as defined below) with the Delaware Secretary of State, in each case, in accordance with the provisions thereof and the General Corporation Law of the State of Delaware (the "DGCL"), (ii) completing, making and procuring all filings required to be made with the Registrar of Companies of the Cayman Islands under the Cayman Islands Companies Act (As Revised), (iii) obtaining a certificate of de-registration from the Registrar of Companies of the Cayman Islands, and (iv) completing and making all filings required to be made with the Securities and Exchange Commission (the "SEC") and the Nasdaq to list the Combined Company Common Stock on the Nasdaq. Upon the effectiveness of the Domestication, Artius will become a Delaware corporation and will change its corporate name to "Origin Materials, Inc." and all outstanding securities of Artius will convert to outstanding securities of the continuing Delaware corporation, as described in more detail in the accompanying proxy statement/prospectus. We refer to this proposal as the "Domestication Proposal". The forms of the proposed Delaware Interim Certificate of Incorporation and the proposed Bylaws of Artius to become effective upon the Domestication, are attached to the accompanying proxy statement/prospectus as Annex C and Annex D, respectively (Proposal No. 1);

2. *Transaction Proposal*—To consider and vote upon a proposal to approve the Agreement and Plan of Merger and Reorganization, dated as of February 16, 2021 (as amended by the letter agreement dated March 5, 2021, and as further amended or modified from time to time, the "Merger Agreement"), by and among Artius, Zero Carbon Merger Sub Inc., a Delaware corporation and a direct, wholly-owned subsidiary of the Artius ("Merger Sub"), and Micromidas, Inc., a Delaware corporation doing business as Origin Materials ("Origin"), a copy of which is attached to this proxy statement/prospectus as Annex A, and approve the transactions contemplated thereby, including, among other things, the merger of Merger Sub with and into Origin, with Origin continuing as the Surviving Corporation (together with the Merger and the other transactions contemplated by the Merger Agreement, the "Business Combination") (Proposal No. 2);

3. *Issuance Proposal*—To consider and vote upon a proposal to approve, for purposes of complying with applicable Nasdaq listing rules, the issuance of more than 20% of Artius's issued and outstanding shares of Common Stock in connection with the Business Combination (Proposal No. 3);

4. *Interim Charter Proposal*—To consider and vote upon a proposal to approve and adopt the proposed Interim Certificate of Incorporation to be in effect as of the Domestication and prior to the Effective Time, and the Bylaws of Artius to be in effect as of the Domestication, in the form attached hereto as Annex C and Annex D, respectively (Proposal No. 4);

Table of Contents

5.  *Charter Proposal*—To consider and act upon a proposal to approve and adopt the proposed Certificate of Incorporation, to be in effect at the Effective Time, in the form attached hereto as Annex E (Proposal No. 5);

6.  *Organizational Documents Proposals*—To consider and act upon, on a non-binding advisory basis, eight separate proposals with respect to certain material differences between the Existing Organizational Documents and the proposed Interim Certificate of Incorporation, Certificate of Incorporation and Bylaws (Proposal No. 6);

7.  *Equity Incentive Plan Proposal*—To consider and vote upon a proposal to approve the 2021 Equity Incentive Plan (the "2021 Equity Incentive Plan") including the authorization of the initial share reserve under the 2021 Equity Incentive Plan, in the form attached hereto as Annex H (Proposal No. 7);

8.  *ESPP Proposal*—To consider and vote upon a proposal to approve the employee stock purchase plan (the "ESPP") that provides for the ability to grant stock purchase rights with respect to Combined Company Common Stock to employees of the Combined Company and its subsidiaries, in the form attached hereto as Annex I (Proposal No. 8);

9.  *Director Election Proposal*—To consider and vote upon a proposal to elect directors to serve staggered terms on the board of directors of the Combined Company until the first, second and third annual meeting of stockholders following the date of the filing of the Certificate of Incorporation, as applicable, and until their respective successors are duly elected and qualified (Proposal No. 9); and

10.  *Adjournment Proposal*—To consider and vote upon a proposal to allow the chairman of the Special Meeting to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Domestication Proposal, the Transaction Proposal, the Issuance Proposal, the Interim Charter Proposal, the Charter Proposal, the Equity Incentive Plan Proposal, the ESPP Proposal or the Director Election Proposal but no other proposal if the Required Proposals (as defined below) are approved (Proposal No. 10).

The Issuance Proposal, the Interim Charter Proposal, the Charter Proposal, Equity Incentive Plan Proposal, the ESPP Proposal and Director Election Proposal are all conditioned on the approval of the Transaction Proposal. If the Interim Charter and Charter Proposals are approved, each of the Interim Certificate of Incorporation, the Certificate of Incorporation and the Bylaws (as defined below) will be approved and adopted in their entirety. The Organizational Documents Proposals and the Adjournment Proposal do not require the approval of the Transaction Proposal and Business Combination to be effective. It is important for you to note that in the event the Transaaction Proposal is not approved, we will not consummate the Business Combination.

Our Initial Stockholders have agreed to vote any Artius Ordinary Shares owned by them in favor of the Business Combination. The record date for the Special Meeting is . Only shareholders of record at the close of business on that date may vote at the Special Meeting or any adjournment thereof. A complete list of our shareholders of record entitled to vote at the Special Meeting will be available for ten days before the Special Meeting at our principal executive offices for inspection by shareholders during ordinary business hours for any purpose germane to the Special Meeting.

**We urge you to read carefully this proxy statement/prospectus in its entirety, including the Annexes and accompanying financial statements of Artius and Origin.** If you have any questions or need assistance voting your shares, please call our proxy solicitor Morrow Sodali LLC at (800) 662-5200. Banks and brokerage firms can call Morrow Sodali LLC at (203) 658-9400.

By Order of the Board of Directors

Boon Sim
Chief Executive Officer and Chief Financial Officer

New York, New York
, 2021

Table of Contents

**TABLE OF CONTENTS**

| | |
|---|---:|
| FREQUENTLY USED TERMS | 1 |
| TRADEMARKS, TRADE NAMES AND SERVICE MARKS | 7 |
| QUESTIONS AND ANSWERS | 8 |
| SUMMARY | 28 |
| RISK FACTORS | 50 |
| GENERAL INFORMATION | 91 |
| SPECIAL MEETING OF THE SHAREHOLDERS OF ARTIUS IN LIEU OF THE 2021 ANNUAL MEETING OF ARTIUS SHAREHOLDERS | 93 |
| THE BUSINESS COMBINATION | 102 |
| MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS | 113 |
| THE MERGER AGREEMENT AND RELATED AGREEMENTS | 124 |
| REGULATORY APPROVALS RELATED TO THE BUSINESS COMBINATION | 142 |
| SELECTED HISTORICAL FINANCIAL DATA OF ARTIUS | 143 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF ORIGIN | 145 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 146 |
| COMPARATIVE SHARE INFORMATION | 155 |
| COMPARATIVE HISTORICAL AND UNAUDITED PRO FORMA PER SHARE DATA | 157 |
| INFORMATION ABOUT ARTIUS | 158 |
| MANAGEMENT OF ARTIUS | 161 |
| ARTIUS MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 169 |
| INFORMATION ABOUT ORIGIN | 173 |
| MANAGEMENT OF ORIGIN | 183 |
| ORIGIN MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 193 |
| MANAGEMENT OF THE COMBINED COMPANY | 202 |
| DESCRIPTION OF SECURITIES | 210 |
| COMPARISON OF STOCKHOLDER RIGHTS | 222 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 228 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 235 |
| PRICE RANGE OF SECURITIES AND DIVIDENDS | 238 |
| PROPOSAL NO. 1—THE DOMESTICATION PROPOSAL | 239 |
| PROPOSAL NO. 2—THE TRANSACTION PROPOSAL | 252 |
| PROPOSAL NO. 3—THE ISSUANCE PROPOSAL | 253 |
| PROPOSAL NO. 4—THE INTERIM CHARTER PROPOSAL | 255 |
| PROPOSAL NO. 5—THE CHARTER PROPOSAL | 256 |
| PROPOSAL NO. 6—THE ORGANIZATIONAL DOCUMENTS PROPOSALS | 257 |
| PROPOSAL NO. 7—THE EQUITY INCENTIVE PLAN PROPOSAL | 261 |
| PROPOSAL NO. 8—THE ESPP PROPOSAL | 269 |
| PROPOSAL NO. 9—THE DIRECTOR ELECTION PROPOSAL | 273 |
| PROPOSAL NO. 10—THE ADJOURNMENT PROPOSAL | 275 |
| ACCOUNTING TREATMENT | 276 |
| LEGAL MATTERS | 276 |
| EXPERTS | 276 |
| APPRAISAL RIGHTS | 276 |
| HOUSEHOLDING INFORMATION | 276 |
| TRANSFER AGENT AND REGISTRAR | 277 |
| FUTURE STOCKHOLDER PROPOSALS | 277 |
| INDEX TO CONSOLIDATED FINANCIAL INFORMATION | F-1 |
| PART II INFORMATION NOT REQUIRED IN PROSPECTUS | II-1 |
| EXHIBIT INDEX | II-4 |
| SIGNATURES | II-7 |
| POWER OF ATTORNEY | II-7 |

Table of Contents

**ANNEXES**

| | |
|---|---|
| Annex A—Agreement and Plan of Merger and Reorganization | A-1 |
| Annex B—Letter Agreement Dated March 5, 2021 | B-1 |
| Annex C—Interim Certificate of Incorporation of Artius | C-1 |
| Annex D—Bylaws of Artius and the Combined Company | D-1 |
| Annex E—Certificate of Incorporation of the Combined Company | E-1 |
| Annex F—Origin 2010 Stock Incentive Plan | F-1 |
| Annex G—Origin 2020 Equity Incentive Plan | G-1 |
| Annex H—Origin 2021 Equity Incentive Plan | H-1 |
| Annex I—Origin 2021 Employee Stock Purchase Plan | I-1 |
| Annex J—Sponsor Letter Agreement | J-1 |
| Annex K—Stockholder Support Agreement | K-1 |
| Annex L—Lock-Up Agreement | L-1 |
| Annex M—Form of Investor Rights Agreement | M-1 |
| Annex N—Artius Amended and Restated Memorandum and Articles of Association | N-1 |

Table of Contents

tax attributes may become subject to an annual limitation in the event of certain cumulative changes in the ownership of its stock. An "ownership change" pursuant to Section 382 of the Code generally occurs if one or more stockholders or groups of stockholders who own at least 5% of a company's stock increase their ownership (as measured by value) by more than 50 percentage points over their lowest ownership percentage within a rolling three-year period. Origin's ability to utilize its NOL carryforwards and other tax attributes to offset future taxable income or tax liabilities may be limited as a result of ownership changes, including potential changes in connection with the Business Combination or other transactions. Similar rules may apply under state tax laws. Origin has not yet determined the amount of the cumulative change in its ownership resulting from the Business Combination or other transactions, or any resulting limitations on its ability to utilize its net operating loss carryforwards and other tax attributes. If Origin earns taxable income, such limitations could result in increased future income tax liability to Origin and its future cash flows could be adversely affected. Origin has recorded a valuation allowance related to its NOL carryforwards and other deferred tax assets due to the uncertainty of the ultimate realization of the future benefits of those assets.

***Origin's outstanding secured and unsecured indebtedness, ability to incur additional debt and the provisions in the agreements governing its current debt, and certain other agreements, could harm Origin's business, financial condition, results of operations and prospects.***

As of December 31, 2020, after giving pro forma effect to the transactions contemplated by the Merger Agreement, Origin had total consolidated debt of $9.3 million including $9.3 million of secured indebtedness. Origin's debt service obligations could have important consequences to the Combined Company for the foreseeable future, including that Origin's ability to obtain additional financing for capital expenditures, working capital or other general corporate purposes may be impaired and Origin may be or become substantially more leveraged than some of Origin's competitors, which could place Origin at a relative competitive disadvantage and make Origin more vulnerable to changes in market conditions and governmental regulations.

Origin is required to maintain compliance with certain financial and other covenants under its debt agreements. There are and will be operating and financial restrictions and covenants in certain of Origin's debt agreements, including the Nestlé Note and the Danone Note (see the section titled "*Origin Relationships and Related Party Transactions*" for more detail), as well as certain other agreements to which Origin is or may become a party. These limit, among other things, Origin's ability to incur certain additional debt, create certain liens or other encumbrances and sell assets. These covenants could limit Origin's ability to engage in activities that may be in Origin's best long-term interests. Origin's failure to comply with certain covenants in these agreements could result in an event of default under the various debt agreements, allowing lenders to accelerate the maturity for the debt under these agreements and to foreclose upon any collateral securing the debt. Under such circumstances, Origin might not have sufficient funds or other resources to satisfy all of its obligations.

**Risks Related to Origin's Operations and Industry**

***Construction of Origin's plants may not be completed in the expected timeframe or in a cost-effective manner. Any delays in the construction of Origin's plants could severely impact its business, financial condition, results of operations and prospects.***

Origin's projected financial performance and results of operations, including its ability to achieve commercial scale production, depend on Origin's ability to construct several commercial scale plants. While Origin expects the Origin 1 plant to be operational by the end of 2022, Origin does not expect the Origin 2 plant to be operational until 2025, and Origin's expansion to additional commercial scale plants is not planned to commence until 2027. In particular, Origin has not selected a site for the Origin 2 plant or any of its other future planned plants, and may have difficulty finding a site with appropriate infrastructure and access to raw materials. With respect to these future plants, Origin also does not have agreements with engineering, procurement or construction firms. Consequently, Origin cannot predict on what terms such firms may agree to design and construct its future plants.

55

Table of Contents

If Origin is unable to construct these plants within the planned timeframes, in a cost-effective manner or at all due to a variety of factors, including, but not limited to, a failure to acquire or lease land on which to build its plants, a stoppage of construction as a result of the COVID-19 pandemic, unexpected construction problems, permitting and other regulatory issues, severe weather, labor disputes, and issues with subcontractors or vendors, including payment disputes, which Origin has previously experienced, its business, financial condition, results of operations and prospects could be severely impacted.

The construction and commission of any new project is dependent on a number of contingencies some of which are beyond Origin's control. There is a risk that significant unanticipated costs or delays could arise due to, among other things, errors or omissions, unanticipated or concealed project site conditions, including subsurface conditions and changes to such conditions, unforeseen technical issues or increases in plant and equipment costs, insufficiency of water supply and other utility infrastructure, or inadequate contractual arrangements. Should these or other significant unanticipated costs arise, this could have a material adverse impact on Origin's business, financial performance and operations. No assurance can be given that construction will be completed on time or at all, or as to whether Origin will have sufficient funds available to complete construction.

In addition, Origin's financial projections and operating assumptions assume Origin can pursue a pulp mill "brownfield" capital expenditure strategy, pursuant to which Origin plans to purchase brownfield sites in the U.S. and Canada, convert or repurpose equipment located at such sites, and integrate such equipment into Origin's plant infrastructure. Origin's current financial projections assume this strategy can yield up to 15% net savings on total plant capital expenditures. If Origin is unable execute on this strategy, its actual financial performance and results of operations could differ materially from Origin's projections, which, among other things, would have a significant impact on the trading price of the Combined Company's securities and its financial position following the completion of the Business Combination.

### *Initially, Origin plans to rely solely on a single commercial scale facility.*

Origin's operating plan assumes that Origin will have one commercial scale facility until 2027. Adverse changes or developments affecting this facility could impair Origin's ability to produce its products. Any shutdown or period of reduced production at this facility, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond Origin's control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, would, among other things, significantly disrupt Origin's ability to generate revenue, execute its expansion plans, and meet its contractual obligations and customer demands. In addition, Origin's plant equipment may be costly to replace or repair, and its equipment supply chains may be disrupted in connection with pandemics (such as COVID-19), trade wars or other factors. If any material amount of Origin's equipment is damaged, Origin could be unable to predict when, if at all, Origin could replace or repair such equipment or find suitable alterative equipment, which could adversely affect Origin's business, financial condition, results of operations and prospects. Performance guarantees may not be sufficient to cover damages or losses, or the guarantors under such guarantees may not have the ability to pay. Any insurance coverage Origin has may not be sufficient to cover all of its potential losses and may not continue to be available to Origin on acceptable terms, or at all.

### *Origin may be delayed in or unable to procure necessary capital equipment.*

While the equipment Origin uses to produce Origin's products is currently widely available, Origin relies on outside companies to continue to manufacture the equipment necessary to produce Origin's products. If Origin's suppliers of capital equipment are unable or unwilling to provide Origin with necessary capital equipment to manufacture its products or if Origin experience significant delays in obtaining the necessary manufacturing equipment, Origin's business, results of operations and financial condition could be adversely affected. In addition, the construction of Origin's plants may require a substantial portion of certain materials and supplies relative to the overall global supply of such materials and supplies. If Origin is unable to secure an adequate

Table of Contents

supply of such materials and supplies on commercially reasonable terms, or at all, the construction of its plants may be delayed or terminated.

***Origin has not produced its products in large commercial quantities.***

Origin has no experience in producing large quantities of its products. While Origin has succeeded in producing small amounts of its products in its pilot plant for customer trials and testing purposes, Origin has not yet commenced large-scale production. There are significant technological and logistical challenges associated with producing, marketing, selling and distributing products in the specialty chemicals industry, including Origin's products, and Origin may not be able to resolve all of the difficulties that may arise in a timely or cost-effective manner, or at all. While Origin believes that it understands the engineering and process characteristics necessary to successfully build and operate its additional planned facilities and to scale up to larger facilities, Origin may not be able to cost effectively manage production at a scale or quality consistent with customer demand in a timely or economical manner.

***Any decline in the value of carbon credits associated with Origin's products could harm Origin's results of operations, cash flow and financial condition.***

The value of Origin's products may be dependent on the value of carbon credits, programs relating to low-carbon materials and products standards and other similar regulatory regimes or the implicit value of decarbonized materials. The value of these credits fluctuates based on market and regulatory forces outside of Origin's control. There is a risk that the supply of low-carbon alternative materials and products outstrips demand, resulting in the value of carbon credits declining. Any such declines could mean that the economic benefits from Origin's customers' efforts to de-carbonize their operations might not be realized. Any decline in the value of carbon credits associated with Origin's products could harm Origin's results of operations, cash flow and financial condition.

***Origin expects to rely on a limited number of customers for a significant portion of its near-term revenue.***

Origin currently has offtake and capacity reservation agreements with a limited number of customers, from which Origin expects to generate most of its revenues in the near future. The loss of one or more of Origin's significant customers, a substantial reduction in their orders, their failure to exercise customer options, their unwillingness to extend contractual deadlines if Origin is unable to meet production requirements, their inability to perform under their contracts or a significant deterioration in their financial condition could harm Origin's business, results of operations and financial condition. If Origin fails to perform under the terms of these agreements, the customers could seek to terminate these agreements and/or pursue damages against Origin, including liquidated damages in certain instances, which could harm Origin's business.

***Origin's products may not achieve market success.***

Origin currently has a small number of binding customer commitments for commercial quantities of Origin's products. Some prospective customers are currently evaluating and testing Origin's products prior to making large-scale purchase decisions. The successful commercialization of Origin's products is dependent on Origin's customers' ability to commercialize the end-products that utilize Origin's products, which may gain market acceptance slowly, if at all. Furthermore, the technology for Origin's products is new, and the performance and ultimate carbon footprint of these products is uncertain. The market for carbon-negative products is nascent and subject to significant risks and uncertainties.

Market acceptance of Origin's products will depend on numerous factors, many of which are outside of Origin's control, including, among others:

- public acceptance of such products;

57

Table of Contents

- Origin's ability to produce products of consistent quality that offer functionality comparable or superior to existing or new products;

- Origin's ability to produce products fit for their intended purpose;

- Origin's ability to produce new products or customizations of existing products to match changes in public demand;

- Origin's ability to obtain necessary regulatory approvals for Origin's products;

- the speed at which potential customers qualify Origin's products for use in their products;

- the pricing of Origin's products compared to competitive and alternative products, including petroleum-based plastics;

- the strategic reaction of companies that market competitive products;

- Origin's reliance on third parties who support or control distribution channels; and

- general market conditions, including fluctuating demand for Origin's products.

***Origin's industry is highly competitive, and Origin may lose market share to producers of products that can be substituted for Origin's products, which may have an adverse effect on Origin's results of operations and financial condition.***

The specialty chemicals industry is highly competitive, and Origin faces significant competition from both large established producers of fossil-based materials, recycled fossil-based materials and a variety of current and future producers of low-carbon, biodegradable, or renewable resource-based materials. Many of Origin's current competitors have longer operating histories, greater name recognition, larger customer bases and significantly greater financial, sales and marketing, manufacturing, distribution, technical and other resources than Origin. Origin's competitors may be able to adapt more quickly to new or emerging technologies, changes in customer requirements and changes in laws and regulations. In addition, current and potential competitors have established or may establish financial or strategic relationships among themselves or with existing or potential customers or other third parties. Accordingly, new competitors or alliances among competitors could emerge and rapidly acquire significant market share.

Origin's competitors may also improve their relative competitive position by successfully introducing new products or products that can be substituted for Origin's products, improving their manufacturing processes, or expanding their capacity or manufacturing capabilities. Further, if Origin's competitors are able to compete at advantageous cost positions, this could make it increasingly difficult for Origin to compete in markets for less-differentiated applications. If Origin is unable to keep pace with Origin's competitors' product and manufacturing process innovations or cost position, it could harm Origin's results of operations, financial condition and cash flows.

***Origin's operating results may fluctuate significantly as a result of a variety of factors, many of which are outside of Origin's control.***

Origin is subject to, among other things, the following factors that may negatively affect Origin's operating results:

- the announcement or introduction of new products by Origin's competitors;

- Origin's ability to upgrade and develop Origin's systems and infrastructure to accommodate growth;

- Origin's ability to attract and retain key personnel in a timely and cost-effective manner;

- Origin's ability to attract new customer and retain existing customers;

- technical difficulties;

58

Table of Contents

- the amount and timing of operating costs and capital expenditures relating to the expansion of Origin's business, operations and infrastructure;

- Origin's ability to identify and enter into relationships with appropriate and qualified third-party providers of necessary testing and manufacturing services;

- regulation by federal, state or local governments; and

- general economic conditions, as well as economic conditions specific to the plastics and fuels industries, and other industries related to compostable or biodegradable substitutes for non-biodegradable plastics, as well as changes to commodity prices to which prices in some of Origin's contracts are indexed.

As a result of Origin's limited operating history and the nature of the markets in which Origin competes, it is difficult for Origin to forecast Origin's revenues or earnings accurately. Origin has based its anticipated future expense levels largely on its investment plans and estimates of future events, although certain of Origin's expense levels will, to a large extent, become fixed. As a strategic response to changes in the competitive environment, Origin may from time to time make certain decisions concerning expenditures, pricing, service or marketing that could harm Origin's business, results of operations and financial condition. Due to the foregoing factors, Origin's revenues and operating results are difficult to forecast.

### *Origin's commercial success may be influenced by the price of petroleum relative to the price of non-fossil feedstocks.*

Origin's commercial success may be influenced by the cost of Origin's products relative to petroleum-based products. The cost of petroleum-based products is in part based on the price of petroleum, which is subject to historically fluctuating prices. Origin's production plans assume the use of timber and forest residues as feedstock, which historically have experienced low volatility. If the price of bio-based feedstocks increases and/or the price of petroleum decreases, Origin's products may be less competitive relative to petroleum-based products. A material decrease in the cost of conventional petroleum-based products may require a reduction in the prices of Origin's products for them to remain attractive in the marketplace and may negatively impact Origin's revenues.

### *Increases or fluctuations in the costs of Origin's raw materials may affect Origin's cost structure.*

The price of raw materials may be impacted by external factors, including uncertainties associated with war, terrorist attacks, weather and natural disasters, health epidemics or pandemics (such as COVID-19), civil unrest, the effects of climate change or political instability, plant or production disruptions, strikes or other labor unrest, breakdown or degradation of transportation infrastructure used in the delivery of raw materials or changes in laws or regulations in any of the countries in which Origin has significant suppliers.

Origin currently uses and plans to use local timber and forest residues as Origin's primary raw materials. The cost of these raw materials is generally influenced by supply and demand factors, and Origin's operating plans include assumptions that the timber and forest residues Origin intends to use as feedstock will be available at prices similar to historic levels with low volatility. As Origin continues to expand Origin's production, Origin will increase Origin's demand for timber and forest residues which may alter the anticipated stability in the costs of Origin's raw materials and potentially drive an increase in the cost of such raw materials.

Origin's results of operations will be directly affected by the cost of raw materials. The cost of raw materials comprises a significant amount of Origin's total cost of goods sold and, as a result, movements in the cost of raw materials, and in the cost of other inputs, will impact Origin's profitability. Because a significant portion of Origin's cost of goods sold is represented by these raw materials, Origin's gross profit margins could be adversely affected by changes in the cost of these raw materials if Origin is unable to pass the increases on to Origin's customers.

59

Table of Contents

*Net Loss Per Ordinary Share*

We apply the two-class method in calculating earnings per share. Ordinary shares subject to possible redemption, which are not currently redeemable and are not redeemable at fair value, have been excluded from the calculation of basic net loss per ordinary share since such shares, if redeemed, only participate in their pro rata share of the Trust Account earnings. Our net income is adjusted for the portion of income that is attributable to ordinary shares subject to redemption, as these shares only participate in the earnings of the Trust Account and not our income or losses.

*Recent Accounting Standards*

Management does not believe that any other recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on our financial statements.

**Quantitative and Qualitative Disclosures About Market Risk**

Following the consummation of the Artius IPO, the net proceeds of the Artius IPO, including amounts in the Trust Account, have been invested in U.S. government treasury bills, notes or bonds with a maturity of 185 days or less or in certain money market funds that invest solely in US treasuries. Due to the short-term nature of these investments, we believe there will be no associated material exposure to interest rate risk.

**Controls and Procedures**

Disclosure controls are procedures that are designed with the objective of ensuring that information required to be disclosed in our reports filed under the Exchange Act, such as this proxy statement/prospectus, is recorded, processed, summarized, and reported within the time period specified in the SEC's rules and forms. Disclosure controls are also designed with the objective of ensuring that such information is accumulated and communicated to our management, including the chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure. Our management evaluated, with the participation of our current chief executive officer and chief financial officer (our "Certifying Officers"), the effectiveness of our disclosure controls and procedures as of December 31, 2020, pursuant to Rule 13a-15(b) under the Exchange Act. Based upon that evaluation, our Certifying Officers concluded that, as of December 31, 2020, our disclosure controls and procedures were effective.

We do not expect that our disclosure controls and procedures will prevent all errors and all instances of fraud. Disclosure controls and procedures, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the disclosure controls and procedures are met. Further, the design of disclosure controls and procedures must reflect the fact that there are resource constraints, and the benefits must be considered relative to their costs. Because of the inherent limitations in all disclosure controls and procedures, no evaluation of disclosure controls and procedures can provide absolute assurance that we have detected all our control deficiencies and instances of fraud, if any. The design of disclosure controls and procedures also is based partly on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions.

This proxy statement/prospectus does not include a report of management's assessment regarding internal control over financial reporting or an attestation report of our independent registered public accounting firm due to a transition period established by rules of the SEC for newly public companies.

There were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

172

Table of Contents

**INFORMATION ABOUT ORIGIN**

*Investors should read this section in conjunction with the more detailed information about Origin, contained in this proxy statement/prospectus, including Origin's audited and unaudited financial statements and the other information appearing in the section entitled "Origin Management's Discussion and Analysis of Financial Condition and Results of Operations." In addition to historical data, this discussion contains forward-looking statements about our business, results of operations, cash flows, financial condition and prospects based on current expectations that involve risks, uncertainties and assumptions. Our actual results could differ materially from such forward-looking statements. Factors that could cause or contribute to those differences include, but are not limited to, those identified below and those discussed in the sections titled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" included elsewhere in this proxy statement/prospectus.*

**Overview**

Origin is a carbon negative materials company with a mission to help enable the world's transition to sustainable materials by replacing petroleum-based materials with decarbonized materials in a wide range of end products, such as food and beverage packaging, clothing, textiles, plastics, car parts, carpeting, tires, adhesives, soil amendments and more. Origin believes that its platform technology can help make the world's transition to "net zero" possible and support the fulfillment of greenhouse gas reduction pledges made by countries as part of the United Nations Paris Agreement as well as corporations that are committed to reducing emissions in their supply chains.

Origin's technology converts sustainable feedstocks such as sustainably harvested wood, agricultural waste, wood waste and even corrugated cardboard into materials and products that are currently made from fossil feedstocks such as petroleum and natural gas. These sustainable feedstocks are not used in food production, which differentiates Origin's technology from other sustainable materials companies that use feedstocks such as vegetable oils or high fructose corn syrup and other sugars.

Origin believes that products made using its platform technology can compete directly with petroleum-derived products on both performance and price. Due to abundant and renewable wood supplies that have historically stable pricing, Origin's cost of production is expected to be more stable than potential competing platforms that use other types of feedstocks. Origin believes that end products made using its platform technology will have a significant unit cost advantage over products made from other low carbon feedstocks.

Origin's platform technology converts biomass-plant-based carbon into "building block" chemicals that can be converted into both "drop-in" materials and new materials with differentiated functional performance. The "drop-in" products are chemically fungible with those produced from petroleum-based raw materials, and therefore these "drop-in" products can be fed into existing supply chains without modification to the equipment or production processes of Origin's customers.

Origin believes it is currently the only company that will be able to produce carbon negative materials at scale. This capability is protected by Origin's intellectual property portfolio comprised of 19 patent families as well as trade secrets covering non-discoverable aspects of its critical manufacturing processes.

Origin has developed strong partnerships with large, brand-name corporations determined to transition to sustainable materials to help meet their emissions reduction goals. For example, in 2017 Origin founded the "NaturALL Bottle Alliance" with Danone and Nestlé Waters, with PepsiCo joining in 2018, to accelerate the development of innovative packaging solutions made with 100% sustainable and renewable resources. In addition to being customers, Danone, Nestlé and PepsiCo are also investors in Origin.

Origin's vision for the future is the replacement of fossil-based feedstocks and materials with non-food, plant-based feedstocks and materials, while capturing carbon in the process. Origin's decarbonizing platform

173

**Table of Contents**

technology potentially addresses an estimated $1.0 trillion dollar market opportunity, and Origin believes it can help revolutionize the production of a wide range of end products.

**Origin's Platform Technology**

Origin has developed a proprietary platform technology to convert biomass, or plant-based carbon, into the versatile "building block" chemicals chloromethylfurfural (CMF) and hydrothermal carbon (HTC), which we collectively refer to as Furanic Intermediates, as well as other minor products. At commercial scale, Origin's platform technology is expected to produce CMF and HTC with a negative carbon footprint. We believe these chemicals can replace petroleum-based inputs, lowering the carbon footprint of a wide range of materials without sacrificing performance or cost.

*CMF*. CMF is a chemically flexible intermediate that can be converted into a variety of products, including paraxylene (PX), that can "drop in" to current supply chains to produce purified terephthalic acid (PTA), and subsequently polyethylene terephthalate (PET). CMF and its derivatives can be used to produce numerous commodity and specialty chemicals. Origin has developed products made from CMF that can be used in applications such as food and beverage packaging and apparel and carpet fibers, and Origin's product development pipeline includes applications such as adhesives, coatings and plasticizers.

*HTC*. HTC is a diverse, high-potential carbon-negative material. Current applications of Origin's HTC include a drop-in, energy-dense solid fuel. HTC can also be calcined to produce a carbon-negative activated carbon for food and water treatment and filtration. Origin's HTC product development pipeline includes carbon black replacement for tires, foams and dyes, paint and coating applications, and agriculture and soil products. Notably, Origin's carbon black has no detectable carcinogenic compounds, known as polyaromatic hydrocarbons, found in carbon black produced from fossil feedstocks.

Origin's manufacturing process to produce CMF and HTC consists of front end feedstock handling, and subsequent liquid phase reaction with Origin's catalyst mixture, followed by downstream separation processes to separate and purify CMF, HTC and other co-products, as described in the following diagram.



174

**Table of Contents**

**Market Opportunity**

*Global Decarbonization Commitments*

Origin believes that increasing consumer awareness and growing governmental initiatives are driving a shift in the global community towards decarbonized materials. The UN Paris Agreement of 2015, joined by 189 countries to date, includes commitments to limit the global average temperature increase by 2100 to well below 2°C compared to pre-industrial levels. To achieve this target, the UN estimated in 2019 that annual carbon dioxide ($CO_2$) emissions must be 15 gigatons lower than current nationally determined contributions imply.

According to the Ellen MacArthur Foundation, approximately 45% of global $CO_2$ emissions are associated with manufacturing products, including the production of materials and chemicals from which those products are made. Barclays estimates that the chemicals market consumes 10.6 million barrels of oil per day, releasing massive quantities of new carbon into the atmosphere in the process. Origin's vision for the future is to replace fossil-based feedstocks and materials with sustainably harvested wood and other non-food, sustainable feedstocks. As a tree grows, it consumes existing $CO_2$ from the atmosphere, and when it dies and decays, that $CO_2$ is released back into the atmosphere. However, through Origin's proprietary manufacturing process, Origin converts the wood into manufacturing and feedstock materials, thereby capturing that $CO_2$.

Many companies have already pledged to achieve net zero carbon targets, with some aiming to achieve that target within the next decade. Despite the progress in the shift to renewable energy generation and electric vehicles, Origin believes that reducing emissions from energy use alone is insufficient to achieve the goals and commitments established by companies and governments. Consequently, in the near-term, Origin believes that these companies will need to integrate decarbonized materials into their supply chains.

The graphic below highlights some of the notable companies that have made public commitments to decarbonization and their respective decarbonization targets:



Source: Company websites and press search.

*Origin's Addressable Market*

According to the International Energy Agency, the chemical sector is the largest industrial consumer of both oil and gas. Currently, organic chemicals are predominantly derived from fossil sources such as petroleum. These chemicals are used to produce a wide array of materials from paints to plastics, space suits to solar panels, and medicines to electronics. More than 10 million barrels of oil are consumed daily to create these materials,

175

**Table of Contents**

releasing massive quantities of new carbon into the atmosphere in the process. According to a 2018 report by The Association of Plastic Recyclers, for example, every kilogram of virgin fossil-PET has a life cycle global warming potential of 2.78 kilograms of carbon emissions. Origin's platform technology enables companies to lower their overall $CO_2$ emissions and meet their emissions reduction commitments by substituting decarbonizing Furanic Intermediates and their derivatives for all or a portion of the fossil-based content of materials like PET in their supply chains.



Source: Our World in Data, 2020

Origin's platform technology produces carbon-negative and low carbon replacements for chemicals that have many potential applications. Origin's platform technology is expected to address some of these applications as soon as its initial production capacity is online, and to address other potential applications over time.

***$390+ billion near-term market focus.*** Origin believes its technology can serve near-term markets representing an aggregate market opportunity that we believe is over $390 billion when its first two commercial-scale plants open. These markets include polyesters for textiles, PET resin for packaging, solid fuels, activated carbon and carbon black for tires and polymer fillers. Origin expects its Origin 1 plant to be operational by the end of 2022 and its Origin 2 plant to be operational in mid-2025.

***$750+ billion long-term market focus.*** Origin's platform technology produces versatile chemical "building blocks" that Origin anticipates, in the long term, can be converted into products to replace a broad range of chemicals and materials representing an addressable market that we believe is more than $750 billion. These markets include paints, coatings, soil additives, advanced polyesters, epoxies, plasticizers, polyurethanes, elastomers, emulsions and solvents.

### *Competitive Landscape*

Origin expects its products to compete with traditional, petroleum-based materials currently used in its target markets, as well as compete with alternatives to these materials that both established and new companies seek to produce.

In Origin's near-term markets, Origin expects to compete with established producers of PET fibers and resins, activated carbon and carbon black. Producers of these materials include global oil and petrochemical companies and large international diversified chemical companies. Several of these producers are seeking to develop materials from renewable sources that could compete with Origin's products. Moreover, a number of established companies and new entrants have announced intentions to develop renewable alternatives for existing chemical products used in Origin's near-term focus markets.

176

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in New York, New York, on March 8, 2021.

**Artius Acquisition Inc.**

By:   /s/ Boon Sim
Name:  Boon Sim
Title:   Chief Executive Officer and Chief Financial Officer

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Boon Sim and Charles Drucker as his or her true and lawful attorney-in-fact and agent, with full power to act alone, with full powers of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this registration statement on Form S-4, and to sign any registration statement for the same offering covered by this registration statement that is to be effective on filing pursuant to Rule 462(b) under the Securities Act of 1933, as amended, and all post-effective amendments thereto, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully for all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or his substitute or resubstitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following person in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Charles Drucker<br>Charles Drucker | Executive Chairman | March 8, 2021 |
| /s/ Boon Sim<br>Boon Sim | Chief Executive Officer and Chief Financial Officer, Director<br>(*Principal Executive, Financial and Accounting Officer*) | March 8, 2021 |
| /s/ Steven W. Alesio<br>Steven W. Alesio | Director | March 8, 2021 |
| /s/ Kevin Costello<br>Kevin Costello | Director | March 8, 2021 |
| /s/ Karen Richardson<br>Karen Richardson | Director | March 8, 2021 |

II-7