**BRAGAR EAGEL & SQUIRE P.C.**
Marion C. Passmore (SBN #228474)
580 California Street, Suite 1200
San Francisco, CA 94104
(415) 568-2124 (phone)
(212) 486-0462 (fax)
passmore@bespc.com

*Liaison Counsel for Lead Plaintiff, Lead Counsel,
and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

In re ORIGIN MATERIALS, INC.          )
SECURITIES LITIGATION                 )
                                      )   Case No.: 2:23-cv-01816-WBS-JDP
_____  )
                                      )
This Document Relates To              )   LEAD PLAINTIFF'S OPPOSITION TO
                                      )   DEFENDANTS' MOTION TO DISMISS
ALL ACTIONS CONSOLIDATED FROM:        )   PLAINTIFF'S SECOND AMENDED
                                      )   COMPLAINT
Antonio F. Soto, individually and     )
on behalf of all others similarly     )   CLASS ACTION
situated,                             )
                                      )   JURY TRIAL DEMANDED
      Plaintiff,                      )
                                      )   Date: February 18, 2025
             v.                       )   Time: 1:30 p.m.
                                      )   Judge: Hon. William B. Shubb
Origin Materials, Inc., Richard J.    )   Courtroom: No. 5- 14th Floor
Riley, and John Bissell,              )
                                      )
      Defendants.                     )
                                      )
_____  )

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

**TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................... 1

STATEMENT OF FACTS.............................................. 4

    A.    Origin Announces the Planned Construction of Origin 2 – The Company's First Commercial Scale Plant........... 4

    B.    Defendants Mislead Investors by Representing That Origin 2 Would Be a PET-Producing Plant and Constructed on Schedule.................................. 5

    C.    Defendants Knew That Technical Issues with Scaling PX/PET Was Delaying the Development of Origin 2......... 6

    D.    Investors Learn the Truth – Origin 2 Will Not be a PX/PET Plant and Will Not Be Constructed on Time........ 9

    E.    The SAC's Response to the Court's Order Dismissing the AC................................................. 11

ARGUMENT....................................................... 12

I.    LEGAL STANDARD............................................ 12

II.   PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER............ 13

    A.    The SAC's Particularized CW Allegations Plead a Strong Inference of Scienter.................................. 14

        1.   CW1 Is Described with Sufficient Particularity..... 14

        2.   CW1's Allegations Are Particularized, Reliable, Based on Personal Knowledge, and Indicative of Scienter......................................... 16

        3.   CW1's Allegations Are Indicative of Scienter...... 18

    B.    The Core Operations Doctrine Supports Scienter......... 21

    C.    Viewing the SAC's Allegations Holistically, Defendants' Purported Innocence Falls Flat.......................... 23

III.  PLAINTIFF ADEQUATELY PLEADS FALSE AND MISLEADING STATEMENTS CONCERNING THE PURPORTED PX/PET ORIGIN 2 PLANT............... 27

i

A.    Defendants Knew Technical Issues Occurred That Prevented the Development of the Origin 2 PX/PET Plant but Falsely Told Investors Otherwise.............. 28

B.    Defendants Falsely Claimed that PX Would Be the Company's Flagship Product............................. 33

1.    Defendants' Challenges to the Importance of PX Are False, Speculative, and Do Not Displace the SAC's Allegations....................................... 36

2.    Statements That PX/PET Was Origin's Flagship Product Are Not Protected Opinions................. 38

C.    Statements Asserting That "Progress" Was Made on the Origin 2 PX/PET Plant's Construction Milestones Were False Because Origin Scrapped the PX/PET Design......... 40

D.    Defendants' Statements Claiming Construction Would Begin in Mid-2023 on the PX/PET Origin 2 Plant Were False Because Origin Was Not Building a PX/PET Plant.... 45

E.    Defendants' False and Misleading Statements Are Not Protected by the Safe Harbor........................... 47

1.    Bissell's Conference Interview Was Not Identified as Forward Looking or Accompanied by Adequate Warnings...................................... 47

2.    Origin's Risk Language Was Not Meaningful......... 49

IV.    THE SAC ADEQUATELY PLEADS LOSS CAUSATION..................... 54

V.    THE SAC STATES AN EXCHANGE ACT §20(a) CLAIM.................. 57

CONCLUSION............................................................ 58

ii

**TABLE OF AUTHORITIES**

*Page(s)*

*Cases*

*Anderson v. Peregrine Pharms., Inc.*,
  2013 WL 4780059 (C.D. Cal. Aug. 23, 2013) ....................... 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................13

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................passim

*Brendon v. Allegiant Travel Co.*,
  412 F. Supp. 3d 1244 (D. Nev. 2019) ............................39

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ...............................32, 35

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Ca. Mar. 24, 2014) ......................53

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align
  Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...................................14

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ....................................40

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020) ............................ 39

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) .............................. 55

*Diaz v. N. Dynasty Mins. Ltd.*,
  2018 WL 5099749 (C.D. Cal. Apr. 30, 2018) ..................... 43

*Ellusionist Cash Balance Plan & Tr. v. Spiegel Acct. Corp.*,
  2024 WL 4294645 (N.D. Cal. Sept. 24, 2024) .................... 42

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016) ...................... 52

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023) ................................ passim

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys*,
   594 U.S. 113 (2021) ........................................ 57

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ............................... 55

*Huddleston v. Herman & MacLean*,
   640 F.2d 534, 544 (5th Cir. 1981),
   *aff'd in part and rev'd in part on other grounds*,
   459 U.S. 375 (1983) (5th Cir. 1981) ......................... 30

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ................................ passim

*In re Amgen Inc. Sec. Litig.*,
   2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ................... 14

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ................................ 34

*In re BioMarin Pharm., Inc. Sec. Litig.*,
   2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .................. 22, 25

*In re Bofi Holding Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ................................ 55

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017) ................... 58

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ............................. 30, 34

*In re ECOtality, Inc., Sec. Litig.*,
   2014 WL 4634280 (N.D. Cal. Sept. 16, 2014) ................. 42

*In re Facebook Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023),
   *cert. granted in part sub nom.*
   *Facebook, Inc. v. Amalgamated Bank*,
   144 S. Ct. 2629 (June 10, 2024) ............................. 29

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
   97 F.4th 1171 (9th Cir. 2024) ............................... 55

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005) ........................ 35

iv

*In re Intel Corp. Sec. Litig.,*
  2024 WL 1693340 (9th Cir. Apr. 19, 2024) ....................... 46

*In re Intel Corp.,*
  2023 WL 2767779(N.D. Cal. Mar. 31, 2023) .................... 49, 51

*In re Invision Techs., Inc. Sec. Litig.,*
  2006 WL 538752 n.1 (N.D. Cal. Jan. 24, 2006) ................... 17

*In re Origin Materials Inc. Sec. Litig.,*
  2024 WL 4608497 (E.D. Cal. Oct. 29, 2024) ..................... 11

*In re Quality Sys., Inc. Sec. Litig.,*
  865 F.3d 1130 (9th Cir. 2017) ............................... passim

*In re QuantumScape Sec. Class Action Litig.,*
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ........................... 48

*In re Rigel Pharm., Inc. Sec. Litig.,*
  697 F.3d 869 (9th Cir. 2012) .................................. 13

*In re Toyota Motor Corp. Sec. Litig.,*
  2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ..................... 17

*In re VeriFone Holdings, Inc. Sec. Litig.,*
  704 F.3d 694 (9th Cir. 2012) .................................. 26

*In re Williams Sec. Litig.-WCG Subclass,*
  558 F.3d 1130 (10th Cir. 2009) ................................ 55

*In re Wrap Techs., Inc. Sec. Exch. Act Litig.,*
  No. CV 20-8760-DMG (PVCx) (C.D. Cal. Nov. 15, 2021) ............ 43

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.,*
  998 F.3d 397 (9th Cir. 2021) ............................... 54, 55

*Karth v. Keryx Biopharmaceuticals, Inc.,*
  6 F.4th 123 (1st Cir. 2021) ................................... 52

*Khoja v. Orexigen Therapeutics, Inc.,*
  899 F.3d 988 (9th Cir. 2018) ............................... passim

*Leventhal v. Chegg, Inc.,*
  2024 WL 924484 (N.D. Cal. Mar. 4, 2024) ....................... 25

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
  416 F.3d 940 (9th Cir. 2005) .................................. 58

v

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ............................... 34, 56

*Markette v. Xoma Corp.*,
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ...................... 40

*Murphy v. Precision Castparts Corp.*,
  2021 WL 2080016 at *4 (D. Or. May 24, 2021),
  *aff'd sub nom.*
  *AMF Pensionsforsakring AB v. Precision Castparts Corp.*,
  2022 WL 2800825 (9th Cir. 2022) ................................ 42

*Nguyen v. Endologix, Inc.*,
  2018 WL 10321880 (C.D. Cal. Sept. 6, 2018) ..................... 42

*Oklahoma Firefighters Pension and Ret. Sys. v. Snap. Inc.*,
  2024 WL 5182634 (9th Cir. Dec. 20, 2024) ....................... 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ............................... 39, 40, 44, 45

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) .................................. 23

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ................................... 22

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ............................... 22, 23

*Salzman v. ImmunityBio, Inc.*,
  2024 WL 3100274 (S.D. Cal. June 20, 2024) ...................... 52

*Scheller v. Nutanix, Inc.*,
  2020 WL 5500422 (N.D. Cal. Sept. 11, 2020) ................. 25, 26

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ................................... 14

*Sgarlata v. Paypal Holdings, Inc.*,
  409 F. Supp. 3d 846, 857 (N.D. Cal. 2019), *aff'd sub nom.*
  *Eckert v. PayPal Holdings*,
  831 F. App'x 366 (9th Cir. 2020) .............................. 20

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2018) ......................... 27

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings Inc.*,
  2022 WL 989240 (W.D. Tenn. Mar. 31, 2022) ....................... 40

*Tellabs Inc. v. Makor Issuers & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................... 13, 14, 23

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ......................................... 48

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) .............................. 27, 35

*Waswick v. Torrid Holdings, Inc.*,
  2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ................... 32, 33

*Welgus v. TriNet Grp., Inc.*,
  765 F. App'x 239(9th Cir. 2019) ............................. 40

*Weston Fam. P'ship LLLP v. Twitter, Inc.*
  29 F.4th 611 (9th Cir. 2022) .............................. 43, 44

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023) ................. 48, 49, 54

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .................... 42, 44, 45, 51

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 956 (N.D. Cal. 2005) ........................... 17

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .............................. 14, 18

*Statutes*

15 U.S.C. § 78u-4(b)(1)(B)................................... 27, 28

15 U.S.C. § 78u-4(b)(2)........................................ 13

15 U.S.C. § 78u-5(c)(1)(A)(i)................................... 48

15 U.S.C. § 78u-5(c)(2)........................................ 48

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Lead Plaintiff Todd Frega ("Plaintiff") submits this memorandum of law in opposition to Defendants' motion to dismiss the Second Amended Complaint for Violations of the Federal Securities Laws (the "SAC").[1]

## INTRODUCTION

CW1's particularized allegations show Defendants had actual knowledge that Origin 2 was a disaster – incapable of producing PX/PET on a commercial scale – while leading investors to believe otherwise. In accordance with the Court's decision dismissing the Amended Complaint ("AC") based on the finding that CW1's allegations about what he "learned" were vague, Plaintiff reinterviewed CW1. CW1's SAC allegations cure the defects previously identified by the Court by describing, in detail, that on March 3, 2024, between 9am and 10am PST, Co-CEO Bissell told CW1 and his group during a video conference that Origin 2 would not produce PX. ¶¶ 90-93. CW1 stated "Bissell was the first person that CW1 heard reveal that the Company would not produce PX at Origin 2." This satisfies the Court's directive permitting amendment only if Plaintiff could provide the particularity required for the CW1's March 2023 information.

Outside of these, and other additional details provided by CW1, further demonstrating his reliability and indicative of Defendants' scienter, the allegations in the SAC are largely the same as in the

---

[1] Unless otherwise defined, all capitalized terms have the same definitions as in the SAC (ECF No. 85). "¶__" refers to paragraphs in the SAC. "Mot." or "Motion" refers to Defendants' Motion to Dismiss the SAC (ECF No.89). "Defs. Ex." refers to the exhibits Defendants submitted in support of their Motion.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

AC. Additionally, the law has not changed since the last round of briefing. The securities laws still do not allow public companies to knowingly make untrue or misleading statements to investors like Defendants did during the Class Period.

Indeed, the SAC alleges that Defendants propped up Origin's stock price by telling investors that the Company was building a commercial-scale plant ("Origin 2") to convert wood waste into PX/PET (a replacement for petroleum-based PET commonly used in plastic bottles). Origin advised investors that it already pre-sold all its PX/PET capacity for the Origin 2 plant and was considering incorporating additional types of recyclable bioplastics into the plant to make extra revenue. Importantly, Defendants published statements throughout the Class Period affirming that there were no technical issues preventing the development of the PX/PET plant and that the construction of Origin 2 would begin in mid-2023 and be completed in mid-2025. Defendants even touted during "fireside chats" with analysts that PX/PET would be the Company's "flagship" product.

But Origin's Co-CEOs, Defendants Bissell and Riley, knew that the Company could not build a commercial plant that produced PX/PET. While the Defendants were publishing statements to the market praising Origin's "progress" on the development of its PX/PET plant, internally, Defendant Bissell told employees, including CW1, that Origin could not build Origin 2 as a viable PX/PET plant. Defendants therefore knew at the beginning of the Class Period that Origin would have to build a different plant, for a different process, on a longer timeline. This information directly contradicted what Defendants were telling investors.

2

Defendants' motion to dismiss refuses to accept that the SAC alleges particularized allegations. It seems no amount of specificity is enough. Since Defendants cannot refute the strong scienter facts alleged, they draft questions that ignore the allegations, the pleading standards, and hope to encourage speculation. Defendants also trot out the same unavailing challenges made to the AC's pleading of falsity. Repeated is Defendants' wrong claim that the misleading statements are true. Even Defendants' arguments that there is no duty to update plans and that the safe harbor protects forward-looking statements are back, despite that neither protection applies here.

Finally, the Court should also reject Defendants' contention that the SAC does not adequately allege loss causation. Loss causation for this action is particularly strong because when Defendants finally revealed the truth about Origin 2, Origin's stock price fell 66.5%, causing millions of dollars in losses to Class members. The SAC sufficiently alleges the negative stock price reaction to Origin's revelation that Origin 2 would not be a PX/PET plant, was not starting construction in mid-2023, would not be completed in mid-2025, and thus providing no foreseeable revenue production for years to come. As analyst HSBC Global Research reported while downgrading the Company: with Origin 2 delayed, "[the Company's] investment case is broken" and "[t]he USD10+ bn in product demand is irrelevant without access to production capacity before 2026."

Accordingly, the SAC adequately alleges violations of Sections 10(b) and 20(a). Defendants' motion to dismiss should be denied in full.

3

## STATEMENT OF FACTS

### A.    Origin Announces the Planned Construction of Origin 2 – The Company's First Commercial Scale Plant

Origin is a sustainable materials company that claims to have developed a platform to convert the carbon found in plant-based carbon or non-food biomass, such as wood residues, into "building block" chemicals known as CMF (chloromethylfurfural) and HTC (hydrothermal carbon). CMF can then be converted into PX (paraxylene), a product that can replace non-sustainable chemicals to produce PET (polyethylene terephthalate), and FDCA (furandicarboxlic acid), which can be converted into PEF (polyethylene furanoate). ¶¶ 5, 6. Origin claims that these chemicals can replace the petroleum-based substances typically used in various end products, such as food and beverage packaging, plastics, and car parts. ¶¶ 5, 31-33.

Prior to the Class Period, Origin announced that the Company would be building two plants: Origin 1, a smaller plant which would be operational by the end 2022; and Origin 2, a commercial-scale plant which would be operational by mid-2025. ¶¶ 40-41. Origin 2 would be the Company's largest and first commercial-scale plant and supply most of the Company's products from 2025 through 2027. ¶¶ 42-45.

The completion of Origin 2 was critical to Origin's financial success and proof of the Company's ability to produce its technology on a commercial scale. ¶ 44. Defendants represented that Origin's future revenue and positive EBITDA depended on the completion of Origin 2, as they did not expect to reach commercial-scale production and positive EBITDA, until Origin 2 was operational in 2025. ¶¶ 44, 70.

4

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

**B.    Defendants Mislead Investors by Representing That Origin 2 Would Be a PET-Producing Plant and Constructed on Schedule**

Defendants announced that Origin 2 would focus on the large-scale production of PET, a product derived from PX (¶¶ 47, 60) and touted the benefits of producing PX/PET prior to, and throughout the Class Period. ¶¶ 60-68; *see e.g.*, ¶ 62 ("The reason we went for PET is because PET has by far the best end of life answer for, frankly, I would say commodity materials generally, not even just plastics"); ¶ 68 ("for PET, the market is so large"); ¶ 66 ("due to strong customer demand," Origin was "substantially committed for our Origin 2 paraxlyene [PX] and PET capacity."); ¶¶ 67-68 (PET derived from PX was the Company's "flagship" product); ¶ 139 (referring to the decision to focus on the production of PET as "brilliant"); ¶ 141 (Origin 2 expected "to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC"); ¶ 148 (touting the benefits of PET and representing that the Defendants' decision to make Origin 2 a PET plant "was very intentional").

Critically, while Defendants stated that additional products "may be" incorporated into Origin 2's product-slate in addition to PX/PET, such as FDCA, PEF and biofuels (¶¶ 115, 117, 119, 129, 131), Defendants continuously represented that Origin 2 would be focused on producing PX/PET. *See* ¶¶ 138, 141, 147, 149.

With respect to the timing for Origin 2, Defendants represented that front-end engineering design (FEED)[2] would be completed in early

---

[2] Origin adopted the front-end loading (FEL) approach for the development of Origin 2. ¶ 59. FEL is divided into three stages: FEL

5

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

2023, construction would begin by mid-2023, and the plant would be operational in mid-2025. ¶ 48. Defendants also represented that Origin 2 would cost $1.07 billion. ¶ 44. Defendants confirmed these representations numerous times prior to, and throughout the Class Period. *See* ¶¶ 69, 72-74, 79-80, 130.

For example, on February 23, 2023 (the first day of the Class Period), Defendants disseminated a PowerPoint presentation reaffirming that Origin 2's FEED package would be imminently completed, and that construction would commence in mid-2023. ¶ 118. Defendants confirmed this timeline on March 7, 2023, May 12, 2023, and May 22, 2023. *See* ¶ 125 (March 7, 2023 PowerPoint Presentation – representing that FEED package would be complete in early-2023 and that "Construction expected to start by mid-2023 and the plant is expected to be operational mid-2025"); ¶ 141 (May 12, 2023 PowerPoint Presentation – "Construction expected to start by mid-2023 and the plant is expected to be operational mid-2025"); ¶ 143 (May 22, 2023 – "Origin 2, is scheduled to come online in the 2025 time frame …").

### C. Defendants Knew That Technical Issues with Scaling PX/PET Was Delaying the Development of Origin 2

A former Origin technical development engineer who worked at Origin prior to and throughout the Class Period ("CW1"), reported that Origin was experiencing technical issues when trying to convert CMF to PX/PET at a commercial scale for Origin 2. CW1 was responsible for developing the technology for converting CMF to PX for Origin 2. ¶ 85-

---

1, FEL 2 (or pre-FEED study), and FEL 3 (or the FEED study). ¶¶ 52-56. The FEED study informs a project's financial investment decision (FID), which is the point when a company finalizes its approach to a project's development and construction can then begin. ¶¶ 57-58.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

86. CW1 was also responsible for compiling chemistry data from Origin's Research and Development ("R&D") group and rerouting the data to Origin 1 to test the findings on a larger scale. *Id*. If successful, CW1 and the internal engineering team would then pass the data to Origin's outside engineering firm that was compiling FEL 2 for Origin 2. *Id*.

In late 2022, CW1 attended biweekly meetings with Origin's R&D group, where he learned that fouling issues were occurring at every step of the Company's conversion from CMF to PX at a commercial scale. ¶ 86. These fouling issues resulted in the Company being unable to finalize the chemistry for Origin 2, which in turn caused CW1 and his team to fall behind in providing critical engineering data/designs to Origin 2's outside engineering firm and the Company to fall behind in completing FEL 2 for Origin 2. *Id.*

By December 2022, Defendants Riley and Bissell were aware of the problems with Origin 2's development and that changes needed to be made. ¶ 87. At a December 2022 quarterly all-hands Company meeting, Defendants Riley and Bissell announced that the Company was considering scaling down the size of Origin 2, splitting the building of the plant into two phases, and shifting the focus of Origin 2 from PX/PET to another product. *Id*. Defendants Riley and Bissell further divulged that Origin could not execute on its original plan for Origin 2. *Id*. Specifically, due to the economics of PX, Defendants stated that the Company would have to make less PX/PET at Origin 2 or pivot the plant's production to another product. *Id.* At the meeting, CW1 was instructed that the Company was far off from completing FEL 2. *Id.*

In early 2023, CW1 learned from biweekly meetings with Origin's R&D group that the Company faced unexpected chemical issues necessary

7

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

for scaling commercial PX. ¶ 88. While the engineers started developing solutions for the issues, it took more time, slowed down Origin 2's engineering designs, and increased costs. *Id.*

Because of the undisclosed technical issues, in February 2023, the Company's commercial strategy pivoted from producing PX/PET at Origin 2 to the development of higher margin products, such as FDCA/PEF. ¶¶ 94-95,160. Accordingly, on February 21, 2023, right before the start of the Class Period, Origin entered into a partnership agreement with Avantium, a technology development company that was completing the world's first factory to produce FDCA on a commercial scale. ¶¶ 96-97. Notably, Origin agreed to pay at least €12.5 million to garner access to Avantium's process technology and design and construction expertise so that Origin could build a commercial-scale plant for the conversion of CMF into FDCA. ¶¶ 98-99, 186-188. As Avantium's CEO discussed during a conference call on February 22, 2023, the only plausible plant for Origin to utilize Avantium's FDCA production technology was Origin 2. ¶ 188. However, Avantium's CEO further stated that it would take Origin several years to implement the production of FDCA into its current Origin 2 plant design. ¶ 100.

Unknown to investors, on March 3, 2023, Defendants announced internally that Origin 2 was not going to be built as originally represented – it was no longer going to produce PX/PET, it was shifting to new products, and it was being broken up into two phases and Origin 2 was being delayed. ¶ 91.

Knowing that PX/PET would no longer be produced at Origin 2, on May 9, 2023, Defendants amended Origin's 2018 offtake agreement with Pepsi, one of the Company's most important clients and investors, to

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

incorporate Origin's new plan for Origin 2 to focus on the production of FDCA and to account for the yet-to-be disclosed delay to the plant's construction and commercial operation timelines. ¶¶ 101, 192-193. Specifically, the amendments extended Origin 2's milestone dates past 2025[3]–pushing back Pepsi's right to terminate the agreement to 2026. ¶ 105. The Original Pepsi Offtake Agreement obligated Origin to keep Pepsi "regularly informed" on the progress and inform Pepsi if the Company obtained actual knowledge of a substantial likelihood that Origin 2's milestone dates in 2025 may not be met. ¶¶ 103-104. The amendments required Origin to meet with Pepsi on at least a quarterly basis to discuss the Company's status on meeting the new 2026 deadlines. ¶ 108.

The Pepsi amendments corroborate CW1's account that Defendants decided to shift the focus of Origin 2 from PX/PET to FDCA/PEF months before the end of the Class Period, as the amendments stated that it was Origin's "strategic plan to accelerate the production of FDCA and PEF." ¶ 107. Indeed, by May 2023, FDCA/PEF had been firmly incorporated into Origin 2's designs, as Origin was required to provide Pepsi with pricing calculations and technical specifications for the FDCA to be produced at Origin 2 before or upon completing FID. ¶¶ 107-108.

### D. Investors Learn the Truth – Origin 2 Will Not be a PX/PET Plant and Will Not Be Constructed on Time

On August 9, 2023, Defendants finally revealed that everything investors had been told about Origin 2 had changed—Origin 2 would no

---

[3] The commercial operation date deadline of June 30, 2025 set forth in the Original Pepsi Offtake Agreement was consistent with the mid-2025 timeline Defendants repeatedly represented to the market. ¶ 194.

9

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

longer produce PX/PET but, instead, would produce FDCA/PEF, the plant would be smaller in scale than represented, construction of the plant would be broken up into 2 phases, and it was impossible to begin construction in mid-2023 and complete the design and construction of a new FDCA plant by mid-2025. ¶¶ 112, 151-155. Defendants revealed that Origin 2's FID and the start of construction was delayed until at least 2025, and the earliest that certain aspects of the plant could be operational was delayed to sometime between late-2026 and 2027. *Id.* Defendant Bissell admitted that once the Company decided to take Origin 2 in a new direction and focus on FDCA/PEF, the Company needed to spend "thousands of hours" to turn a new engineering assessment and compile a revised estimate on the plant's cost and schedule, which played a "meaningful" role in delaying Origin 2's timing. ¶¶ 113, 156-159. In fact, Origin announced that the shift in production from PX to FDCA had such a dramatic effect on Origin 2's timeline that FDCA/PEF will not be produced at the plant until 2028, a delay of almost three years. ¶¶ 114, 161.

In response to the news concerning the revised product-slate, scope, and timeline for Origin 2, the Company's share price fell 66.5% on August 10, 2023. ¶ 161. Analysts were shocked, downgraded the stock, and underscored that with Origin 2 delayed, "[the Company's] investment case is broken" and that "[t]he USD10+ bn in product demand is irrelevant without access to production capacity before 2026." ¶¶ 164-165. Origin's share price never recovered, as the Company's main source of future revenue—Origin 2—is now years from completion (if ever). ¶ 166.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

**E. The SAC's Response to the Court's Order Dismissing the AC**

On October 29, 2024, the Court ruled "that the statements attributed to CW1 – which are foundational to plaintiff's allegations that defendants committed securities violations – fail to satisfy the PSLRA's particularity requirements." *In re Origin Materials Inc. Sec. Litig.*, 2024 WL 4608497, at *4 (E.D. Cal. Oct. 29, 2024). The Court found that CW1's allegations concerning what he "learned" at meetings in March 2023 lacked detail in that they failed to allege what Defendants' roles were during the March 2023 meetings, how exactly CW1 "learned" that "Origin 2 was being broken up into two phases, was shifting to new products, and would no longer produce [PX/PET]," front-end loading was being delayed for Origin 2, or whether the Defendants knew of the information that was communicated to CW1. *See Id*. at *3-4 (comparing the level of detail provided with respect to March 2023 meetings to the "detailed allegations" CW1 provided with respect to a December 2022 meeting with Riley and Bissell).

After reinterviewing CW1, Plaintiff now adds these details and clarifies what CW1 "learned" and what Defendants knew in March 2023. *See* Defs' Ex. 1 (ECF No. 90-1) (Redline comparison of the SAC to the AC). Regarding CW1, the new allegations are as follows:

> CW1 stated that he attended weekly meetings, which were held by video conference, on Fridays, between 9am and 10am PST with Bissell and others. The meetings generally lasted an hour or more. The moderator would start the meeting with a safety moment, introduce new employees, and then the meeting would proceed. Bissell was usually one of the later people to speak. The moderator would introduce Bissell and the topics Bissell planned to discuss. CW1 recalled that Bissell would often lead discussions and also introduced other speakers. CW1 stated that Bissell was a "huge contributor" to the weekly meeting and "was in charge." ¶ 90.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

> During the March 3, 2023 meeting, CW1 heard Bissell discuss how Origin 2 would now be broken up into two phases, was shifting to new products, and would no longer produce PX. This was communicated by Bissell to all participants at that meeting. CW1 recalled Bissell explaining the changes by saying things like: PX is not performing strongly, the cost of the plant is very high, and we need to get the company net positive. Accordingly, Bissell told the group, "we are going to move in this new direction." Bissell was the first person that CW1 heard reveal that the Company would not produce PX at Origin 2. ¶ 91.

> CW1 stated that at the March 3, 2023 meeting, Bissell presented a detailed plan of action to move forward with the changes at Origin 2 away from PX production and the changes to plant construction. CW1 stated that since a plan of action to move forward with the changes at Origin 2 were already formulated and communicated to the group during the March 3, 2023 meeting, Bissell must have known well before March 3, 2023 that Origin 2 would not produce PX in order for Bissell and management to have time to come up with the change in plan. CW1 stated that the plan announced on March 3, 2023 was likely formulated months in advance because it was well thought out by the time it was conveyed by Bissell to CW1 and others at the March 3, 2023 meeting. ¶ 92.

> CW1 recalled that toward the end of March 2023, there were email communications in his group discussing that FEL 2 was delayed for Origin 2. CW1 stated that the late March 2023 emails reiterated what Bissell told the group at the weekly meetings, where Bissell discussed Origin 2's production changes away from PX, construction delays, and FEL2 delays. ¶ 95.

The Court provided that Plaintiff had 20 days to amend the AC to provide more detail concerning the March meetings in accordance with its Order. Plaintiff has complied.

**ARGUMENT**

## I.    LEGAL STANDARD

Dismissal pursuant to Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable theory or sufficient facts to support

12

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

a cognizable theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted). A complaint must only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any [12(b)(6) motion,] accept all factual allegations in the complaint as true . . . [and] consider the complaint in its entirety." *Tellabs Inc. v. Makor Issuers & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To state a claim under §10(b) of the Exchange Act, as amended by the PSLRA, a plaintiff must plead in accordance with Rule 9(b): "(1) a material misstatement or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Khoja*, 899 F.3d at 1008 (quoting *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Here, Defendants contest scienter, falsity, and loss causation. However, each of these elements is adequately alleged and Defendants' Motion should be denied.

**II.   PLAINTIFF ALLEGES A STRONG INFERENCE OF SCIENTER**

Plaintiff has adequately alleged that Defendants acted with scienter. To properly plead scienter under Rule 9(b) and the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "A defendant is liable under Section 10(b)

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

and Rule 10b-5 when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.* 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). In ruling on a motion to dismiss, the scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre.'" *Tellabs*, 551 U.S. at 324. Rather, "it must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 314. "In other words, the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).

**A.    The SAC's Particularized CW Allegations Plead a Strong Inference of Scienter**

A complaint can establish a strong inference of scienter through confidential witness ("CW") allegations by satisfying the Ninth Circuit's test: (1) the CW "must be described with sufficient particularity to establish their reliability and personal knowledge;" and (2) their "statements which are reported by the Confidential Witness with sufficient reliability and personal knowledge must themselves be indicative of scienter." *In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1144 (9th Cir. 2017)(citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Here, the SAC satisfies both prongs.

**1.    CW1 Is Described with Sufficient Particularity**

To satisfy the first prong, a complaint must describe the CW "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the

14

information alleged." *Quality Sys.*, 865 F.3d at 1145 (citation omitted). The SAC pleads enough details about CW1's job description, including his title, role and duties, and tenure to show that he was positioned to know the information attributed to him. ¶¶ 83-93. *See Quality Sys.*, 865 F.3d at 1145 (CWs reliable where complaint alleges their "job description and responsibilities, and, in some instances, the witness's exact title"). CW1 was a technical development engineer who was employed at Origin prior to and throughout the Class Period and who worked on developing the technology for the fourth stage of converting CMF to PX for Origin 2. ¶ 85. CW1 was part of an internal engineering group responsible for compiling chemistry data provided by the R&D group, rerouting the information to Origin 1 to test those findings on a larger scale, and passing the data to the outside engineering firm compiling FEL 2 for Origin 2. ¶¶ 85, 86, 88. Thus, CW1 was well positioned to directly observe that Origin was experiencing problems with scaling the production of PX at Origin 2. ¶ 84.

This is the same description that was used in the AC, reported by the Court in its Opinion without criticism, and there has not been a specific challenge to its sufficiency by Defendants. Peppered in the Defendants' Motion are baseless protests about what *Defendants think* CW1 would know about Origin 2, or how the Defendants arrived at the decision to abandon PX at the beginning of the Class Period. Mot. 11 and 12 at n3. Regardless, it is logical that CW1, a technical engineer working on PX for Origin 2, would be told when PX is being discontinued *by Defendants* during weekly meetings *with Defendants* when discussing *PX*. Accordingly, CW1 is described with sufficient particularity to

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

remain unnamed, satisfying the first prong of this Circuit's test to rely on confidential witness information concerning the known failures of Origin 2 as alleged in the SAC.

### 2. CW1's Allegations Are Particularized, Reliable, Based on Personal Knowledge, and Indicative of Scienter

The second prong considers whether CW1's allegations are based on personal knowledge, particularized, and reliable. *Quality Sys.,* 865 F.3d at 1144. Here, CW1 reports firsthand accounts of what the Individual Defendants admitted to CW1 (and his group) prior to and during the Class Period. CW1 knew from meetings with the Individual Defendants that PX for Origin 2 was experiencing technical issues causing delays in late 2022 and was abandoned altogether by March 2023.

The SAC's allegations are extremely specific concerning Origin's March 2023 meetings and how CW1 learned of Defendants' decision to abandon PX at Origin 2. The first time CW1 learned that Defendants were abandoning plans to construct Origin 2 as a PX plant was during a video conference on March 3, 2023, between 9am and 10am PST, where Bissell told CW1 (and his group) that Origin 2 would not produce PX. ¶¶ 90-92. During that meeting, Bissell presented a detailed plan of action to move forward with the changes at Origin 2 away from PX production and the changes to plant construction. ¶ 92. CW1 also advised that he received (and Origin possesses) March 2023 emails that reiterated what Bissell told the group at the weekly meetings throughout March, where Bissell discussed Origin 2's production changes away from PX, construction delays, and FEL2 delays. ¶ 93.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Indeed, these allegations supply the level of detail required by the Court. They meet the level of detail that CW1 provided for the December 2022 all-hands meeting which the Court cited as an example of a sufficiently detailed allegation. That allegation, realleged in the SAC, recounts what happened at the meeting and that Bissell and Riley instructed CW1, and the group, that Origin 2 was far off. Order at 3.[4] CW1's allegations all satisfy Rule 9(b)and are particularized in accordance with the PSLRA.

In their motion, Defendants wrongly claim CW1's SAC allegations are unreliable because they supposedly contradict the AC allegations. Mot. at 9-10. While CW1's new allegations do not mention Co-CEO Riley as speaking at the March 3, 2023 meeting, they are still consistent with the AC. In the SAC, CW1 is reporting when he first learned of Origin's plan to abandon PX at Origin 2. That he heard it from CO-CEO Bissell. This is not inconsistent with CW1's prior allegations that CW1 also learned details about the new Origin 2 plan from others at meetings and by email throughout March. Defendants also claim that CW1's allegations are based on his personal beliefs. Mot. at 11. But a fair reading of the SAC shows that this was not CW1's personal

---

[4] Allegations by CW1 about pre-Class Period issues with Origin 2 are relevant, consistent with, and further corroborate CW1's Class Period allegations. *See, e.g.*, *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at \*4 (C.D. Cal. Mar. 12, 2012) ("…facts relevant to scienter 'will ordinarily date from before any alleged misrepresentations' because the 'circumstances preceding the statements…would be among those knowable at the time of the statements'") (quoting *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 956, 971 (N.D. Cal. 2005); *In re Invision Techs., Inc. Sec. Litig.*, 2006 WL 538752, at \*2 n.1 (N.D. Cal. Jan. 24, 2006)("To the extent that these [pre-class period] statements are used to demonstrate the truth or falsity of Class Period statements, they are relevant").

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

belief, but rather, CW1 is reporting Origin's decision (which was shared with him on March 3, 2023) to abandon PX at Origin 2 and to move in another direction. This was directly communicated by Bissell, thereby distinguishing the SAC from the cases Defendants cite.

The remainder of Defendants' arguments against CW1 simply refuse to accept the allegations. Defendants call CW1's information vague and generalized when it is not. Then when CW1 provides information about who ran the March 3 meeting (as the Court noted was missing), Defendants call that fact and the date and time of the meeting "trivia." Mot. at 10. Defendants also gin up false discrepancies, claiming it is somehow inconsistent to link the cause of PX plastic fouling to immature technology or that amending CW1's allegations is itself disqualifying. Defendants also pose a group of irrelevant questions – all of them essentially asking the Court to ignore the Ninth Circuit's pleading standard for alleging information from a confidential witness, which the SAC easily meets.

Accordingly, CW1 offers specific and corroborative details both before and during the Class Period, including Individual Defendants' participation at internal Origin meetings that, contrary to their public assurances, demonstrates they knew that Origin 2 was encountering issues with scaling the production of PX, experiencing delays, and would never produce PX.

### 3.   CW1's Allegations Are Indicative of Scienter

As part of the second prong of the Ninth Circuit's test for relying on confidential witness information, the alleged CW information must be indicative of scienter. *Zucco,* 552 F.3d at 995, 998. Here, CW1's information from the December 2022 and March 3, 2023

18

meetings adequately show that Defendants knew Origin 2 construction was delayed and Origin 2 would not produce PX by the beginning of the Class Period, but misled investors about those facts.

CW1 recalled that at a quarterly Company meeting in December 2022, Defendants Riley and Bissell told Origin employees that due to the economics of scaling PX, Origin was forced to either produce less PX at Origin 2 or pivot the plant's production to another product, and that the Company was "far off" from completing FEL 2. ¶ 87. In other words, Individual Defendants revealed that Origin could not execute on its plan for Origin 2. This required changes and delayed FEL 2. Then, per CW1, Defendant Bissell advised employees of Origin's decision to no longer produce PX at Origin 2 and break the plant's construction up into two phases, further delaying the plant's completion of FEL 2. ¶¶ 88-92. These statements by Defendants were personally heard by CW1.

CW1's account that Origin 2's problems and delays were known by Individual Defendants are corroborated by other facts alleged. With technical fouling issues causing delays to Origin 2's construction schedule and increasing the costs to produce PX/PET at the plant in late 2022 and early 2023, Defendants were forced to explore alternatives to PX/PET. ¶¶ 94-100. Accordingly, on February 21, 2023, Origin entered into a deal with Avantium to garner its assistance and expertise with the production of FDCA at an Origin plant.[5] ¶¶ 95-100,

_____

[5] Defendants' assertion that Origin also entered into an offtake agreement to purchase FDCA from Avantium is irrelevant. Mot. at 16. Avantium CEO's statements demonstrate that the primary purpose of the partnership was to "open the market to accelerate the large-scale

180-191. As Avantium's CEO discussed during a conference call on February 22, 2023, the only plausible plant for Origin to utilize Avantium's FDCA production technology was Origin 2. ¶ 188. During the call, Avantium's CEO, the preeminent expert on building a commercial-scale FDCA plant, further corroborated CW1's allegations that Individual Defendants knew that FEL 2 for Origin 2 was delayed by advising that with Origin 2 pivoting to FDCA, the plant would not be operational in accordance with Defendants' timeline and would require substantially more time to develop. ¶¶ 100, 182-183, 188. Unlike the vague and attenuated basis for a former employee's statements raised in *Sgarlata v. Paypal Holdings, Inc.*, 409 F. Supp. 3d 846, 857 (N.D. Cal. 2019), *aff'd sub nom. Eckert v. PayPal Holdings*, 831 F. App'x 366 (9th Cir. 2020) (Mot. at 10), Avantium's CEO was well positioned to provide a credible opinion on Origin 2's timeline. Not only is Avantium the first company in the world to build a commercial-scale FDCA plant, but the company was specifically contracted with, and paid by Origin to provide Origin with that very expertise for Origin 2. ¶¶ 182-188.

Then, on May 9, 2023, to account for the known delay to Origin 2's construction timeline and the plant's pivot from PX to FDCA, Defendants amended Origin's offtake agreement with Pepsi to reflect these developments. ¶¶ 101-114, 192-203. This was driven by the Original Pepsi Agreement's provisions requiring Origin to inform Pepsi if it obtained actual knowledge of a substantial likelihood that Origin

---

production of FDCA and PEF" by allowing Origin to use "Avantium's process technology to enable the conversion of CMF into FDCA at a facility of 100 kiloton per annum scale" – which could only be Origin 2. Defs. Ex. 26 (ECF No. 69-28) at 1-2.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

2's milestone completion dates in 2025 may not be met, which would then trigger certain termination rights for Pepsi. ¶¶ 190-192. In the face of delays to Origin 2, Origin and Pepsi opted to salvage their offtake agreement by extending the termination dates beyond 2025—evincing that Origin now expected Origin 2's commercial operation to occur by June 30, 2026 and product delivery by December 31, 2026. *Id.* Accordingly, the Pepsi Offtake Agreement Amendments demonstrate that Defendants knew by May 9, 2023 that Origin 2 was experiencing delays, would not begin construction by mid-2023, and would not be operational by mid-2025. ¶ 197.

Scienter is further supported by the amendments' incorporation of the production of FDCA into Origin 2's design. As Defendant Bissell later admitted on August 9, 2023, once the Company decided to focus on the production of FDCA instead of PX, the Company needed to spend "thousands of hours" to turn a "new engineering assessment" and compile a revised estimate on the plant's cost and schedule, which played a "meaningful" role in delaying the plant's timing. ¶ 113.

**B.    The Core Operations Doctrine Supports Scienter**

The SAC's core operations allegations — that the completion of Origin 2 was vital to Origin's financial success and proof of large commercial production of its touted technology — further support scienter. ¶ 204. Under the core operations theory, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within

21
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

the company." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).

PX/PET from Origin 2 was expected to be the backbone of Origin, supply most of Company's products for years, and carry the Company into profitability.[6] ¶¶ 42, 44-45, 60, 70; *see Oklahoma Firefighters Pension and Ret. Sys. v. Snap. Inc.*, 2024 WL 5182634, at \*2-3 (9th Cir. Dec. 20, 2024) (finding scienter pursuant to core operations theory for knowledge of business concerning half of revenue); *See In re BioMarin Pharm., Inc. Sec. Litig.*, 2022 WL 164299, at \*14 (N.D. Cal. Jan. 6, 2022) (finding valrox "to be a significant and lucrative product" which "reinforced" an inference of scienter). Given the importance of Origin 2 to Origin's commercial operation and bottom line, "it would be absurd to suggest that management was without knowledge" of Origin 2's failures in meeting its construction milestones and the plant's production issues, even absent other scienter allegations. *Reese v. Malone*, 747 F.3d 557, 577 (9th Cir. 2014) (quoting *S. Ferry LP, No. 2*, 542 F.3d at 786).

Defendants also had actual access to the planning and development of Origin 2. CW1 confirms that Individual Defendants, who shared the position of CEO, closely monitored the status of Origin 2 by leading weekly and quarterly meetings in which Origin 2's development and product slate were discussed. ¶¶ 87, 89-91. Indeed, for two and a half years, Individual Defendants publicly provided extensive and regular

---

[6] Compared to Origin 1, Origin's only other plant under development, Origin 2' production output was expected to be over sixteen times greater, equating to almost 6 times the revenue. ¶ 60. Origin 2 was also expected to generate $385M in profit, while Origin 1 would operate at a loss. *Id.*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

updates on Origin 2's planning, construction, and product focus. Unlike the defendants in *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1109, 1112 (9th Cir. 2021) (Mot. at 18), Individual Defendants admitted they were closely monitoring the plant's construction costs and timeline. ¶¶ 69, 71-82, 115-142 (*e.g.*, "[w]e are of course continually reviewing construction costs and timeline…we were pleased to reaffirm our previously disclosed expected capital budget and production timelines for Origin 1 and Origin 2") (¶ 69). *See Quality Sys.*, 865 F.3d at 1145 (that defendants "themselves told investors they had real-time access to, and knowledge of, sales information" bolstered scienter). Defendants' knowledge of the core operations supports the SAC's inference of scienter.[7]

### C.   Viewing the SAC's Allegations Holistically, Defendants' Purported Innocence Fails

The guiding question for determining whether a plaintiff has alleged scienter is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Courts must consider "the totality of [the] circumstances" and "need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2*, 542 F.3d at 784. Here, the SAC's allegations, when viewed holistically, demonstrate

---

[7] Defendants' reliance on *Anderson v. Peregrine Pharms., Inc.*, 2013 WL 4780059, at *12 (C.D. Cal. Aug. 23, 2013) (Mot. at 18) is inapposite as the court rejected the core operations theory because it was impossible for defendants to have any knowledge of the drug's study errors and mislabeling as the study was a double-blind study conducted by outside investigators and the drug was labeled by a third-party.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Defendants knew they issued false or misleading statements to investors because:

- in late 2022, Origin was experiencing fouling issues "at every step" of the process of converting CMF to PX at a commercial scale, resulting in the Company being unable to finalize the chemistry for Origin 2 and causing delays to the plant's engineering development and completing FEL 2 (¶¶ 86-87);

- in December 2022, Defendants Bissell and Riley told Origin's employees in a meeting that due to the economics of scaling PX, Origin was forced to either produce less PX at the plant or pivot the plant's production to another product (¶ 87);

- in early 2023, Origin's R&D group started developing solutions to the chemical issues; however, this further delayed Origin 2's engineering designs and increased the plant's costs (¶ 88);

- the failure of PX development forced Defendants to make a strategic shift in Origin's commercial strategy in February 2023 to focus on high-margin products, such as FDCA (¶ 160), and enter into a deal with Avantium on February 21, 2023 to produce FDCA at Origin 2; Avantium's CEO advised that Origin 2 would not be operational in two years but would take several years past the plant's timeline (¶¶ 95-100, 180-191);

- During the March 3, 2023 meeting, CW1 heard Bissell discuss how Origin 2 would now be broken up into two phases, was shifting to new products, and would no longer produce PX. This was communicated by Bissell to all participants at that meeting. CW1 recalled Bissell explaining the changes by saying things like: PX is not performing strongly, the cost of the plant is very high, and we need to get the company net positive. Accordingly, Bissell told the group, "we are going to move in this new direction." Bissell was the first person that CW1 heard reveal that the Company would not produce PX at Origin 2 ¶ 91;

- CW1 stated that at the March 3, 2023 meeting, Bissell presented a detailed plan of action to move forward with the changes at Origin 2 away from PX production and the changes to plant construction. CW1 stated that since a plan of action to move forward with the changes at Origin 2 were already formulated and communicated to the group during the March 3, 2023 meeting, Bissell must have known well before March 3, 2023 that Origin 2 would not produce PX in order for Bissell and management to have time to come up with the change in plan. CW1 stated that the plan announced on March 3, 2023 was likely formulated months in advance because it was well thought out by the time it was conveyed by Bissell to CW1 and others at the March 3, 2023 meeting ¶ 92.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

- CW1 stated that the late March 2023 emails reiterated what Bissell told the group at the weekly meetings, where Bissell discussed Origin 2's production changes away from PX, construction delays, and FEL2 delays ¶ 93.

- Defendants admitted that once the Company decided to take Origin 2 in a new direction, the Company then needed to spend "thousands of hours" to turn a new engineering assessment and compile a revised estimate on the plant's cost and schedule, which played a "meaningful" role in delaying the plant's timing (¶¶ 157, 159);

- on May 9, 2023, Defendants amended the Original Pepsi Offtake Agreement to reflect that Origin 2's construction would not begin by mid-2023, operations would not begin by June 30, 2025, and the plant's focus shifting to FDCA (¶¶ 101-110, 192-204);

- Origin claimed the shift from PX to FDCA had such a dramatic effect on Origin 2's timeline that FDCA will not be produced at the plant until 2028, a delay of almost three years (¶ 161); and

- Origin 2 was the core business of Origin Materials and the Co-CEO Defendants closely monitored the project (¶ 69).

These facts show that Defendants knew but "withheld important warning signs from the market." *BioMarin*, 2022 WL 164299, at *14; *see also Leventhal v. Chegg, Inc.*, 2024 WL 924484, at *8 (N.D. Cal. Mar. 4, 2024)("[t]he extensive communications between university officials and Chegg about rampant cheating on the platform combined with detailed former employee testimony [ ] meet the high bar for pleading scienter at this stage"); *Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at *9 (N.D. Cal. Sept. 11, 2020) (finding scienter in connection with statements regarding new customers given the importance of the corporate-defendant's sales pipeline, confidential witnesses attending meetings with individual defendants in which sales pipeline was discussed, and inferring that problems with the pipeline were discussed at the meeting based on other allegations in the complaint, including the "hands-on" nature that the CEO-defendants approached the sales pipeline). At most, this presents "a close question," which, at

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

this stage, must be resolved in Plaintiff's favor. *Scheller*, 2020 WL 5500422, at *9.

Defendants fail to rebut the SAC's strong inference of scienter with any viable non-fraudulent inference. Defendants' plea of ignorance until August 2023 is refuted by CW1 and Defendants' Class Period revisions to the Pepsi Agreement.[8] Mot. at 5. If Defendants were truly in the dark as to whether Origin 2 was encountering problems and needed a revised timeline, then the Company would have had no reason to revise its offtake agreement with Pepsi before FEL 2's completion. Instead, they revised the Pepsi Agreement in May 2023 to reflect delays that were already known to Defendants to Origin 2's timeline and the known loss of future PX/PET production. ¶¶ 101-110. Defendants' actions confirm that the much more plausible explanation is that they knew Origin experienced technical issues with scaling the production of PX, which repeatedly delayed the FEL 2 process for Origin 2 (¶¶ 86-92), Defendants concluded that scaling the production of PX was not economically viable (¶¶ 91-92), requiring Origin to abandon PX/PET and pivot Origin 2's focus to FDCA/PEF (¶¶ 89-98, 180-191), and push back the plant's construction timeline.

Instead of identifying any plausible and innocent explanation, Defendants only seek to "attack individual allegations in isolation," which "cannot overcome the overwhelming inference drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).

---

[8] Moreover, CW1 adequately described how Origin's employees were intimately involved in the FEL 2 process. ¶ 85.

26

## III. PLAINTIFF ADEQUATELY PLEADS FALSE AND MISLEADING STATEMENTS CONCERNING THE PURPORTED PX/PET ORIGIN 2 PLANT

The SAC pleads particularized facts from CW1, Origin contracts, and partners showing that Defendants did not plan to build Origin 2 as a PX/PET plant during the Class Period. Those facts provide a basis for why the false and misleading statements: (i) concealed technical issues; (ii) falsely described Origin 2 as a PX/PET-producing plant; (iii) insincerely touted PX/PET as the Company's main product; and (iv) deceptively claimed progress was being made on the PX/PET plant's construction milestones with start-up in mid-2023. ¶¶ 115-150.

Pleading a material misstatement or omission ("falsity") "is subject to … the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Falsity must satisfy Rule 9(b), and the PSLRA requires that "the complaint shall state with particularity all facts" supporting the plaintiff's belief that defendants made an untrue statement or "omitted facts necessary in order to make the statement made in the light of the circumstances in which they were made, not misleading." 15 U.S.C. § 78u-4(b)(1)(B).

A misrepresentation or omission is actionable if it "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "'[O]nly if reasonable minds could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6).'" *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2018) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Plaintiff has adequately alleged falsity under Rule 9(b) and the PSLRA by "'specify[ing] each statement alleged to have been misleading, . . . the reason or reasons why the statement is misleading, and … stat[ing] with particularity all facts on which that belief is formed.'" *Khoja*, 899 F.3d at 1008; 15 U.S.C. § 78u-4(b)(1)(B).

### A.    Defendants Knew Technical Issues Occurred That Prevented the Development of the Origin 2 PX/PET Plant but Falsely Told Investors Otherwise

Origin's false and misleading disclosures concerning potential risks associated with the construction of Origin 2 that had already transpired are actionable.[9] *See* ¶¶ 125, 136. Merely warning that issues "could" occur in the future when they have already materialized is misleading." *Alphabet*, 1 F.4th at 703-04; *see also Facebook*, 87 F.4th at 949 (explaining why speaking about risks in the abstract would mislead when they are already present).[10]

---

[9] Defendants ignore these allegations and ignore *Alphabet*, the leading Ninth Circuit decision finding misleading risk language actionable. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021). *See* Mot. at 19-42 (arguing only that Defendants' statements concerning "progress" at Origin 2 (¶¶ 115-17, 119-20, 129-32), the "construction schedule" for Origin 2 (¶¶ 118, 127, 141, 143), and the production of "PX/PET" at Origin 2 (¶¶ 115, 117, 119, 127, 129, 131, 138-39, 141, 144-45, 147, 148-49) were not false and misleading).

[10] Defendants' only attempt to grapple with Origin's risk language arises in the context of their (unavailing) argument in favor of the safe harbor. *See* Mot. at 35-36. Even in that context, however, Defendants fail to even acknowledge the Ninth Circuit's holding in *Alphabet*, or any of the line of cases that have applied it (instead, citing law from outside the Ninth Circuit). *Id*.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

*Alphabet* is directly on point. In *Alphabet*, internal Google investigators discovered a software glitch that had existed for three years that allowed developers to collect users' profile data. *Alphabet*, 1 F.4th at 695. Despite knowledge of the software bug, Alphabet's Form 10-Q incorporated the company's earlier risk disclosures in its 2017 10-K, which warned of the risk that public concerns about Alphabet's "practices with regard to collection, use, disclosure, or security of personal information or other privacy related matters" *could* damage the company's "reputation and adversely affect [its] operating results." *Id.* at 694-695. The Ninth Circuit held that "Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized. *Id*. at 704.

*Facebook* is similarly instructive. In *Facebook*, "[t]he essence of the challenged risk statements is that, although Facebook knew Cambridge Analytica had improperly accessed and used Facebook users' data, Facebook represented in its 2016 Form 10-K that only the hypothetical risk of improper third-party misuse of Facebook users' data could harm Facebook's business, reputation, and competitive position." *In re Facebook Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023), *cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank,* 144 S. Ct. 2629 (June 10, 2024). Relying on *Alphabet*, the Court held that the plaintiffs had adequately alleged that Facebook's risk warnings were misleading by alleging facts supporting the claim that Facebook was aware of Cambridge Analytica's misconduct prior to the issuance of the 10-K. *Id*. at 949 ("Facebook represented the risk of

29
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired."). *Id*.[11]

Here too, the risk language issued by Origin was false and misleading because it warned of potential risks that "could" arise when those risks had already materialized. *See* ¶¶ 125, 136. Specifically, Defendants warned on February 23, 2023 and May 10, 2023 that:

- "***there is a risk that*** significant unanticipated costs or ***delays could arise due to***, among other things … ***unforeseen technical issues***" (*see* ¶¶ 125-126 (2/23/23 10-K); 136-137 (5/10/23 10-Q)); and

- "***we may not be successful***… in developing or implementing new production processes….***Such risks include difficulties in designing, developing, implementing, and scaling up new process technologies***." ¶¶ 136-137 (5/10/23 10-Q).

Plaintiff alleges that at the time Origin issued these risk disclosures, these risks had already materialized. By February 2023, Origin had already experienced "unforeseen technical issues" in connection with scaling the production of PX, which was delaying Origin 2's development and construction. ¶¶ 125-126. Specifically as of February 2023: (1) Origin knew that PX fouled at a commercial scale,

---

[11] *Alphabet* affirmed the prevailing view that it is "deceit[ful]" to caution of a potential risk that the company is experiencing. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983); *see also Berson,* 527 F.3d at 987 (a company may make a materially misleading statement when it "speaks entirely of as-yet-unrealized risks" when the risks have "already come to fruition"); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("[t]o warn that the untoward may occur when the event is contingent is prudent" but to state "it is only possible for the unfavorable events to happen when they have already occurred is deceit").

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

as Origin was experiencing unforeseen fouling issues when trying to convert CMF to PX at commercial scale, which was preventing the Company from finalizing the chemistry for Origin 2, causing delays in Origin 2's development and the completion of FEL 2 (¶¶ 83-84, 86, 126); (2)Origin knew the Company was far off from completing FEL 2 for Origin 2 and that due to the economics of scaling PX, Origin was going to either produce less PX at Origin 2 than planned or was going to have to pivot the plant's production to other products (¶¶ 87, 126); and (3) Origin's R&D group started developing solutions to the chemical issues in early 2023, however, this caused delays, slowed down Origin 2's engineering designs and increased the plant's costs (¶¶ 88, 126). The materialization of these risks culminated in the Defendants' decision to abandon PX at Origin 2 prior to March 3, 2023. (¶¶ 91-92, 126).

Indeed, by May 10, 2023 (when Origin issued its 1Q'23 10-Q), Defendants knew that there was going to be a significant delay with the construction of Origin 2. Two months earlier, on March 3, 2023, the Defendants advised Origin employees that because PX was not performing strongly and because of costs, Origin 2 was going to be broken up into two phases and would focus on the production of FDCA rather than PX. ¶ 91. Defendants presented Origin employees with a detailed plan of action to move forward with the changes to Origin 2 away from PX production and to change plant construction. ¶ 92. By the end of March 2023, it was known that FEL 2 and construction was delayed for Origin 2. ¶ 93. Further, on May 9, 2023 Defendants amended Origin's agreement with Pepsi to incorporate Origin 2's new focus on the production of FDCA and to account for the known delay to the plant's

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

construction and commercial operations timelines. ¶¶ 101-110. Once Defendants decided to focus on FDCA instead of PX in March 2023, Origin needed to spend "thousands of hours" to turn a new engineering assessment and to compile a revised estimate on the plant's costs and schedule, which Defendants have admitted played a "meaningful" role in delaying Origin 2's timing. ¶¶ 156-159.

Thus, the risk that Origin "could" experience unforeseen technical issues that "could" delay the development of Origin 2, and the risk that the Company "may" not be successful in scaling up new processes, were not future, potential risks. These are actionable false and misleading statements because the risks had already materialized. *See Alphabet*, 1 F.4th at 702-703 (risk disclosures that "even unfounded concerns . . . could damage the company's reputation[,]"misleading because they were made after Google detected cybersecurity issues); *Berson*, 527 F.3d at 987 (risk disclosures that "speak[ ] entirely of as-yet-unrealized risks and contingencies" and do not "alert[ ] the reader that some of these risks may already have come to fruition" are misleading); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)(by presenting the risk as a future possibility, instead of a present reality, Defendants "create[d] an impression of a state of affairs that differs in a material way from one that exists").[12]

---

[12] Defendants' erroneously rely on *Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *7 (C.D. Cal. Dec. 1, 2023). *Waswick* was essentially overruled by *Facebook*. *See*, *Facebook*, 87 F.4th 934 (holding that general warnings inherent to a social media company – that third-party misuse of its users' data could harm its business, reputation and competitive position – were misleading where the

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

**B.    Defendants Falsely Claimed That PX Would Be the Company's Flagship Product**

During the Class Period, Defendants misleadingly touted PX/PET as the Company's "flagship" product and falsely confirmed that Origin 2 would be a PX/PET plant. On May 10, 2023, Defendant Riley stated, "PET derived from PX remained the Company's flagship product." ¶ 138; *see also* ¶ 139 (May 12, 2023 – Origin 2 was "expected to convert an estimated 1 million dry metric tons of sustainable wood residues each year into carbon-negative materials used to make PET and HTC…"); ¶ 147 (June 8, 2023 – referring to PX/PET as the "flagship" product); ¶ 149 (June 8, 2023 – "para-xlene [PX], which hopefully goes into PET, is kind of our flagship and our first product").

These statements were false and misleading because by March 2023, Defendants encountered technical issues while attempting to scale the production of PX/PET. ¶¶ 86-88. This resulted in Defendants advising CW1 and Company employees that Origin 2 would no longer produce PX/PET but instead would produce FDCA/PEF and other products. ¶¶ 87-89, 91-92. Consistent with these allegations, Defendants took steps to incorporate the production of FDCA/PEF into Origin 2: (1) in February 2023, the Company's commercial strategy pivoted from demand generation to revenue generation and the development of higher margin products, such as FDCA (¶ 160); (2) on February 21, 2023, Origin agreed to pay Avantium at least €12.5 million for access to Avantium's process technology and expertise so that Origin could turn Origin 2 into a

plaintiff alleged that the company knew that a third-party had already accessed users' data). Further, Origin's risk warnings are misleading even under *Waswick*, since they pertained to "a discrete, relatively rare risk, the occurrence of which is itself a significant event." 2023 WL 9197563 at *7 (citing *Berson*, 527 F.3d at 984).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

commercial-scale plant for the production of FDCA (¶¶ 98-100, 186-188); and (3) on May 9, 2023, Defendants amended Origin's offtake agreement with Pepsi to incorporate Origin's new plan for Origin 2 to focus on the production of FDCA/PEF (¶¶ 101, 192-193). Critically, the amendments stated that it was Origin's "strategic plan to accelerate the production of FDCA and PEF." ¶ 107. Indeed, by May 2023, FDCA had been firmly incorporated into Origin 2's designs, as Origin was now required to provide Pepsi with pricing calculations and technical specifications for the FDCA to be produced at Origin 2. ¶¶ 107-108.

Defendants erroneously assert that Plaintiff has not pled falsity with respect to Defendants' representations that PX was Origin's flagship product because Origin "truthfully" told investors that it "may" "add" other products into the design of Origin 2. Mot. at 37-38. That is a red herring. Plaintiff agrees that other processes were contemplated in addition to PX/PET, but Origin 2 was represented to investors as a PX/PET plant. "[D]isclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *In re Convergent Techs.*, 948 F.2d at 512. "[L]iterally [true]" statements are actionable if they mislead investors due to the omission of material information. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 797 (9th Cir. 2017) (omissions of contrary fact actionable, even if statements are "not literally false"); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (alleged statements were technically true, but still misleading). Affirmatively creating an impression of a state of affairs that differ in a material way from the one that actually existed is misleading. *Brody*, 280 F.3d at 1006.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Here, Defendants' statements created the false impression that PX remained Origin 2's flagship product. Defendants misleadingly represented: that "new products and applications [] **may be incorporated into** the design of [Origin 2]" (¶¶ 115, 117, 119, 129, 131);  that "*due to strong customer demand, we are substantially committed for our Origin 2 paraxylene and PET capacity*… *as such*, our sales and marketing team has shifted focus from active marketing of PET towards higher end products" (¶ 117); and that "we are pleased to **potentially add** some of these products" (¶ 119); Origin 2 expected to make PX/PET (¶127, 141). These statements created the misleading impression that PX/PET was still going to be the flagship product for Origin 2 and that Origin was considering **adding** products because of the "strong customer demand" for PX/PET, and because the Company was "substantially committed" for its Origin 2 PX/PET capacity. In truth, at the time these statements were made, Origin was experiencing chemical fouling issues that were preventing Origin from converting CMF to PX at commercial scale, delaying the development of Origin 2 as a PX/PET plant, and resulting in the Defendants' decision to abandon the production of PX/PET at Origin 2 altogether. *See* ¶¶ 84-93. Accordingly, Plaintiff has sufficiently pled that Defendants' statements were misleading.[13]

---

[13] *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005) ("Whether a statement is misleading and whether adverse facts are adequately disclosed are generally questions that should be left to the trier of fact"); *see also Warshaw*, 74 F.3d at 959 ("[O]nly if 'reasonable minds' could disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)").

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Accordingly, Plaintiff satisfies the falsity requirement of the PSLRA and Rule 9(b). *See Khoja*, 899 F.3d at 1008 ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time"). "Requiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one." *Glazer Cap. Mgmt.*, 63 F.4th at 769.

### 1. Defendants' Challenges to the Importance of PX Are False, Speculative, and Do Not Displace the SAC's Allegations

Defendants disingenuously claim some of their "flagship" statements are not "tied" to Origin 2, and therefore, Plaintiff's allegations that Origin 2 was touted as PX/PET plant are false. Mot. at 39-40. This argument belies the well-pled, factual allegations in the SAC. Origin touted its decision to produce PX/PET at Origin 2 as early as April 2021. ¶ 60-68. Defendant Riley confirmed that PX/PET was Origin 2's flagship product when, responding to a question from an analyst about the timing of PX/PET, he stated: "***"para-xlene, [] is kind of our flagship and first product.***" ¶ 149. The Company confirmed that Origin 2 was intended to supply the Company's first products at commercial scale (as opposed to Origin 1) in February 23, 2023: "Origin 1 is a strategic asset which we plan to use to qualify higher-value application for our intermediaries CMF and HTC. At scale, Origin 2 is intended to focus on supply products that serve our near-term markets of interest." *See* Defs' Ex. 2  (ECF No. 90-2) at 7. In fact, Origin 2 was expected to supply most of the Company's products for years and carry the Company into profitability. ¶¶ 42, 44-45, 60, 70. Lastly, Defendant Bissell confirmed that PX/PET was supposed to be Origin 2's

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

flagship product on August 9, 2023, when explaining why the shift to FDCA played a "meaningful role" in delaying Origin 2's timing, stating:

> So looking at these other products, one, takes more time, right? ***So we obviously didn't expect to be producing those kinds of [non-PX] products off of OM2*** when we originally provided estimates…

¶ 157. Analysts following the Company also understood Defendant's statements to mean that Origin 2's flagship product would be PX/PET. For example, analysts from Craig-Hallum were shocked by the sudden shift away from PX/PET, stating, "***this all takes a back seat to the major curveball served up in the form of the decision to shift planned Origin 2 production to focus on FDCA [] from paraxylene (pX)***…" ¶ 165. Thus, despite Defendants' revisionist history, Defendants represented, and the market understood, that Origin 2 was to be a PX/PET plant, with PX/PET as its flagship product.

Faced with this reality, Defendants continue to improperly attempt to present their own version of the facts to rebut Plaintiff's allegations that PX/PET was touted as Origin 2's flagship product.[14]

---

[14] Plaintiff objects to Defendants' Request for Judicial Notice (ECF No. 89-1)to the extent the exhibits are used for the truth of the matters asserted. *See Khoja,* 899 F.3d at 998 ("[W]e note a concerning pattern in securities cases like this one: exploiting [the incorporation-by-reference doctrine and judicial notice rule] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage."). For example, Defs' Ex. 11 (ECF No. 90-11) is an Origin press release dated August 7, 2023 claiming Origin could recycle PET bottlecaps. The assertions in Exhibit 11 are not verifiable, not cited in the SAC, nor was it filed with the SEC. Currently, a third-party is working on recycling petroleum based PET caps with Origin in Switzerland, Origin 1 is mothballed, and Origin 2 has no development plans. Exhibit 11 was likely issued just two days before Defendants revealed that Origin 2 was a failure to soften the negative price impact of the curative disclosure.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Mot. at 39-40. Aside from being improper on a Rule 12(b)(6) motion, Defendants' assertions are not even plausible. Defendants suggest that Riley's statement that PX/PET "is kind of our flagship and our first product" was not referring to Origin 2 but rather, was referring to partnerships that Origin was building with other companies. *Id*. First, the fact that Origin may have entered into partnerships for PX/PET is irrelevant to whether it was the flagship product for Origin 2. Second, Defendants argue the Company's end-of-the-Class Period, August 9, 2023 press release supports their argument, when that release revealed Origin 2 would not be producing PX/PET. *Id*. at 39-40 (citing Defs' Ex. 13 at 2, 4). However, the press release acknowledges that PX was Origin's 2 intended flagship product: "we initially expected Origin 2 to primarily focus on para-xylen (pX)". *See* Defs. Ex. 13 (ECF No. 90-13) at 1. Further, the press release confirms that because PX/PET could not be produced at Origin 2 as planned (and FDCA/PEF was expected to be the new flagship product), Origin entered into partnerships, so that it could supply its customers with bio-PX: "***Origin plans to supply bio-pX to customers primarily through collaborations with strategic partners.***" *Id*. at 4. Accordingly, Defendants' factual arguments (while improper) confirm that PX/PET was Origin 2's flagship product.

### 2. Statements That PX/PET Was Origin's Flagship Product Are Not Protected Opinions

Defendants' statements representing that PET/PX was Origin 2's flagship product are also not protected opinions.[15] *See* Mot. at 40-41.

---

[15] Merriam-Webster defines flagship as "the finest, largest, or most important one of a group of things." https://www.merriam-webster.com/dictionary/flagship#:~:text=ship%20%CB%88flag%2D%CB%8Cship-,1,store%20is%20the%20company's%20flagship

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Opinion statements are actionable misstatements so long as the opinion contains "embedded statements of facts" that are untrue. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015). Here, Defendant Riley's statements that PX/PET remained Origin's "flagship" product rest on an underlying, verifiable fact: that Origin 2, Origin's first commercial-scale plant, would be focusing on the production of PX. However, at the time these statements were made, this was no longer true. ¶¶ 86-93. *See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1259 (D. Nev. 2019) (opinion that airline was a safe operation was actionable because it was embedded with a factual denial of questions on corporation's operational challenges as they reflected safety issues); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 134 (S.D.N.Y. 2020) (statement that the company was "working on" the "rights renewal process outside the U.S." was actionable opinion with an embedded fact that the renewal process was ongoing).

Further, even if Defendants' "flagship" statements were "pure" opinions, they are still actionable because *Omnicare* does not insulate Defendants when an opinion "omits material facts about [a defendant's] inquiry into, or knowledge concerning, a statement of opinion, and if those facts conflict with what a reasonable investor, reading the statement fairly and in context, would take from the statement itself." *Omnicare*, 575 U.S. at 189; *see also Glazer Cap. Mgmt.*, 63 F.4th at 771 (statements actionable where the defendants "repeatedly reassured investors during the class period that the number … of prospective sales in the pipeline was unchanged . . . and reassured them that the pipeline was full and growing" because the statements created an

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

impression of state of affairs that did not "fairly align[] with the information in [Forescout's] possession at the time") (citing *Omnicare*, 575 U.S. at 189). Here, Defendants' "flagship" statements falsely reassured investors that Origin 2 would be a PX/PET-producing plant and are actionable when they knew that Origin 2 would no longer be producing PX/PET.[16]

Lastly, Defendants wrongly claim that their misleading statements are forward-looking statements protected by the safe harbor. Mot. at 41. However, as set forth in Section III.E., *infra*, Defendants' statements are not entitled to safe harbor because they were not identified as forward-looking, not accompanied by cautionary language, and were knowingly false when made.

**C.    Statements Asserting That "Progress" Was Made on the Origin 2 PX/PET Plant's Construction Milestones Were False Because Origin Scrapped the PX/PET Design**

Plaintiff adequately alleges that Defendants' Class Period updates on the "progress" toward Origin 2's PX/PET construction milestones were false. *See* ¶ 118 (February 23, 2023 4Q'22 Earnings Presentation - reaffirming that FEED would be imminently completed); ¶ 115 ("the Company continues to make progress on front-end design,

---

[16] Defendants' cited authority is inapposite. *See Welgus v. TriNet Grp., Inc.*, 765 F. App'x 239, 240-241(9th Cir. 2019) (plaintiff failed to plead any facts showing that the defendants knew their statements were false when made); *Markette v. Xoma Corp.*, 2017 WL 4310759, at *5-6 (N.D. Cal. Sept. 28, 2017) (same). Further, Defendants' opinion on the importance of the production of PX/PET for Origin was neither open-ended, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014), nor a vague expression on the Company's ability to produce PET, *Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings Inc.*, 2022 WL 989240, at *22 (W.D. Tenn. Mar. 31, 2022).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

construction planning and financing for Origin 2"); ¶ 116 (February 23, 2023: "for Origin 2, front-end loading, construction planning and financing are progressing…"); ¶ 119 (February 23, 2023: "we continue to make progress on the front-end design, construction planning, and financing of our second plant…"); ¶¶ 120 (February 23, 2023: same), 129-130, 132 (May 10, 2023: same); and ¶ 127 (March 7, 2023 PowerPoint – reaffirming that FEED would be imminently completed).

Defendants' statements were materially false and misleading because Origin was not making progress towards the construction milestones for the Origin 2 PX/PET plant. By February 2023, Origin had already encountered technical issues in connection with scaling the production of PX, which was delaying Origin 2's development and construction. ¶¶ 88, 126. On February 21, 2023, Origin agreed to pay Avantium at least €12.5 million to assist with incorporating FDCA into Origin 2. ¶¶ 95-100,180-191. Avantium's CEO opined that FDCA production at Origin 2 would not be operational in two years but would take several years past the plant's timeline. *Id.* By March 2023, Defendants knew that (i) the Company abandoned the plans for, and was no longer working towards, a PX/PET Origin 2 plant as previously represented to investors (one that focused on the production of PX and ready to begin construction in less than 6 months), and instead, required a new engineering assessment for an FDCA plant, (ii) FEL 2 was further delayed for the plant, and (iii) the plant's developmental problems had resulted in its construction being broken up into two phases. ¶¶ 89, 90, 156-159, 177.

In the face of these well-pled facts, Defendants wrongly assert that Plaintiff must allege that "all progress had stopped" on Origin

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

2. Mot. at 26. That is not what *Tesla* requires. Defendants represented that Origin 2 would be a PX/PET plant (*see* ¶¶ 60-68, 138-139, 147, 149) and analysts following the Company understood that Origin 2 was going to be a PX/PET plant. ¶ 165. Unlike the plaintiff in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021), Plaintiff has alleged sufficient facts to support his claim that Origin was making *no* progress towards the construction milestones for the plant Defendants planned and touted – the Origin 2 PX/PET plant.[17] Defendants' statements concerning the progress and construction timeline of the Origin 2 PX/PET plant are actionable.

Contrary to Defendants' assertions, Plaintiff does not allege that Defendants had a duty to update. Mot. at 27-28. Defendants had a duty to be truthful and not misleading. Plaintiff alleges that Defendants knew of material facts that drastically altered Origin 2's scope and timeline that had been represented to investors. ¶¶ 115-150. Despite technical issues with the scaling of PX causing delays and altering Origin 2's plans, Defendants continued to reaffirm Origin 2's production focus and expected timeline. By omitting disclosure of the known-delay and product-switch, Defendants altered the "total mix" of

---

[17] For this reason, this case is also distinguishable from *In re ECOtality, Inc., Sec. Litig.*, 2014 WL 4634280, at *9 (N.D. Cal. Sept. 16, 2014); *Ellusionist Cash Balance Plan & Tr. v. Spiegel Acct. Corp.*, 2024 WL 4294645, at *8 (N.D. Cal. Sept. 24, 2024); *Nguyen v. Endologix, Inc.*, 2018 WL 10321880, at *6 (C.D. Cal. Sept. 6, 2018), *aff'd*, 962 F.3d 405 (9th Cir. 2020); and *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *4 (D. Or. May 24, 2021), *aff'd sub nom. AMF Pensionsforsakring AB v. Precision Castparts Corp.*, 2022 WL 2800825 (9th Cir. 2022). *See* Mot. at 26.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

information made available for investors. *See Diaz v. N. Dynasty Mins. Ltd.*, 2018 WL 5099749, at *5 (C.D. Cal. Apr. 30, 2018).[18]

Defendants' representations as to Origin 2's timeline are very different from those in *Weston*. *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022). In *Weston*, the plaintiff alleged that Twitter's failure to disclose a software bug's impact on its Mobile App Promotion (MAP) product left a "misimpression" that the work Twitter was doing to improve MAP was "on track." 29 F.4th at 620. However, the court held that Twitter's statements that they were working on the MAP program did not suggest that Twitter's MAP program was "on track" because Twitter qualified their statements with warnings that "we're not there yet" and "we're still in the middle of that work." 29 F.4th at 620. As such, Twitter's statements were "so imprecise and noncommittal that they are incapable of objective verification." *Id*. at 621. The court further noted that perhaps – "if Twitter had set a specific deadline" for MAP – like Defendants did here with respect to the construction start-up date – Twitter's "statements could "seem like an implied affirmation of that target. *Id*. at 620-21 (citing *Wochos*, 985 F.3d at 1192).

Defendants also wrongly argue that their progress statements are nonactionable opinions. *See* Mot. at. 29-30. However, Defendants' statements that the Company was making "progress" on Origin 2's front-end design and construction planning (¶¶ 115-120, 129-132) are

---

[18] Since Plaintiff does not allege a duty to update, *In re Wrap Techs., Inc. Sec. Exch. Act Litig.*, No. CV 20-8760-DMG (PVCx), slip op. at 9 (C.D. Cal. Nov. 15, 2021) (Dkt. No. 75) is inapposite. *See id*. (plaintiff alleged a separate duty to correct past statements).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

actionable because they were confirmations that Origin was going forward and progressing on the milestones for the Origin 2 PX/PET plant. *See Omnicare,* 575 U.S. at 185 (opinion statements actionable when they contain embedded statements of fact that are untrue). Defendants repeatedly represented that Origin 2 would produce PX and touted the benefits and advantages of focusing on PX. *See* ¶ 47 (touting that Origin was "the only company that can make PET that is chemically identical using a carbon negative process - not buying offsets."); ¶ 60 (Origin 2 slated for PET production); ¶ 62 ("[t]he reason we went for PET is because PET has by far the best end of life answer…"); ¶ 68 (the Company's decision to focus on PX/PET "was very intentional" because "it's one of the best polymers out there…."); *see also* ¶¶ 63-66.

Defendants' statements about the "progress" of front-end design, construction and planning for Origin 2 were false representations that gave investors the misleading impression that Origin was making progress towards the Origin 2 plant as represented – a plant that would produce primarily PX/PET and would begin construction in mid-2023. *See Weston,* 29 F.4th at 620-621 (recognizing that "on track" statements are an implied affirmation when defendants set corresponding and specific targets). Indeed, Defendant Bissell stated that he was "proud of how our team continues to execute against our Origin 1 and Origin 2 construction milestones" (¶¶ 119, 131) and analysts following the Company understood the representations on "progress" to mean that Origin 2 was on schedule. ¶¶ 122, 134.

Further, even if Defendants' "progress" statements were "pure statements of opinion," they are still actionable because Plaintiff

44
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

has alleged that, unknown to investors, Origin was making *no* progress on the PX/PET Origin 2 plant as originally represented. *See Wochos*, 985 F.3d at 1196 (noting that "great progress" could be an actionable statement if no progress had been made) (citing *Omnicare*, 575 U.S. at 187). Instead, Defendants were abandoning PX/PET as the target product, reducing the scope of the plant, and extending the timing for construction (breaking it up into two phases).[19] *See* ¶¶ 123, 135. Accordingly, Defendants' "progress" statements are actionable.

### D. Defendants' Statements Claiming Construction Would Begin in Mid-2023 on the PX/PET Origin 2 Plant Were False Because Origin Was Not Building a PX/PET Plant

During the Class Period, Defendants repeatedly provided updates on the expected timeline for Origin 2, representing that construction would begin in mid-2023. *See* ¶ 118 (February 23, 2023 PowerPoint slide affirming that construction of Origin 2 was expected to begin in mid-2023); ¶ 127 (March 7, 2023 PowerPoint slide confirming that construction was expected to start by mid-2023); ¶ 141 (May 12, 2023, republishing the same PowerPoint slide that was published on March 7, 2023).

Defendants' statements concerning the construction start-up for the Origin 2 PX/PET plant were materially false and misleading for the same reasons Defendants' statements concerning Origin's "progress" on

---

[19] Moreover, a "pure statement[] of opinion" is actionable if it "omits material facts" that "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 186, 189. Here, Defendants' statements omitted numerous conflicting, material facts—particularly, the delays to FEL 2 for Origin 2 and the product shift away from PX.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Origin 2's milestones were false. *See* pages 41-42,*supra*. By March 3, 2023, Defendants knew that (i) the Company was no longer working towards the Origin 2 plant as previously represented to investors (one that focused on the production of PX), and instead, the Company abandoned the plans for the production of PX/PET at Origin 2 and required a new engineering assessment for an FDCA plant, (ii) FEL 2 was further delayed for the plant, and (iii) the plant's developmental problems had resulted in its construction being broken up into two phases. ¶¶ 89-93, 156-159. Defendant Riley later admitted that abandoning PX/PET played a "meaningful" role in delaying the plant's timing. ¶¶ 156-159.

Defendants wrongly assert that their construction timeline statements are not actionable because Origin did not promise investors "intermediate checkpoints." Mot. at 27. However, unlike the plaintiffs in *Intel*, Plaintiff has pleaded facts with particularity that Defendants knew while repeatedly confirming the schedule that Origin would not be starting construction on the Origin 2 PX/PET plant in the summer or start-up by mid-2025; that Origin was abandoning the production of PX/PET at Origin 2, and that Origin was moving forward with changes to the plant's construction that would take thousands of engineering hours to develop. ¶ 93. *See In re Intel Corp. Sec. Litig.,* 2024 WL 1693340, at *1 (9th Cir. Apr. 19, 2024) (noting that the plaintiffs failed to plead that any defendant had "actual knowledge" "that Intel would miss the projected product release dates").

Accordingly, the SAC sufficiently alleges that Defendants' statements concerning the construction timeline for the PX/PET Origin 2 plant were false and misleading.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

### E.   Defendants' False and Misleading Statements Are Not Protected by the Safe Harbor

Defendants wrongfully claim that the false and misleading statements alleged in ¶¶ 115-120, 127, 129-132, 141 and 143, are protected by the safe harbor. However, forward-looking false or misleading statements only find safe harbor if they are identified as forward-looking and are accompanied by meaningful cautionary language. *Quality Sys.*, 865 F.3d at 1141. As shown below, the safe harbor does not apply to any of Defendants' false or misleading statements.[20]

#### 1.   Bissell's Conference Interview Was Not Identified as Forward Looking or Accompanied by Adequate Warnings

Defendant Bissell's May 22, 2023 statement that "Origin 2, is scheduled to come online in the 2025 time frame," is not entitled to safe harbor protection because it was not identified as forward-looking at the time it was made. ¶ 143. Bissell made the statement during a "fireside chat" at the Morgan Stanley 8th Annual Sustainable Futures Conference. *Id*. The conference transcript shows that Defendants did not identify any of their statements made at the conference as forward-looking.[21] This fact alone renders the safe harbor unavailable. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i);(c)(2). Boilerplate language added by the transcript company, Refinitiv, *after* the conference took place is not enough to invoke the safe harbor. *See* Plt's Ex. 1 at 10; *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 877, n.4 (N.D. Cal. 2023) (forward-looking statements made at

---

[20] Defendants do not assert that the statements set forth in ¶¶ 138-139, 144-145, or 148-149 are protected by the safe harbor.

[21] *See* Plt's. Ex. 1, attached to the Declaration of Marion C. Passmore in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss the SAC.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

conferences not protected by safe harbor because they were not identified as forward looking when made and the conference transcripts only included "generic language about forward-looking statements" that was "a standard disclaimer added by the company that owns and distributes the transcripts, not DocuSign.").

In addition, Bissell's May 22, 2023 statement was not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially." *See* 15 U.S.C. § 78u-5(c)(1)(A)(i);(c)(2). "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil'" *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)). The caution "must precisely and directly address the alleged misrepresentations." *Id.* (citations omitted and cleaned up). The conference transcript's general, boilerplate disclaimer has nothing to do with Origin and fails to precisely address the alleged misrepresentation by Bissell,– who misrepresented Origin 2's expected startup date.[22] The disclaimer

---

[22] *See* Plt's Ex. 1 at 10: The conference transcript contains the following boilerplate disclaimer:

> In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in

48
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

language is not meaningful for purposes of the safe harbor. *See DocuSign*, 669 F. Supp. 3d at 877 n.4. Because Bissell knew his May 22, 2023 statement was false and misleading (*see*, Section II, *supra*) it is not protected by the safe harbor. *See In re Intel Corp.*, 2023 WL 2767779, at *15 (forward-looking statements not accompanied by meaningful cautionary language not entitled to safe harbor if the defendants knew the statements were false).

### 2.    Origin's Risk Language Was Not Meaningful

The false and misleading statements alleged in ¶¶ 115-120, 127, 129-132, 141 and 147 are not entitled to safe harbor protection because the accompanying risk warnings were themselves false and misleading and therefore, not meaningful. *See* ¶¶ 125, 136. As explained above in Section III.A, *supra*, in the Ninth Circuit (and elsewhere), merely warning that issues "could" occur in the future when they have already materialized is misleading." *Alphabet*, 1 F.4th at 703-04. "The same logic follows in the context of the safe harbor: cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized." *Glazer Cap. Mgmt.*, 63 F.4th at 780-81 (emphasis in original) (finding cautionary language not meaningful for purposes of safe harbor where the defendants were aware that risk

---

the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

warned of would materialize and did not warn investors of the development).

As explained above, the risk language issued by Origin was not meaningful because it warned of potential risks that "could" arise when those risks had already materialized. *See* Section III.A., *supra*. For example, despite knowing that that Origin had already experienced "unforeseen technical issues" in connection with scaling the production of PX, which was delaying Origin 2's development and construction, Origin's February 23, 2023 risk disclosures misleadingly warned that there was only a "risk" that unanticipated costs or delays could arise due to, among other things, unforeseen technical issues. ¶¶ 125-126. Origin repeated the exact same misleading risk language in the Company's May 10, 2023 risk disclosures, even though by that time Defendants had already decided to abandon the production of PX/PET at Origin 2 because PX was not performing strongly and because of costs, and it was known that FEL 2 and construction for Origin 2 was delayed. ¶¶ 136-137. *See Alphabet*, 1 F.4th at 698-697, 702 (repeating "the same assurances about security and privacy" in multiple risk disclosures was misleading when they continued to be made after the detection of cybersecurity issues).[23]

---

[23] Origin's risk language is not at all like the risk language found meaningful in *Wochos*, where Tesla expressly disclosed that it *had already experienced* the challenges it warned investors could occur. *Id*. 985 F.3d at 1195-96(finding risk language "if we are unable to resolve ramping challenges" adequate because Tesla specifically disclosed in its risk warnings that "Tesla has 'experienced to date' the sort of 'challenges' that it would have to overcome in order to

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Ignoring Ninth Circuit controlling law, Defendants rely on law from outside this Circuit to disingenuously argue that the risks Origin warned of had not materialized because "none of CW1's allegations support the inference that Defendants knew Origin 2 was so far behind in its construction and design process that it *was virtually certain to cause harm to the business*." Mot. at 35-36 (internal quotations omitted) (emphasis added). However, this argument confuses the "risk" with its "consequence," and was rejected by the Ninth Circuit in *Facebook*:

> ***Our case law does not require harm to have materialized for a [risk factor] to be materially misleading.*** Facebook's statement was plausibly materially misleading ***even if Facebook did not yet know the extent of the reputational harm it would suffer as a result of the breach***: Because Facebook presented to prospect of a breach as purely hypothetical when it had already occurred, such a statement could be misleading ***even if the magnitude of the ensuing harm was still unknown***.…
>
> ***The mere fact that Facebook did not know whether its reputation was already harmed when filing the 10-K does not avoid the reality that it create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].***

*Facebook*, 87 F.4th at 949-950 (citations and internal quotation marks omitted) (emphasis added); *see also Glazer*, 63 F.4th at 781 (cautionary language not meaningful even though the risk that the merger would terminate" ***had not yet become an absolute certainty***" because the defendant "was aware of a significant likelihood that the risk would achieve its stated objective.") (emphasis in original); *see also In re Intel Corp.*, 2023 WL 2767779, at *1, *13 (risk disclosures meaningful where the defendant disclosed that product delays (the risk the plaintiff claim had materialized) *had occurred and had* caused the company to miss customer product design windows in the past) (emphasis added).

materialize and did not apprise its investors of this development") (emphasis added); *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *1, *10-11 (S.D. Cal. June 20, 2024) (risks of "production difficulties" and "cGMP deficiencies" that were presented as hypothetical risks were misleading even though "the consequences had not yet materialized"); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *12 (C.D. Cal. June 9, 2016) ("That Sientra had not yet felt the loss resulting from [its CMO]'s regulatory shortcomings when it allegedly made these statements does not make the statements any less misleading.").[24]

Lastly, Defendants cannot avoid liability by relying on *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *1 (N.D. Ca. Mar. 24, 2014), a case that predates *Alphabet*, to disingenuously argue that Origin's risk language was meaningful because other courts have approved "substantially similar" risk disclosures." Mot. at 33. The fact that

---

[24] Defendants' reliance on *Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 138 (1st Cir. 2021) is not controlling or persuasive. *See* Mot. at 35. Regardless, Plaintiff's allegations of materialization of risks are also sufficient under *Karth*. The First Circuit has long held that risk statements are misleading if they frame risks as merely hypothetical: "company must disclose a relevant risk if that risk had already begun to materialize." *See Karth*, 6 F.4th at 137-138 (citing *Berson*, 527 F.3d at 986). However, unlike Plaintiff's allegations here, the plaintiff in *Karth* failed to show that the risk that he claimed had materialized (a supply interruption with respect to the company's only product) was actively occurring "or even close" to happening at the time the risk warnings were issued. *Id*. at 138. To the contrary the allegations demonstrated that the defendants did not experience a supply interruption during the class period, nor did they even suspect such an interruption to occur. *Id*. at 139-141. That is not the case here, as Plaintiff has alleged numerous facts supporting his allegations that at the time Origin issued its risk disclosures, the risks presented as hypotheticals, had in fact, already occurred. *See* ¶¶ 126, 137.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

Origin may have had similar risk disclosures as the defendant in *Amyris* is irrelevant to whether Origin's risk disclosures were meaningful to Origin's investors. The issue is not whether Origin's risk disclosures identified the correct risks that the Company could face; the issue in light of *Alphabet* is whether any of the risks that Origin identified as *possible*, *future* risks, had already occurred **_at Origin_**. *See Alphabet*, 1 F.4th at 703-04. It is irrelevant whether similar language was found sufficient for a different company, in a different case, alleging different facts. Further, Judge Orrick did not analyze the risk language in *Amyris* under *Alphabet* (nor could he since *Amyris* predates *Alphabet*). Instead, the court rejected the plaintiff's allegation that Amyris' cautionary language was not meaningful because "the defendants fail[ed] to specify how their 'cautionary statements' relate[ed] to the specific allegations in the Complaint…", a point not at issue in this case. *See Amyris*, 2014 WL 1285175, at \*14; *see also Facebook*, 87 F.4th at 948 (reversing the district court's dismissal concerning risk statements, noting that "its holding predated our decision in *Alphabet*" and did not have the benefit of the Ninth Circuit's reasoning in *Alphabet*).

Notably, in a more recent decision, applying *Alphabet*, Judge Orrick, found cautionary language not to be meaningful for purposes of the safe harbor where the plaintiffs alleged that the defendant's risk disclosures misleadingly warned of potential risks related to the COVID-19 pandemic that "could" or "may" impact its business, when those risks had already come to pass. *See DocuSign*, 669 F. Supp. 3d at 879 (citing *Alphabet*, 1 F.4th at 703). Specifically, Judge Orrick held:

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

The FAC includes enough detail about what DocuSign allegedly knew at the start of the pandemic and as it progressed to plausibly show that the pandemic-related risks the company warned investors about during the earnings call had already come to fruition, meaning their disclosures were inadequate. *See Alphabet*, 1 F.4th at 703. Whether DocuSign actually was aware of these risks will prove out as this case progresses. For now, however, the plaintiffs have sufficiently alleged otherwise. As a result, none of the forward-looking statements fall under the PSLRA's safe-harbor provision, at least with respect to the first prong.

Accordingly, under *Alphabet* and current Ninth Circuit law, Origin's risk disclosures were not meaningful and Defendants' statements set forth in ¶¶ 115-120, 127, 129-132, and 141, are not protected under the safe harbor.

## IV.    THE SAC ADEQUATELY PLEADS LOSS CAUSATION

"Typically, to establish loss causation, a plaintiff must show that the defendants' alleged misstatements artificially inflated the price of stock and that, once the market learned of the deception, the value of the stock declined." *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021)(citations omitted). "[A] plaintiff "need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Id.*[25] While the allegations are subject to Rule 9(b), "[u]ltimately, the Ninth Circuit "focus[es] on plausibility: 'can we plausibly infer that the alleged corrective disclosure provided new information to the

---

[25] *See also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1207–08 (9th Cir. 2020) (finding the curative disclosure "need not mirror . . . the earlier misrepresentation but . . . must at least relate to the misrepresentation and not other negative information." (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)

54

market that was not yet reflected in the company's stock price?'" *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024) (citing *In re Bofi Holding Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020).[26]

The SAC easily meets the Ninth Circuit's requirement for pleading loss causation. ¶¶ 151-165, 213-228. The SAC details how Defendants made materially false and misleading statements related to the timing and production of PX/PET at Origin 2, which inflated the price of Origin stock during the Class Period. ¶¶ 115-150; 213. Then in one curative disclosure on August 9, 2023, Origin revealed the fraud by informing the market that Origin was materially altering its stated plans for Origin 2 by significantly delaying the timeline for construction, opening of a new Origin 2 plant with a new product slate, and changing Origin 2 from PX/PET (for which capacity was purportedly sold out) to FDCA/PEF. ¶¶ 112-114, 151-159, 216. In response to this news, Origin's stock fell 66.5%, to close at $1.45 per share the next day. ¶¶ 162, 217. This decline was a direct result of Defendants'

---

[26] See, *e.g.*, *Cutler v. Kirchner*, 696 F. App'x 809, 811 (9th Cir. 2017) finding loss causation was sufficiently alleged when:

> 1View was the signal project for UTi's executive team, and a matter of keen interest to the company's investors. For months, UTi executives assured investors, in essence, that the project was going according to plan. A reasonable investor could plausibly have understood UTi's subsequent disclosure—that 1View's invoicing difficulties materially contributed to a liquidity crisis—to indicate that the company's prior assurances that things were going well had been false or misleading. And it is eminently plausible that such a revelation about such a critical program was a substantial factor in causing UTi's stock price to collapse.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

false and misleading statements being revealed to the market. ¶¶ 218, 162, 163.

The SAC plainly links the drop in Origin's stock price to the truth of the Company's revised plans for Origin 2 being disclosed to the market and provides Defendants with ample and details in accordance with Rule 9(b). ¶¶ 112-114, 151-159, 216. Moreover, the SAC's misstatements all relate to a singular issue — the Company's plans for Origin 2 — and when substantial changes to those plans were revealed to the market on August 9, 2023 (which Defendants knew about during the Class Period), Origin's stock dropped precipitously. Indeed, analyst commentary linking these disclosures to the subject of the misstatements confirm their corrective nature, proximate cause, and reject Defendants' loss causation arguments. *See Lloyd*, 811 F.3d at 1210-11; *see also*, *e.g.*, ¶ 164 (August 10, 2023 HSBC report downgrading Origin and stating that the new plans for Origin 2, including the delay, broke the investment case for the Company highlighted that product demand "is irrelevant without access to production capacity before 2026."); ¶ 165 (August 11, 2023 Craig-Hallum report downgrading Origin in light of Origin 2's production focus shift and multiple-year delay describing it as a "major curveball," which may not be successful).

Regardless, Defendants claim loss causation is not sufficiently alleged by refusing to accept the well-pled allegations of the SAC as true. Defendants boldly argue that loss causation fails because there was no corrective disclosure (Mot. 45) and that the truth was previously revealed (Mot. 46). It is a fact, however, that Defendants did not reveal Origin abandoned PX at Origin 2 and delayed construction

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

of Origin 2 past August 2023 until the curative disclosure. None of Defendants' bulleted lists of purported earlier disclosures of the truth say otherwise. Mot. at 46-47. Accordingly, these arguments have no weight. But perhaps even more dubious is Defendants' argument that the Court should dive into the expert issues of quantifying price impact at the pleading stage and citing the Supreme Court's class certification decision under Rule 23 in *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys*, 594 U.S. 113, 123 (2021) in support. Neither the Supreme Court, nor any case Defendants cite, require that level of scrutiny for pleading loss causation.

Accordingly, the SAC sufficiently alleges loss causation in connection with the curative disclosure that caused massive losses when investors learned that they overpaid for Origin stock because Defendants misled them about Origin 2.

**V.    THE SAC STATES AN EXCHANGE ACT §20(a) CLAIM**

The SAC states a viable §10(b) claim under Rule 10b-5(b) and establishes that Individual Defendants were control persons. ¶¶ 250-258. Since Defendants' only challenge to Plaintiff's §20(a) claim is on the basis that Plaintiff failed to establish a §10(b) violation (Mot. at 48, n.10), the §20(a) claim should be sustained. *See In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP

**CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[27]

Dated: January 21, 2025         Respectfully submitted,

*/s/ Marion C. Passmore, Esq.*

**BRAGAR EAGEL & SQUIRE P.C**
Marion C. Passmore (SBN #228474)
580 California Street, Suite 1200
San Francisco, CA 94104
(415) 568-2124 (phone)
(212) 486-0462 (fax)
passmore@bespc.com

*Liaison Counsel for Lead Plaintiff,*
*Lead Counsel, and the Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Michael S. Bigin
Stephanie M. Beige
10 East 40th Street
New York, NY  10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bernstein@bernlieb.com
bigin@bernlieb.com
beige@bernlieb.com

*Lead Counsel for the Lead Plaintiff*
*and the Proposed Class*

---

[27] If the Court grants any part of the Motion, Plaintiff respectfully requests leave to amend. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC
2:23-cv-01816-WBS-JDP