BORIS FELDMAN, State Bar No. 128838
boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
doru.gavril@freshfields.com
CARL HUDSON, State Bar No. 317201
carl.hudson@freshfields.com
REBECCA LOCKERT, State Bar No. 348810
rebecca.lockert@freshfields.com
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants Origin Materials, Inc., Richard J. Riley, and John Bissell*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re ORIGIN MATERIALS, INC. SECURITIES LITIGATION<br><br>_____<br><br>This Document Relates To<br><br>ALL ACTIONS CONSOLIDATED FROM:<br><br>Antonio F. Soto, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiff,<br><br>　　　　　　v.<br><br>Origin Materials, Inc., Richard J. Riley, and John Bissell,<br><br>　　　Defendants. | Case No.: 2:23-cv-01816-WBS-JDP<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Date:　　　　February 18, 2025<br><br>Time:　　　　1:30 p.m.<br><br>Location:　　Courtroom 5 – 14th Floor<br><br>Judge:　　　Hon. William B. Shubb |

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

TABLE OF CONTENTS

Page

**INTRODUCTION**.............................................................. 1

  I. PLAINTIFF FAILS TO ADD ANY PARTICULARIZED FACTUAL ALLEGATIONS OF SCIENTER...................................... 2

    A. Plaintiff's Claim that His Counsel Re-Interviewed CW1 Does Not Bolster Plaintiff's Scienter Theory.............. 2

    B. The Amended Complaint Fails to Cure Deficient CW1 Allegations............................................. 4

      1. CW1's Allegations Are Not Described with Sufficient Particularity to Establish His Reliability and Personal Knowledge................................................ 4

        a) CW1's Account Lacks Sufficient Particularity..... 4

        b) CW1 Lacks Personal Knowledge..................... 8

    C. CW1's Allegations Are Not Indicative of Scienter and Are Uncorroborated........................................ 9

    D. Plaintiff Does Not Meet High Bar of Applying the Core Operations Doctrine...................................... 12

    E. Even When Holistically Viewed, the Whole of Plaintiff's Scienter Theory Is Not Greater than the Sum of Its Parts. 14

  II. PLAINTIFF'S FALSITY ALLEGATIONS ARE BASED ON AN UNSUPPORTED PREMISE......................................... 16

    A. Origin's Technology Has Multiple Outputs, Not Only PX/PET.................................................... 16

    B. Origin Did Not Comment on How Much of Origin 2's Output Would Be Used for PX/PET and Told Investors that Origin 2's Output Would Be Used for FDCA/PEF....................... 18

    C. All of Plaintiff's Theories of Falsity Are Based on the Unsupported Premise that Origin 2 Would Be a "PX/PET Plant"................................................... 19

      1. Technical Issues Concerning PX/PET Conversion....... 19

      2. PX as Origin's "Flagship" Product.................. 21

      3. Statements About Progress Were Not False........... 24

      4. Statements About Construction Were Not False....... 25

      5. The PSLRA's Safe Harbor Applies.................... 26

  III. PLAINTIFF AGAIN IGNORES THE NEED TO PLEAD LOSS CAUSATION WITH PARTICULARITY......................................... 29

    A. Plaintiff's Scattershot Loss Causation Theory Fatally Lacks Particularity...................................... 30

    B. Plaintiff Does Not Engage with the Actual Information Known by the Market....................................... 32

**CONCLUSION**.............................................................. **34**

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

**TABLE OF AUTHORITIES**

**Cases**                                                           **Page**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021)........................... 20, 21, 29

*Anderson v. Peregrine Pharms., Inc.*,
   2013 WL 4780059 (C.D. Cal. Aug. 23, 2013)................... 13

*Brady v. Delta Energy & Commc'ns, Inc.*,
   2023 WL 2683203 (C.D. Cal. Jan. 25, 2023)............... 31, 32

*Browning v. Amyris, Inc.*,
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)................... 29

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   654 F. Supp. 2d 1037 (N.D. Cal. 2009)....................... 8

*Crosbie v. Endeavors Techs., Inc.*,
   2009 WL 3464135 (C.D. Cal. Oct. 22, 2009)................... 3

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)....................................... 30

*Espy v. J2 Glob., Inc.*,
   99 F.4th 527 (9th Cir. 2024).............................. 16

*EVIG, LLC v. Natures Nutra Co.*,
   685 F. Supp. 3d 991 (D. Nev. 2023)....................... 7,8

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023), *cert. granted in part sub nom.*
   *Facebook, Inc. v. Amalgamated Bank*, 144 S. Ct. 2629 (2024),
   *and cert. dismissed as improvidently granted sub nom.*
   *Facebook, Inc. v. Amalgamated Bank*,
   604 U.S. 4 (2024)............................... 20, 21, 27, 28

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
   501 F. Supp. 3d 735 (N.D. Cal. 2020)...................... 15

*Fields v. Stockton Unified Sch. Dist.*,
   2023 WL 7286148 (E.D. Cal. Nov. 1, 2023).................... 7

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016)................... 28

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023).............................. 29

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

*In re Intel Corp. Sec. Litig.*,
2023 WL 2767779 (N.D. Cal. Mar. 31, 2023)................... 15

*In re Intel Corp. Sec. Litig.*,
2024 WL 1693340 (9th Cir. Apr. 19, 2024).................... 26

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
2018 WL 4181954 (N.D. Cal. Aug. 31, 2018)................... 31

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
998 F.3d 397 (9th Cir. 2021)............................. 30, 31

*Jui-Yang Hong v. Extreme Networks, Inc.*,
2017 WL 1508991 (N.D. Cal. Apr. 27, 2017)................... 27

*Kodiak Warehouse LLC v. Morrice*,
2009 WL 10668446 (C.D. Cal. May 13, 2009)................... 14

*Kong v. Fluidigm Corp.*,
2021 WL 3409258 (N.D. Cal. Aug. 4, 2021)..................... 9

*Lefter v. Yirendai Ltd.*,
2017 WL 2857535 (C.D. Cal. June 20, 2017)................... 33

*Lentell v. Merril Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)................................. 32

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022)........................... 25, 26

*Martinez v. Robinhood Crypto, LLC*,
2022 WL 17882140 (C.D. Cal. Sept. 29, 2022).................. 3

*In re Mellanox Techs. Ltd. Sec. Litig.*,
2014 WL 12650991 (N.D. Cal. Mar. 31, 2014)................. 27

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)............................... 30

*MVP Asset Mgmt. (USA) LLC v. Vestbirk*,
2013 WL 1726359 (E.D. Cal. Mar. 22, 2013).................. 34

*In re Nektar Therapeutics*,
2020 WL 3962004 (N.D. Cal. July 13, 2020).................. 12

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013)............................... 33

*In re Nvidia Corp. Sec. Litig.*,
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010)................... 9

-iii-

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014)............................... 12

*Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*,
    50 F. Supp. 3d 1328 (C.D. Cal. 2014)................. 3, 14, 16

*Oklahoma Firefighters Pension and Ret. Sys. v. Snap Inc.*,
    2024 WL 5182634 (9th Cir. Dec. 20, 2024).................... 13

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters
    Pension Plan v. First Solar Inc.*,
    2023 WL 4161355 (D. Ariz. June 23, 2023)................... 32

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)........................... 12, 14

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021)............................... 13

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)........................... 4, 14

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)............................... 20

*Sakkal v. Anaplan Inc.*,
    557 F. Supp. 3d 988 (N.D. Cal. 2021)........................ 8

*Salzman v. ImmunityBio, Inc.*,
    2024 WL 3100274 (S.D. Cal. June 20, 2024).................. 28

*Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*,
    2018 WL 6787349 (C.D. Cal. Dec. 13, 2018................... 27

*In re Turbodyne Techs., Inc. Sec. Litig.*,
    2000 WL 33961193 (C.D. Cal. Mar. 15, 2000).................. 3

*In re Verifone Holdings, Inc. Sec. Litig.*,
    2009 WL 1458211 (N.D. Cal. May 26,2009)..................... 3

*In re Versant Object Tech. Corp.*,
    2001 WL 34065027 (N.D. Cal. Dec. 4, 2001)................... 9

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023)....................... 29

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021)............................... 25

-iv-

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2008)....................... 3, 4, 9, 11

**Statutes**

15 U.S.C. § 78u-5(c)(1)(B)(i).................................. 26

-v-

**TABLE OF ABBREVIATIONS[1]**

| Abbreviation | Meaning |
|---|---|
| ¶, Amended Complaint, Complaint, or SAC | Plaintiff's Second Amended Complaint for Violations of the Federal Securities Laws, filed November 18, 2024 (ECF No. 85) |
| CMF | Chloromethylfurfural |
| Defendants | Defendants Origin Materials, Inc., Richard J. Riley, and John Bissel |
| Ex. | Exhibit attached to First or Second Declaration of Carl Hudson in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint |
| FDCA | Furandicarboxylic acid |
| FEL | Front-end loading |
| Individual Defendants | Defendants Richard J. Riley and John Bissell |
| Mot. or Motion to Dismiss | Defendants' Notice of Motion and Motion to Dismiss Plaintiff's Second Amended Complaint for Violations of the Federal Securities Laws, filed December 19, 2024 (ECF No. 89) |
| Mot. Order or Order | Memorandum and Order re: Motion to Dismiss Corrected Amended Complaint, filed October, 29, 2024 (ECF No. 82) |
| Opp. or Opposition | Lead Plaintiff's Opposition To Defendants' Motion To Dismiss Plaintiff's Second Amended Complaint, filed January 18, 2025 (ECF No. 91) |
| Origin or the Company | Origin Materials, Inc. |
| PEF | Polyethylene furanoate |
| PET | Polyethylene terephthalate |
| PSLRA | Private Securities Litigation Reform Act, Pub. L. 104-67, 109 Stat. 737 (1995) |
| PX | Paraxylene |

---

[1] Herein, emphasis is added unless otherwise noted. Certain quotation marks, alteration marks, citations, and emphases have been omitted.

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

**INTRODUCTION**

Plaintiff's Opposition retreads old, rejected grounds. It relies on tweaked confidential witness allegations that suffer from the same fatal vagueness as Plaintiff's first complaint.

**No Scienter.** The Opposition introduces a new, unpleaded assertion that Plaintiff conducted a "reinterview" of CW1 and stretches the SAC's *actual* allegations until they lose any resemblance with their source. But even if the allegations were properly pleaded, CW1's allegations remain too vaguely described to be reliable, do not support personal knowledge of any Individual Defendant's state of mind, and fail to meet the test of plausibility, let alone the particularity required under the PSLRA. Recourse to the rarely-applicable "core operations" doctrine and a plea that his allegations should be viewed "holistically" cannot save inadequate pleadings. The Opposition fails to address the overwhelming authority, cited by Defendants, rejecting such arguments.

**No Falsity.** The Opposition misunderstands and misrepresents Origin's business model and its public statements, in order to conjure up a theory of falsity unsupported by facts. It imagines a world where Origin promised that Origin 2 would be a "PX/PET plant," where Origin 1 is nothing more than a test facility, and where plans for a future Origin 3 and beyond are irrelevant. The content of Origin's *actual* public statements was far different: The Company explained repeatedly that it planned to create multiple end-products and precursors to those products, that it would not commit any particular amount of its output at Origin 2 to PX/PET, and that its plans were constantly subject to evolution.

-1-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

Unsurprisingly, the Opposition also fails to explain why the Court should part with established case law and deny protection to statements that are opinions and forward-looking on their face.

**No Loss Causation.** Plaintiff effectively ignores his loss causation burden, as he did on the first Motion to Dismiss. Plaintiff downplays the need to plead this element with particularity, assumes his theory of loss causation is obvious, and makes no real attempt to explain why information already known to the market would have caused loss. Congress set the standards of the securities laws much higher, and Plaintiff does not meet them.

This Court has already dismissed Plaintiff's first complaint for fatal vagueness and evasive pleading. The Opposition shows that Plaintiff is content to rely on his unpleaded "reinterview" of CW1 and has made no serious attempt to address the flaws of his allegations. The federal securities laws demand far more. Defendants respectfully request that this Court dismiss the action with prejudice.

## I.    PLAINTIFF FAILS TO ADD ANY PARTICULARIZED FACTUAL ALLEGATIONS OF SCIENTER

### A. Plaintiff's Claim that His Counsel Re-Interviewed CW1 Does Not Bolster Plaintiff's Scienter Theory

Defendants and this Court learn for the first time in Plaintiff's Opposition——not from a pleading, nor a declaration, nor an affidavit——that "Plaintiff reinterviewed CW1." Opp. at 1. Instead of pleading this new fact in the SAC or submitting a sworn statement that such a reinterview occurred, Plaintiff simply mentions it in his Opposition. Plaintiff does not plead (or even state) when this purported reinterview occurred. Was it before or after the Court's Order dismissing the prior complaint?

This purported reinterview does not add legitimacy to Plaintiff's faulty scienter claim. "In deciding a motion to dismiss, courts may not 'take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).'" *In re Turbodyne Techs., Inc. Sec. Litig.*, 2000 WL 33961193, at *10 (C.D. Cal. Mar. 15, 2000); *see also Martinez v. Robinhood Crypto, LLC*, 2022 WL 17882140, at *3 n.2 (C.D. Cal. Sept. 29, 2022) (rejecting new allegations in opposition brief intended to bolster factually insufficient complaint); *In re Verifone Holdings, Inc. Sec. Litig.*, 2009 WL 1458211, at *7 (N.D. Cal. May 26, 2009) (rejecting plaintiffs' attempts to add "some additional data" in opposition brief to support insufficient scienter theory). "Nor should the court countenance 'new' facts alleged for the first time in opposing papers." *Crosbie v. Endeavors Techs., Inc.*, 2009 WL 3464135, at *3 (C.D. Cal. Oct. 22, 2009) (granting motion to dismiss §10(b) claim); *see also Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1366–67 (C.D. Cal. 2014) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

As discussed below, even after amendment, CW1's allegations are still (1) not "described with sufficient particularity to establish their reliability and personal knowledge," and (2) not "themselves [] indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2008). Plaintiff's other allegations also come up short. Plaintiff baselessly

-3-

speculates about Origin's partnerships with Avantium and PepsiCo and raises a generic "core operations" theory of liability. Each fails to show that scienter is "more cogent or compelling than an alternative innocent inference" and so fails to plead scienter under the Ninth Circuit's standard. *Zucco*, 552 F.3d at 999-1000.

Plaintiff's Section 10(b) claim should be dismissed. It is clear that CW1's inadequate allegations do not give the Court any reason to revisit its prior ruling.

## B. The Amended Complaint Fails to Cure Deficient CW1 Allegations

### 1. CW1's Allegations Are Not Described with Sufficient Particularity to Establish His Reliability and Personal Knowledge

Plaintiff fails to show how CW1 "would possess the information alleged" to make sufficient allegations regarding either Mr. Riley's or Mr. Bissell's states of mind, to whom CW1 does not claim to have spoken. *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017).

#### a) CW1's Account Lacks Sufficient Particularity

Plaintiff attempts to validate CW1 with a perfunctory statement of "CW1's job description, including his title, role and duties, and tenure." ¶¶ 83-93; Opp. at 15. However, even if CW1 was a member of the "internal engineering group," 85, it is difficult to understand how he would have been "well positioned to directly observe that Origin was experiencing problems with scaling the production of PX at Origin 2." Opp. at 15. According to the Amended Complaint, CW1 "reroute[d]" data "to Origin 1 to test those findings on a larger scale," and then "pass[ed] the data" to an "outside engineering firm." 85. It is simply not "logical" (as Plaintiff would like the Court to believe) that CW1's role as a

-4-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

middleman who "rerout[es]" and "pass[es]" along information would allow him to "directly observe" Origin 2's problems. Opp. at 15. Plaintiff even misconstrues this Court's Order by asserting that the Court "reported" CW1's description "without criticism," Opp. at 15, implying that the Court accepted Plaintiff's allegations as adequately pleaded. But the Court's mention of CW1's job description was merely that—a report. *See* Order at 6. In fact, this Court made very clear that when "defendants lack a crucial piece of information," namely "the witness's identity," "sufficient detail is all the more important." *Id.* at 8. Despite a second attempt, Plaintiff still fails to describe CW1 with sufficient particularity.

*CW1 Lacks Reliability.* Plaintiff's Opposition takes liberties with the allegations raised in his Amended Complaint. As pleaded, CW1's allegations did not provide Plaintiff with enough information to plead scienter. *See* Mot. at 1–2, 7–14. To save his case, Plaintiff stretches his pleadings by arguing (1) CW1 heard both Individual Defendants say that Origin will no longer produce PX, (2) CW1 attended multiple meetings where issues surrounding Origin 2 were discussed, and (3) sufficient information was provided regarding the March 3, 2023 meeting. Plaintiff's actual pleadings do not support these conclusions.

*"Late" 2022.* Plaintiff never pleaded that Defendants Bissell and Riley told CW1 that "PX is being discontinued[.]" Opp. at 15. Plaintiff alleges that, "in late 2022," CW1 "attended biweekly meetings with Origin's R&D group," but never alleges that either Mr. Riley or Mr. Bissell attended those purported meetings. Opp. at 6. Then, in a quarterly all-hands Company meeting allegedly held in

-5-

December 2022 and purportedly "helmed by Defendants Riley and Bissell[,]" CW1 alleges only that Mr. Riley and Mr. Bissell "discussed the state of the Company" and "provided an update on [Origin 2]," sharing "consider[ations]" by stating that "the Company would either have to make less PX at [Origin 2] or pivot the production to another product due to the economics of PX." 87. CW1 does not allege that Defendants told employees that PX "was experiencing technical issues[,]" Opp. at 16, but instead purportedly said Origin would be "shifting the focus of Origin 2 from PX to another product."  87. But at no point does Plaintiff plead that CW1 heard Mr. Bissell or Mr. Riley say that PX will be discontinued or that Origin 2 would be delayed. In fact, Plaintiff pleaded that "[a]t the meeting, CW1 was instructed that the Company was far off from completing *FEL 2* for Origin 2." *Id.* Putting aside the fact that (a) Plaintiff does not provide any details as to *who* provided such instructions to CW1 and (b) FEL 2 was, in fact, completed on time, Mot. at 22-23, FEL 2 and Origin 2 are not the same thing. Given that even Plaintiff admits that FEL 2 was being carried out by an "outside engineering firm,"  86, and certainly not by the Individual Defendants or even Origin, any such delay to FEL 2 has no bearing on the Defendants' states of mind.

*March 2023.* It was not from "*meetings* with the Individual Defendants that [CW1 knew that] PX for Origin 2 was experiencing technical issues causing delays in late 2022." Opp. at 16. Although Plaintiff argues that CW1 received "March 2023 emails that reiterated what Bissell told the group at the *weekly meetings throughout March*," *id.*, the SAC alleges only *one* meeting in March that Mr. Bissell purportedly attended. The SAC's actual

-6-

allegations——in contrast to Plaintiff's characterizations of them in the SAC——are that:

- CW1 attended "biweekly meetings with Origin's R&D group" in "early 2023," but does not allege that either Mr. Bissell or Mr. Riley attended any such meetings.   88.

- CW1 attended *one* virtual meeting, purportedly also attended by Mr. Bissell (but not Mr. Riley) on March 3, 2023, at which Mr. Bissell's alleged statements did not cite "technical issues," Opp. at 16, as the reason why Origin 2 would be "mov[ing] forward . . . away from PX production."   92.

- CW1 "recalled" that "there were email communications in his group discussing that FEL 2 was delayed for Origin 2" and which allegedly "reiterated what Bissell told the group at the weekly meetings," but once again does not allege that Mr. Bissell or Mr. Riley participated in those emails.   93.

According to the SAC's actual allegations, CW1 came to the conclusion that "technology maturity was the biggest issue for Completing Origin 2" from his "biweekly meetings with Origin's R&D group," ¶¶ 88-89, and "email communications in his group,"  93, not from any "weekly meetings throughout March" with Mr. Bissell. Opp. at 16. The gulf between the SAC and Plaintiff's Opposition underscores the unreliability of CW1's purported allegations.[2]

---

[2] Plaintiff's reference to emails that Origin "possesses" is a thinly-veiled call for discovery and is inappropriate at this stage of pleadings. Opp. at 16. Under the PSLRA and the Federal Rules, Plaintiff's pleadings must rise or fall on their own merits. *See Fields v. Stockton Unified Sch. Dist.*, 2023 WL 7286148, at *3 (E.D. Cal. Nov. 1, 2023) ("Given the dearth of facts in the [amended complaint], however, permitting discovery would be sanctioning a fishing expedition. The Court is at loss as to how discovery requests could possibly be adequately fashioned since the factual basis of Plaintiffs' claims is wholly lacking."); *see also EVIG,*

-7-

### b) CW1 Lacks Personal Knowledge

Rather than showing how the SAC "easily meets" Ninth Circuit's pleading standards, Opp. at 18, Plaintiff largely fails to address Defendants' arguments and fill the gaping holes in CW1's narrative. For example, CW1 never purported to directly communicate with either Mr. Riley or Mr. Bissell, or any of the other members of management. Instead, CW1 alleges to have attended *one* virtual meeting with Mr. Bissell (but not Mr. Riley) during the alleged Class Period.   91; Opp. at 11. Plaintiff cannot herald the inconsistent account of a single confidential witness who has never "had any significant contact with" any Defendant as evidence Defendants were committing securities fraud. *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021); *see also* Mot. at 11-12.

Indeed, it is puzzling how CW1, who has never had a conversation with the Individual Defendants, could speculate that Mr. Bissell "must have known well before March 3, 2023 that Origin 2 would not produce PX" and that the plan was "likely formulated months in advance because it was well thought out." ¶¶ 92, 175; *see also In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1047 (N.D. Cal. 2009) (rejecting confidential witness accounts that defendants "must have known" or "must have approved" the alleged fraud based on "general . . . practices"). Even the details of the meeting that CW1 purportedly attended on March 3, 2023 are vague and generalized. *See* Mot. at 7-8, 10, 24. Nor has

---

*LLC v. Natures Nutra Co.*, 685 F. Supp. 3d 991, 998 (D. Nev. 2023) (*quoting Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1204 (9th Cir. 2021)) ("This court will not 'condone the use of discovery to engage in fishing expeditions' when a plaintiff's allegations are based on mere speculation.").

-8-

Plaintiff addressed the internal inconsistencies in CW1's purported account, given Plaintiff provides CW1's accounts of what "generally" occurred and who "usually" would speak rather than what *actually* happened at the March 3, 2023 meeting. *See* Mot. at 10-11; *see also In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *6 (N.D. Cal. Oct. 19, 2010) (rejecting confidential witness allegations discussing "general practice[s]" of Nvidia without providing "any particularized details"). CW1 was in no position to make such claims about Mr. Bissell's or Mr. Riley's states of mind, and his account must be rejected.

### C. CW1's Allegations Are Not Indicative of Scienter and Are Uncorroborated

The Ninth Circuit requires that confidential witness allegations must themselves be indicative of scienter in order to be credited. *Zucco*, 552 F.3d at 995. Plaintiff's allegations fail to meet this standard. For example, Plaintiff points to a meeting held on an unspecified date in December 2022 (prior to the alleged Class Period) where Mr. Riley and Mr. Bissell purportedly provided updates about the Company's unfinalized plans. *See* Opp. at 7, 22. But "weekly or quarterly" meetings where internal strategies or challenges were discussed are "insufficient to give rise to an inference of scienter." *See Kong v. Fluidigm Corp.*, 2021 WL 3409258, at *11 (N.D. Cal. Aug. 4, 2021) (meetings and calls where company was "falling short" of sales performance and experiencing "disappointing sales" insufficient to satisfy *Zucco*'s second prong); *see also In re Versant Object Tech. Corp.*, 2001 WL 34065027, at *6 (N.D. Cal. Dec. 4, 2001) (emails discussing problems with products do not give rise to an inference of scienter). Similarly, CW1's allegations about how Origin's meetings

-9-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

"generally" went and how Mr. Bissell "would often" behave are fatally vague. *See* Mot. at 10–11.

Plaintiff attempts to corroborate his deficient CW1 allegations with details of Origin's partnership with Avantium and PepsiCo. However, Plaintiff fails to show how these events are related, let alone indicative of fraud.

***Avantium Partnership.*** Plaintiff cherrypicks and mischaracterizes the terms of Origin's partnership with Avantium. For example, Plaintiff cannot claim that it is "irrelevant[,]" Opp. at 19 n.5, that Origin's partnership with Avantium also included an offtake agreement in which Origin agreed to buy FDCA and PEF from Avantium, *see* Mot. at 16, especially when Plaintiff attempts to inaccurately paint the license agreement as indicative of Origin's commitment to produce only FDCA.

Plaintiff also attempts to argue that Origin 2 was "the only plausible plant for Origin to utilize Avantium's FDCA production technology[,]" Opp. at 20, but completely ignores Origin's plans for Origin 3 (and beyond). Ex. 20 at 38. In fact, Plaintiff himself admits that the deal with Avantium was "to garner [Avantium's] assistance and expertise with the production of FDCA ***at an Origin plant.***" Opp. at 19;   186. This makes sense because Avantium's CEO stated that "it's up to Origin to make [an] announcement regarding the timing of OM2 ***and of the licensed facility***[,]" indicating that Origin 2 and the "licensed facility" contemplated in the Avantium agreement were not one and the same.   98. This is also consistent with Origin's public disclosures, which highlighted the Avantium partnership for FDCA production in "***future plants.***" Ex. 23 at 7–8.

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

Beyond this mischaracterization, Plaintiff again attempts to use statements made by Avantium's CEO to impute knowledge to the Defendants. Plaintiff alleges that Avantium's CEO was "well positioned to provide a credible opinion on Origin 2's timeline." Opp. at 20. However, the opinion of Avantium's CEO was based on his "own experience," 100, and does not reveal anything about what Mr. Riley and Mr. Bissell believed to be the timeline. *See* Mot. at 17. Indeed, Avantium's CEO himself expressly disclaimed any knowledge of Origin's internal processes and progress by stating that "it's up to Origin to make [an] announcement regarding the timing of OM2 and of the licensed facility[.]" 100.

***PepsiCo Offtake Agreement.*** Plaintiff also attempts to deflect from the facts of the PepsiCo agreement by willfully ignoring all "alternative innocent inference[s]" that Defendants have presented. *Zucco*, 552 F.3d at 1000. Origin was forthcoming about the revisions to its contract with PepsiCo, disclosing that "[t]he amendment added FDCA as a product potentially available to be supplied to the customer" and "eliminated the Company's obligation to sell a specified annual amount of product from the Origin 1 facility while adding the planned ***Origin 3 facility*** as a potential source of product to be supplied to the customer." Ex. 22 at 27. Even in light of the amendment to the offtake agreement, Origin continued to offer to supply PX to PepsiCo and reassured the market that Origin was building "strategic partnerships." *See* Mot. at 17-18. Plaintiff cannot take the terms of the amendment out of context and cite to a conclusory allegation in the SAC to argue that the "Amendments demonstrate that Defendants knew by May 9, 2023 that Origin 2 was experiencing delays, would not begin construction by

-11-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

mid-2023, and would not be operational by mid-2025." Opp. at 21. Indeed, if Origin truly chose to amend its agreement with PepsiCo to cover up its fraud, why would Origin have highlighted revisions to the agreement in its public SEC filings? *See* Ex. 22 at 27.

### D. Plaintiff Does Not Meet High Bar of Applying the Core Operations Doctrine

The Ninth Circuit instructs that courts invoke the core operations doctrine only "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Plaintiff has not demonstrated such unusual circumstances here.

Given "Plaintiff['s] global failure to adequately allege falsity in the first place," *infra* 16-29, Origin 2 being "vital to Origin's financial success" and important to "Origin's commercial operation and bottom line," Opp. at 21-22, is insufficient to impute scienter on Mr. Riley and Mr. Bissell. *See In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (N.D. Cal. July 13, 2020) ("simply alleging" that company's partnership "was crucial does not give rise to a strong inference of scienter"); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063-64 (9th Cir. 2014) (rejecting plaintiffs' argument that core operations doctrine should be applied when concerning the company's "flagship" product, "absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter"); Mot. at 18-19.

Unlike in *Oklahoma Firefighters Pension and Retirement System v. Snap Inc.*, Mr. Bissell was not directly responsible for the

-12-

areas of operations underlying Plaintiff's SAC: Mr. Bissel was not a member of the R&D team, and it would be "absurd" to argue that purely by the nature of his position as Co-CEO, he would be aware of complex scientific and engineering related challenges purportedly facing Origin 2. 2024 WL 5182634, at *3 (9th Cir. Dec. 20, 2024). Additionally, similar to *Anderson v. Peregrine Pharmaceuticals, Inc.*, 2013 WL 4780059 (C.D. Cal. Aug. 23, 2013), where Plaintiff acknowledges that "the court rejected the core operations theory because it was impossible for defendants to have any knowledge" of a "study conducted by outside investigators and the drug was labeled by a third party," Opp. at 23 n.7, Plaintiff equally recognizes that FEL 2 was being conducted by an "outside engineering firm, which caused the Company to fall behind in completing FEL 2 for Origin 2."    86.

Nor do Plaintiff's allegations that Defendants "monitored the status of Origin 2 by leading weekly and quarterly meetings in which Origin 2's development and product slate were discussed" suffice to invoke this doctrine. Opp. at 22; ¶¶ 87, 89-91. Putting aside the generality of Plaintiff's allegations, the fact that Defendants led weekly and quarterly meetings does not suggest that they had "any involvement with the minutiae" of the complex scientific and engineering related delays facing Origin 2, such as "fouling" or "unexpected chemical issues." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1112 (9th Cir. 2021); Mot. at 20-21, 23. Other than pointing to two meetings that occurred in December 2022 and on March 23, 2023, Plaintiff fails to allege with specificity "reports and their contents" or any other means in which Mr. Bissell would have been aware of information making

-13-

statements he made on August 12, 2021,¶ 69, May 9, 2022, ¶¶ 77-78, and August 3, 2022,    79, false at the time they were made. *Intuitive Surgical*, 759 F.3d at 1063 (a "mere inference of [the defendant's] knowledge of [the company's] core operations" does not create an inference of scienter).[3]

Plaintiff fails to show that this is a "rare circumstance[]" in which core operations doctrine applies. *Intuitive Surgical*, 759 F.3d at 1062.

### E. Even When Holistically Viewed, the Whole of Plaintiff's Scienter Theory Is Not Greater than the Sum of Its Parts

Finally, Plaintiff argues that his deficient allegations are somehow rendered sufficient when lumped together. This is not so. "[A] collection of primarily vague allegations are insufficient to support a cogent inference of scienter." *Kodiak Warehouse LLC v. Morrice*, 2009 WL 10668446, at *12 (C.D. Cal. May 13, 2009). Even if "the whole is indeed greater than the sum of its parts, the facts pled do not give rise to a 'strong inference' of scienter that is as compelling as plausible innocent explanations." *IXIA*, 50 F. Supp. 3d at 1368.

Plaintiff devotes paragraphs to describing what *CW1* was aware of and the issues *CW1* knew regarding Origin 2, but he critically does not plead what *Mr. Riley or Mr. Bissell* knew. *See* Opp. at 28-29. Even taking everything that Plaintiff pleads as true, CW1's allegations at best "paint a picture that there were problems with [Origin 2,] and perhaps, given the importance of [Origin 2] to [the

---

[3] Plaintiff's reliance on case law that does not even invoke the core operations doctrine underscores the paucity of his arguments. In *In re Quality Systems, Inc. Sec. Litig.*, the Ninth Circuit did not find that the plaintiffs had pleaded the core operations doctrine, but rather accepted particularized allegations of at least *four* confidential witnesses alleging the defendants' personal knowledge. 865 F.3d 1130, 1145 (9th Cir. 2017).

-14-

Company], that the Individual Defendants were generally aware that issues existed. The allegations go no further, though. Because the complaint is lacking allegations describing with particularity the information that Individual Defendants received, or the documents that they had access to, the Court cannot infer that any Individual Defendants knew . . . or were deliberately reckless in not realizing." *In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *25 (N.D. Cal. Mar. 31, 2023); *see also Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 766 (N.D. Cal. 2020).

Plaintiff claims that Defendants fail to provide "any viable non-fraudulent inference," Opp. at 26, but this is simply not true, as is evidenced throughout the Motion to Dismiss. As Mr. Bissell has explained, Origin only obtained results out of the "black box" of FEL 2 in July of 2023. Mot. at 5. In reality, there was no way that Origin would have known that there would be delays given that throughout the alleged Class Period, the FEL 2 process was being completed by an outside engineering firm. *Supra* 6, 13. As for the Company's partnership with Avantium, this was built on a series of agreements, with the licensing agreement for one of Origin's future plants (not necessarily Origin 2) being just one part of the partnership. *Supra* 10; *see* Mot. at 16–17. Lastly, the PepsiCo offtake agreement——which Origin disclosed in its Form 10-Q——provided for the production of both PX *and* FDCA. *Supra* 11; *see* Mot. at 17–18.

Plaintiff asks the Court to take inferential leaps in order to buy a theory of scienter that falls short of the PSLRA's heightened pleading standard. "Even viewed holistically," Plaintiff's theory

-15-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

of scienter "is not compelling on the face of the pleading." *IXIA*, 50 F. Supp. 3d at 1369; *see also Espy v. J2 Glob., Inc.*, 99 F.4th 527, 539-40 (9th Cir. 2024) (holding that viewing allegations holistically did not alter Court's view of insufficiently pleaded allegations of scienter).

## II.  PLAINTIFF'S FALSITY ALLEGATIONS ARE BASED ON AN UNSUPPORTED PREMISE

Plaintiff's theory of falsity is built on a fundamentally flawed premise: the false notion that "Origin 2 was represented to investors as a PX/PET plant." Opp. at 34. This theory is wrong for at least two reasons. ***First***, Plaintiff misunderstands and misrepresents Origin's technology and business model, simplifying a process with multiple outputs and optionalities into a one-input-one-output process that does not exist. ***Second***, Plaintiff's theory that Origin told investors that Origin 2 would be a PX/PET plant directly contradicts Origin's actual disclosures: (1) that Origin would not disclose what percentage of Origin 2's output would be converted into PX versus any other product (including FDCA), *and* (2) that Origin 2 would produce CMF convertible *either* to FDCA or PX.

### A. Origin's Technology Has Multiple Outputs, Not Only PX/PET

Origin can be thought of as a refining company. It takes an initial input (here, biomass like wood pulp) and converts it into the "'building-block' chemicals" CMF and HTC. *See* Ex. 23 at 11 ("So the mental model I use is one that looks kind of like a refinery where you're putting in a feedstock and you're converting it into a variety of different streams. And the way we've looked at this has always been CMF and HTC are the 2 primary streams[.]"). Both CMF and HTC are intermediaries, which can be further refined. In the

-16-

case of CMF, it can be refined into either PX or FDCA, depending on which output Origin or its customers desire. *See* Ex. 2 at 4 (explaining that "CMF is a chemically flexible intermediate that can be converted into a variety of products, including [PX], that can 'drop in' to current supply chains to produce [PTA], and subsequently [PET]. Alternatively, CMF can be used to produce [FDCA], which can be converted into [PEF]"). In the process of refining biomass into CMF and HTC, Origin's technology creates other commercializable outputs. It refers to these as its "'oils and extractives' co-products stream [which] is produced alongside our CMF and HTC." *Id.*[4]

Plaintiff ignores the entirety of this process and erroneously simplifies Origin's technology and Origin 2's production into a single output: PX, which can be converted into PET. *See* Opp. at 5-6. Not only is this incorrect as a matter of Origin's technology, it is also not what Origin told investors. The Company repeatedly told investors that "Origin 2, our first world-scale manufacturing facility will produce carbon negative materials ***used to make*** PET plastic resin and fiber, which is used in packaging, textile, apparel and other applications and HTC, which can be used as fuel,

---

[4] Comparison to an oil refinery helps illustrate Origin's technology and business model. An oil refinery takes an input——crude oil——and converts it into higher value primary outputs like gasoline, diesel, and jet fuel. But it also produces lower value secondary outputs, such as asphalt. *See Oil and Petroleum Products Explained*, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/oil-and-petroleum-products/refining-crude-oil-inputs-and-outputs.php#:~:text=Refineries%20can%20produce%20high%2Dvalue,crude%20oil%20with%20simple%20distillation (last visited Feb. 4, 2025) (explaining the oil refining process). In Origin's case, CMF and HTC are like the gasoline, diesel, and jet fuel that an oil refinery produces, and its "oils and extractives" co-stream is like the asphalt.

-17-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

as activated carbon, and as a replacement for Carbon Black." Ex. 24 at 8 ; *see also id.*, Ex. 25 at 7. Plaintiff interprets this as stating that Origin 2 will produce **only** "PX/PET". Opp. at 27, 33-35. But again, that is not what the Company said; rather, it said that it would create materials "***used to make PET***," i.e., ***CMF***. *See* Mot. at 37-40. Origin did not promise that it would make PX/PET at Origin 2. The fact that Origin used shorthand to refer to CMF as the material "used to make PET" is not fraud, no more than it would be fraud to say that an oil refinery produces the materials "used to make" conventional plastic, instead of specifying that it produces naptha, the petrochemical feedstock for plastic.[5]

### B. Origin Did Not Comment on How Much of Origin 2's Output Would Be Used for PX/PET and Told Investors that Origin 2's Output Would Be Used for FDCA/PEF

Even putting aside Plaintiff's fundamental misunderstanding of Origin's technology, Plaintiff ignores that the Company explicitly declined to comment on what percentage of Origin 2's CMF would be converted to PX versus FCDA *and* told investors that CMF from Origin 2 would be used to create PEF (not only PET). During Origin's Q3-2022 earnings call on November 3, 2022 (only three months before the beginning of the alleged class period), Defendant Riley was asked, "[W]hat fraction of the CM[F] capacity at that plant are you allocating to [PX]? And so therefore, what fraction are you going down another path, which I would assume would be the furan based chemistries like PEF." He responded:

_____

[5] *See Oil and Petroleum Products Explained*, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/oil-and-petroleum-products/refining-crude-oil-inputs-and-outputs.php#:~:text=Refineries%20can%20produce%20high%2Dvalue,crude%20oil%20with%20simple%20distillation (last visited Feb. 4, 2025).

-18-
DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

Steve, great question. **So we're not disclosing the specific allocations of our CMF from Origin 2 at this time. But we've always talked about and planned for a portion of the CMF to go to those higher-value applications.** You mentioned PEF, I would call out surfactants is another one. And CMF is this incredibly flexible molecule that can go on to be a lot of things.

*See* Ex. 21 at 10.

Given this explicit statement that (a) Origin was declining to tell investors exactly what the CMF from Origin 2 would be allocated to and (b) "a portion of the CMF" from Origin 2 would "go to those higher-value applications" like PEF, *id.*, Plaintiff's premise that "Origin 2 was represented to investors as a PX/PET plant" is manifestly baseless. Opp. at 34.

### C. All of Plaintiff's Theories of Falsity Are Based on the Unsupported Premise that Origin 2 Would Be a "PX/PET Plant"

Without the premise that Origin 2 was represented to investors as a "PX/PET plant," each of Plaintiff's theories of falsity crumbles. *See* Opp. at 2-3, 9-10, 27-54.

#### 1. Technical Issues Concerning PX/PET Conversion

Plaintiff's argument that Origin failed to disclose that it purportedly "encountered 'technical issues' in connection with scaling the production of PX, which was delaying Origin 2's development and construction" fails for three reasons. Opp. at 41.

***First***, even if CW1's allegations are taken as true, Plaintiff's allegations do not support the claim that purported issues with PX production were delaying Origin 2's development and construction. As explained above, Origin told investors that Origin 2 was intended to primarily produce CMF and HTC, intermediates convertible to many potential end products. Whether Origin 2 faced issues scaling production of PX is irrelevant to whether Origin 2

-19-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

was processing through the front-end design, construction planning, and financing process for the production of CMF and HTC. Once again, Plaintiff's inaccurate image of Origin 2 as a "PX/PET plant" ignores the reality of Origin's actual business model: the production of CMF and HTC. *See* Opp. at 2–3, 9–10, 27–55.

**Second**, even if the alleged issues with PX were relevant, Plaintiff has pleaded no facts indicating that the purported "fouling issues" actually caused a delay in Origin 2's front-end design, construction, and financing process. *See* Mot. at 20–21. For example, Plaintiff does not plead that the purported "fouling issues" extended beyond December 2022. *Id.* Nor does Plaintiff explain how alleged "chemical issues necessary for scaling commercial PX" delayed progress for the design of Origin 2's CMF or HTC production processes——its actual business. *Id.* at 23. To the contrary, Plaintiff alleges that Origin continued along the design process, making product and design decisions, and working to address any challenges that arose along the way. *See id.* at 22–23. Without such allegations, Plaintiff cannot plead that any challenged statement was false when made. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012) (plaintiff must plead "why the statements were false or misleading at the time they were made").

**Third**, even accepting Plaintiff's unsupported allegations that Origin was facing production challenges, Plaintiff's reliance on *Alphabet* and *Facebook* is nevertheless misplaced. This is not a case like *Alphabet* or *Facebook* where the warned-of risk was an irreversible event. Once a data leak occurs, that data cannot be gathered back up and cleaned off the internet——the risk has

-20-

manifested. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948-49 (9th Cir. 2023), *cert. granted in part sub nom*. *Facebook, Inc. v. Amalgamated Bank*, 144 S. Ct. 2629 (2024), *and cert. dismissed as improvidently granted sub nom. Facebook, Inc. v. Amalgamated Bank*, 604 U.S. 4 (2024) (risk disclosure did not insulate against known data leak). Similarly, once a cybersecurity vulnerability exposes user data, user trust in data security is broken. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021) (noting that Google operates "in an industry based on security and privacy").

Here, Origin warned that "there is a risk that significant unanticipated costs or delays could arise due to, among other things . . . unforeseen technical issues" and that "we may not be successful . . . in developing or implementing new production processes . . . includ[ing] difficulties in designing, developing, implementing, and scaling up new process technologies." Opp. at 30. Not every technical problem manifests in a delay. Nor do development or implementation challenges necessarily manifest in the failure of a new technology. Plaintiff has offered no particularized facts supporting his argument that the purported issues CW1 raised had—at the time of the challenged statements—actually manifested into a material delay in Origin 2's progress. *See* Mot. at 21-24.

### 2. PX as Origin's "Flagship" Product

Once again, Plaintiff bases his argument on the allegation that "Origin 2 would be a PX/PET plant," and therefore, any statements referring to PX/PET as a "flagship" product were false. Opp. at 33. Once again, this argument fails.

-21-

*First*, Plaintiff misconstrues Origin's public statements to argue that the Company described PX/PET as "***Origin 2's*** flagship product." Opp. at 35. But Plaintiff fails to cite a single instance where ***Origin*** described PX/PET as such. *See* Opp. at 33, 35–38; *see also* Mot. at 39. Moreover, Plaintiff misrepresents Defendant Riley's statement in response to an analyst question that "para-xlene," i.e., PX, "is kind of our flagship and first product." Opp. at 36. Plaintiff asserts that this statement showed that "Defendant Riley confirmed that PX/PET was Origin 2's flagship product[,]" *id.*, but the full context of the question and response shows that Mr. Riley and the analyst were discussing the potential opportunities presented by Origin's products in general, and not specifically with respect to PX production at Origin 2:

> [Question:] Great. And you touched upon this at the beginning of the call here. What are the different opportunities for CMF and HTC? In the near term, it sounds like it's PET, fuel pellets, activated carbon; and longer-term, PEF, carbon black, and agriculture. Like how do you think about those different opportunities as far as which one is the kind of the largest component of that and how do you think that develops over time?

> [Answer:] Yes, so CMF and HTC are both really important intermediates for us. So it's -- I make the analogy sometimes to gasoline and diesel -- Yeah. Big fractional components coming out of a refinery. If you want to be selling both to the high side, but you can't. So we sort of don't have a favorite child. **CMF, as you said, para-xylene, which hopefully goes into PET, is kind of our flagship and our first product.** It's effectively an unlimited market for our purposes. The great spot to be for all the reasons that I mentioned earlier. PEF is a really interesting polymer to us. So PEF performs better than PET in a whole bunch of applications. In fact, it enables the use of polymers in applications right now that you really can't very efficiently use either polymers or you can't use single

-22-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

polymers, which is a big deal for recycling. So just a momentary digression.

ECF 72-8 Passmore Decl. Ex. 8 at 4-5. In fact, the only mention of Origin 2 in Defendant Riley's response to the analyst's question came later, where he expounded on the potential for PEF and reiterated that the Company would be updating its investors on Origin 2's product slate in August: "We originally thought that PEF was something that was a little ways off. We now think the customers are ready for that sooner than we expected. So we're pretty excited about that, *and that will be something we're talking about in August['s] sort of OM2 refresh*." *Id.* at 5. Recourse to the actual source Plaintiff cites shows that there is little overlap between Plaintiff's characterizations and reality.

*Second*, at the time of the challenged statements, Origin 1 was only months away from launching commercial scale production of CMF, the chemical precursor to PX/PET, and Origin was continuing to develop strategic partnerships to build out its PX/PET business throughout (and beyond) the alleged class period. *See* Mot. at 39-40; *see, e.g.*, Ex. 25 at 5-6 (describing new PET partnership with LVMH). Plaintiff ignores these facts and instead claims—without any citation or particularized allegations in support—that Origin 1 is "mothballed." Opp. at 37 n.14. Contrary to Plaintiff's baseless characterization, "[i]n late June [2023], [Origin] announced that Origin 1, the world's first commercial-scale plant to produce Origin's intermediates, CMF, HTC and oils and extractives, had initiated startup in line with prior guidance[,]" and in August 2023, reaffirmed Origin's "commit[ment] to providing [PX] for our bio-PET customers and plan to bring

-23-

commercial quantities of [PX] to the market before 2030" through "multiple strategic partners[hips][.]" Ex. 26 at 6.

*Third*, each of the challenged statements about Origin's flagship product is a non-actionable opinion statement. Plaintiff's sole rebuttal to directly applicable law is the erroneous premise that "Origin 2 . . . would be focusing on the production of PX" or "would be a PX/PET-producing plant[.]" Opp. at 39-40. Once again, this premise ignores both Origin's explicit statements about the uses for Origin 2's CMF production and Origin's core business model: the conversion of biomass into CMF, HTC, and a variety of downstream products, including PX/PET and FDCA/PEF. *See supra* 16-18.

### 3. Statements About Progress Were Not False

Each of Defendants' statements about Origin 2's progress were true and not misleading when made, and none of Plaintiff's arguments show otherwise. Once again, Plaintiff's argument is founded on the false premise that these statements were about "the Origin 2 PX/PET plant." Opp. at 41. But, as with each of Plaintiff's other arguments, this premise falls apart in the face of Origin's actual business of producing CMF that can be converted into either PX/PET or FDCA/PEF (amongst other products like HTC and oils and extractives), as well as Origin's explicit statement that Origin 2 was not disclosing how much of its CMF would be converted into PX versus FDCA. *See supra* 18-19. Plaintiff's reductive and inaccurate characterization of Origin's business cannot be the basis for fraud.

Without this flawed premise, Plaintiff offers nothing in rebuttal to controlling case law showing that Origin's progress

-24-

statements were not actionable unless he can allege that Origin was "making no progress at all." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021); *see* Mot. at 26-27. Plaintiff simply argues that Origin was "making no progress" towards the purported "Origin 2 PX/PET plant"——a plant that exists only in the unsupported pleadings of Plaintiff's SAC. *See supra* 17-18. Similarly, it is unclear how Origin breached its duty to be truthful when it disclosed to investors that it was planning to incorporate PEF into Origin 2 and would not disclose the share of Origin 2's CMF that would be allocated to PX/PET versus FDCA/PEF. *See supra* 18-19.[6]

### 4. Statements About Construction Were Not False

As with its challenges to Origin's statements about progress, Plaintiff's challenges to its statements about Origin 2's construction schedule fail because they are premised on the false notion that Origin 2 was represented to investors as a "PX/PET plant." Opp. at 45. Stripping away this baseless premise, Plaintiff cannot contest that Origin 2 continued to make progress throughout the alleged class period, even taking as true CW1's allegations that such progress was slowed and beset by challenges. *See Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) (no falsity for progress statements where progress is made, "albeit at a diminished rate"); *see also* Mot. 26-27, *supra* 4-7. Similarly, Plaintiff's attempt to distinguish *Intel* is based entirely on the false premise that Origin had planned an "Origin 2

---

[6] Plaintiff's contention that Origin's "progress" statements were not protected opinions, *see* Opp. at 44-45, is baseless for the same reason as its attack on Origin's other opinion statements: Plaintiff's foundational premise that Origin 2 was a "PX/PET plant" is without any support and contrary to actual facts. *See supra* 17-18.

-25-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

PX/PET plant" and had actual knowledge that such a "PX/PET plant" was delayed. Opp. at 46; *In re Intel Corp. Sec. Litig.*, 2024 WL 1693340, at *1 (9th Cir. Apr. 19, 2024). Once again, such an allegation fails. *See supra* 16-18.

### 5. The PSLRA's Safe Harbor Applies

Through his silence, Plaintiff concedes that all but one of the challenged statements were adequately identified as forward-looking and meet the first requirement for statutory protection under the PSLRA. *See* Opp. at 47-49. As to the single statement that Plaintiff argues was not accompanied by such language, Plaintiff cannot evade the statutory protection afforded to statements made without actual knowledge of falsity. 15 U.S.C. § 78u-5(c)(1)(B)(i); *see supra* 4-16. Nor does the Complaint plead that the statement was not identified as forward-looking or accompanied by risk disclosures. Plaintiff relies on an "edited transcript" of Defendant Bissell's statements and simply assumes that Origin's standard forward-looking statement warning was not given. *See generally* ECF No. 92-1, Passmore Dec. Ex. 1. Moreover, Defendant Bissell's statements came in the context of a closed-door conference which was "not for members of the press." *Id.* at 2. Aside from the closed audience of conference participants, consumers of Defendant Bissell's statement would have read it through a transcript, accompanied by a disclaimer identifying forward-looking statements and directing individuals to Origin's SEC filings. *See id.* at 10. As courts have repeatedly found, reference to risk disclosures in a company's SEC filings is sufficient to invoke the Safe Harbor. *See, e.g.*, *Steamfitters Loc. 449 Pension Plan v. Molina Healthcare, Inc.*, 2018 WL 6787349, at *2

-26-

(C.D. Cal. Dec. 13, 2018) ("every earnings call [and] conference . . . cited in the FAC incorporated the cautionary language from Defendant Molina's public filings, putting investors on notice of the risks that the Company was facing"); *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *12 (N.D. Cal. Mar. 31, 2014) ("Mellanox prefaced each earnings call with a forward-looking statement warning, and directed listeners to review its 10-K, its 10-Qs, 8-Ks, and its press releases for a discussion of risks facing the company.").

As to the remaining challenged forward-looking statements, Plaintiff's theory is once again premised on the notion that Origin represented Origin 2 as a "PX/PET plant" and that the risk of such a "PX/PET plant" being delayed had already manifested. *See* Opp. at 2-3, 50. Once again, this premise is unsupported by any well-pleaded facts. *See supra* 16-18. But even setting aside this fundamental flaw in Plaintiff's argument and taking CW1's allegations as true, all Plaintiff has pleaded is that Origin 2 faced challenges and worked to overcome them. *See supra* 5-7. These allegations "do not speak directly to the falsity of the alleged statements when made, but rather, reflect generally on difficulties experienced with the overall [project]." *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *16 (N.D. Cal. Apr. 27, 2017).

In attempting to rely on an inapposite line of cases, Plaintiff elides over a fundamental difference between *Facebook* and his allegations here. In *Facebook*, the plaintiffs adequately alleged that the defendant's warning of a data leak was inadequate because a data leak had already occurred. Once data is out in the world, it is impossible to bottle it back up. 87 F.4th 934, 949. As

-27-

such, the Ninth Circuit recognized that it was irrelevant whether the extent of the reputational harm from the data leak was known at the time of Facebook's disclosure. Because the data leak had already occurred, the risk had manifested. *Id.* at 949-50. Here, any alleged construction and design challenges for Origin 2 had not crossed over a tipping point or manifested in a delay to Origin's construction schedule. On the contrary, Plaintiff's allegations admit that Origin's engineers were hard at work identifying and addressing issues as they arose, and that the outside engineers tasked with completing the FEL 2 process continued their work. *See* Mot. at 23. Yet Plaintiff would cry fraud at any challenge that could result in a delay, even if that delay never manifested. This theory is incompatible with innovation and punishes companies who pioneer new technologies and attempt the zig-zagging path to success. *See* Mot. at 20–21, 36.[7]

---

[7] None of the other cases Plaintiff relies upon changes this analysis. In *Salzman*, the court found disclosures about the risk of non-compliance with regulatory drug manufacturing standards to be misleading because the plaintiff adequately alleged that the company had violated those standards repeatedly and had actual knowledge of those violations, including through multiple FDA inspector reports. *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274 at *2 (S.D. Cal. June 20, 2024). Similarly, the plaintiff in *Flynn* adequately alleged that the warned-of regulatory noncompliance had already occurred——and had been independently confirmed by a government investigation—before the challenged statements were made. *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *2 (C.D. Cal. June 9, 2016). Plaintiff has alleged no such actual knowledge here, nor has he alleged that any actual delay manifested before the challenged statements. *See supra* 4–16. Unlike in *Glazer*, Plaintiff here has not alleged with particularity even a "significant likelihood that the risk would materialize" because each of his allegations of materialized risk is to an imagined "PX/PET plant." *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023).

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

Plaintiff's attempt to distinguish *Amyris* is similarly misguided, seemingly based on the unsurprising fact that *Amyris* involved "a different company, in a different case[.]" Opp. at 53. Moreover, Plaintiff does not explain why *Amyris* is inconsistent with *Alphabet*, except to state that it pre-dates that decision. *Id.* Given that Plaintiff has failed to allege with particularity *either* that any warned-of risk had manifested *or* that any Defendant had actual knowledge of such manifestation at the time any challenged statement was made, the strikingly similar risk disclosures and facts at issue in *Amyris* illustrate that Origin met the standard required under the Safe Harbor and should be afforded statutory protection, as Congress intended. *See Browning v. Amyris, Inc.*, 2014 WL 1285175, at *13-14 (N.D. Cal. Mar. 24, 2014); Mot. at 32-35. Judge Orrick's decision in *DocuSign* is not to the contrary: there, the court held that risk disclosures about declining growth rates following the COVID-19 pandemic had already manifested because the plaintiffs had adequately alleged that the defendants were aware of "red flags" of declining demand (including customers opting for shorter contract terms). *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 879 (N.D. Cal. 2023). Plaintiff has alleged no such actual knowledge here. *See supra* 4-16.

## III. PLAINTIFF AGAIN IGNORES THE NEED TO PLEAD LOSS CAUSATION WITH PARTICULARITY

In opposition, Plaintiff simply repeats the SAC's conclusory loss causation theory. It is not enough, however, to point to a stock drop after a company announces news, and assume there is necessarily a link between the two—and that remains Plaintiff's sole argument. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) ("[A] plaintiff [cannot] plead

-29-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

loss causation through "euphemism" and thereby avoid alleging the necessary connection between defendant's fraud and the actual loss.").

## A. Plaintiff's Scattershot Loss Causation Theory Fatally Lacks Particularity

As Plaintiff's own authority states, he can only allege loss causation if he "allege[s] the decline in the defendant's stock price was proximately *caused by* a revelation of fraudulent activity[.]" *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021); Opp. at 54. But as Defendants' Motion demonstrated, Mot. at 45-46, that is precisely what the SAC fails to show. It is insufficient to show a loss on its own, since as the Supreme Court held, and as Plaintiffs do not acknowledge, the securities laws do "not [] provide investors with broad insurance against market losses, but [] protect them against those economic losses *that misrepresentations actually cause.*" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

Plaintiff's classic scattershot pleading strategy fails to achieve that particularity by failing to settle on any coherent loss causation theory. Setting aside that the SAC itself is even more imprecise,[8] Plaintiff's opposition puts forward no less than three potential theories of which "revelations" caused loss: "that Origin was [1] materially altering its stated plans for Origin 2 by significantly delaying the timeline for construction, [2] opening

---

[8] The Motion set forth a non-exclusive list of the wide-ranging content of the statements: "expected progress in Origin 2's design, construction, and financing; expected timing for updates to investors; exploration of potential products to be produced at the company's plants; assessments of the commercial potential of various chemical products; management's pride in the Origin team's achievements, and more." Mot. at 44-45 (citing ¶¶ 115-20, 125, 127, 129-32, 136, 138-39, 141, 143-45, 147-49).

-30-

of [sic] a new Origin 2 plant with a new product slate, and [3] changing Origin 2's product focus from PX/PET (for which capacity was purportedly sold out) to FDCA/PEF." Opp. at 55. With these three theories, Plaintiff attempts to conceal that he does not plead particularity as to any one.[9] It is telling, to that point, that Plaintiff tries to downplay the particularity requirement for loss causation. Opp. at 54–55 (conceding that Rule 9(b) applies to loss causation allegations, but attempting to shift focus to "plausibility").

It is even more telling that Plaintiff entirely ignores a case cited in the Motion, Mot. at 44, that is a perfect example[10] of failing to distinguish between disclosures that purportedly caused loss. *Brady v. Delta Energy & Commc'ns, Inc.*, 2023 WL 2683203, at *9 (C.D. Cal. Jan. 25, 2023). Also applying *Irving*, Judge Slaughter in the Central District of California dismissed loss causation allegations that set forth a similar litany of supposed misstatements that were later "corrected": "***the readiness of Delta's technology, Delta's existing and prospective customers and***

---

[9] The other formulation Plaintiff attempts is fatally vague: "the Company's plans for Origin 2[.]" Opp. at 56. *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 2018 WL 4181954, at *9 (N.D. Cal. Aug. 31, 2018) (dismissing loss causation allegations "[g]iven the vague and attenuated connection between the cited disclosures of potential fraud and declines in the price of Uber's securities").

[10] *Irving* itself, moreover, is another example of a case where the plaintiff failed to connect a loss to a particular purported misstatement. There, the Ninth Circuit affirmed the dismissal of "general allegations, which lump[ed] together the effects of various alleged scandals" and "di[d] not contain sufficient detail to provide Uber and Kalanick with ample notice of Irving's loss causation theory or provide [the Ninth Circuit] with assurance that its theory [wa]s plausibly based in fact as required by Rule 9(b)." *Irving*, 998 F.3d at 408.

-31-

*contracts*, the number of existing and potential external investors in Delta, Delta's amount of funding, and the amount of investment in Delta its own executives purported to hold." *Id.* Nor does Plaintiff address Defendants' citation to Judge Liburdi's opinion from the District of Arizona, Mot. at 44, holding that allegations about factors that *might* affect a metric did not show statements about that metric false. *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *7 (D. Ariz. June 23, 2023).

Plaintiff instead responds by casting an illusion of causality in the form of two outside analyst reports. Opp. at 56. His account of them is highly misleading. First, both these analysts set Origin as a "hold" after the August 9 announcement, suggesting that they, on balance, still considered Origin's stock a worthy investment to maintain. Exs. 27 at 1, 28 at 1. Second, to the extent treated in case law——to which Plaintiff cites none——revisions to "buy" recommendations by analysts have been treated as not inducing loss causation. *See Lentell v. Merril Lynch & Co.*, 396 F.3d 161, 176 (2d Cir. 2005) (holding that previous "buy" and "accumulate" recommendations by analyst were not shown false by later downgrade, especially because "the risk of price volatility——and hence, the risk of implosion—[wa]s apparent on the face of every report").

**B. Plaintiff Does Not Engage with the Actual Information Known by the Market**

Plaintiff also handwaves the facts already disclosed about Origin 2, which were confirmed by the August 9, 2023 disclosure rather than corrected. Plaintiff argues "Defendants did not reveal Origin abandoned PX at Origin 2 and delayed construction of Origin 2 past August 2023 until the curative disclosure." Opp. at 56-57.

-32-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

He then concludes summarily that Defendants' "arguments have no weight." *Id.* at 57. Not only does this ignore that Origin never represented to investors that it was building Origin 2 as a "PX/PET plant," *supra* 16-18, this also simply repeats the same failure highlighted in the Motion. *See* Mot. at 45-48.

Plaintiff fails specifically to substantively address how the August 9 disclosure confirmed the actual information contained in Origin's prior statements. *See* Mot. at 46-47; *Lefter v. Yirendai Ltd.*, 2017 WL 2857535 at *7 (C.D. Cal. June 20, 2017) (new Chinese government regulation that impacted a defendant company did not cause loss, because it matched the draft regulation discussed in the defendant's SEC filing). Origin said that it would provide an update regarding Origin 2's construction, ¶¶ 115-19, 129-31; the August 9 announcement *was* that update, and thus confirmed this statement. Ex. 13 at 1. Origin said it would incorporate, and was making progress in incorporating, FDCA into Origin 2, ¶¶ 115, 117, 119, 129, 131; the August 9 announcement confirmed this statement. Ex. 13 at 1. It is again Plaintiff's burden to show how these confirmations, not revelations, caused a drop in Origin's stock price. Mot. at 47. Apparently though, Plaintiff thinks he is above meeting this burden, declining to engage with any authorities cited by Defendants. *See, e.g., Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) ("[T]o satisfy the loss causation requirement, *the plaintiff must show* that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.").

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP

**CONCLUSION**

Defendants respectfully request that the SAC be dismissed with prejudice.[11]


Dated: February 4, 2025          FRESHFIELDS US LLP


                                 */s/Boris Feldman*
                                 BORIS FELDMAN
                                 DORU GAVRIL
                                 CARL HUDSON
                                 REBECCA LOCKERT
                                 855 Main Street
                                 Redwood City, CA 94063
                                 Telephone: (650) 618-9250
                                 boris.feldman@freshfields.com
                                 doru.gavril@freshfields.com
                                 carl.hudson@freshfields.com
                                 rebecca.lockert@freshfields.com

                                 *Attorneys for Defendants Origin*
                                 *Materials, Inc., Richard J. Riley,*
                                 *and John Bissell*

---

[11] As with the FAC, Plaintiff's Section 20(a) claim should also be dismissed, because he fails to allege any primary violation of the securities laws. *MVP Asset Mgmt. (USA) LLC v. Vestbirk*, 2013 WL 1726359, at *7 (E.D. Cal. Mar. 22, 2013) ("Because Plaintiff's primary claim under Section 10(b) is dismissed, the[] [Section 20(a)] claim[] must also be dismissed.").

-34-

DEFS' REPLY ISO MOTION TO DISMISS
CASE NO. 2:23-cv-01816-WBS-JDP