1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12   In re ORIGIN MATERIALS, INC.     No. 2:23-cv-01816 WBS JDP
     SECURITIES LITIGATION
13

14   _____       MEMORANDUM AND ORDER RE:
                                        MOTION TO DISMISS SECOND
15   ALL ACTIONS CONSOLIDATED FROM:     AMENDED COMPLAINT

16
     ANTONIO F. SOTO, individually
17   and on behalf of all others
     similarly situated,
18
                     Plaintiff,
19
           v.
20
     ORIGIN MATERIALS, INC., RICHARD
21   J. RILEY, and JOHN BISSELL,

22                   Defendants.

23   _____

24                          ----oo0oo----

25         Lead plaintiff Todd Frega brings this putative class

26   action against defendants Origin Materials Inc., Richard Riley,

27   and John Bissell, alleging violations of Sections 10(b) and 20(a)

28   of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a).  The

                                  1

1  court previously dismissed plaintiff's Corrected Amended

2  Complaint.  (See Docket No. 82.)  Plaintiff subsequently filed

3  the Second Amended Complaint (Docket No. 85), which defendants

4  move to dismiss (Docket No. 89).[1]

5  I.  Factual Background[2]

6       Defendant Origin Materials ("Origin" or "the company")

7  is a publicly traded company that purports to produce

8  "sustainable materials" by converting plant-based matter such as

9  wood residues into materials that can replace the petroleum-based

10 plastics typically used in consumer products.  (Second Am. Compl.

11 ("SAC") (Docket No. 85) ¶ 5.)  Defendants Bissell and Riley are

12 the co-CEOs of Origin.  (See id. ¶¶ 12, 14.)

13      Origin produces chloromethylfurfural ("CMF"), a

14 "building block" chemical that can be converted into other

15 products.  (Id. ¶ 6.)  As relevant here, CMF can be converted

16 into (1) paraxylene ("PX"), a chemical used to produce a type of

17 plastic called polyethylene terephthalate ("PET"); and (2)

18

19      [1]    Pursuant to the parties' stipulation, on November 25,
       2024 the court set oral argument on defendants' motion to dismiss
       the Second Amended Complaint for February 18, 2025. (Docket No.
20     88.)  On February 7, 2025 -- less than two weeks prior to a
       hearing that had been set for months -- the parties submitted a
21     new stipulation to continue the hearing one month, to March 17,
       2025, based on an unspecified "family event." (Docket No. 95.)
22     The court approved that stipulation.  On February 11, 2025, the
       parties submitted a third stipulation, seeking to continue the
23     hearing an additional two weeks to March 31, 2025.  (Docket No.
       96.)
24          The issues have been thoroughly briefed by the parties
       and the court has carefully considered all arguments raised.
25     Rather than further delay resolution of the matter, the court
       will decide the motion on the papers without oral argument
26     pursuant to Local Rule 230(g).  The scheduled March 17, 2025
       hearing on the motion is hereby VACATED.
27

28      [2]    All facts recited in this Order are as alleged in the
       Second Amended Complaint unless otherwise noted.

2

1   furandicarboxylic acid ("FDCA"), a chemical used to produce a

2   different type of plastic called polyethylene furanoate ("PEF").

3   (See id.)[3]

4          In February 2021, Origin announced plans to build

5   Origin 2, a manufacturing plant intended to focus on, inter alia,

6   production of PX/PET, with construction to be completed by mid-

7   2025.  (See id. ¶¶ 41-43, 60, 71-75.)

8          In November 2021, Origin retained an outside

9   engineering firm to conduct the "front-end loading" process, a

10  multiphase development process involving "progressively refining

11  the project scope, definition, and feasibility, ultimately paving

12  the way for detailed engineering and construction."  (Id. ¶¶ 51,

13  59.)

14         Origin subsequently encountered chemical engineering

15  issues related to scaling up the production of PX/PET.  (See id.

16  ¶¶ 86-88.)  As a result, the plans for Origin 2 changed, with the

17  plant to instead focus on the production of FDCA/PEF and

18  construction to be delayed by several years.  (See id. ¶¶ 89-92,

19  112-14.)  On August 9, 2023, defendants publicly announced these

20  changes.  (See id. ¶¶ 151-55.)  The company's share price

21  subsequently fell.  (See id. ¶¶ 162, 166-67.)

22  II.  Section 10(b)

23         Section 10(b) of the Securities Exchange Act of 1934

24  makes it unlawful for any person to "'use or employ, in

25  connection with the purchase or sale of any security registered

---

26         [3]    The complaint frequently refers to PX and PET

27  interchangeably or as one unit.  As such, the court will refer to
    the first product line as "PX/PET."  The court will refer to the

28  second product line as "FDCA/PEF."

1  on a national securities exchange . . . any manipulative or

2  deceptive device or contrivance in contravention of such rules

3  and regulations as the [Securities and Exchange] Commission may

4  prescribe as necessary or appropriate in the public interest or

5  for the protection of investors.'"  In re Rigel Pharms., Inc.

6  Sec. Litig., 697 F.3d 869, 876 (9th Cir. 2012) (quoting 15 U.S.C.

7  § 78j(b)).  "One of those rules promulgated under the Act is

8  Securities and Exchange Commission Rule 10b-5," id., which makes

9  it unlawful to, inter alia, (a) "employ any device, scheme, or

10  artifice to defraud," (b) "make any untrue statement of a

11  material fact or to omit to state a material fact necessary in

12  order to make the statements made, in the light of the

13  circumstances under which they were made, not misleading," or (c)

14  "engage in any act, practice, or course of business which

15  operates or would operate as a fraud or deceit upon any person,

16  in connection with the purchase or sale of any security."  17

17  C.F.R. § 240.10b-5.

18      "To survive a motion to dismiss under this regime, [the

19  plaintiff] must plead: (1) a material misrepresentation or

20  omission by the defendant ('falsity'); (2) scienter; (3) a

21  connection between the misrepresentation or omission and the

22  purchase or sale of a security; (4) reliance upon the

23  misrepresentation or omission; (5) economic loss; and (6) loss

24  causation."  Espy v. J2 Glob., Inc., 99 F.4th 527, 535 (9th Cir.

25  2024) (quotation marks omitted).

26      "At the pleading stage, a complaint alleging claims

27  under section 10(b) and Rule 10b-5 must . . . satisfy the

28  heightened pleading requirements of both Federal Rule of Civil

4

1  Procedure 9(b) and the Private Securities Litigation Reform Act"

2  ("PSLRA").  <u>Rigel Pharms.</u>, 697 F.3d at 876.

3         Rule 9(b) provides: "In alleging fraud or mistake, a

4  party must state with particularity the circumstances

5  constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Thus,

6  Rule 9(b) requires particularized allegations of the

7  circumstances constituting fraud, including identifying the

8  statements at issue and setting forth what is false or misleading

9  about the statement and why the statements were false or

10 misleading at the time they were made."  <u>Rigel Pharms.</u>, 697 F.3d

11 at 876.

12        "Under the PSLRA, 'the complaint shall [1] specify each

13 statement alleged to have been misleading [and] the reason or

14 reasons why the statement is misleading, and [2], if an

15 allegation regarding the statement or omission is made on

16 information and belief, the complaint shall state with

17 particularity all facts on which that belief is formed."  <u>In re</u>

18 <u>Genius Brands Int'l, Inc. Sec. Litig.</u>, 97 F.4th 1171, 1180 (9th

19 Cir. 2024) (quoting 15 U.S.C. § 78u-4(b)(1)(B)); <u>see also</u>

20 <u>Tellabs, Inc. v. Makor Issues & Rts., Ltd.</u>, 551 U.S. 308, 321

21 (2007) (same).  The PSLRA also requires that the complaint

22 "'state with particularity facts giving rise to a strong

23 inference that the defendant acted with the required state of

24 mind.'"  <u>Rigel Pharms.</u>, 697 F.3d at 882 (quoting 15 U.S.C. § 78u-

25 4(b)(2)).

26    A.   <u>Confidential Witness & Supporting Allegations</u>

27        In pleading the alleged violations, the complaint

28 relies primarily upon statements attributed to a former Origin

5

1  employee referred to as Confidential Witness 1 ("CW1").

2          To comply with the PSLRA, "[a] complaint relying on
3  confidential witness statements must describe the confidential
4  witnesses 'with sufficient particularity to establish their
5  reliability and personal knowledge.'"  Glazer Cap. Mgmt., L.P. v.
6  Forescout Techs., Inc., 63 F.4th 747, 766-67 (9th Cir. 2023)
7  (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 995
8  (9th Cir. 2009)).  In determining whether the complaint has
9  established the reliability and personal knowledge of a
10 confidential witness, courts consider "the level of detail
11 provided by the confidential witnesses, the plausibility of the
12 allegations, the number of sources, the reliability of the
13 sources, corroborating facts, and similar indicia of
14 reliability."  Id. at 767.

15          1.  Prior Order Finding Allegations of CW1
16              Insufficient

17          The court previously addressed the sufficiency of CW1's
18 allegations in ruling on defendants' motion to dismiss the
19 Correct Amended Complaint.  There, the court noted that the
20 Corrected Amended Complaint ("CAC" (Docket No. 61)) attributed
21 the following allegations to CW1:

22      In "late 2022" and "early 2023," CW1 "learned from
        attending biweekly meetings with Origin's R&D group"
23      that there were "unexpected chemical issues" (referred
        to as "fouling" occurring "at every step" of the
24      PX/PET production process), leading to delays in the
        development process for Origin 2.  ([CAC] ¶¶ 86, 88.)
25      In December 2022, CW1 attended a meeting at which
        defendants Riley and Bissell provided updates on
26      Origin 2, including that the company was "considering"
        changing the plans and construction schedule for
27      Origin 2.  (See id. ¶ 87.)

28      "CW1 further reported that in March 2023, based on

                              6

emails with his direct manager and his attendance at
weekly meetings held by Defendants Riley and Bissell,
CW1 learned that Origin 2 was being broken up into two
phases, was shifting to new products, and would no
longer produce [PX/PET]." (Id. ¶ 89.) "CW1 also
learned from these weekly Friday meetings with
Defendants Riley and Bissell in March 2023, that
[front-end loading] was being delayed for Origin 2."
(Id. ¶ 90.)

(Order Dismissing CAC (Docket No. 82) at 6-7.)

Based on the facts alleged in the Corrected Amended

Complaint, the court concluded that "the allegations concerning

what CW1 'learned' at meetings attended by defendants are fatally

vague, as they do not indicate 'when this information was

conveyed to [defendants], who conveyed it, or the substance of

what was allegedly conveyed.'" (Order Dismissing CAC at 7

(quoting In re Ditech Commc'ns Corp. Sec. Litig., No. 05-cv-02406

JSW, 2007 WL 2990532, at *8 (N.D. Cal. Oct. 11, 2007).)

The court also explained that the Corrected Amended

Complaint "fail[ed] to allege with specificity what defendants'

role was during these meetings and whether defendants had access

to the same information that was communicated to CW1," expressing

concern that what CW1 "learned" might not be based on reliable

information. (See id.) Accordingly, the court concluded that

"the statements attributed to CW1 -- which are foundational to

plaintiff's allegations that defendants committed securities

violations -- do not satisfy the PSLRA's particularity

requirements," and therefore granted the motion to dismiss the

Corrected Amended Complaint. (Id. at 9.)

            2.    Amended CW1 Allegations

Plaintiff's Second Amended Complaint contains updated

allegations attributed to CW1. Plaintiff's amendment has

7

1    partially cured the defects previously identified by the court.

2            According to the Second Amended Complaint, CW1 was a

3    "technical development engineer who was employed at Origin prior

4    to and throughout the Class Period" and "worked on developing the

5    technology for . . . converting CMF to PX for Origin 2." (SAC ¶

6    85.) CW1 was part of an engineering group that compiled

7    chemistry data and sent it to the Origin 1 plant for further

8    testing. (Id.) If the tests were successful, CW1 and his team

9    would send the data to the outside engineering firm working on

10   the "front-end loading" development process for Origin 2. (Id.)

11           The Second Amended Complaint rehashes several of the

12   allegations from the prior complaint, including that in "late

13   2022" and "early 2023," CW1 "learned from attending biweekly

14   meetings with Origin's R&D group" that there were "unexpected

15   chemical issues" (including "fouling" occurring "at every step"

16   of the PX/PET production process), leading to delays in the

17   development process for Origin 2. (See id. ¶¶ 86, 88.).

18   Further, in December 2022, CW1 attended an all-hands meeting

19   "helmed by" defendants Riley and Bissell, at which Riley and

20   Bissell "revealed" that the company "was already considering

21   scaling down the size of Origin 2, splitting the building of the

22   plant into two phases, and shifting the focus of Origin 2 from PX

23   to another product," and explained that the company "would either

24   have to make less [PX/PET] at the plant or pivot the production

25   to another product due to the economics of [PX/PET]." (See id. ¶

26   87.)

27           However, the amended complaint goes further and also

28   provides new details concerning the pivotal March 2023 meeting.

According to CW1, the meeting in question occurred on March 3, 2023 and was one of the recurring weekly meetings held via video conference on Fridays from 9-10am.  (See id. ¶¶ 90-91.)  These weekly meetings, which typically lasted an hour or more, were led by a moderator and included Bissell as a speaker.  (Id. ¶ 90.)  Bissell was a "huge contributor" to the weekly meetings and was "in charge" of them.  (Id.)

CW1 elaborates that during the weekly meeting that took place on March 3, 2023, Bissell spoke to those in attendance concerning Origin 2, explaining that because of issues related to the poor performance of PX/PET and the high cost of the plant, Origin 2 would be "broken up into two phases, was shifting to new products, and would no longer produce PX[/PET]."  (Id. ¶ 91.)  "Accordingly, Bissell told the group [attending the meeting], 'we are going to move in this new direction.'"  (Id.)  Further, Bissell "presented a detailed plan of action to move forward with the changes at Origin 2 away from PX production and the changes to plant construction."  (Id. ¶ 92.)  CW1 explains that Bissell was the "first person [he] heard reveal that the [c]ompany would not produce PX[/PET] at Origin 2."  (Id. ¶ 91.)

The statements attributed to CW1 have sufficient indicia of personal knowledge and reliability.  CW1 was an engineer working on Origin 2's development process, and it is "probab[le] that a person in the position occupied by [CW1] would possess the information alleged."  See Glazer, 63 F.4th at 767.  The statements explain how, when, and from whom CW1 obtained the information (company meetings with Origin's R&D group and with Bissell) and provide detail concerning the information he learned

9

1   regarding Origin 2's development.  See In re Quality Sys., Inc.

2   Sec. Litig., 865 F.3d 1130, 1145 (9th Cir. 2017) (indicating that

3   information such as job titles, roles in company, attendance at

4   meetings with defendant, and work on project at issue served to

5   establish reliability and personal knowledge of confidential

6   witnesses).  Further, CW1's allegations are plausible given that

7   the changed plans he describes were later confirmed by the

8   company.

9        Defendants argue that CW1's statements are unreliable

10  because they are internally inconsistent.  Specifically, they

11  point out that CW1 discussed the issues with Origin 2's

12  development in several different ways, referring to "fouling

13  issues" in manufacturing PX/PET, problems with Origin 2's

14  "technology maturity," and difficulties in "finaliz[ing] the

15  chemistry for Origin 2" leading to delays in the front-end

16  loading process.  (See SAC ¶¶ 86, 89, 95.)  These descriptions do

17  not appear inconsistent, but rather refer to the same set of

18  difficulties facing the company in Origin 2's development

19  process.  For instance, the complaint explicitly states that the

20  "fouling issues resulted in the [c]ompany being unable to

21  finalize the chemistry for Origin 2."  (Id. ¶ 86.)

22       Defendants also argue that CW1's new allegations are

23  not credible because they contradict his allegations as stated in

24  the Corrected Amended Complaint.  The Corrected Amended Complaint

25  stated that CW1 learned of the changes via "emails with his

26  direct manager and his attendance at weekly meetings held by

27  Defendants Riley and Bissell."  (CAC ¶ 89.)  Defendants argue

28  that the allegations concerning the emails are missing from the

1    Second Amended Complaint.  This is not so.  The Second Amended

2    Complaint merely adds greater specificity concerning the March

3    2023 meeting and emails, explaining that Bissell described the

4    changed plans at the March 3, 2023 meeting and these changes were

5    reiterated in emails with CW1's team -- which presumably included

6    his manager -- later in the month.  (See SAC ¶¶ 91-93.)

7         CW1's statements are also consistent with other

8    allegations made in the complaint regarding the company's

9    contracts with Avantium and Pepsi.  The complaint alleges that on

10   February 21, 2023, Origin entered into an agreement to license

11   Avantium's technology, enabling Origin to convert CMF into FDCA

12   at a commercial scale.  (SAC ¶¶ 94-98.)  Discussing the agreement

13   during a call with analysts, Avantium's CEO implied that Origin

14   would produce FDCA/PEF at Origin 2.  (See id. ¶ 100.)  The

15   Avantium agreement lends credence to CW1's allegation that by the

16   following month, Origin had affirmatively decided to shift

17   towards FDCA/PEF production at Origin 2.[4]

18        The complaint further alleges that on May 9, 2023,

19   Origin finalized amendments to an existing "offtake" agreement

20   _____

21        [4]    Defendants argue that the complaint mischaracterizes
     the Avantium partnership by omitting portions of the Avantium
22   CEO's statements, which are incorporated by reference, see Khoja
     v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir.
23   2018).  Specifically, defendants point to the Avantium CEO's
     discussion of an offtake agreement whereby Avantium would sell
24   FDCA/PEF to Origin.  (See Def.'s Ex. 16 (Docket No. 90-16) at 2.)
     This information does not change the analysis.  That Origin
25   agreed to purchase FDCA/PEF from Avantium does not negate that
     Origin had also licensed technology to produce FDCA/PEF at its
26   own plants.  Indeed, it appears that the offtake agreement was
     intended not to supplant, but to "support . . . the industrial
27   technology license agreement" whereby Origin would produce
     FDCA/PEF.  (See id.)
28

                                11

1    (i.e., an agreement to purchase goods from a supplier) with

2    Pepsi.  (See id. ¶ 101.)  The original offtake agreement

3    provided, inter alia, that Pepsi had a five-year term to purchase

4    a specified amount of PX/PET from Origin 2.  (Id. ¶ 102.)  It

5    allowed Pepsi to terminate the contract if Origin 2 did not begin

6    commercial operation by June 30, 2025 and required Origin to

7    provide regular progress reports concerning the construction of

8    Origin 2.  (Id. ¶ 103.)  If Origin obtained actual knowledge that

9    there was a substantial likelihood Origin 2 would not begin

10   production by June 30, 2025, Origin was required to notify Pepsi

11   and provide an updated estimated timeline.  (Id. ¶ 104.)

12         The May 9, 2023 amendment revised the commercial

13   operation deadline to June 30, 2026.  (Id. ¶ 105.)  The amended

14   agreement also permitted Origin to provide Pepsi with FDCA/PEF

15   from Origin 2 (rather than only PX/PET), stating that Origin was

16   "focused on carrying out its strategic plan to accelerate

17   production of FDCA and PEF . . . ."  (Id. ¶¶ 106-107.)  This

18   agreement bolsters the credibility of CW1's allegation that by

19   March 2023, the company had already decided to shift Origin 2 to

20   FDCA/PEF production and to delay Origin 2's construction

21   schedule.

22         Based on the foregoing, the statements attributed to

23   CW1 bear sufficient indicia of reliability and personal knowledge

24   to be relied upon in analyzing whether the section 10(b)

25   requirements are satisfied.

26     B.   Scienter

27         Scienter is "'a mental state embracing intent to

28   deceive, manipulate, or defraud.'"  Or. Pub. Emps. Ret. Fund v.

1   Apollo Grp. Inc., 774 F.3d 598, 607 (9th Cir. 2014) (quoting

2   Tellabs, 551 U.S. at 319)).  "A defendant who makes

3   misrepresentations or omissions 'either intentionally or with

4   deliberate recklessness acts with scienter.'"  Id. (quoting In re

5   Daou Sys., Inc., 411 F.3d 1006, 1015 (9th Cir. 2005)).

6   "Deliberate recklessness is a higher standard than mere

7   recklessness," representing "an extreme departure from the

8   standards of ordinary care . . . which presents a danger of

9   misleading buyers or sellers that is either known to the

10  defendant or is so obvious that the actor must have been aware of

11  it."  Espy, 99 F.4th at 535-36 (internal quotation marks

12  omitted).

13          "To adequately plead scienter under the PSLRA, the

14  complaint must 'state with particularity facts giving rise to a

15  strong inference that the defendant acted with the required state

16  of mind.'"  Rigel Pharms., 697 F.3d at 882 (quoting 15 U.S.C. §

17  78u-4(b)(2)).  "The inquiry . . . is whether all of the facts

18  alleged, taken collectively, give rise to a strong inference of

19  scienter, not whether any individual allegation, scrutinized in

20  isolation, meets that standard."  Tellabs, 551 U.S. at 322-23.

21  "The 'strong inference' 'must be cogent and compelling, thus

22  strong in light of other [countervailing] explanations,' not

23  merely 'reasonable' or 'permissible.'"  In re NVIDIA Corp. Sec.

24  Litig., 768 F.3d 1046, 1052 (9th Cir. 2014) (quoting Tellabs, 551

25  U.S. at 324) (alteration in original).

26          Plaintiff relies on the allegations already discussed

27  above to establish scienter -- namely, the statements attributed

28  to CW1, the agreement with Avantium, and the amendment to the

13

1    Pepsi offtake agreement.  To plead scienter based on confidential

2    witness statements, the complaint "must satisfy two hurdles

3    imposed by the PSLRA."  Espy, 99 F.4th at 536.  "First, the

4    confidential witnesses whose statements are introduced to

5    establish scienter must be described with sufficient

6    particularity to establish their reliability and personal

7    knowledge.  Second, those statements which are reported by

8    confidential witnesses with sufficient reliability and personal

9    knowledge must themselves be indicative of scienter."  Id.  The

10   court has already completed the first step of the inquiry by

11   establishing the reliability and personal knowledge of CW1.  The

12   court thus turns to the question of whether the confidential

13   witness statements are indicative of scienter on the part of each

14   defendant.

15        Based on the allegations provided, plaintiff has

16   adequately pled scienter as to Bissell and the company, but not

17   as to Riley.

18            1.   Bissell and The Company

19        As relevant here, CW1 states that at the March 3, 2023

20   meeting, Bissell informed the meeting attendees that Origin 2

21   "would now be broken up into two phases, was shifting to new

22   products, and would no longer produce [PX/PET]," telling the

23   group that the company was "'going to move in this new

24   direction.'"  (See SAC ¶ 91.)  Bissell also presented a "detailed

25   plan of action" by which the changes would be implemented.  (Id.

26   ¶ 92.)  These allegations clearly support a strong inference that

27   Bissell had knowledge of the changed plans; it need hardly be

28   said that Bissell had knowledge of what he himself said at the

1  meeting.

2          As discussed above, CW1's allegations indicating that

3  Bissell knew of the changed plans by March 3, 2023 are consistent

4  with the February 21, 2023 Avantium agreement that would allow

5  Origin to produce FDCA/PEF, and the May 9, 2023 Pepsi amendment

6  that pushed back the deadline for production at Origin 2 and

7  would allow Origin to provide Pepsi with FDCA/PEF rather than

8  only PX/PET.  While these agreements are not themselves

9  indicative of scienter, they bolster CW1's allegations that the

10  decision to change the plans for Origin 2 had already been made

11  by March 3, 2023.

12          The "core operations" doctrine provides further support

13  concerning Bissell's knowledge.  Pursuant to this doctrine, the

14  court "may consider a senior executive's role in a company to

15  determine whether there is a cogent and compelling inference that

16  the senior executive knew of the information at issue," including

17  "consideration of the executive's access to the information, and,

18  whether, given the importance of the information, it would be

19  'absurd' to suggest that management was without knowledge of the

20  matter."  In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 706 (9th

21  Cir. 2021) (cleaned up, emphasis added).

22          Origin 2 was a highly important project -- Origin's

23  first large-scale plant -- and Bissell was a co-CEO of the

24  company who regularly communicated with investors concerning the

25  company's technology and provided updates about Origin 2's

26  development.  (See SAC ¶¶ 14, 41-45, 62-65, 69, 73, 75, 77-81,

27  87, 90-92, 113, 119, 131, 139, 145, 148, 154-59.)  "[I]n

28  conjunction with [the] detailed and specific allegations about

1    [Bissell]'s exposure to factual information within the company"

2    concerning the changed plans for Origin 2, Bissell's role in the

3    company and the importance of the information at issue contribute

4    to a strong inference of scienter.  See S. Ferry LP, No. 2 v.

5    Killinger, 542 F.3d 776, 785 (9th Cir. 2008); see also Quality

6    Sys., 865 F.3d at 1145 (executives' public representations that

7    they possessed "access to, and knowledge of" sales information

8    indicated that they possessed scienter concerning detrimental

9    changes to sales pipeline).

10         Once Bissell allegedly had knowledge of the affirmative

11   changes to the plans for Origin 2, it would have been abundantly

12   clear that any representations to the contrary (discussed below)

13   were likely to mislead consumers regarding the plant's

14   development.  "When the defendant is aware of the facts that made

15   the statement misleading, he cannot ignore the facts and plead

16   ignorance of the risk."  See S.E.C. v. Platforms Wireless Int'l

17   Corp., 617 F.3d 1072, 1094 (9th Cir. 2010) (defendant acted with

18   deliberate recklessness in issuing press release touting

19   company's new product when defendant knew the product did not

20   exist); see also Flynn v. Sientra, Inc., No. 15-cv-07548 SJO RAO,

21   2016 WL 3360676, at *12-14 (C.D. Cal. June 9, 2016) (finding

22   plaintiff pled scienter based on statements attributed to one

23   confidential witness and core operations doctrine).

24         Accordingly, plaintiff has pled that defendant Bissell

25   possessed scienter, which can be imputed to defendant Origin.

26   See Alphabet, 1 F.4th at 706 ("the 'scienter of the senior

27   controlling officers of a corporation may be attributed to the

28   corporation itself to establish liability as a primary violator

                                  16

1  of § 10(b) and Rule 10b-5 when those senior officials were acting

2  within the scope of their apparent authority'") (quoting In re

3  ChinaCast Educ. Corp. Sec. Litig., 809 F.3d 471, 475 (9th Cir.

4  2015)).

5         2.   Riley

6         In contrast, noticeably absent from the Second Amended

7  Complaint are any allegations concerning whether or when Riley

8  knew of the changes to Origin 2 during the class period.  While

9  the complaint alleges that Riley discussed that the company was

10  "considering" changing the plans for Origin 2 in December of 2022

11  (SAC ¶ 87), this allegation alone does not support a strong

12  inference concerning Riley's knowledge of the final decision to

13  change the plans communicated by Bissell at the March 3, 2023

14  meeting.  Although Riley was co-CEO, the core operations doctrine

15  does not suffice to establish a strong inference of scienter in

16  the absence of allegations concerning Riley's access to

17  information concerning the final changes.  See Alphabet, 1 F.4th

18  at 706; S. Ferry, 542 F.3d at 785.  For instance, it is possible

19  that Riley was less involved in or knowledgeable about the

20  technological aspects of the company than Bissell.  Accordingly,

21  plaintiff has failed to plead Riley possessed scienter and his

22  claims will be dismissed as against defendant Riley.

23       C.   False or Misleading Statements

24         "In setting forth the reasons why they contend that

25  each challenged statement is misleading, securities plaintiffs

26  may rely on either an affirmative misrepresentation theory or an

27  omission theory."  Wochos v. Tesla, Inc., 985 F.3d 1180, 1188

28  (9th Cir. 2021).  "Under Rule 10b-5, an affirmative

17

1  misrepresentation is an 'untrue statement of a material fact,'
2  and a fraudulent omission is a failure to 'state a material fact
3  necessary in order to make the statements made, in the light of
4  the circumstances under which they were made, not misleading.'"
5  Id. (quoting See 17 C.F.R. § 240.10b-5(b)).

6         "To determine whether a statement or omission is
7  misleading, 'our central inquiry is whether a reasonable investor
8  would have been misled about the nature of his investment.'"
9  Genius Brands, 97 F.4th at 1181 (quoting In re VeriFone Sec.
10 Litig., 11 F.3d 865, 869 (9th Cir. 1993)).  "This is an objective
11 inquiry that requires us to assess 'whether an investor who had
12 been reasonably diligent in reviewing' the statement or omission
13 at issue 'would have been misled.'"  Id. (quoting Durning v.
14 First Bos. Corp., 815 F.2d 1265, 1268 (9th Cir. 1987)).

15        Courts typically perform a separate analysis of each
16 disclosure pursuant to the PSLRA's requirement that plaintiffs
17 "specify each statement alleged to have been misleading."  See
18 Zhou v. Desktop Metal, Inc., 120 F.4th 278, 293 (1st Cir. 2024)
19 ("When a plaintiff alleges multiple false or misleading
20 statements, we perform our analysis statement by statement,
21 considering each statement in turn."); Bondali v. Yum! Brands,
22 Inc., 620 F. App'x 483, 491 (6th Cir. 2015) ("[O]ther circuits,
23 like this circuit, undertake a statement-by-statement
24 analysis."); In re Eventbrite, Inc. Sec. Litig., No. 5:18-cv-
25 02019-EJD, 2020 WL 2042078, at *10 (N.D. Cal. Apr. 28, 2020)
26 ("[F]or falsity, the Court must do a statement-by-statement
27 analysis.").

28        Plaintiff argues that defendants made several

18

1  statements and omissions that misled consumers concerning both

2  the construction timeline of Origin 2 and the products to be

3  produced at Origin 2.  Specifically, they allege that defendants

4  continued to represent that Origin 2 would produce PX/PET and

5  construction would be completed by mid-2025, despite knowing that

6  Origin 2 would instead produce FDCA/PEF and would not be

7  completed by that date.[5]

8                    1.    Statements Prior to March 3, 2023

9         As discussed above, CW1 alleges that by March 3, 2023,

10 the company affirmatively changed course such that Origin 2 would

11 "be broken up into two phases, was shifting to new products, and

12 would no longer produce PX[/PET]."  (See SAC ¶ 91.)  However,

13 CW1's statements indicate that prior to March 3, 2023, CW1

14 learned only that defendants had confronted technical

15 difficulties and delays and "consider[ed]" alternative plans for

16 Origin 2.  (See id. ¶¶ 86-88.)  Although the complaint also

17 alleges that Origin entered the Avantium licensing agreement on

18 February 21, 2023, that agreement alone is insufficient to plead

19 that defendants definitively changed the plans for Origin 2 prior

20 to March 3, 2023; it is possible that in February 2023, Origin

21 had only decided to incorporate FDCA/PEF into Origin 2 alongside

22 PX/PET, rather than in lieu of it.  (See id. ¶ 87 (in December

23 2022, Riley and Bissell "stated that the [c]ompany would either

24 have to make less [PX/PET] at the plant or pivot the production

25 to another product").)

26

27        [5]    Defendants dispute that the statements or omissions
were false or misleading, but do not dispute that they were
28 material.

1          Defendants were under no obligation to disclose these

2    developing technical difficulties and potential future plans, as

3    their omission did not render representations about the plans for

4    Origin 2 (to produce PX/PET and be completed by mid-2025)

5    misleading.  "[C]ompanies do not have an obligation to offer an

6    instantaneous update of every internal development, especially

7    when it involves the oft-tortuous path of product development,"

8    but rather must "disclose a negative internal development only if

9    its omission would make other statements materially misleading."

10   See Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611, 620

11   (9th Cir. 2022).

12          It appears from the complaint that the company at first

13   attempted to work through the technical issues and continue the

14   development process based on the original plan for Origin 2.  CW1

15   and his team were "falling behind" in their work for Origin 2's

16   front-end loading development process in late 2022 and engineers

17   "started developing solutions for the issues" in early 2023.

18   (SAC ¶¶ 86, 88.)  As a result of the technological difficulties,

19   in December 2022, "CW1 was instructed that the [c]ompany was far

20   off from completing [the front-end loading process] for Origin

21   2."  (Id. ¶ 87.)  These allegations indicate that the company was

22   still working towards completing the in-progress development

23   process despite the problems.  By contrast, CW1 learned for the

24   first time on March 3, 2023 that the plans for Origin 2 had

25   changed entirely.  (See id. ¶ 91.)

26          While CW1 states that "the plan announced on March 3,

27   2023 was likely formulated months in advance because it was well

28   thought out by the time it was conveyed by Bissell . . . at the

1   March 3, 2023 meeting" (see id. ¶ 92), this is pure conjecture.

2   Based on the complaint, the court has no way of inferring how

3   long the plans had been formulated prior to Bissell's

4   announcement at the March 3, 2023 meeting.  Although the company

5   was "considering" alternative plans for Origin 2 prior to that

6   meeting (see SAC ¶ 87), "[t]he existence of a contingency plan

7   does not evince an intent to execute that plan."  See In re Intel

8   Corp. Sec. Litig., No. 5:20-cv-05194 EJD, 2023 WL 2767779, at *19

9   (N.D. Cal. Mar. 31, 2023), aff'd, No. 23-15695, 2024 WL 1693340

10  (9th Cir. Apr. 19, 2024).

11       Accordingly, the complaint fails to plead that any

12  statements or omissions concerning the plans for Origin 2 made

13  prior to March 3, 2023 -- namely, the Press Release, Earnings

14  Call, PowerPoint, and Form 10-K dated February 23, 2023 (see SAC

15  ¶ 115-20) -- were false or misleading.  See In re Stac Elecs.

16  Sec. Litig., 89 F.3d 1399, 1404 (9th Cir. 1996) ("the statement

17  or omission must be shown to have been false or misleading when

18  made"); Weston, 29 F.4th at 622 ("without more, temporal

19  proximity alone does not satisfy the particularity requirements

20  of Rule 9(b)"); Glazer, 63 F.4th 777 (plaintiffs failed to plead

21  that company partnerships terminated "prior to the date on which

22  [defendant] made the alleged statements [to the contrary], and

23  therefore failed to plead falsity").  Accordingly, plaintiff's

24  claims will be dismissed insofar as they are premised on

25  statements made prior to March 3, 2023.

26       2.   March 7, 2023 PowerPoint

27       A PowerPoint presentation posted to the company's

28  website on March 7, 2023 stated that Origin 2 was "expected" to

21

1   use sustainable materials "to make PET," and that construction

2   was "expected to start by mid-2023," with the plant "expected to

3   be operational mid-2025."  (SAC ¶ 127.)

4          As explained above, CW1 alleges that by March 3, 2023,

5   defendants had affirmatively made the decision to change the

6   plans for Origin 2, which would no longer produce PX/PET and

7   would not be completed by mid-2025.  Assuming the truth of that

8   allegation, the statements to the contrary in the March 7

9   PowerPoint presentation were false because they "affirmatively

10  created an impression of a state of affairs that differed in a

11  material way from the one that actually existed."  See Quality

12  Sys., 865 F.3d at 1144 (quoting Brody v. Transitional Hosps.

13  Corp., 280 F.3d 997, 1006 (9th Cir. 2002)) (alterations adopted);

14  see also id. at 1143 ("reassuring investors that 'everything

15  [was] going fine' with FDA approval when the company knew FDA

16  approval would never come was materially misleading," as was a

17  statement that a company "'anticipate[d] a continuation of its

18  accelerated expansion schedule' when the expansion had already

19  failed") (citations omitted).

20         That the representations concerning Origin 2 were

21  couched in terms of subjective "expectations" makes no

22  difference.  Even if defendants "sincerely believed" that Origin

23  2 would be completed as originally planned, that expectation did

24  not "fairly align with the information in [defendants']

25  possession at the time" -- i.e., that Origin would not be

26  proceeding as planned, but would instead produce FDCA/PEF and

27  would not be completed in 2025.  See Glazer, 63 F.4th at 779; see

28  also Omnicare, Inc. v. Laborers Dist. Council Const. Indus.

1    Pension Fund, 575 U.S. 175, 185 (2015) (opinion statements can

2    "contain embedded statements of fact," which "may be read to

3    affirm not only the speaker's state of mind . . . but also an

4    underlying fact").  Based on the allegations of the complaint,

5    these statements were not merely projections made amidst

6    uncertainty concerning Origin 2's development, but rather

7    directly contradicted the new, concrete plans for the plant.

8    Accordingly, plaintiff has pled that the representations in the

9    March 7, 2023 PowerPoint were false or misleading.[6]

10                   3.   May 10, 2023 Press Release

11             According to a press release dated May 10, 2023: "For

12   Origin 2, the Company continues to make progress on front-end

13   design, construction planning, and financing."  (SAC ¶ 129.)

14             "'[V]ague statements of optimism' are generally not

15   actionable because investors 'know how to devalue the optimism of

16   corporate executives.'"  Glazer, 63 F.4th at 770 (quoting In re

17   Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010)).  A

18   "pure statement of opinion" is also "generally not actionable."

19   Wochos, 985 F.3d at 1196 (citing Omnicare, 575 U.S. at 187).

20             A statement that Origin "continue[d] to make progress"

21   in the development process for Origin 2 (SAC ¶ 129) is merely an

22   optimistic opinion and is not actionable unless the company had

23   _____

24        [6]    Defendants represent that this presentation was
     accompanied by the company's cautionary language.  However, there
25   is nothing before the court, whether in the complaint or provided
     as an exhibit, indicating that the March 7, 2023 PowerPoint was
26   accompanied by cautionary language.  Regardless, as discussed in
     further detail below, plaintiff has sufficiently alleged that the
27   cautionary language itself was misleading, so its inclusion would
     not activate the PSLRA's "safe harbor" protection.  See 15 U.S.C.
28   § 78u-5(c)(1); Glazer, 63 F.4th at 781.

1  been "making no progress at all."  See Wochos, 985 F.3d at 1195-

2  96 (statement that company was "making great progress" towards

3  achieving manufacturing goal was not actionable, even if company

4  was aware of problems that could prevent company from meeting

5  that goal).  Plaintiffs have pled "no facts that would establish

6  falsity in that sense."  See id.  As the complaint alleges, the

7  development process for Origin 2 was still ongoing (albeit with

8  setbacks and changes), and thus it cannot be said that no

9  "progress" was occurring.  See id.; see also Weston, 29 F.4th at

10  620 (statements that company was "continuing [its] work" on

11  "ongoing" project did not suggest that project was "on track,"

12  but rather provided a "vaguely optimistic assessment" that was

13  not false or misleading); Macomb Cnty. Emps.' Ret. Sys. v. Align

14  Tech., Inc., 39 F.4th 1092, 1099 (9th Cir. 2022) (statements that

15  sales market was a "huge market opportunity" and "growing

16  significantly for us" were not false or misleading but were

17  merely "feel-good descriptions from [defendant's] executives"

18  because the market was still growing, "albeit at a diminished

19  rate").  The complaint therefore fails to plead that this

20  statement concerning "progress" was false or misleading.

21        Plaintiff also points to a statement in the press

22  release that Origin had "made progress developing new products

23  and applications that may be incorporated into the design of the

24  plant, including FDCA, PEF, and biofuels."  (SAC ¶ 129.)

25  However, as plaintiff alleges, Origin 2 did, in fact, shift

26  towards producing FDCA/PEF.  (See id. ¶ 152.)  The statement at

27  issue suggested to consumers that Origin 2 may incorporate

28  FDCA/PEF production, and the company later confirmed this plan.

24

1  (See id.)  Thus, based on plaintiff's allegations, this statement

2  was neither false nor misleading.

3         4.   May 10, 2023 1Q'23 Earnings Call

4         During an investor earnings call on May 10, 2023,

5  defendant Bissel stated that the company "continue[d] to advance

6  for design, construction, planning, and financing."  (SAC ¶ 131.)

7  Bissell also stated that he was "proud of how our team continues

8  to execute against our Origin 1 and Origin 2 milestones."  (Id.)

9  For the reasons given above, these are merely statements of

10 optimism and opinion that are not actionable as securities

11 violations.  See Glazer, 63 F.4th at 770; Wochos, 985 F.3d at

12 1195-96; see also In re Atossa Genetics Inc. Sec. Litig., 868

13 F.3d 784, 799-800 (9th Cir. 2017) (company's statement that it

14 was "reasonably confident" was not actionable).

15        During the call, Bissell also represented that the

16 company "continue[d] to make progress developing new products and

17 applications, which may be incorporated into the design of the

18 plant such as FDCA, which can be converted to [P]EF . . . ."

19 (SAC ¶ 131.)  As explained above, plaintiffs have not pled that

20 this representation is false or misleading, as Origin did

21 ultimately incorporate FDCA/PEF into the plant design.

22        5.   May 10, 2023 1Q'23 Form 10-Q

23        Origin's Form 10-Q dated May 10, 2023 stated that "[w]e

24 continue to make progress on front-end design, construction

25 planning, and financing."  (SAC ¶ 132.)  For the reasons given

26 above, this general statement concerning "progress" in Origin 2's

27 development is not actionable.  See Glazer, 63 F.4th at 770;

28 Wochos, 985 F.3d at 1195-96.

1          Form 10-Q also provided Origin's standard cautionary

2    language, including the following: (1) "Construction of our

3    plants may not be completed in the expected timeframe or in a

4    cost effective manner"; (2) "There is a risk that significant

5    unanticipated costs or delays could arise due to, among other

6    things, . . . unforeseen technical issues or increases in plant

7    and equipment costs . . ."; (3) "[W]e may not be able to resolve

8    all of the difficulties that may arise in a timely or cost-

9    effective manner, or at all"; (4) "If we experience delays or

10   increased costs, our estimates and assumptions are incorrect, or

11   other unforeseen events occur, our business, ability to supply

12   customers, financial condition, results of operations and cash

13   flows could be adversely impacted"; and (5) "[W]e may not be

14   successful or efficient in developing or implementing new

15   production processes" due to risks including "difficulties in

16   designing, developing, implementing, and scaling up new process

17   technologies, development and production timing delays . . . ."

18   (SAC ¶ 136 (emphasis added).)

19          The complaint plausibly alleges that the cautionary

20   language referring to purely hypothetical engineering

21   difficulties and construction delays was misleading, given that

22   defendants allegedly knew such problems had already manifested

23   with respect to Origin 2.  As the Ninth Circuit has explained,

24   "[r]isk disclosures that 'speak entirely of as-yet-unrealized

25   risks and contingencies' and do not 'alert the reader that some

26   of these risks may already have come to fruition' can mislead

27   reasonable investors."  Alphabet, 1 F.4th at 703 (quoting Berson

28   v. Applied Signal Tech., Inc., 527 F.3d 982, 985-87 (9th Cir.

1  2008)) (alterations adopted); see also In re Facebook, Inc. Sec.

2  Litig., 87 F.4th 934, 948–49 (9th Cir. 2023) (plaintiff pled

3  falsity of risk disclosure stating that "our users' data may be

4  improperly accessed, used, or disclosed" where company knew that

5  user data had already been accessed by third party) (emphasis in

6  original).  "Defendants cannot rely on boilerplate language

7  describing hypothetical risks to avoid liability for the failure

8  to disclose that the company already had information" indicating

9  that the risk spoken of had already occurred.  Glazer, 63 F.4th

10 at 779.  Accordingly, plaintiff has pled that Origin's cautionary

11 language was misleading.

12            6.  May 10, 2023 Fireside Chat[7]

13            Also on May 10, 2023, Bissell participated in a virtual

14 "fireside chat" that was disseminated to investors on the

15 company's website.  (SAC ¶ 138.)  During the discussion, Bissell

16 discussed and promoted Origin's process for producing PET, and

17 stated that Origin's PET is "identical to PET that's made for

18 [sic] fossil materials" and is a "next-generation PET that has

19 better performance in a whole bunch of areas."  (Id. ¶ 139.)

20            Plaintiff argues that these statements were false or

21 misleading because they gave the impression that Origin 2 would

22 still produce PX/PET.  However, the statements at issue were not

23 specific to Origin 2.  The complaint does not suggest that the

24 company entirely abandoned PX/PET, only that Origin 2 would no

25 _____

26       [7]   The court disregards the statements during the May 10,
   2023 Fireside Chat attributed to Riley, and statements attributed
27 to Riley in subsequent Fireside Chats, given the court's
   determination that the complaint did not raise a strong inference
28 of scienter as to Riley.

1   longer produce that material.  Indeed, the complaint indicates

2   that PX/PET was also intended to be a "primary product" at both

3   Origin 1 and Origin 3.  (See SAC ¶ 60.)  The complaint therefore

4   fails to plead that these statements concerning the company's

5   production of PX/PET are false or misleading.

6               7.  May 12, 2023 PowerPoint

7               A PowerPoint presentation posted to the company's

8   website on May 12, 2023 stated that Origin 2 was "expected" to

9   use sustainable materials "to make PET," and that construction

10  was "expected to start by mid-2023," with the plant "expected to

11  be operational mid-2025."  (SAC ¶ 141.)  This language is

12  identical to the language in the March 7, 2023 PowerPoint already

13  discussed.  As the court concluded above, plaintiff has

14  adequately alleged that this language was false or misleading.

15              8.  May 22, 2023 Fireside Chat[8]

16              In a May 22, 2023 virtual "fireside chat" posted on the

17  company's website, Bissell discussed the PET market and PET

18  recycling process, stating, inter alia, that "mechanically

19  recycled PET . . . is just not quite the same as new material

20  that we can make" and that Origin's PET has a "lower carbon

21  footprint."  (SAC ¶ 145.)  As explained above, the complaint does

22  not allege that the company was ceasing to produce PX/PET

23  altogether, only that Origin 2 would not produce PX/PET.  Because

24  these statements do not represent that Origin 2 would produce

25  PX/PET, they are not false or misleading.

26              9.  June 8, 2023 Fireside Chat[9]

27

28              [8]   As discussed above, the court disregards the statements
    during the May 22, 2023 Fireside Chat attributed to Riley.

1    In a June 8, 2023 virtual "fireside chat" posted on the

2    company's website, Bissell discussed the PX/PET production

3    process in general and the benefits of PX/PET, stating that "for

4    us, going into PET was very intentional."  (SAC ¶ 148.)

5    As explained above, the complaint does not allege that

6    the company was ceasing to produce PX/PET altogether, only that

7    Origin 2 would not produce PX/PET.  Because Bissell's discussion

8    of PX/PET during this fireside chat does not represent that

9    Origin 2 would produce PX/PET, it was not false or misleading.

10    Based on the foregoing, the court concludes that

11    plaintiff has pled falsity only as to the statements concerning

12    Origin 2's timeline and production of PX/PET in the March 7, 2023

13    PowerPoint; the cautionary language in the May 10, 2023 1Q'23

14    Form 10-Q; and the statements concerning Origin 2's timeline and

15    production of PX/PET in the May 12, 2023 PowerPoint.

16    D.    Loss Causation

17    "Plaintiffs in securities fraud actions must allege

18    loss causation" -- i.e., that the alleged securities violations

19    caused the plaintiffs to suffer an economic loss.  See Genius

20    Brands, 97 F.4th at 1183.  "In a fraud-on-the-market case like

21    this one, loss causation 'begins with the allegation that the

22    defendant's misstatements (or other fraudulent conduct)

23    artificially inflated the price at which the plaintiff purchased

24    her shares.'"  Id. (quoting In re BofI Holding, Inc. Sec. Litig.,

25    977 F.3d 781, 789 (9th Cir. 2020)).  "Next, a plaintiff must

26    allege that 'the truth became known.'"  Id. (quoting Dura

27    

28    ⁹    As discussed above, the court disregards the statements
during the June 8, 2023 Fireside Chat attributed to Riley.

29

1  Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005)). "Finally, a
2  plaintiff must allege that the revelation caused the fraud-
3  induced inflation in the stock's price to be reduced or
4  eliminated." Id. (quotation marks omitted). "At that point, the
5  plaintiff has suffered an economic loss caused by the
6  misstatements because she is no longer able to recoup in the
7  marketplace the inflationary component of the price she
8  originally paid." BofI, 977 F.3d at 789.

9       "The most common way for plaintiffs to prove that 'the
10  truth became known' is to identify one or more corrective
11  disclosures." Genius Brands, 97 F.4th at 1184 (quoting BofI, 977
12  F.3d at 790). A corrective disclosure occurs when "'information
13  correcting the misstatement or omission that is the basis for the
14  action is disseminated to the market.'" BofI, 977 F.3d at 790.
15  (quoting 15 U.S.C. § 78u-4(e)(1)).

16      "The plaintiff need not show 'that a misrepresentation
17  was the sole reason' for a price decline, but rather that it was
18  'one substantial cause.'" Genius Brands, 97 F.4th at 1183
19  (quoting Daou, 411 F.3d at 1025). "In the end, loss causation is
20  simply a variant of proximate cause, and the ultimate issue is
21  whether the defendant's misstatement, as opposed to some other
22  fact, foreseeably caused the plaintiff's loss." Id. (cleaned
23  up). "Plaintiffs need only show a causal connection between the
24  fraud and the loss." Id. (cleaned up).

25      Here, plaintiff alleges that Origin's August 9, 2023
26  press release constituted a corrective disclosure because it
27  revealed, inter alia, that Origin 2's construction was being
28  delayed -- with "Phase 1 [of construction] start-up projected for

1    late 2026 to 2027 and Phase 2 start-up projected for 2028" -- and
2    that Origin 2 would "focus on the production of FDCA[/PEF]"
3    rather than PX/PET.  (See SAC ¶¶ 151-52.)  As the above
4    discussion indicates, this press release directly contradicts the
5    previous representations that Origin 2 would make PX/PET and that
6    the plant was expected to begin construction by mid-2023 and
7    begin operations mid-2025.  (See id. ¶¶ 127, 141.)  The complaint
8    further explains that "[a]nalysts were shocked by the substantial
9    Origin 2 delays and changes," with one analyst noting that "with
10   Origin 2 delayed and significantly more expensive than indicated
11   earlier," the company's "investment case is broken."  (Id. ¶
12   164.)  Another analyst referred to the "decision to shift planned
13   Origin 2 production" as a "major curveball."  (Id. ¶ 165.)

14          Over the course of the day following the announcement,
15   Origin's "share price fell $2.87 per share, or 66.5%, to close at
16   $1.46 per share on August 10, 2023."  (Id. ¶ 162.)  The share
17   price continued to fall in the following weeks, closing at $0.99
18   per share on October 31, 2023.  (Id. ¶ 167.)  Plaintiff alleges
19   that these drops in share price immediately following the
20   corrective disclosure indicate that Origin's stock price had been
21   "artificially inflated due to [d]efendants' false and misleading
22   public statements," and the decline in stock price was "a direct
23   result of [d]efendants' misrepresentations and omissions being
24   revealed to the market."  (Id. ¶¶ 213, 215.)

25          Here, plaintiff has adequately pled loss causation.  He
26   "identif[ied] a specific economic loss: the [immediate] drop in
27   value on [August 10, 2023], that followed the [August 9, 2023]
28   press release" -- which directly contradicted information

1  previously disseminated by defendants -- and he "allege[d] that
2  this loss was caused by [defendants'] misrepresentations."  See
3  In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1056 (9th Cir.
4  2008); see also BofI, 977 F.3d at 791 (plaintiffs pled loss
5  causation by alleging drop in stock price of more than 30%
6  occurred "immediately after" corrective disclosure).
7  Accordingly, the complaint will not be dismissed on this ground.
8  III. Section 20(a)

9       Section 20(a) of the Securities Exchange Act "makes
10 certain 'controlling' individuals also liable for violations of
11 section 10(b) and its underlying regulations."  Zucco, 552 F.3d
12 at 990.  "Controlling persons liability under Section 20(a) . . .
13 is derivative, such that there is no individual liability where
14 there is no primary violation of securities law."  Genius Brands,
15 97 F.4th at 1180.

16      Defendants argue only that because plaintiff fails to
17 plead a claim under section 10(b), his claim under section 20(a)
18 also fails.  (See Docket No. 89 at 48 n.10.)  As discussed above,
19 plaintiff has adequately pled a violation of section 10(b).
20 Accordingly, the claim under section 20(a) will not be dismissed.

21      IT IS THEREFORE ORDERED that defendants' motion to
22 dismiss (Docket No. 89) be, and the same hereby is, GRANTED on
23 all claims against defendant Richard Riley.

24      IT IS FURTHER ORDERED that on the claims against
25 defendants John Bissell and Origin Materials, Inc. the motion to
26 dismiss is GRANTED as to the following:
27 • All statements dated February 23, 2023;
28 • May 10, 2023 Press Release;

1        • May 10, 2023 1Q'23 Earnings Call;

2        • Statements about "progress" in May 10, 2023 1Q'23 Form 10-Q;

3        • May 10, 2023 Fireside Chat;

4        • May 22, 2023 Fireside Chat; and

5        • June 8, 2023 Fireside Chat;

6  And is DENIED as to the following:

7        • March 7, 2023 PowerPoint;

8        • Cautionary language in May 10, 2023 1Q'23 Form 10-Q; and

9        • May 12, 2023 PowerPoint.

10        Plaintiff has twenty days from the date of this Order

11  to file an amended complaint, if he can do so consistent with

12  this Order.

13  Dated:   February 12, 2025                   

                                 WILLIAM B. SHUBB

14                                 UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28